## IN THE UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF COLUMBIA

GANNETT SATELLITE    )
INFORMATION NETWORK,  )
           )  Civ. A. No. 22-cv-475
   Plaintiff,     )
           )
   v.        )
           )
U.S. DEPARTMENT OF JUSTICE,  )
           )
   Defendant.    )

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    LEGISLATIVE BACKGROUND ...................................................................2

II.   FACTUAL BACKGROUND ..........................................................................5

III.  LEGAL STANDARDS ...................................................................................5

IV.  ARGUMENT ..................................................................................................6

    A.  Title I's confidentiality provision does not apply because the ordinary
        meaning of information "furnished under" Title I does not encompass the
        death-in-custody information requested here ...............................................7

        1.  The ordinary meaning of "furnished under this title" is "provided
             pursuant to the requirements of Title I of the Crime Control Act."......7

        2.  The U.S. Code is consistent with Plaintiff's interpretation of "furnished
             under this title." .................................................................................10

        3.  Defendant's interpretation of "furnished under this title" conflicts with
             its ordinary meaning and relies entirely on a single inapposite case ..................12

    B.  The statutory context and history of amendment of Title I further
        demonstrates that Title I's confidentiality provision does not apply to the
        death-in-custody information requested here ...............................................16

        1.  Plaintiff's interpretation of "furnished under this title" avoids superfluity
             across related statutes, but Defendant's interpretation does not ..........................16

        2.  Title I's history of amendment supports Plaintiff's interpretation of
             "furnished under this title." ...............................................................19

V.   CONCLUSION ............................................................................................21

## **TABLE OF AUTHORITIES**

*Cases*

*ACLU v. Dep't of Def.*, 628 F.3d 612 (D.C. Cir. 2011) ......................................................6

*Ardestani v. INS*, 502 U.S. 129 (1991) .............................................................................9

*Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010) ..............................................................16

*Boyd v. DOJ*, 475 F.3d 381 (D.C. Cir. 2007) ...................................................................6

*Church of Scientology of Cal. v. IRS*, 792 F.2d 146 (D.C.Cir.1986) ................................6

*Finley v. United States*, 490 U.S. 545 (1989) ................................................................11

*Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008) ................9

*Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ...................15

*Goldring v. D.C.*, 416 F.3d 70 (D.C. Cir. 2005) ..............................................................19

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ......................................................7

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 214 F. Supp. 3d 43
(D.D.C. 2016) ....................................................................................................................6

*Kellogg Brown & Root Servs., Inc. v. US ex rel. Carter*, 135 S. Ct. 1970 (2015) ........20

*Kingdomware Techs., Inc. v. US*, 579 U.S. 162 (2016) ..................................................14

*Loughrin v. US*, 573 U.S. 351 (2014) .............................................................................14

*Nat'l Ass'n of Mfrs. v. DOD*, 138 S. Ct. 617 (2018) .......................................................10

*National Parks & Conservation Association v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) ............15

*Seymour v. Barabba*, 559 F.2d 806 (D.C. Cir. 1977) .....................................................14

*Steinberg v. DOJ*, 23 F.3d 548 (D.C. Cir. 1994) ..............................................................6

*Wis. Project on Nuclear Arms Control v. Dep't of Com.*, 317 F.3d 275 (D.C. Cir. 2003) ..........5, 6

*Statutes*

5 U.S.C. § 552(b)(3) .................................................................................................6

13 U.S.C. § 9 ...........................................................................................................14

34 U.S.C. § 10231 ...................................................................................................11

34 U.S.C. § 11182(b) ..............................................................................................17

34 U.S.C. §§ 11212(b)(7)-(8), 11222(a)(9) ............................................................17

34 U.S.C. § 50101(c)(6) ..........................................................................................18

34 U.S.C. § 50105 ...................................................................................................19

34 U.S.C. § 50109 ...................................................................................................18

34 U.S.C. § 60105 ...............................................................................................9, 11

Pub. L. 90-351 ......................................................................................................2, 3

Pub. L. 93-415 .........................................................................................................17

Pub. L. 98-473 ...........................................................................................3, 17, 18, 19

Pub. L. 107-273 .....................................................................................................3, 20

Pub. L. 113-242 .....................................................................................................4, 13

Pub. L. 114-198 .....................................................................................................3, 20

Pub. L. 116-165 .......................................................................................................20

Pub. L. 116-18 .........................................................................................................20

Pub. L. 116-22 .........................................................................................................20

Pub. L. 116-281 .......................................................................................................20

Pub. L. 116-283 .......................................................................................................20

Pub. L. 116-32 .........................................................................................................20

Pub. L. 117-159 .......................................................................................................20

Pub. L. 117-61..................................................................................................................20

Pub. L. 740.....................................................................................................................14


*Other Authorities*

*American Heritage Dictionary of the English Language* (5th ed. 2022),
HarperCollins Publishers ...............................................................................................8

BJS, Mortality in Correctional Institutions, DOJ OFFICE OF JUSTICE PROGRAMS
(May 15, 2009)..................................................................................................................4

*Black's Law Dictionary* (6th ed. 1990)...........................................................................8

*Merriam-Webster Dictionary*, Simon & Schuster: Pocket Books (1974) ..................7, 8

*Merriam-Webster.com Dictionary*, Merriam-Webster ....................................................8

Office of the Attorney General, *Report of the Attorney General to Congress Pursuant to
the DCRA*, DOJ (Dec. 16, 2016)....................................................................................13

OJJDP, *About OJJDP*, DOJ OFFICE OF JUSTICE PROGRAMS .........................................17

OJP, *About Us*, DOJ.........................................................................................................4

OJP, *The EFLEA Program Fact Sheet*, DOJ OFFICE OF JUSTICE PROGRAMS..............18

OLRC, *About Classification*, US HOUSE OF REPRESENTATIVES...................................10

OLRC, *Detailed Guide to the Code*, US HOUSE OF REPRESENTATIVES........................10

OLRC, *US Code*, US HOUSE OF REPRESENTATIVES ....................................................10

US DOJ, *DOJ Guide to the FOIA: Litigation Considerations*, OFFICE OF INFORMATION
POLICY GUIDANCE...........................................................................................................6

*Webster's New Collegiate Dictionary*, G. & C. Merriam Co. (1975) .........................7, 8

The Death in Custody Reporting Act of 2013 (DCRA)—a reauthorization of 2000 legislation by the same name—requires states to report individual-level information on the deaths of incarcerated people in the custody of local jails, state prisons, and the Federal Bureau of Prisons. In response to the original and reauthorized DCRA, the DOJ's Office of Justice Programs (OJP) created and maintains the Mortality in Correctional Institutions (MCI) program, which collects the death-in-custody information reported pursuant to the DCRA.

On April 9, 2021, Steve Suo, an editor for USA Today, requested that OJP provide copies of the death-in-custody information submitted to the MCI program since 2010. Although OJP identified responsive documents, it withheld all of them based on the confidentiality provision of a separate act, the Omnibus Crime Control and Safe Streets Act of 1968 (the "Crime Control Act"). That confidentiality provision only exempts information "furnished under" Title I of that same act.

Defendant's withholding of the requested death-in-custody information violates FOIA. Plaintiff does not dispute that the confidentiality provision qualifies as a withholding statute, but the provision does not apply to the death-in-custody information requested here. That information—reported pursuant to the requirements of the DCRA, to a program that exists only because of the DCRA—is not "furnished under" Title I of the Crime Control Act; rather, it is furnished under the DCRA. The ordinary meaning, statutory context, and history of amendment of the Crime Control Act and its confidentiality provision make that clear. Defendant, arguing otherwise, relies on a single inapposite case from 1977 that interprets a different statute, relies on reasoning inapplicable here, and advances an approach to statutory interpretation recently rebuked by the Supreme Court.

The Court should grant summary judgment for Plaintiff and deny Defendant's summary judgment motion. The Court should order that FOIA Exemption 3 is not applicable here because

- 1 -

Title I's confidentiality provision does not apply to the requested information. Plaintiff reserves its right to challenge the adequacy of Defendant's search for responsive records. Defendant's Motion for Summary Judgment argues that its search was adequate, Def.'s Mem. at 6-7, but the parties agreed—and this Court ordered—that the motions here be "limited to the applicability of Exemption 3[.]" Minute Order (June 21, 2022); Joint Status Report (ECF No. 10) at 2.

## I.       LEGISLATIVE BACKGROUND

The Crime Control Act was passed into law on June 19, 1968. Pub. L. 90-351, 82 Stat. 197. It comprises eleven sections, designated Titles I through XI. *See id.*, 82 Stat. 197-239. Title I, at issue here, was originally intended "to assist State and local governments in strengthening and improving law enforcement at every level by national assistance." *Id.* at Title I, 82 Stat. 198. National assistance largely took the form of three different types of federal grants: "Planning Grants," "Grants for Law Enforcement Purposes," and "Training, Education, Research, Demonstration, and Special Grants[.]" *Id.* at Title I, Parts B-D, 82 Stat. 198-99, 203. For each type of grant, Title I established requirements for eligibility, reporting, and distribution and use of funds. *Id.* § 513, 82 Stat. 207. Title I also created a bipartisan Law Enforcement Assistance Administration (LEAA) within the DOJ that administered the grants. *Id.* § 101, 82 Stat. 198.

In the fifty-plus years since its enactment, Title I of the Crime Control Act has been frequently amended. One amendment, passed in 1979, added the confidentiality provision at issue here, which prohibits disclosure of information "furnished under" Title I. The text of the confidentiality provision, as currently amended, reads:

> No officer or employee of the Federal Government, and no recipient of assistance under the provisions of this title shall use or reveal any research or statistical information *furnished under this title* by any person and identifiable to any specific private person for any purpose other than the purpose for which it was obtained in accordance with this title. Such information and copies thereof shall be immune from legal process, and shall not, without the consent of the person furnishing such

information, be admitted as evidence or used for any purpose in any action, suit, or other judicial, legislative, or administrative proceedings.

Def.'s Mem. at 3 (quoting Pub. L. 90-351, Title I, § 812(a), *formerly* § 818, *as added* Pub. L. 96-157, § 2, 93 Stat. 1213 (Dec. 27, 1979), *redesignated* as § 812 by Pub. L. 98-473, Title II, § 609(f), 98 Stat. 2093 (Oct. 12, 1984), *amended by* Pub. L.109-162, Title XI, § 1115(c), 119 Stat. 3104 (Jan. 5, 2006)) (emphasis added).[1]

Other amendments to Title I proliferated new grant programs. As one example, in 2002, Congress added a grant program to Title I called "Crime Free Rural State Grants" "to develop rural States' capacity to assist local communities in the prevention and reduction of crime, violence, and substance abuse." Pub. L. 107-273, Div. C, Title I, § 11027(b), 116 Stat. 1834 (Nov. 2, 2022). As another example, Title I was amended in 2016 to add the "Comprehensive Opioid Abuse Grant Program" for "States, units of local government, and Indian tribes . . . to provide services primarily relating to opioid abuse[.]" Pub. L. 114-198, Title II, § 201, 130 Stat. 711-17 (July 22, 2016). Like many amendments before them, those amendments—added to Title I's litany of subsections as Part GG and Part LL, respectively—enumerated their own requirements for eligibility, reporting, and distribution and use of funds. *See* Pub. L. 107-273, § 11027(b), 116 Stat. 1834-35; Pub. L. 114-198, § 201, 130 Stat. 711-13.

Today, the grant programs set out in Title I of the Crime Control Act are administered by the DOJ's Office of Justice Programs (OJP), the successor to the LEAA established in the original act. Def.'s Mem. at 2 (citing Pub. L. 98-473, Title II, § 603(a), 98 Stat. 2078). The OJP is under the general authority of the Attorney General. Pub. L. 98-473, Title II, § 603(a), 98 Stat. 2078.

---

[1] Plaintiff does not dispute that the requested information is "research or statistical information" or that it is "identifiable to any specific private person." *See* Def.'s Mem. at 8-10 (arguing the same). Rather, Plaintiff disputes that the information is "furnished under this title" as required by the confidentiality provision.

The OJP oversees six program offices, including the Bureau of Justice Statistics (BJS), which received the FOIA request at issue here.  OJP, *About Us*, DOJ, https://www.ojp.gov/about (last visited July 23, 2022); Compl. Ex. 1.

The Death in Custody Reporting Act—reauthorized on December 18, 2014—is an entirely different statutory scheme with an explicit purpose "[t]o encourage States to report to the Attorney General certain information regarding the deaths of individuals in the custody of law enforcement agencies[.]" Pub. L. 113-242, 128 Stat. 2860 (Dec. 18, 2014) (attached as Exhibit A).  The DCRA requires reporting of death-in-custody information by both federal law enforcement agencies and states: Section 2 requires reporting by states that receive funds from the Edward Byrne Memorial Justice Assistance Grant (JAG) Program, *id.* § 2(a), and Section 3 requires reporting by all federal law enforcement agencies, *id.* § 3(a).  The DCRA specifies the types of information that must be reported regarding the death of any person who is detained, arrested, incarcerated, or in the process thereof: their name, gender, race, ethnicity, and age; the date, time, and location of death; the agency involved; and a brief description of the circumstances surrounding the death.  *Id.* at § 2(a)-(b), 3(a)-(b).  In the event a state does not comply with Section 2 of the DCRA, the DCRA authorizes the Attorney General to reduce that state's annual funding from the JAG program by 10%.  *Id.* § 2(c)(2).

Although the DCRA only requires reporting "to the Attorney General," Ex. A § 2(a), DOJ established the Mortality in Correctional Institutions (MCI) program under the purview of the OJP to collect the information reported by states and federal agencies pursuant to the original and reauthorized DCRA.  BJS, Mortality in Correctional Institutions, DOJ OFFICE OF JUSTICE PROGRAMS (May 15, 2009), https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program#methodology-0 (last visited July 21, 2022) (MCI

- 4 -

"began in 2000 in response to the passage of the Death in Custody Reporting Act of 2000" and now collects "many . . . of the elements outlined in the [DCRA]" of 2013; MCI "[c]ollects inmate death records from each of the nation's 50 state prison systems, Federal Bureau of Prisons, and approximately 2,800 local jail jurisdictions").

## II.        FACTUAL BACKGROUND

On April 9, 2021, Plaintiff submitted a FOIA request to OJP, which oversees the BJS program office, which in turn oversees the MCI program.  Compl. Ex. 1.  Plaintiff asked for "all information submitted to BJS under the Mortality in Correctional Institutions program."  *Id.*  The request explicitly included any "data elements states are required to provide under" the DCRA (34 U.S.C. § 60105), "from 2010 through the date on which [the] request is processed."  *Id.*  Plaintiff also asked for various forms of "documentation that describe[] elements contained in the electronic database requested above[,]" though that documentation was released by Defendant and is not at issue here.  *Id.*; Eason Decl. ¶¶ 12-13.

OJP ultimately identified responsive records, all of which OJP withheld pursuant to FOIA Exemption 3 and the confidentiality provision of the Crime Control Act.  Compl. Ex. 2.  Plaintiff appealed the decision to the DOJ's Office of Information Policy, which affirmed the withholding. Compl. Ex. 3, 5; Eason Decl. ¶¶ 11-13.

## III.        LEGAL STANDARDS

FOIA embodies "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language."  *Wis. Project on Nuclear Arms Control v. Dep't of Com.*, 317 F.3d 275, 279 (D.C. Cir. 2003) (internal quotation marks omitted).  "FOIA accordingly mandates a strong presumption in favor of disclosure, under which the statutory exemptions to disclosure are to be narrowly construed[.]"  *Id.* (internal quotation marks and

citations omitted).

FOIA Exemption 3 permits an agency to withhold information prohibited from disclosure by another federal statute.  5 U.S.C. § 552(b)(3).  "Exemption 3 takes literally the requirement that disclosure prevail absent clearly delineated statutory language[.]"  *Wis. Project*, 317 F.3d at 280 (internal quotation marks omitted).  It "has evolved from its original text to require that Congress, not the agencies of the Executive Branch, determine the need for nondisclosure."  *Id*.  In other words, FOIA disclosure and review requirements—not deferential administrative law standards— govern interpretation of federal statutes asserted through Exemption 3.  *See Church of Scientology of Cal. v. IRS*, 792 F.2d 146, 148–50 (D.C.Cir.1986), *aff'd*, *Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 18 (1987).

Under FOIA, agencies must prove that withheld information is exempt, *Boyd v. DOJ*, 475 F.3d 381, 385 (D.C. Cir. 2007), and all exemptions are narrowly construed, *Judicial Watch, Inc. v. Nat'l Archives & Records Admin*., 214 F. Supp. 3d 43, 51 (D.D.C. 2016), *aff'd* 876 F.3d 346 (D.C. Cir. 2017).  To prevail by summary judgment, the agency must show, viewing the facts in the light most favorable to the FOIA requester, that there is no genuine issue of material fact.  *Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994).  Supporting declarations must be "clear, specific, reasonably detailed" and describe any withheld information "in a factual and nonconclusory manner," all in the absence of any "evidence of agency bad faith."  US DOJ, *DOJ Guide to the FOIA: Litigation Considerations*, OFFICE OF INFORMATION POLICY GUIDANCE, at 113, https://www.justice.gov/oip/page/file/1205066/download (last visited July 5, 2022) (citing cases); *see, e.g.*, *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011).

## IV.        ARGUMENT

Summary judgment should be granted for Plaintiff and denied for Defendant because the confidentiality provision in the Crime Control Act does not apply to the information requested

here.  That provision only exempts information that is "furnished under" Title I of that same act.

Plaintiff requested death-in-custody information furnished under the DCRA, an entirely separate

statutory scheme.  No reasonable interpretation of Title I's confidentiality provision prohibits

release of information furnished under an entirely different act.  The confidentiality provision's

ordinary meaning, statutory context, and history of amendment make clear that such information

is not "furnished under" Title I.

> **A.**  **Title I's confidentiality provision does not apply because the ordinary meaning of information "furnished under" Title I does not encompass the death-in-custody information requested here.**

The confidentiality provision in Title I of the Crime Control Act only encompasses

"information furnished under this title" (*i.e.*, Title I).  *See* Section I, *supra*.  The resolution of the

motion here turns on whether the information requested —death-in-custody information reported

to the DOJ's MCI program pursuant to requirements in the DCRA—is "furnished under" Title I

of the Crime Control Act.  *See* Def.'s Mem. at 10-11.  It is not.  The ordinary meaning of "furnished

under" makes clear that the information requested by Plaintiff is not furnished under Title I—it is

furnished under the DCRA—and is therefore not prohibited from disclosure by Title I's

confidentiality provision.

> **1.**  **The ordinary meaning of "furnished under this title" is "provided pursuant to the requirements of Title I of the Crime Control Act."**

"Statutory construction must begin with the language employed by Congress and the

assumption that the ordinary meaning of that language accurately expresses the legislative

purpose."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (internal quotation marks and

citations omitted).  The ordinary meaning of the verb "furnish" is to "provide" something that is

needed.  *See Merriam-Webster Dictionary*, Simon & Schuster: Pocket Books (1974) ("furnish"

means "to provide with what is needed"); *Webster's New Collegiate Dictionary*, G. & C. Merriam

Co. (1975) (same); *see also Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/furnish (last visited July 21, 2022) ("furnish" means, among other things, "to provide with what is needed"); *American Heritage Dictionary of the English Language* (5th ed. 2022), HarperCollins Publishers, https://www.ahdictionary.com/word/search.html?q=furnish (last visited July 21, 2022) ("furnish" means, among other things, "to provide (what is needed or desired)" or "to provide something necessary or desired to").   The preposition "under" ordinarily describes a relationship of subordination, where the thing "under" is controlled or required by the thing following the preposition.  *See Merriam-Webster Dictionary*, Simon & Schuster: Pocket Books (1974) ("under" means, among other things, "controlled, limited, or oppressed by," and "subject to the authority of [sic] guidance of"); *Webster's New Collegiate Dictionary*, G. & C. Merriam Co. (1975) ("under" means, among other things, "subject to the authority, control, guidance, or instruction of"); *see also Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/under (last visited July 21, 2022) ("under" means, among other things, "subject to the authority, control, guidance, or instruction of"); *American Heritage Dictionary of the English Language* (5th ed. 2022), HarperCollins Publishers, https://www.ahdictionary.com/word/search.html?q=under (last visited July 21, 2022) ("under" means, among other things, "subject to the authority, rule, or control of" and "subject to the restraint or obligation of"); *Black's Law Dictionary* (6th ed. 1990) ("under" "frequently" means "subordinate").  Finally, the ordinary meaning of the phrase "this title" refers to the specific section of the Crime Control Act that includes the confidentiality provision: "Title I—Justice System Improvement[.]"  The meaning of that phrase is not in dispute here.  Def.'s Mem. at 1 ("[T]he version of the confidentiality provision passed by both houses of Congress and signed into law by

the President covers all information furnished under Title I of the Crime Control Act[.]"), 10 ("The applicability of Exemption 3 thus turns entirely on whether the information Plaintiff seeks was 'furnished under this title,' i.e. Title I of the Crime Control Act.").  In sum, the ordinary meaning of information "furnished under this title" is information "provided pursuant to the requirements of Title I of the Crime Control Act."  *See Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52–53, (2008) ("under" in 11 U.S.C. § 1146(a) of Bankruptcy Code means "pursuant to"); *Ardestani v. INS*, 502 U.S. 129, 135 (1991) ("under section 554" in the Equal Access to Justice Act means "subject to" or "governed by" 5 U.S.C. § 554).

The death-in-custody information withheld by Defendant is not subject to Title I's confidentiality provision because it is not "provided pursuant to the requirements of Title I" of the Crime Control Act.  It is provided pursuant to the requirements of the DCRA.  Plaintiff's FOIA request asked for all information submitted to the MCI program, a program created and maintained only to collect information reported pursuant to the DCRA.  Section I, *supra*.  Moreover, the request explicitly included data states are required to provide under the DCRA (34 U.S.C. § 60105).  Compl. Ex. 1.  That is because the DCRA, not the Crime Control Act, requires the reporting of the requested death-in-custody information.  Ex. A § 2(a).  The DCRA, not the Crime Control Act, specifies the types of death-in-custody information that must be reported.  *Id.* § 2(a)-(b), 3(a)-(b).  The DCRA, not the Crime Control Act, penalizes states for any failure to report death-in-custody information.  *Id.* § 2(c)(2).  Tellingly, even Defendant's understanding of the words at issue supports Plaintiff's interpretation here.  *See* ECF No. 10 (Joint Status Report) ("This case concerns a . . . request seeking information submitted to the Bureau of Justice Statistics, a component of Defendant the U.S. Department of Justice ("DOJ"), **under the** Mortality in Correctional Institutions program, **as required by** 34 U.S.C. § 60105 [Section 2 of the DCRA]."

(emphasis added)).  To wit, the death-in-custody information withheld by Defendant was provided pursuant to the requirements of the DCRA, not pursuant to any requirements in Title I of the Crime Control Act.

> **2.      The U.S. Code is consistent with Plaintiff's interpretation of "furnished under this title."**

Plaintiff's interpretation of the confidentiality provision is further supported by the language and organization of the U.S. Code.  Defendant identifies a distinction between the language of the confidentiality provision in the Statutes at Large and in the U.S. Code and refers the Court to the text of the Statutes at Large as prevailing law.  Def.'s Mem. at 3, 11-12.  Specifically, Defendant notes that the confidentiality provision as written in the U.S. Code prohibits disclosure of information "furnished under this chapter," whereas the Statutes at Large prohibit disclosure of information "furnished under this title."  *Id.* at 3 (comparing 34 U.S.C. § 10231(a) with corresponding Statutes at Large).  But, as explained below, that distinction is without a difference, which only further supports Plaintiff's interpretation of the provision.

The Code is a "'consolidation and codification' of the laws 'prepared by the Office of the Law Revision Counsel [OLRC] of the United States House of Representatives.'"  Def.'s Mem. at 11 (quoting OLRC, *US Code*, US HOUSE OF REPRESENTATIVES, http://uscode.house.gov/ (last visited July 21, 2022)).  The Code is organized to present statutes in a more accessible format (*i.e.*, amended and organized by subject matter) than the Statutes at Large (*i.e.*, ordered by chronology of passage).  OLRC, *About Classification*, US HOUSE OF REPRESENTATIVES, http://uscode.house.gov/about_classification.xhtml (last visited July 21, 2022).  When a new statute is integrated into the Code, the OLRC commonly "translates" the text of the original statute.  OLRC, *Detailed Guide to the Code*, US HOUSE OF REPRESENTATIVES, http://uscode.house.gov/detailed_guide.xhtml#statutory (last visited July 21, 2022).  Translations

often "involve changing a cross reference in [the Statutes at Large] into a reference to the corresponding provision in the Code[.]"  *Id.*  For example, "what appears in [the Statutes at Large] as a reference to 'section 401 of the Social Security Act (42 U.S.C. 601)' will be translated to 'section 601 of title 42' when put into the Code."  *Id.*  One particularly common type of translation is the "substitution of references such as 'this chapter' for 'this Act', 'this subchapter' for 'this title', and the like, where appropriate."  *Id.*  Translations "are purely technical and do not change the meaning of the law."  *Id.*

The Code and the Statutes at Large are presumed to have the same substantive effect.  *See Finley v. United States*, 490 U.S. 545, 554 (1989) ("Under established canons of statutory construction, it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." (internal quotation marks and citations omitted)).  In the instant case, the OLRC organized and translated the Crime Control Act and the DCRA to reflect their recognition that Title I's confidentiality provision does not apply to death-in-custody information reported pursuant to the DCRA.   The OLRC codified the confidentiality provision of the Crime Control Act in Chapter 101 of Subtitle I of Title 34 of the Code.  34 U.S.C. § 10231.  In doing so, it translated the provision's protection of information "furnished under this title" (in the Statutes at Large) to protection of information "furnished under this chapter" (in the Code).  *Id.*  Subsequently, the OLRC codified the DCRA into an entirely separate chapter—Chapter 601 of Subtitle VI of Title 34—apart from the chapter including Title I's confidentiality provision.  34 U.S.C. 60105.  In other words, the OLRC recognized that death-in-custody information reported pursuant to the DCRA is not encompassed by Title I's

confidentiality provision and translated and organized the statutes accordingly.  This only further supports Plaintiff's interpretation of Title I's confidentiality provision.

> **3.     Defendant's interpretation of "furnished under this title" conflicts with its ordinary meaning and relies entirely on a single inapposite case.**

Defendant offers no explicit construction of "furnished under this title" to support its argument.  Instead, Defendant argues that the DCRA and Title I of the Crime Control Act are "necessarily and inextricably intertwined" such that any information furnished under the DCRA is "furnished solely through and because of Title I[.]" Def.'s Mem. at 11.  But Title I's confidentiality provision does not encompass information "furnished under this title and interrelated titles," it encompasses information "furnished under" Title I.  Put another way, none of the interactions between the DCRA and Title I—individually or collectively—can reasonably be described as death-in-custody information being "furnished under" Title I.

Defendant points to three forms of interaction between the DCRA and Title I to support its extra-textual interpretation of the confidentiality provision.  Def.'s Mem. at 10-11.  First, Defendant notes that the DCRA only requires states to furnish death-in-custody information "by virtue of their voluntary participation in a Title I program, the [JAG] program."  Def.'s Mem. at 10.  But information being "furnished . . . by virtue" of a state's participation in a program established by Title I is different than information being "furnished under"—provided pursuant to the requirements of—Title I.

Second, Defendant notes that the failure to report death-in-custody information can result in a reduction of funds from the JAG program.  Def.'s Mem. at 10.  However, information being "furnished to avoid reduction of Title I funds" is different than information being "furnished under" Title I.  Moreover, the reduction in funds is prescribed by the DCRA, and results from

noncompliance with requirements in the DCRA.  Section I, *supra*.  In other words, when or how much to reduce funds is not dictated by any provision in the Crime Control Act.

Finally, Defendant finds significant that death-in-custody information is "furnished to a Title I entity[.]"  Def.'s Mem. at 10.  As an initial matter, Defendant mischaracterizes the office and program collecting death-in-custody information as a "Title I entity."  Death-in-custody information is collected by the MCI program, a program created and maintained in response to the original and reauthorized DCRA, not Title I.  Section (I), *supra*.  Although the MCI program is coordinated by the BJS—an entity originally authorized by Title I—the decision to establish the program under the purview of BJS was made at the discretion of the Attorney General, not required by Congress.  *See* Pub. L. 113-242, § 2(a), 128 Stat. 2860 (DCRA only requiring that death-in-custody information be reported "to the Attorney General"); Office of the Attorney General, *Report of the Attorney General to Congress Pursuant to the DCRA*, DOJ (Dec. 16, 2016), https://www.justice.gov/archives/page/file/918846/download ("In response to the [original DCRA], BJS created the Deaths in Custody Reporting Program (DCRP)[,]" now renamed the MCI program.) (last visited July 25, 2022).  Describing the federal entity collecting death-in-custody information as a "Title I entity" exaggerates the interdependence of DCRA and Title I.

Moreover, information being "furnished to" an entity created by Title I is plainly different than information being "furnished under" Title I.  Defendant's interpretation ignores that any sensible meaning of information furnished "under" Title I requires that the information be "required by," "governed by," or "subject to the control" of Title I, not merely provided to an entity

established by Title I.  Section (IV)(A)(I).  Defendant's interpretation is so broad as to encompass any and all information that is received by a Title I entity, whether or not Title I requires it.

Defendant's overbroad interpretation of "furnished under" relies on one inapposite case, *Seymour v. Barabba*, 559 F.2d 806 (D.C. Cir. 1977), that uses inapplicable reasoning recently rebuked by the Supreme Court.  Def.'s Mem. at 11.  At the outset, *Seymour* is not controlling here because its statutory interpretation is performed in the context of the Census Act, an entirely unrelated statutory scheme.  Courts interpret statutory language like "furnished under" first and foremost based on ordinary meaning within the context of the statute where the language appears. *See, e.g.*, *Loughrin v. US*, 573 U.S. 351, 365 (2014) ("Language like 'by means of' is inherently elastic: It does not mean one thing as to all fact patterns—and certainly not in all statutes, given differences in context and purpose."); *see also Kingdomware Techs., Inc. v. US*, 579 U.S. 162, 171 (2016) ("If the statutory language is unambiguous and the statutory scheme is coherent and consistent—as is the case here—the inquiry ceases." (internal quotation marks omitted)). Nevertheless, *Seymour*'s holding does not apply here for three additional reasons.

First, the issue in *Seymour* was narrower than the issue here.  *Seymour* considered only "whether the names and addresses of private companies utilized by the Bureau of the Census in fulfilling its duties under the federal census laws" were exempt from disclosure as "information furnished under the provisions of this Title[,]" where "Title" referred to the federal census laws as codified in Title 13 of the U.S. Code.  559 F.2d at 807; Pub. L. 740, 68 Stat. 1012 (Aug. 31, 1954) (13 U.S.C. § 9).  In *Seymour*, there was no dispute that the names and addresses were received by the Census Bureau because of requirements in the Census Act.  *See* 559 F.2d at 807 (names and addresses were "utilized by the Bureau of the Census in fulfilling its duties under the federal census laws").  Accordingly, the *Seymour* court never interpreted the word "under," only the word

"furnished." *Id.* at 808-09. Here, Plaintiff disputes that the death-in-custody information was furnished "under" Title I because it was provided pursuant to the requirements of an entirely different statutory scheme, the DCRA, and not the requirements of Title I.

Second, *Seymour*'s interpretation of "furnished"—"'gathered' for ultimate statistical purposes"—relied on "the thrice emphatically expressed intent of Congress to protect census information." *Id.* at 809. "[C]ensus information was foremost in the consideration of Congress to be protected." *Id.* at 808. That intent was evidenced in Congress' express overruling of prior Supreme Court precedent and Congressional debates about FOIA and Exemption 3. *Id.* "In that context," the court thought it did "no violence to the statute" to interpret the word "furnished" to include the names and addresses of census reporting firms gathered by the Bureau when fulfilling its duties under the Census Act. *Id.* at 809. Here, Defendant does not point to any evidence of Congressional intent to protect death-in-custody information, let alone "thrice emphatically expressed intent."

Finally, the reasoning of *Seymour*—reliance on legislative history rather than ordinary meaning—was recently admonished by the Supreme Court. In *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019), the Supreme Court interpreted the meaning of "confidential" as used in FOIA Exemption 4. 139 S. Ct. at 2363. In doing so, the Court confronted a 1970's D.C. Circuit decision, *National Parks & Conservation Association v. Morton*, 498 F.2d 765 (D.C. Cir. 1974), that established widely adopted precedent interpreting the word "confidential" to require proof that disclosure would cause "substantial competitive harm." *Argus Leader*, 139 S. Ct. at 2363-64. The Court abrogated that decision, taking issue with its overreliance on legislative history. *Id.* at 2364. "*National Parks'* contrary approach is a relic from a bygone era of statutory construction." *Id.* It "inappropriately resort[ed] to legislative history before

consulting the statute's text and structure[.]"  *Id.*; *see also id.* ("Indeed, this Court has repeatedly refused to alter FOIA's plain terms on the strength only of arguments from legislative history."). Defendant here, like the defendant in *Argus Leader*, pins its hopes on a 1970's D.C. Circuit decision that relies on legislative history in lieu of ordinary meaning to interpret a confidentiality provision under FOIA.  That approach has now been rejected by the Supreme Court in the FOIA context, even if *Seymour* had applied to the facts of this case in the first place.

*     *     *     *     *

Defendant ignores the controlling point here: It is the DCRA, not the Crime Control Act, that establishes and dictates when, where, and what death-in-custody information is furnished to the MCI program, and the penalty for noncompliance.  The ordinary meaning of information "furnished under" Title I cannot be said to include death-in-custody information provided pursuant to the requirements of the DCRA, a separate statute from Title I.  Thus, Title I's confidentiality provision does not apply to the information requested here.

**B.**     **The statutory context and history of amendment of Title I further demonstrates that Title I's confidentiality provision does not apply to the death-in-custody information requested here.**

**1.**     **Plaintiff's interpretation of "furnished under this title" avoids superfluity across related statutes, but Defendant's interpretation does not.**

It is an "established rule of statutory interpretation" that courts should not "interpret[] any statutory provision in a manner that would render another provision superfluous."  *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010).  "This principle, of course, applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times."  *Id.* at 608.  Here, Plaintiff's interpretation of "furnished under this title" avoids superfluity, but Defendant's interpretation renders superfluous the confidentiality provisions of at least two other

statutory schemes: the Juvenile Justice and Delinquency Prevention Act (JJDPA) and the Justice Assistance Act (JAA).

In 1984, Congress explicitly incorporated Title I's confidentiality provision into the JJDPA even though the JJDPA interacts with Title I in ways similar to the DCRA. The JJDPA established the Office of Juvenile Justice and Delinquency Prevention (OJJDP) to administer programs targeting problems of juvenile delinquency, including providing resources to states and localities and conducting related research. Pub. L. 93-415, Title I, §§ 102(a)-(b), 88 Stat. 1109-1111; Pub. L. 93-415, Title II, § 201, 88 Stat. 1112-3 (34 U.S.C. § 11111). The OJJDP is under the purview of a "Title I entity," the OJP. *Id.* § 201(a) (34 U.S.C. § 11111(a)); *see* OJJDP, *About OJJDP*, DOJ OFFICE OF JUSTICE PROGRAMS, https://ojjdp.ojp.gov/about (last visited July 24, 2022). States are required to report statistical information to the OJJDP to qualify for assistance. Pub. L. 93-415 § 312(b)(6)-(7), 88 Stat. 1131; 34 U.S.C. §§ 11212(b)(7)-(8), 11222(a)(9). To wit, the JJDPA and Title I are interrelated, and reporting pursuant to the JJDPA is like reporting pursuant to the DCRA because information is provided to a "Title I entity" to qualify for federal assistance.

Notwithstanding the JJDPA's interactions with Title I, Congress explicitly incorporated Title I's confidentiality provision in the JJDPA. Pub. L. 98-473, Title II, § 641, 98 Stat. 2122 (Oct. 12, 1984) ("Sections 809(c), 811(a), 811(b), 811(c), 812(a), 812(b), and 812(d) of the Omnibus Crime Control and Safe Streets Act of 1968 . . . shall apply with respect to the administration of and compliance with this Act, except that . . . the term 'this title' as it appears in such sections shall be deemed to be a reference to this Act."); 34 U.S.C. § 11182(b). Congress would not have explicitly incorporated Title I's confidentiality provision if it already encompassed the information reported to OJJDP. That is, Defendant's interpretation, which would extend Title I's confidentiality provision to encompass information reported under the JJDPA, would render

superfluous the provision's subsequent explicit incorporation in the JJDPA.  Moreover, incorporation of the confidentiality provision in the JJDPA demonstrates that Congress knows how to apply Title I's confidentiality provisions to other statutes when it intends to, yet it did not in the DCRA.

In the same public law, Congress also incorporated Title I's confidentiality provision into the JAA.  The JAA established the Emergency Federal Law Enforcement Assistance (EFLEA) Program to provide emergency federal law enforcement assistance when needed by states.  Pub. L. 98-473, Title II, § 609M, 98 Stat. 2103 (34 U.S.C. §§ 50101-112).  The EFLEA is under the purview of a "Title I entity," the BJA within the OJP.  *Id.* § 609V, 98 Stat. 2106 (34 U.S.C. § 50109); OJP, *The EFLEA Program Fact Sheet*, DOJ OFFICE OF JUSTICE PROGRAMS, https://www.ojp.gov/library/publications/emergency-federal-law-enforcement-assistance-eflea-program-fact-sheet (last visited July 24, 2022).  Funding from EFLEA is affected by grant funding from Title I.  *Id.* § 609M(c)(6), 98 Stat. 2104 ("In determining whether to approve or disapprove an application for assistance under this section, the Attorney General shall consider . . . any assistance which the State or other appropriate unit of government has received, or could receive, under any provision of Title I of the Omnibus Crime Control and Safe Streets Act of 1968.") (34 U.S.C. 50101(c)(6)).  Thus, like the DCRA and Title I, the JAA and Title I are interrelated: the EFLEA is under the purview of a "Title I entity" and JAA funding is tied to Title I funding.

Again, despite these interactions with Title I, Congress still found it necessary to explicitly incorporate Title I's confidentiality provision in the JAA to prohibit disclosure of information reported by states to OJP.  *Id.* § 609Q, 98 Stat. 2105 ("Section 812 of part H of title I of the Omnibus Crime Control and Safe Streets Act of 1968 . . . shall apply with respect to . . . information furnished under this subdivision . . . except that the terms 'this title' and 'this section', as such

terms appear in such section 812, shall be deemed to be references to this subdivision and this section, respectively, of this Act[.]") (34 U.S.C. § 50105).  By explicitly incorporating Title I's confidentiality provision in the JAA, Congress made clear that the provision's original scope is strictly limited to information provided pursuant to the requirements of Title I.  If Title I's confidentiality provision already encompassed all information provided to a "Title I entity" or connected to Title I funding, the JAA's explicit incorporation of the Title I confidentiality provision would be rendered superfluous.

Furthermore, Congress was very familiar with the provisions of Title I at the time it incorporated the confidentiality provision into the JJDPA and JAA.  The incorporation happened less than five years after Title I's confidentiality provision was enacted, and, in the same public law, Congress significantly amended and renumbered the Crime Control Act.  *See* Pub. L. 98-473, §§ 601-609H, 98 Stat. 2077-2102.

### 2.   Title I's history of amendment supports Plaintiff's interpretation of "furnished under this title."

Finally, Title I's history of amendment further indicates that Congress did not intend information "furnished under" Title I to encompass information provided pursuant to the DCRA's reporting requirements.  Courts should not resort to legislative history where, as here, "language is plain and does not lead to an absurd result[.]"  *Goldring v. D.C.*, 416 F.3d 70, 75 (D.C. Cir. 2005).  Indeed, plain language prevails even "when plain language and legislative history may seem to point in opposite directions."  *Id.*  Nonetheless, the history of amendment of the Crime

Control Act only further supports the ordinary meaning of the confidentiality provision here.

Congress has not been reluctant to amend Title I.[2]  More specifically, Congress has frequently amended Title I to add new programs governed by Title I's administrative requirements, including the confidentiality provision.  Many past amendments established new grant programs with their own requirements for eligibility and distribution and use of funds, and often conditioned funding on compliance with reporting requirements to the Attorney General.  *See, e.g.*, Pub. L. 107-273, Div. C, Title I, § 11027(b), 116 Stat. 1834-35 (Nov. 2, 2022) (amending Title I to establish "Crime Free Rural Grants"); Pub. L. 114-198, Title II, § 201, 130 Stat. 711-13 (July 22, 2016) (amending Title I to establish "Comprehensive Opioid Abuse Grant Program").  If Congress intended the administrative provisions of Title I to apply to death-in-custody reporting required by the DCRA, it could have simply amended Title I—as it has many times before—to include the death-in-custody provisions.  Instead, Congress chose to pass the DCRA into law as a separate act with its own statutory scheme, demonstrating an intent to establish its reporting scheme outside the strictures of Title I.  Accordingly, considering Congress' frequent amendment of Title I— including amendments requiring reporting similar to the reporting under the DCRA—its decision to require death-in-custody reporting in an entirely separate statutory scheme, the DCRA, demonstrates an intention that death-in-custody information not be subject to Title I's confidentiality provision.  *See Nat'l Ass'n of Mfrs. v. DOD*, 138 S. Ct. 617, 633 (2018) ("Had Congress wanted to prioritize efficiency, it could have authorized direct circuit-court review of all nationally applicable regulations, as it did under the Clean Air Act."); *Kellogg Brown & Root*

---

[2] By way of example, Title I has been amended at least eight times in the last four years alone.  *See* Pub. L. 117-159, 136 Stat. 1313 (June 25, 2022); Pub. L. 117-61, 135 Stat. 1474 (Nov. 18, 2021); Pub. L. 116-283, 134 Stat. 3388 (Jan. 1, 2021); Pub. L. 116-281, 134 Stat. 3381 (Dec. 31, 2020); Pub. L. 116-165 , 134 Stat. 760 (Oct. 10, 2020); Pub. L. 116-32, 133 Stat. 1036 (July 25, 2019); Pub. L. 116-22, 133 Stat. 905 (June 24, 2019); Pub. L. 116-18, 133 Stat. 869 (May 23, 2019).

*Servs., Inc. v. US ex rel. Carter*, 135 S. Ct. 1970, 1977 (2015) ("Congress has used clearer and more specific language when it has wanted to toll the statutes of limitations for civil suits as well as crimes.").

## V. CONCLUSION

Defendant has improperly withheld records under FOIA Exemption 3. Defendant's attempt to apply Title I's confidentiality provision beyond its own statutory scheme, and well beyond reasonable interpretation, is unsupported by the ordinary meaning, statutory context, and history of amendment of the Crime Control Act. For the foregoing reasons, the Court should grant Plaintiff's Cross-Motion for Summary Judgment, deny Defendants' Motion for Summary Judgment, and order FOIA Exemption 3 inapplicable to the information withheld here. Pursuant to the agreement between the parties, *see* Joint Status Report (ECF No. 10) at 1-2, and the Court's June 21, 2022, Minute Order, the Court should also order Defendant to process all responsive records and determine whether any other exemptions may apply.

Dated: July 29, 2022

RESPECTFULLY SUBMITTED,

/s/ *Matthew V. Topic*

_____

Attorneys for Plaintiff

Matthew Topic, DC Bar No. IL0037
Josh Loevy, DC Bar No. IL0105
Merrick Wayne, DC Bar No. IL0058
Shelley Geiszler, DC Bar No. IL0087
(E-Mail: foia@loevy.com)
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, Illinois 60607
Tel.: (312) 243-5900
Fax: (312) 243-5902