IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GANNETT SATELLITE INFORMATION NETWORK,<br><br>   *Plaintiff*,<br> v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>   *Defendant*. | Case No. 22-cv-475-BAH |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. The Information Plaintiff Seeks was "Furnished Under" Title I of the Crime Control Act and is Protected From Disclosure ..... 2

II. Historical Practice Rebuts Plaintiff's Theory that the Records are Only Provided Under DCRA ..... 6

III. The Other Statutory Schemes that Plaintiff References Support Defendant's Interpretation ..... 8

CONCLUSION ..... 11

# TABLE OF AUTHORITIES

**Cases**

*Ardestani v. I.N.S.*,
    502 U.S. 129 (1991) ................................................................................................. 3

*Davis v. Michigan Dep't of Treasury*,
    489 U.S. 803 (1989) ................................................................................................. 2

*Decker v. United States*,
    140 F.2d 375 (4th Cir. 1944) ................................................................................... 2

*E.W. Bliss Co. v. United States*,
    248 U.S. 37 (1918) ................................................................................................... 2

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ......................................................................................... 2, 5, 6

*Jam v. Int'l Fin. Corp.*,
    139 S. Ct. 759 (2019) ............................................................................................... 5

*Seymour v. Barabba*,
    559 F.2d 806 (D.C. Cir. 1977) ................................................................................. 2

*Trope v. United States*,
    276 F. 348 (8th Cir. 1921) ....................................................................................... 2

**Statutes**

34 U.S.C. § 10132 ............................................................................................................ 7, 8
34 U.S.C. § 10153 ......................................................................................................... 1, 3, 5
34 U.S.C. § 10231 ....................................................................................................... 1, 5, 6, 8
34 U.S.C. § 11111 ................................................................................................................ 10
34 U.S.C. § 11182 .................................................................................................................. 8
34 U.S.C. § 50101 ................................................................................................................ 11
34 U.S.C. § 50109 ................................................................................................................ 10
34 U.S.C. § 60105 .................................................................................................................. 3

**Other**

*American Heritage Dictionary*,
    available at https://www.ahdictionary.com/word/search.html?q=pursuant+to ......... 3, 4

Black's Law Dictionary 1525 (6th ed. 1990) .......................................................................... 4

Bureau of Justice Statistics, *Census of Local Jails*, *1978*, NCJ-72279, Aug. 1981,
    available at https://bjs.ojp.gov/content/pub/pdf/cj78-vol1.pdf ................................................. 6

Bureau of Justice Statistics, *Mortality in Local Jails, 2000-2018 - Statistical Tables*, NCJ-256002, April 2021,
    available at https://bjs.ojp.gov/library/publications/mortality-local-jails-2000-2018-statistical-tables ................................................................................................................................ 6, 7

Bureau of Justice Statistics, *Mortality in State and Federal Prisons, 2001–2019 – Statistical Tables*, NCJ-300953, December 2021,
    available at https://bjs.ojp.gov/library/publications/mortality-state-and-federal-prisons-2001-2019-statistical-tables ............................................................................................................ 6

Bureau of Justice Statistics, *Prisoners in State and Federal Institutions on December 31, 1978*, NCJ-64671, May 1980,
    available at https://bjs.ojp.gov/content/pub/pdf/psfi78.pdf ....................................................... 6

2B SUTHERLAND STATUTORY CONSTRUCTION § 51:7 (7th ed.) ................................................. 4, 5

**INTRODUCTION**

Plaintiff requests that the Court order the Department of Justice to release records relating to the deaths of individual inmates while in custody, notwithstanding Congress' clear direction that "[n]o officer or employee of the Federal Government . . . shall use or reveal any research or statistical information furnished under" Title I of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title I"). 34 U.S.C. § 10231. Because the requested death-in-custody records are statistical information "furnished under" Title I, the Court should deny Plaintiff's request and grant summary judgment to Defendant.

Plaintiff argues that the death-in-custody records were furnished under the Death in Custody Reporting Act ("DCRA"), not Title I. DCRA requires States that receive federal funding under the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne Grant program")—a Title I program—provide information about deaths in custody to a Title I entity in DOJ. States that fail to comply with this reporting requirement may be subject to a ten-percent reduction in their Title I funding. Title I also requires every Byrne Grant program applicant to certify that it "will comply with all provisions of [the Byrne Grant program's organic statute] and all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). DCRA is one such law. The death-in-custody records were therefore furnished under Title I, and Title I's confidentiality provision applies to bar their disclosure.

## ARGUMENT

I. **THE INFORMATION PLAINTIFF SEEKS WAS "FURNISHED UNDER" TITLE I OF THE CRIME CONTROL ACT AND IS PROTECTED FROM DISCLOSURE**

The sole question at issue in this case is whether the records Plaintiff seeks were "furnished under" Title I. *See* Def.'s Mem. at 10, ECF No. 12-1; Pl.'s Mem. at 7, ECF No. 13-1.[1] They were. It is "a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)). When the full interplay of DCRA and Title I is considered, it is clear that Title I's confidentiality provision applies to the records at issue here.

As Defendant explained in its opening brief, records are "furnished" when they are "gathered" for relevant purposes. Def.'s Mem. at 11. Courts have interpreted the term "furnish" as "one of very broad and general denotation." *Decker v. United States*, 140 F.2d 375, 377 (4th Cir. 1944), citing, *inter alia*, *E.W. Bliss Co. v. United States*, 248 U.S. 37, 45 (1918) ("to furnish means to supply") and *Trope v. United States*, 276 F. 348, 350–51 (8th Cir. 1921) ("furnish" means "provided or supplied"). In *Seymour v. Barabba*, the D.C. Circuit analyzed an analogous confidentiality provision of the Census Act and held that records were "furnished under the provisions of th[e] Title" when they were "'gathered' for ultimate statistical purposes." 559 F.2d 806, 808 (D.C. Cir. 1977). The same applies here, where the Bureau of Justice Statistics ("BJS"), which is a bureau within the Office of Justice Programs ("OJP"), has gathered the death-in-custody records in question for statistical purposes. Although Plaintiff believes that "furnished" is better

---

[1]  Plaintiff concedes that the other elements of the confidentiality provision apply to the records at issue in this case. Pl.'s Mem. at 3 n.1.

understood to mean "provided," Plaintiff, nonetheless, does not seem to dispute that the records were "provided" to BJS. Rather, the only dispute is whether the records were provided "under" Title I. *See* Pl.'s Mem. at 7-10.

Any reasonable definition of "under" leads to the conclusion that death-in-custody records are furnished "under" Title I. "Under" means "subject to" or "by reason of the authority of." *Ardestani v. I.N.S.*, 502 U.S. 129, 135 (1991); *American Heritage Dictionary*, available at https://www.ahdictionary.com/word/search.html?q=under ("Subject to the restraint or obligation of"; "Subject to the authority, rule, or control of") (last accessed Aug. 18, 2022); Webster's New College Dictionary 4th ("subject to the control [of]"); Oxford English Dictionary Online (last accessed Aug. 18, 2022) (defining "under" as "[i]n accordance with (some regulative power or principle)" and "[s]ubject to, bound or constrained [legally] by"). Title I established the Byrne Grant program and requires that all applicants for funding from the program certify that they will "will comply with all provisions of [the Byrne Grant program's organic statute] and all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D); *see* Def.'s Mem. at 2-4. One such requirement is that States that receive Byrne Grant program funding submit, each quarter, "information regarding the death of any person who is detained, under arrest, or is in the process of being arrested, is en route to be incarcerated, or is incarcerated" in any "State or local correctional facility." *Id.* § 60105(a) (DCRA). Failure to comply with this reporting requirement can result in a ten-percent reduction in funding under the Byrne Grant program. *Id.* § 60105(c)(2). States are subject to the reporting requirement of DCRA only because of their participation in, and the requirements of, the Byrne Grant program. *Id.* § 60105(a) ("For each fiscal year … in which a State receives funds [under the Byrne Grant program], the State shall report…."). If a State did not participate in the Byrne Grant program, it would not be "subject to" the DCRA requirement to

3

provide these records each quarter. Accordingly, States provide BJS with these records "by reason of the authority of" the requirements of Title I. The fact that there is a reporting requirement if and only if a State receives certain funding under this Title I program means that the reporting of that information is a requirement of Title I.

The confidentiality provision applies even with Plaintiff's preferred definition of "under." *See* Pl.'s Mem. at 9 ("[T]he ordinary meaning of information 'furnished under this title' is information "provided pursuant to the requirements of Title I of the Crime Control Act."). Information is provided "pursuant to" Title I of the Crime Control Act when it is provided "in accordance with" that Title. *See American Heritage Dictionary*, available at https://www.ahdictionary.com/word/search.html?q=pursuant+to (last accessed Aug. 18, 2022); *see also* Black's Law Dictionary 1525 (6th ed. 1990) (defining "under" as "according to"). As explained above, Title I explicitly ties funding under the Byrne Grant program to compliance with applicable federal laws, which includes DCRA's requirement that States that are Byrne Grant program recipients report death-in-custody information. Simply put, to be in accord with the requirements of Title I, States that receive grants under the Byrne Grant program must provide the death-in-custody information to BJS. This suffices, even under Plaintiff's definition of "under" for the records to be "furnished under" Title I of the Crime Control Act.

Paying little heed to the fact that DCRA expressly cross-references provisions of Title I and only applies to States that are Title I Byrne Grant program recipients, *id.* § 60105(a), (c)(2), Plaintiff argues that Congress' enactment of DCRA as a separate statute demonstrates "an intent to establish its reporting scheme outside the strictures of Title I," Pl.'s Mem. at 20. But Plaintiff cites no authority for such a cramped understanding of the interplay between the two statutes. In fact, provisions of the U.S. Code frequently cross-reference and incorporate each other. *See*

4

*generally* "Statutes adopted by reference," 2B SUTHERLAND STATUTORY CONSTRUCTION § 51:7 (7th ed.). "According to the 'reference' canon, when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises." *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019). Here, Congress placed as a requirement for the receipt of money under the Byrne Grant program, which is a program created by and situated in Title I, that each applicant "comply with all provisions of [the Byrne Grant organic statute] and all other applicable Federal laws," *see* 34 U.S.C. § 10153(a)(5)(D). Title I's requirement is a general reference provision that incorporates the requirements of federal law as it exists when it is applied, including later-enacted provisions like DCRA. *See Jam*, 139 S. Ct. at 769; "Statutes adopted by reference," 2B Sutherland Statutory Construction § 51:7 (7th ed.). Moreover, Congress cross-referenced Title I in DCRA by having it apply only to states that participate in Title I's Byrne Grant program. 34 U.S.C. § 10231. Given the general reference provision in Title I and the indisputable fact that DCRA applies only to states that receive funding under the Byrne Grant program, it is no matter that Congress decided to enact DCRA without amending Title I. The requirement to provide death-in-custody information arises "under" and pursuant to Title I's Byrne Grant program, by virtue of the references in 34 U.S.C. §§ 10153(a)(5)(D) and 60105. The records are thus "furnished under" Title I and protected from disclosure by Title I's confidentiality provision, § 10231(a). *See* Pub. L. 90-351, Title I, § 812(a), 82 Stat. 197, codified as amended at 34 U.S.C. § 10231(a).

Plaintiff's contrary conclusion would have the Court ignore the language in both Title I and DCRA that ties DCRA's "reporting scheme" to the "strictures of Title I." *Cf.* Pl.'s Mem. at 20. The Court should instead give full effect to both DCRA and Title I, particularly the fact that the requirement to report death-in-custody information applies if and only if a State receives

funding from a Title I program, the Byrne Grant program. *See Brown & Williamson*, 529 U.S. at 133 ("the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (citation omitted).

## II. HISTORICAL PRACTICE REBUTS PLAINTIFF'S THEORY THAT THE RECORDS ARE ONLY PROVIDED UNDER DCRA

Plaintiff's argument that the death-in-custody information is provided only under DCRA ignores the historical record that BJS collected and published statistics on deaths in custody under its Title I authority for decades prior to the enactment of DCRA in 2000. Those data have therefore historically been protected from unauthorized disclosure by the Title I confidentiality statute, 34 U.S.C. § 10231(a).

Since its establishment more than forty years ago, BJS has collected statistics regarding the deaths of state and federal prisoners. *See*, Bureau of Justice Statistics, *Prisoners in State and Federal Institutions on December 31, 1978*, NCJ-64671, May 1980, available at https://bjs.ojp.gov/content/pub/pdf/psfi78.pdf (last accessed Aug. 25, 2022). BJS has also been collecting statistics regarding the deaths of inmates held in local jails. Bureau of Justice Statistics, *Census of Local Jails*, *1978*, NCJ-72279, Aug. 1981, available at https://bjs.ojp.gov/content/pub/pdf/cj78-vol1.pdf (last accessed Aug. 25, 2022).

Though DCRA was enacted in 2000, it expired in December 2006; States nonetheless continued to furnish BJS with information on deaths in custody under BJS' Title I authority throughout the nearly eight years until DCRA was reenacted late in 2014. And BJS continued to issue publications on deaths in State and federal prisons and local jails after the 2006 expiration of DCRA. Bureau of Justice Statistics, *Mortality in State and Federal Prisons, 2001–2019 – Statistical Tables*, NCJ-300953, December 2021, available at https://bjs.ojp.gov/library/publications/mortality-state-and-federal-prisons-2001-2019-statistical-tables (last

accessed Aug. 25, 2022). Bureau of Justice Statistics, *Mortality in Local Jails, 2000-2018 - Statistical Tables*, NCJ- 256002, April 2021, available at https://bjs.ojp.gov/library/publications/mortality-local-jails-2000-2018-statistical-tables (last accessed Aug. 25, 2022).

If Plaintiff were correct that the death-in-custody information was only provided under DCRA, rather than Title I, then the expected result would be that there would be no such publications by BJS prior to 2000 or from 2006 to 2014.  The historical record shows, however, that BJS gathered that information for decades, notwithstanding the absence of DCRA.  The key difference, for purposes of this lawsuit, under the 2000 and 2014 DCRA statutes is that they incentivized this reporting through Title I grants and through potential reduction in Title I grant awards.  Thus, whether collected in connection with DCRA or prior to the passage of DCRA, the deaths-in-custody information has always been "furnished under" Title I because BJS itself is an entity established by *and* with the authority to collect such information under Title I of the Crime Control Act, independent of DCRA.

Plaintiff is correct that "[t]he MCI program (formerly named the Deaths in Custody Reporting Program (DCRP)) was created in response to the Death in Custody Reporting Act of 2000," Pl.'s Statement of Undisputed Material Facts at ¶ 6, ECF No. 13-3, but this "new" program simply relabeled BJS' data collections that had proceeded for decades prior under BJS' Title I authority.  The point is that BJS has always had the general authority under Title I to collect such information, even prior to the enactment of DCRA.  *See* 34 U.S.C. § 10132(c) (setting forth BJS' duties and functions, which includes the authority to "compile, collate, analyze, publish, and disseminate uniform national statistics concerning all aspects of criminal justice").  For the preceding reasons, and to the extent that the FOIA request concerns records collected from federal correctional institutions and law enforcement agencies, the records collected from these federal

entities are equally covered by § 10231 because these entities have also been furnishing records to BJS under BJS' Title I authority.

### III. THE OTHER STATUTORY SCHEMES THAT PLAINTIFF REFERENCES SUPPORT DEFENDANT'S INTERPRETATION

Plaintiff draws the wrong conclusion from the fact that the Juvenile Justice and Delinquency Prevention Act ("JJDPA") and the Justice Assistance Act ("JAA") specifically incorporate Title I's confidentiality provision, § 10231. Pl.'s Mem. at 16-19. Plaintiff argues that Defendant's interpretation of § 10231 renders superfluous the confidentiality provisions of the JJDPA and JAA, thereby violating an "established rule of statutory interpretation that courts should not interpret[] any statutory provision in a manner that would render another provision superfluous." Pl. Mem. at 16-17 (citation omitted). *Id.* But the references to § 10231 in the JJDPA and JAA are not superfluous under Defendant's theory because they do more than simply incorporate § 10231 and because the two Acts are not tied to Title I in the same way as DCRA.

First, Congress curtailed the scope of § 10231 in JJDPA and expanded the application of the provision in JAA, making the specific references to the confidentiality provision necessary. As to JJDPA, Congress declined to incorporate § 10231(c), and the statute therefore reads: "Sections . . . 10231(a), 10231(b), and 10231(d) of this title, shall apply" to JJDPA. 34 U.S.C. § 11182(b) (excluding 34 U.S.C. § 10231(c) from being incorporated into JJDPA). As to JAA, Congress significantly expanded the scope of the information protected from release under the Act, by removing the qualification in § 10231(a) that information needs to be related to research or statistical purposes to be protected. *Compare* 34 U.S.C. § 10231(a) (prohibiting the release of "any research or statistical information" furnished under Title I), *with id.* § 50105 (providing that "[§ 10231] shall apply with respect to (1) information furnished under this chapter," and also replacing references to the "Office of Justice Programs" with the "Attorney General"). By

8

contrast, Congress did not alter the scope of § 10231's confidentiality protections for information furnished under DCRA. There was thus no need for Congress to specifically incorporate the confidentiality provision rather than rely on the cross-reference between Title I and DCRA discussed above.

An additional reason why Congress expressly incorporated elements of § 10231 into JJPDA and JAA—and why it did not do so for DCRA—is that JJDPA and JAA do not have reporting schemes tied to Title I. As discussed above, DCRA's death-in-custody information is tied to the reporting scheme of the Byrne Grant program. The confidentiality provision of § 10231 thus applies. *See supra* 2-6. JJDPA and JAA, however, do not require the reporting of any information conditional upon a State's status as a recipient of funding from a Title I program. *See generally* 34 U.S.C. §§ 11101, *et seq.*; 34 U.S.C. §§ 50101, *et seq.* Rather, to the extent that there is any reporting requirement under JJPDA and JAA, it is because of funding from programs that are not located under Title I (*e.g.*, programs created by JJDPA and JAA). Therefore, the incorporation of certain provisions of § 10231 into JJPDA and JAA was necessitated, *inter alia*, by the fact that the reporting of information was not required by virtue of a State's receipt of Title I funds, and by the fact that the statutory schemes that created the reporting requirements were not located within Title I.

Though Plaintiff asserts that "reporting pursuant to the JJDPA is like reporting pursuant to DCRA," reports under the two schemes are materially distinct, with respect to this dispute. *Contra* Pl.'s Mem. at 17. DCRA requires reporting to an entity whose authority is created by, and whose duties are set forth under, Title I; DCRA requires no reports unless a State opts to receive funding under the Byrne Grant program, and such a State that fails to report DCRA information risk only the penalty of having funding reduced under that Title I grant program. None of the statutes that

Plaintiff cites under JJDPA in support of this argument create any requirements or incentives for reporting based on a State's participation in a Title I program, because reporting pursuant to the JJDPA bears no connection to any grant program created under Title I. Additionally, to the extent that 34 U.S.C. § 11111 states that the Administrator of the Office of Juvenile Justice and Delinquency Prevention ("OJJDP") has "the same reporting relationship with the Attorney General as the directors of other offices and bureaus within the Office of Justice Programs have," this alone does not establish OJJDP as a Title I entity because JJDPA, which created OJJDP, did not amend Title I when it established OJJDP and its duties. By contrast, the statute that established BJS and provided it with its authority to collect the statistical information in question here placed its creation and authority under Title I by specifically amending that title. *See* Pub. L. 96-157, 93 Stat. 1167, Part C (Dec. 27, 1979) (amending Title I of the Omnibus Crime Control and Safe Streets Act of 1968 to establish BJS and set forth its authority and responsibilities).

      Similar distinctions apply to JAA. First, the Emergency Federal Law Enforcement Assistance ("EFLEA") program, which was created by JAA, is not a Title I program simply because it is administered by the Bureau of Justice Assistance ("BJA"). As with BJS, BJA itself was established by amending Title I. But unlike BJS, which has the authority under Title I to collect the statistical information in question independent of DCRA, BJA's authority to administer EFLEA is not derived from its authority created under Title I. BJA's statutory authority to administer EFLEA instead is only pursuant to the provisions of JAA. *See* 34 U.S.C. § 50109. Next, the reference in JAA to Title I funding under the Byrne Grant program does not create a reporting requirement whereby § 10231 would be incorporated by reference. JAA does not create any requirement for States to report information *because of* their receipt of Title I funding. Rather, to the extent that the JAA's reference to Title I funding creates any requirement, it is a requirement

imposed on the Attorney General, not on the States, to ensure that federal funds are being expended judiciously in light of other sources. *See* 34 U.S.C. § 50101(c)(6). The relationship between JAA and Title I, therefore, is not analogous to that of DCRA and Title I.

The explicit incorporation of § 10231 into DCRA actually would have violated the cannon against surplusage that Plaintiff argues the Court should apply. As explained above, the death-in-custody information was provided to BJS pursuant to the requirements of Title I, because Title I requires applicants for funding to comply with DCRA reporting requirements. It would have been superfluous for Congress to again incorporate § 10231 into DCRA, because it already applies to DCRA for all the reasons discussed above.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Defendant's opening brief, the Court should grant summary judgment in favor of Defendant on all of Plaintiff's claims.

Dated: August 26, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Brian Rosen-Shaud*
BRIAN C. ROSEN-SHAUD
ME Bar No. 006018
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-7667
brian.c.rosen-shaud@usdoj.gov

*Counsel for Defendant*