**IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GANNETT SATELLITE | ) | |
| INFORMATION NETWORK, | ) | |
| | ) | Civ. A. No. 22-cv-475-BAH |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
|     Defendant. | ) | |

**<u>PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY
JUDGMENT</u>**

## TABLE OF CONTENTS

I.   ARGUMENT ...................................................................................................1

   A.  The ordinary meaning of Title I's confidentiality provision does not include
       information furnished under the DCRA, which is not Title I of the Crime
       Control Act ................................................................................................1

   B.  The Court should reject Defendant's improperly expansive construction of
       "furnished under." .....................................................................................2

   C.  Defendant's argument that all information collected by BJS is "furnished
       under" Title I is irrelevant, unsupported, and supplants Congressional intent ..........5

   D.  Mere "interplay" between Title I and the DCRA does not justify expansion of
       Title I's confidentiality provision to encompass information provided pursuant
       to the requirements of the DCRA ...............................................................9

   E.  The JJDPA and JAA support Plaintiff, not Defendant................................12

II.  CONCLUSION ...............................................................................................16

# TABLE OF AUTHORITIES

***Cases***

*Am. Tobacco Co. v. Patterson*, 456 U.S. 63 (1982)........................................................9

*Ardestani v. I.N.S.*, 502 U.S. 129 (1991) ........................................................................3

*Bilski v. Kappos*, 561 U.S. 593 (2010)..........................................................................12

*Church of Scientology of Cal. v. IRS*, 792 F.2d 146 (D.C.Cir.1986)..............................7

*Fed. Express Corp. v. Holowecki*, 552 U.S. 389 (2008).................................................12

*Finley v. US*, 490 U.S. 545 (1989).................................................................................2

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ................................12

*Goldring v. D.C.,* 416 F.3d 70 (D.C. Cir. 2005) .............................................................1

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ....................................................12

*Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759 (2019)...............................................................9

*Johnson v. Panetta*, 953 F. Supp. 2d 244 (D.D.C. 2013) ...............................................6

*Kingdomware Techs., Inc. v. US*, 579 U.S. 162 (2016) ..................................................1

*Lamie v. US Trustee*, 540 U.S. 526 (2004) .....................................................................1

*Seymour v. Barabba*, 559 F.2d 806 (D.C. Cir. 1977) .....................................................3

*Wis. Project on Nuclear Arms Control v. Dep't of Com.*, 317 F.3d 275 (D.C. Cir. 2003).............8

***Statutes***

18 U.S.C. § 4001......................................................................................8, 10, 13

34 U.S.C. § 10132(c) ......................................................................................5, 7

34 U.S.C. § 10132(c)(4)......................................................................................7

34 U.S.C. § 10153(a)(5)(D) ...............................................................................11

34 U.S.C. § 10231 .................................................................................................2, 16

34 U.S.C. § 11182 ......................................................................................................15

34 U.S.C. § 50105 .................................................................................................15, 16

34 U.S.C. § 60105 .........................................................................................................2

34 U.S.C. § 60105(a) ........................................................................................8, 10, 13

34 U.S.C. § 60105(a)-(b) ............................................................................................14

34 U.S.C. §§ 10101-02 ...............................................................................................13

34 U.S.C.A. § 12104 .....................................................................................................9

## *Other Authorities*

BJS, MCI, DOJ Office of Justice Programs (May 15, 2009) ......................................5

Pub. L. 106-297, 114 Stat. 1045 (Oct. 13, 2000) .......................................................9

Pub. L. 113-242, 128 Stat. 2860 (Dec. 18, 2014) .....................................................10

U.S. Senate Comm. on the Judiciary, Senators Request Full Implementation, Enforcement of the Death In Custody Reporting Act (July 7, 2020) .............................6, 9

The plain language of the confidentiality provision of the Crime Control Act only protects information "furnished under" Title I of that Act.  The information requested by Plaintiff here—death-in-custody information furnished by states and federal law enforcement agencies under the Death in Custody Reporting Act (DCRA)—is beyond the scope of Title I's confidentiality provision under the text of the statute on which Defendant relies for its Exemption 3 claim.  The Court should therefore grant summary judgment for Plaintiff.

## I.       ARGUMENT

### A.      The ordinary meaning of Title I's confidentiality provision does not include information furnished under the DCRA, which is not Title I of the Crime Control Act.

The confidentiality provision of Title I of the Crime Control Act prohibits disclosure of information "furnished under this title"; that is, information "provided pursuant to the requirements of Title I of the Crime Control Act."  Pl.'s Mem. at 2-3, 8-9.  The information requested here—death-in-custody information—is not provided pursuant to the requirements of Title I: no statutory provision in Title I requires reporting of such information.  *Id.* at 7-10.  Accordingly, because "the statutory language is unambiguous and the statutory scheme is coherent and consistent . . . the inquiry ceases."  *Kingdomware Techs., Inc. v. US*, 579 U.S. 162, 171 (2016); *see Goldring v. D.C.,* 416 F.3d 70, 74-75 (D.C. Cir. 2005) ("When the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." (quoting *Lamie v. US Trustee*, 540 U.S. 526, 534 (2004))).

This result is also consistent with the statutory structures.  The requested information is comprehensively governed by the DCRA, an independent act of legislation comprising a separate statutory scheme.  Pl.'s Mem. at 9-10.  As explained in Plaintiff's opening brief, the DCRA has a distinct legislative purpose; mandates reporting of death-in-custody information by states receiving funding from the Edward Byrne Memorial Justice Assistance Grant (JAG) Program and

by federal law enforcement agencies; specifies the types of death-in-custody information that must be reported; and authorizes the Attorney General to reduce a state's annual JAG funding by 10% in the event the state fails to comply with the DCRA. *Id.* at 4, 9-10. It is the DCRA, not Title I of the Crime Control Act, that governs when, where, and what death-in-custody information is furnished, and the penalty for noncompliance.

Further, the language and organization of the U.S. Code recognizes that Title I's confidentiality provision does not apply to death-in-custody information reported pursuant to the DCRA. *Id.* at 10-12. When codifying those laws, the Office of the Law Revision Counsel (OLRC) of the U.S. House of Representatives translated Title I's confidentiality provision to apply only to information "furnished under this Chapter" (Chapter 101 of Subtitle I of Title 34 of the Code (34 U.S.C. § 10231)) and organized the DCRA in an entirely separate Chapter (Chapter 601 of Subtitle VI of Title 34 (34 U.S.C. § 60105)). *Id.* at 11. The OLRC recognized that death-in-custody information reported pursuant to the DCRA is not encompassed by Title I's confidentiality provision and translated and organized the statutes accordingly. *Id.* at 11-12 (citing *Finley v. US*, 490 U.S. 545, 554 (1989) ("Under established canons of statutory construction, it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." (internal quotation marks and citations omitted))). Defendant fails even to address this point, and thus concedes it.

Under the plain text of the statute on which Defendant relies, Exemption 3 does not apply to the requested information.

### B.   The Court should reject Defendant's improperly expansive construction of "furnished under."

Because the plain text of the statute is clear and does not support Defendant's Exemption 3 claim, Defendant relies on an expansive construction of "furnished under"—"gathered by reason

of the authority of" Title I—that it claims to encompass the death-in-custody information requested here.  Def.'s Reply at 2-4.  The Court should reject Defendant's construction.  *See* Pl.'s Mem. at 7-10.

Defendant argues that "furnished" means "gathered" based on *Seymour v. Barabba*, 559 F.2d 806 (D.C. Cir. 1977).  *See* Def.'s Reply at 2.  But *Seymour* is inapposite here because it interprets a different statute, relies on inapplicable reasoning, and advances an approach to FOIA statutory interpretation that has since been rebuked by the Supreme Court.  *See* Pl.'s Mem. at 13-16.  The remainder of the case law Defendant cites case supports Plaintiff's construction of "furnished"—*i.e.*, "provided"—not Defendant's.  *See* Def.'s Mem. at 2 (citing cases interpreting "furnished" to mean "to supply" or "provided or supplied").  Thus, the Court should apply Plaintiff's construction of "furnished" ("provided"), not Defendant's improperly expansive construction.

Defendant further argues that "under" means "subject to" or "by reason of the authority of," but the definitions Defendant cites support Plaintiff's construction—"pursuant to the requirements of"—even more.  *See* Def.'s Reply at 3-4 (citing definitions of "under" including "subject to the restraint or obligation of" and "subject to the authority, rule, or control of").  Furthermore, the one case cited by Defendant—*Ardestani v. I.N.S.*, 502 U.S. 129 (1991)—applies Defendant's preferred construction of "under" but using reasoning that supports Plaintiff's position here.  *See* Def.'s Reply at 7.

In *Ardestani*, the Supreme Court interpreted a statutory provision in the Equal Access to Justice Act (EAJA) that restricts recovery of attorney's fees to adjudications "under section 554 of this title."  502 U.S. at 132-33.  The Court, after interpreting "under section 554" to mean "'subject to' or 'governed by'" section 554, strictly limited the scope of adjudications "under section 554"

to adjudications "governed by the procedural provisions established in [section 554]." *Id.* at 134-36.  Similarly, the Court here should limit information furnished "under this title" to information "governed by the reporting provisions established in Title I."  *See id.* at 136 ("We must assume that the EAJA's unqualified reference to a specific statutory provision mandating specific procedural protections is more than a general indication of the types of proceedings that the EAJA was intended to cover.").  By *Ardestani*'s logic, death-in-custody information is not furnished "under" Title I because no provision in Title I governs reporting of death-and-custody information. It is the DCRA that governs that reporting.

In sum, even under Defendant's own cited authorities, Plaintiff's construction of "furnished under" reflects the ordinary meaning of that phrase and is consistent with Supreme Court precedent, not Defendant's.  But even if Defendant's construction of "furnished under"—*i.e.*, "gathered by reason of the authority of"—controlled, the death-in-custody information would still not be encompassed by Title I's confidentiality provision because it is not furnished under "this title."  Under both parties' interpretations of Title I's confidentiality provision, information is only protected from disclosure when that information is "furnished under" Title I itself.  Pl.'s Mem. at 8-9; Def.'s Mem. at 10 ("The applicability of Exemption 3 thus turns entirely on whether the information Plaintiff seeks was 'furnished under this title,' *i.e.* Title I of the Crime Control Act."). Thus, the information must be provided pursuant to the requirements of—or, under Defendant's construction, "gathered by reason of the authority of," Def.'s Reply at 2-4—the statutory provisions comprising the specific section of the Crime Control Act that includes the confidentiality provision (Title I—Justice System Improvement).  Pl.'s Mem. at 8-9.  Again, the information requested here is not provided pursuant to any provision in Title I.  It is provided pursuant to the requirements in the statutory provisions comprising the DCRA, which govern

when, where, and what death-in-custody information is furnished, and the penalty for noncompliance.  Thus, Defendant's argument fails even if the Court accepted Defendant's improperly expansive interpretation of the statutory provision.

## C.   Defendant's argument that all information collected by BJS is "furnished under" Title I is irrelevant, unsupported, and supplants Congressional intent.

Defendant's reply also argues, for the first time, that all death-in-custody information collected by BJS is furnished under "this title" because Section 3029(c) of Title I (34 U.S.C. § 10132(c)) authorizes BJS to collect such information.  *See* Def.'s Reply at 7.  In support, Defendant points to BJS' historical practice of analyzing death-in-custody information before enactment of the original DCRA and between the original DCRA's expiration and reauthorization.  *See id*.  The Court should reject this argument for several reasons.

First, Defendant's argument is irrelevant because it concerns types of death-in-custody information not requested by Plaintiff.  Plaintiff only requested the death-in-custody information submitted to BJS as required by the DCRA, not any other death-in-custody information voluntarily collected or submitted pursuant to other directives: Plaintiff's request asked for "all information submitted to BJS under the Mortality in Correctional Institutions program," Compl. Ex. 1, which was "created in response to the Death in Custody Reporting Act," Def.'s Reply at 7, with a sole purpose to collect data reported pursuant to the original and reauthorized DCRA, Def.'s Resp. to Pl.'s SOF ¶¶ 6-7.  Based on BJS' own public representations, the types of death-in-custody information required by the DCRA are distinct from any death-in-custody information collected prior to the DCRA.  *See* BJS, MCI, DOJ OFFICE OF JUSTICE PROGRAMS (May 15, 2009), https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program#methodology-0 (last visited Aug. 31, 2022) (explaining that, prior to the DCRA of 2000, "only two states (California and Texas) collected information on all types of

arrest-related deaths"). It is that distinct set of death-in-custody information that Plaintiff seeks here. While Defendant also suggests that the death-in-custody information reported under the DCRA is no different than death-in-custody information historically collected by BJS, it cites no authority for that proposition. Def.'s Reply at 7.

Defendant's lack of cited authority alone is sufficient to reject that argument, *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013), but it also fails on the merits. In July 2020, the U.S. Senate Committee on the Judiciary released a letter demonstrating that Defendant was not collecting the types of death-in-custody information required under the DCRA. *See* U.S. Senate Comm. on the Judiciary, SENATORS REQUEST FULL IMPLEMENTATION, ENFORCEMENT OF THE DEATH IN CUSTODY REPORTING ACT (July 7, 2020), https://www.judiciary.senate.gov/press/dem/releases/senators-request-full-implementation-enforcement-of-the-death-in-custody-reporting-act (last visited Sep. 9, 2022). Because Defendant failed to collect the death-in-custody information specified by the DCRA, it was a "stark, staggering fact . . . that there exists no reliable metric on the number of law enforcement-related deaths that occur each year[.]" *Id*. The Committee explained that "data collected pursuant to the DCRA"—which Defendant failed to collect—is "a critical step" in accountability for law enforcement-related deaths and that the data "would help us, as policymakers, and the Attorney General, as the nation's chief law enforcement officer, make critical decisions to reduce . . . preventable deaths[.]" The Committee "demand[ed] that [Defendant DOJ] begin the immediate implementation and enforcement of the DCRA." *Id*. Accordingly, Defendant's unsupported suggestion that it has always collected the types of death-in-custody information requested here is contradicted by public evidence of Defendant's failure to collect that information under the DCRA. Defendant's argument that Title I authorizes BJS to collect death-in-custody information, then, is

irrelevant: even if Title I did grant such authority, the subset of death-in-custody information requested here was only "furnished under"—provided pursuant to the requirements of—the DCRA.

Second, even if Defendant's argument were relevant, the Court also should reject it because it fails to establish that any provision of Title I governs reporting of any type of death-in-custody information. As explained in Plaintiff's opening brief, Title I's confidentiality provision only applies to information provided pursuant to the requirements of Title I of the Crime Control Act, and no statutory provision in Title I requires reporting of death-in-custody information. Pl.'s Mem. at 7-10. According to Defendant, however, Section 302(c) of Title I (34 U.S.C. § 10132(c)) is a Title I provision that has always authorized BJS to collect death-in-custody information, such that all death-in-custody information provided to BJS was indeed "furnished under" Title I. Def.'s Reply at 7. But that Title I provision simply grants BJS the authority to "collect and analyze statistical information, concerning the operations of the criminal justice system[,]" 34 U.S.C. § 10132(c)(4) (emphasis added); it does not govern, let alone require, the provision to, or collection by, BJS of any death-in-custody information. Thus, it cannot serve as the statutory basis for Defendant's argument that death-in-custody information is "furnished under" Title I.

In an effort to substantiate BJS' alleged Title I authorization to collect death-in-custody information, Defendant points to its historical practice of collecting certain types of death-in-custody information before enactment of the original DCRA, but fails to cite any case for the proposition that such agency practice can establish or prove a statutory basis for such authority. *See* Def.'s Reply at 6-8 (citing only 34 U.S.C. 10132(c) as legal authority); *see also Church of Scientology of Cal. v. IRS*, 792 F.2d 146, 148–50 (D.C.Cir.1986), *aff'd, Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 18 (1987) (explaining that FOIA disclosure and review requirements—not

deferential administrative law standards—govern interpretation of federal statutes, like Title I, asserted through Exemption 3).   In sum, Defendant's argument that all death-in-custody information provided to BJS is "furnished under" Title I fails because Defendant does not identify any provision of Title I that governs reporting of death-in-custody information.

Finally, Defendant's argument should be rejected because it improperly grants the Attorney General—not Congress—the discretion to exempt information from disclosure under FOIA. FOIA Exemption 3, asserted by Defendant here, "require[s] that Congress, not the agencies of the Executive Branch, determine the need for nondisclosure." *Wis. Project on Nuclear Arms Control v. Dep't of Com.*, 317 F.3d 275, 280 (D.C. Cir. 2003).   "[FOIA] and its legislative history make clear that Congress did not want the exemption to be triggered by every statute that in any way gives administrators discretion to withhold documents from the public.   On the contrary, Congress intended exemption from the FOIA to be a legislative determination and not an administrative one." *Id.* (internal quotation marks omitted).

Here, Congress determined that the death-in-custody information required by the DCRA should be reported "to the Attorney General," Ex. A to Pl.'s Mem. §§ 2(a) (34 U.S.C. § 60105(a)), 3(a) (18 U.S.C. § 4001 statutory note), and declined to declare that information confidential.   It was the Attorney General, not Congress, that delegated handling of such information to the MCI program under the purview of BJS.   Pl.'s Mem. at 4-5.   As Defendant would have it, the Attorney General has the discretion to conceal all criminal justice information from disclosure under FOIA simply by delegating its collection to an agency originally authorized by Title I.   This position is irreconcilable with the D.C. Circuit's insistence that "Congress, not the agencies of the Executive Branch, determine the need for nondisclosure" by using "clearly delineated statutory language." *Wis. Project*, 317 F.3d at 79-280.

**D.      Mere "interplay" between Title I and the DCRA does not justify expansion of Title I's confidentiality provision to encompass information provided pursuant to the requirements of the DCRA.**

Defendant next argues that the reporting requirements of the DCRA are effectively subsumed by Title I because of just two cross-references—*i.e.*, "interplay"—between the statutes. *See* Def.'s Reply at 2.   The Court should reject Defendant's argument because neither cross-reference can be interpreted to bring death-in-custody information, which is provided pursuant to the requirements of the DCRA, within the scope of information "furnished under" Title I.   *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019) ("We ordinarily assume, 'absent a clearly expressed legislative intention to the contrary,' that 'the legislative purpose is expressed by the ordinary meaning of the words used.'" (quoting *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982))).

The two cross-references relied on by Defendant exist only in the reenacted DCRA of 2014. The original DCRA—enacted in October 2000—made no reference whatsoever to Title I.   The original DCRA amended Section 20104(a) of the Violent Crime Control and Law Enforcement Act of 1994 to require reporting of death-in-custody information as part of the Violent Offender Incarceration and Truth-in-Sentencing Grant Program under Title II of that act.   Pub. L. 106-297, 114 Stat. 1045 (Oct. 13, 2000) (now codified at 34 U.S.C.A. § 12104).   It did not contain a single reference to the Crime Control Act, let alone Title I.   *Id*.   Thus, the original DCRA suggests that the cross-references to Title I in the reenacted DCRA were simply Congress' way of giving "the Attorney General an enforcement mechanism—the authority to withhold up to 10-percent of [JAG] Program funds from states that failed to comply with the DCRA reporting requirement." U.S. Senate Comm. on the Judiciary, SENATORS REQUEST FULL IMPLEMENTATION, ENFORCEMENT OF THE DEATH IN CUSTODY REPORTING ACT (July 7, 2020), https://www.judiciary.senate.gov/press/dem/releases/senators-request-full-implementation-enforcement-of-the-death-in-custody-reporting-act (last visited Sep. 5, 2022).   This makes sense:

- 9 -

according to Defendant, JAG funding is "the leading source of federal justice funding to state and local jurisdictions." Def.'s Mem. at 2. Accordingly, it is unlikely that Congress, when reenacting the DCRA, intended for two new cross-references to subsume the DCRA into Title I such that all information furnished under the DCRA was now also to be considered furnished under Title I.

Relying on one such cross-reference, Defendant first argues that the reporting requirement in the DCRA is actually "a requirement of Title I" because the DCRA only requires reporting if states receive funding under a "Title I program" (JAG). Def.'s Reply at 4 (citing 34 U.S.C. § 60105(a) (DCRA)). Defendant does not offer any caselaw to support its unprecedented suggestion that such a cross-reference qualifies a provision of one statute as "a requirement of" an entirely separate statute. *See id*. And Defendant's argument ignores that the DCRA also requires federal law enforcement agencies—which do not receive Title I funding—to report the same death-in-custody information. Ex. A to Pl.'s Mem. § 3(a) (Pub. L. 113-242, 128 Stat. 2860 (Dec. 18, 2014)) (codified in statutory note at 18 U.S.C. § 4001). The DCRA's reporting requirement cannot be considered "a requirement of Title I" where it also includes reporting by federal law enforcement agencies that bear no relationship to Title I whatsoever.

In any event, even if Defendant's argument were legally and factually supported, it still ignores the controlling point: the ordinary meaning of "furnished under this title" does not include death-in-custody information provided pursuant to the reporting requirements in the DCRA—an entirely separate statute—whether or not some of those reporting requirements are conditioned on participation in a Title I program (JAG). *See* Pl.'s Mem. at 12 (arguing "information being 'furnished . . . by virtue' of a state's participation in a program established by Title I is different than information being 'furnished under'—provided pursuant to the requirements of—Title I.").

Relying on another cross-reference between the statutes, Defendant also argues that reporting of death-in-custody information pursuant to the DCRA is effectively a requirement of Title I because Title I's certification provision is "a general reference provision that incorporates the requirements of federal law . . . including later-enacted provisions like DCRA." *See* Def.'s Reply at 4 (relying on 34 U.S.C. § 10153(a)(5)(D) (Section 502(a)(5)(D) of Title I)).  But Section 10153(a)(5)(D) does not incorporate any requirements of federal law, it simply requires that applicant-states certify—in their JAG grant application—that they will comply with other applicable Federal laws; its plain language cannot fairly be read to incorporate the substantive requirements of those laws.  *See* 34 U.S.C. § 10153(a)(5)(D) (applications for JAG grant "shall include . . . [a] certification . . . that . . . the applicant will comply with all provisions of this part and all other applicable Federal laws").  Defendant's argument otherwise is absurd: it would require that Title I's confidentiality provision apply to information furnished under "all other applicable Federal laws," a gross overexpansion of the provision's limitation to information "furnished under this title."  Thus, Title I does not incorporate the DCRA's reporting requirements by reference; information provided pursuant to the reporting requirements of the DCRA are only "furnished under" the DCRA, not Title I.

In sum, Defendant's arguments violate well-settled rules of statutory interpretation by neglecting the ordinary meaning of Title I's confidentiality provision in favor of an interpretation that would have Title I of the Crime Control Act subsume the DCRA.  But the DCRA, though it cross-references Title I, is a separate act of legislation which Congress designed to govern reporting of the death-in-custody information at issue here.  The Court should reject Defendant's attempts to reorganize the DCRA and Title I and hold that Title I's confidentiality provision does not encompass death-in-custody information reported pursuant to the requirements of the DCRA.

*See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (where "careful examination of the ordinary meaning and structure of the law itself . . . yields a clear answer, judges must stop" (internal citations and quotation marks omitted)); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) ("When conducting statutory interpretation, we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'" (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008))).

### E.  The JJDPA and JAA support Plaintiff, not Defendant.

While the plain text of the statute alone is sufficient to reject Defendant's Exemption 3 claim, as explained in Plaintiff's opening brief, the "interactions" between Title I and the DCRA on which Defendant relies are similar to Title I's interactions with the Juvenile Justice and Delinquency Prevention Act (JJDPA) and the Justice Assistance Act (JAA).  Pl.'s Mem. at 16-19. Congress made clear that Title I's confidentiality provision did not originally encompass information reported pursuant to the JJDPA or JAA when it later expressly incorporated the confidentiality provision in both of those acts.  *Id.*  Accordingly, because Title I's confidentiality provision does not apply to the JJDPA or JAA, it likewise does not apply to the DCRA.  *Id.* (citing *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010) (explaining the "established rule" of superfluity)).

In response, Defendant argues that Title I's ties to the DCRA are more significant than Title I's ties to the JJDPA and JAA, such that Title I's original confidentiality provision applies only to the DCRA.  *See* Def.'s Reply at 9-11.  Defendant offers two unconvincing reasons that the DCRA is distinct from the other two acts, both of which the Court should reject.

First, Defendant suggests that the DCRA, unlike the JJDPA and JAA, requires reporting to a "Title I entity," *id.* at 9-11; that is, "an entity whose authority is created by, and whose duties are set forth under, Title I," *id.* at 9; *but see id.* at 10 (arguing that EFLEA "is not a Title I program simply because it is administered by the Bureau of Justice Assistance (BJA)" notwithstanding

"BJA itself was established by amending Title I").   As a result, according to Defendant, information reported under the DCRA, but not the JJDPA or JAA, is under the purview of Title I's confidentiality provision.   Defendant is wrong at the threshold: as explained in Plaintiff's opening brief and Section (I)(C), *supra*, the DCRA does not require reporting to a "Title I entity" at all, but only requires reporting to the Attorney General.   Pl.'s Mem. at 4-5.   It was the Attorney General, not Congress, that delegated handling of death-in-custody information to the MCI program under the purview of BJS (an entity authorized by Title I).   *Id*.

Moreover, under both the JJDPA and JAA, information is similarly provided to DOJ components—the Office of Juvenile Justice and Delinquency Prevention (OJJDP) and the Emergency Federal Law Enforcement Assistance (EFLEA) Program, respectively—that are under the purview of the Office of Justice Programs (OJP) (an entity authorized by Title I).   *Id*. at 17-18; *see* 34 U.S.C. §§ 10101-02 (Sections 101-02 of Title I) (creating, and setting forth duties, of OJP). To wit, the MCI program is no more a "Title I entity" than the OJJDP or EFLEA: it is a component of the DOJ, created in response to legislation outside the statutory scheme of the Crime Control Act, that happens to be under the purview of an entity created and authorized by Title I.

Second, Defendant argues that only the DCRA conditions reporting of information on receipt of "Title I funding."   Def.'s Reply at 9-11.   Initially, Defendant again ignores that the DCRA requires that federal law enforcement agencies, which do not receive Title I funding, report the same death-in-custody information as states.   *See* Section (I)(A) *supra*; *see also* Ex. A §§ 2(a), 2(c)(2), 3(a)-(b) (34 U.S.C. §§ 60105(a), (c)(2); 18 U.S.C. § 4001 statutory note) (conditioning only states' reporting, not federal agencies' reporting, on JAG funding).   And like the DCRA, both the JJDPA and JAA require that applicants report information to programs administered by a Title I entity (OJP) to qualify for federal funding.   Pl.'s Mem. at 17-18.

Defendant's last purported distinction is that the DCRA alone implicates funding distributed by a program (JAG) authorized in the statutory provisions of Title I.  Although it is true that the funding affected by the JJDPA and JAA's reporting requirements is authorized within those statutes themselves—not within Title I—it is implausible, at best, to suggest that Congress understood and intended that single distinction to bring information reported under the DCRA, but not the JJDPA or JAA, under the purview of Title I's confidentiality provision.  Defendant cites no statutory language, legislative history, or caselaw that suggests otherwise.  *See* Def.'s Reply at 9-11.

In sum, Defendant mischaracterizes the differences in Title I's interactions with the JJDPA, JAA, and DCRA, and contorts its characterizations of "Title I programs," "Title I entities," and "Title I funding" in an attempt to fit its argument.  Defendant can hardly maintain its own distinctions: Defendant argues that incorporating Title I's confidentiality provision "into JJDPA and JAA was necessitated . . . by the fact that the statutory schemes that created [those acts'] reporting requirements were not located within Title I," *id.* at 9, but the statutory scheme that creates the reporting requirements of the DCRA is also not located within Title I; it is located within the DCRA.  Pl.'s Mem. at 9; 34 U.S.C. § 60105(a)-(b) (DCRA).  Defendant's distinctions are unsupported by the plain language of Title I and cannot reasonably be said to explain why Congress incorporated Title I's confidentiality provision in the JJDPA and JAA and not the DCRA. They are certainly insufficient to overcome the plain text and structure of the statute, as discussed above.

Finally, Defendant offers an alternative reason that Congress expressly incorporated Title I's confidentiality provision in the JJDPA and JAA: Congress intended to tailor the scope of confidentiality in the JJDPA and JAA, but not the DCRA.  *See* Def.'s Reply at 8 ("Congress

- 14 -

curtailed the scope of § 10231 in JJDPA and expanded the application of the provision in JAA, making the specific references to the confidentiality provision necessary"). Defendant's explanation is speculative and implausible. If Congress believed Title I's confidentiality provision already applied to the JJDPA and JAA, it would have used simpler language to tailor the provision. For example, if Congress intended to simply expand the application of the provision in the JAA "by removing the qualification in § 10231(a) that information needs to be related to research or statistical purposes to be protected," *id.*, it could have enacted a statutory provision saying just that. Instead, the JAA first explicitly applies all of Title I's confidentiality provisions to the JAA, and then proceeds to tailor its internal references consistent with the JAA. *See* 34 U.S.C. § 50105 ("Section 10231 of this title shall apply with respect to . . . "). Likewise, if Congress intended to narrow the scope of the confidentiality provision's application to the JJDPA by "declin[ing] to incorporate § 10231(c)," Def.'s Reply at 8, the JJDPA could have simply stated that "Section 10231(c) does not apply to this chapter."

Instead, the JJDPA expressly incorporates all other sections of Title I's confidentiality provision, even though, according to Defendant, those exact provisions already apply to the JJDPA. *See* 34 U.S.C. § 11182 ("Sections 10228(c), 10230(a), 10230(b), 10230(c), 10231(a), 10231(b), and 10231(d) of this title, shall apply with respect to the administration of and compliance with this chapter[.]"). Therefore, it is implausible that Congress was incorporating Title I's confidentiality provision in the JJDPA and JAA simply to tailor the scope of the provision where it already applied.

Further, despite Defendant's argument to the contrary, Def.'s Reply at 8, Congress did not expand the scope of Title I's confidentiality provision when it incorporated it into the JAA. Defendant argues that the provision's scope was expanded "by removing the qualification . . . that

information needs to be related to research or statistical purposes to be protected," *id.*, but the JAA does not remove that qualification at all.  Rather, it simply "appl[ies]" the provisions of 34 U.S.C. § 10231 "to information furnished under" the JAA.  *See* 34 U.S.C. § 50105 ("Section 10231 of this title shall apply with respect to . . . information furnished under this chapter[.]").  After applying the provision, Congress did not additionally substitute the confidentiality provision's references to "research or statistical information" with references to "all information." Accordingly, Congress' unmodified application of Title I's confidentiality provision further suggests that it never applied to the JAA in the first place.

In any event, Defendant's argument is not dispositive here because, at most, it cuts both ways.  Adjustments to the scope of Title I's confidentiality provision in the JJDPA or JAA do not evidence that Congress intended the original provision to apply to those acts in the first place. Even if, as Plaintiff contends, Title I's confidentiality provision did not already apply to the JJDPA or JAA, Congress could have still incorporated it and subsequently tailored it to accommodate the language and structure of the JJDPA and JAA.  Indeed, to the extent the scope of the provision was adjusted in either act, that is precisely what Congress did here.

In sum, Defendant's attempts to explain Congress' incorporation of Title I's confidentiality provision in the JJDPA and JAA are unsupported and untenable.  Defendant ignores the simplest and logical explanation: Congress knew that Title I's confidentiality provision did not apply to the JJDPA or JAA—or, by extension, the DCRA—in the first place.

## II.        CONCLUSION

The ordinary meaning of information "furnished under this title" does not encompass information provided pursuant to the requirements of a separate statute.  The Court should therefore grant Plaintiff's Cross-Motion for Summary Judgment, deny Defendants' Motion for Summary Judgment, and order FOIA Exemption 3 inapplicable to the information withheld here.

Pursuant to the agreement between the parties, *see* Joint Status Report (ECF No. 10) at 1-2, and the Court's June 21, 2022, Minute Order, the Court should also order Defendant to process all responsive records, subject to any other applicable exemptions.

Dated:  September 9, 2022

<div style="margin-left: 40%;">

RESPECTFULLY SUBMITTED,

/s/ *Matthew V. Topic*

_____

Attorneys for Plaintiff

</div>

Matthew Topic, DC Bar No. IL0037
Josh Loevy, DC Bar No. IL0105
Merrick Wayne, DC Bar No. IL0058
Shelley Geiszler, DC Bar No. IL0087
(E-Mail:  foia@loevy.com)
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, Illinois 60607
Tel.: (312) 243-5900
Fax: (312) 243-5902