**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GANNETT SATELLITE INFORMATION NETWORK, LLC, | |
| Plaintiff, | Civil Action No. 22-cv-475 (BAH) |
| v. | Judge Beryl A. Howell |
| U.S. DEPARTMENT OF JUSTICE, | |
| Defendant. | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Gannett Satellite Information Network, d/b/a USA Today, filed this lawsuit

against the U.S. Department of Justice ("DOJ") challenging the agency's response to plaintiff's

request, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for data

regarding "individual-level information on the deaths of incarcerated people in the custody of

local jails, state prisons, and the Federal Bureau of Prisons," Pl.'s Mem. in Supp. of Cross-Mot.

for Summ. J. & Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") at 1, ECF No. 13-1, which

data is collected by a DOJ component in compliance with the Death in Custody Reporting Act of

2013 ("DCRA"), Pub. L. No. 113-242, 128 Stat. 2860 (codified as amended in scattered sections

of 34 U.S.C. and 14 U.S.C.).

After a search uncovered over 230,000 pages of documents potentially responsive to

plaintiff's FOIA request, defendant invoked FOIA Exemption 3, 5 U.S.C. § 552(b)(3), to

withhold the release of all those materials under the confidentiality provision of the Omnibus

Crime Control and Safe Streets Act of 1968 ("Crime Control Act"), 34 U.S.C. § 10231.  As a

result, the key question in this dispute, one of first impression in this Circuit, is whether the text

of the Crime Control Act's confidentiality provision exempts disclosure of the requested

1

information under FOIA Exemption 3.  In their cross-motions for summary judgment, the parties

offer divergent interpretations of the statute that favor their positions.  For the reasons explained

below, plaintiff's cross-motion for summary judgment, Pl.'s Cross-Mot. for Summ. J., ECF No.

13, is granted and defendant's motion for summary judgment, Def.'s Mot. for Summ. J., ECF

No. 12, is denied.

## I.     BACKGROUND

The factual background and procedural history relevant to the pending motion are

described below.

### A.      Statutory Context

The DCRA was originally enacted in 2000 and, after expiration in 2006, reauthorized in

2014.  *See infra* n.3.  This law aims to "encourage States to report to the Attorney General

certain information regarding the deaths of individuals in the custody of law enforcement

agencies."  Pub. L. No. 113-242, 128 Stat. 2860 (2014).  To fulfill that goal, the DCRA requires

certain states and federal law enforcement agencies to report to the Attorney General information

regarding the death of "any person who is detained, under arrest, or is in the process of being

arrested, is en route to be incarcerated, or is incarcerated" at a local or state jail, prison, boot

camp, contract facility, or other correctional facility, including juvenile facilities.  *See* DCRA §

2(a), 128 Stat. at 2861 (outlining state reporting requirements); *accord* 34 U.S.C. 60105(a)

(codification of such state requirements); *see also* DCRA § 3(a), 128 Stat. at 2861 (outlining

federal law enforcement reporting requirements); 18 U.S.C. § 4001 note (codification of such

federal requirements).  Both states and federal agencies must include "at a minimum" in their

disclosures "(1) the name, gender, race, ethnicity, and age of the deceased; (2) the date, time, and

location of death; (3) the law enforcement agency that detained, arrested, or was in the process of

arresting the deceased; and (4) a brief description of the circumstances surrounding the death."

DCRA § 2(b) (listing information required of states); 34 U.S.C. § 60105(b) (codifying such); *accord* DCRA § 3(b) (explaining that information required for federal agency reporting is the same as that outlined in § 2(b) for states).

Compliance with the DCRA is required of those states that receive federal funds under Title 1 of the Crime Control Act, *see* DCRA § 2(a), (c)(2); 34 U.S.C. § 60105(a), (c)(2), and failure to comply when required with the DCRA's reporting requirements makes a state, "at the discretion of the Attorney General, [] subject to not more than a 10-percent reduction of the funds" otherwise allocated to them under Title I of the Crime Control Act, "whether characterized as the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs, the Local Government Law Enforcement Block Grants Program, the Edward Byrne Memorial Justice Assistance Grant Program, or otherwise," DCRA § 2(c)(2); 34 U.S.C. § 60105(c)(2). The Attorney General, through the Department of Justice and its Office of Justice Programs ("OJP"), established the Mortality in Correctional Institutions ("MCI") program to collect the DCRA-mandated information. *See* Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)), U.S. DEP'T OF JUSTICE OFFICE OF JUSTICE PROGRAMS – BUREAU OF JUSTICE STATISTICS, https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program#methodology-0 (last visited Mar. 24, 2023).

The Crime Control Act, enacted in 1968 over thirty years earlier than the DCRA, sought "[t]o assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes." Pub. L. No. 90-351, 82 Stat. 197 (1968) (codified at 34 U.S.C. § 10151 *et seq.*). At issue in this dispute is Title I of the Act, named "Law

Enforcement Assistance," intended "to assist State and local governments in strengthening and improving law enforcement at every level by national assistance."  Crime Control Act, tit. I, 82 Stat. at 198.  Congress provides such national assistance through federal grant programs available to state law enforcement agencies.  *See id.*, tit. I, §§ 201–405, 82 Stat. at 198–204. Title I also authorizes DOJ to "request any Federal department or agency to supply such statistics, data, program reports, and other material as [DOJ] deems necessary to carry out its functions under this title."  *Id.*, tit. I, § 513, 82 Stat. at 207.

In 1979, Congress amended Title I by adding a confidentiality provision—the interpretation of which is the central question in this case.  The provision, as originally enacted, states:

> Except as provided by Federal law other than this title, *no officer or employee of the Federal Government*, and no recipient of assistance under the provisions of this title *shall* use or *reveal any research or statistical information furnished under this title* by any person and identifiable to any specific private person for any purpose other than the purpose for which it was obtained in accordance with this title.  Such information and copies thereof shall be immune from legal process, and shall not, without the consent of the person furnishing such information, be admitted as evidence or used for any purpose in any action, suit, or other judicial, legislative, or administrative proceedings.

Pub. L. No. 90-351, tit. I, § 812(a), formally § 818, as added Pub. L. No. 96-157, § 2, 93 Stat. 1167, 1213 (1979) (codified at 34 U.S.C. § 10231(a)) (emphasis supplied).[1]

---

[1]    Title I's confidentiality provision was amended in 2006, Pub. L. No. 109-162, § 1115(c), 119 Stat. 2960 (2006), editing the above language by striking the first clause.  The currently codified provision reads as follows:

> No officer or employee of the Federal Government, and no recipient of assistance under the provisions of this chapter shall use or reveal any research or statistical information furnished under this chapter by any person and identifiable to any specific private person for any purpose other than the purpose for which it was obtained in accordance with this chapter.  Such information and copies thereof shall be immune from legal process, and shall not, without the consent of the person furnishing such information, be admitted as evidence or used for any

Currently, OJP administers Title I grant programs under the Attorney General's authority. Pub. L. No. 98-473, tit. II, § 603(a), 98 Stat. 2078.  A division of OJP, the Bureau of Justice Statistics ("BJS"), is DOJ's "primary statistical agency" and "collects, analyzes, publishes, and disseminates information on crime, criminal offenders, crime victims, and criminal justice operations."  Offices – Bureau of Justice Statistics (BJS), U.S. Dep't of Justice – Office of Justice Programs (Jan. 7, 2020), https://www.ojp.gov/about/offices/bureau-justice-statistics-bjs.  One of the grant programs Title I created and facilitates is the Edward Byrne Memorial Justice Assistance Grant Program, the grant program subject to the 10% reduction upon a state's failure to comply with the requirements of the DCRA.

### B.    Factual Background

On April 9, 2021, plaintiff submitted a two-part FOIA request to the DOJ's Office of Justice Programs, seeking:

> 1.  [A]ll information submitted to BJS under the Mortality in Correctional Institutions program.  This includes information contained in submissions of BJS Forms CJ-9 and CJ-10 and any other data elements states are required to provide under 34 USC 60105, from 2010 through the date on which my request is processed.  If this information is stored in a tabular database format, please provide a copy to me in tabular, sortable form such as comma-separated values (CSV).  If the information exists ONLY as a paper or PDF form submission, please provide PDF copies.  To be clear, I am requesting data on the deaths of individual inmates, not the summaries of inmate deaths published on the BJS website.

> 2.  [A] copy of any data dictionary, record layout or other documentation that describes elements contained in the electronic database requested above.

---

purpose in any action, suit, or other judicial, legislative, or administrative proceedings.

34 U.S.C. § 10231(a).

Pl.'s Statement of Undisputed Material Facts ("Pl.'s Statement of Facts") ¶ 1, ECF No. 13-3;

Def.'s Statement of Material Facts as to Which There Is No Genuine Issue ("Def.'s Statement of

Facts") ¶ 1, ECF No. 12-3.

On April 13, 2021, OJP notified plaintiff about receipt of the latter's FOIA request and

that 236,568 pages of potentially responsive documents had been located, but were exempt from

disclosure under FOIA Exemption 3, 3 U.S.C. § 552(b)(3), because the confidentiality provision

of the Crime Control Act prohibited such disclosure. *See* Pl.'s Statement of Facts ¶ 2; Def.'s

Statement of Facts ¶¶ 2–4. On April 14, 2021, plaintiff appealed OJP's decision to DOJ's Office

of Information Policy, *see* Pl.'s Statement of Facts ¶ 3; Def.'s Statement of Facts ¶ 5, which

subsequently affirmed OJP's Exemption 3 withholding decision, *see* Pl.'s Statement of Facts ¶ 4;

Def.'s Statement of Facts ¶ 6.

### C.    Procedural Background

Plaintiff filed the instant complaint, on February 23, 2022, alleging that "[d]efendant

refused to release non-exempt information under Exemption 3" and Title I of the Crime Control

Act, in violation of FOIA. Compl. ¶ 1, ECF No. 1. Defendant answered the complaint,

reasserting its invocation of Exemption 3. *See* Def.'s Answer, Defenses ¶ 1, ECF No. 7. After

more than a month of dormancy in litigation, in violation of the Standing Order issued in this

case, *see* Standing Order, ECF No. 4, plaintiff was directed to show cause why this case should

not be dismissed for failure to prosecute because the parties had yet to file a meet and confer

statement within 14 days of the filing of defendant's answer, as required by Standing Order ¶

3.b.i. *See* Min. Order (May 10, 2022). In response to that directive, the parties subsequently

filed a Joint Status Report stating that, after conferral, they agreed to seek resolution of the

Exemption 3 issue before litigating any other issues in this dispute, including whether other

FOIA exemptions might apply. *See* Joint Status Report at 1–2, ECF No. 10. The Court granted

that joint request, *see* Min. Order (May 31, 2022), and the parties subsequently briefed the propriety of withholding responsive DCRA records under FOIA's Exemption 3, *see generally* Def.'s Mot.; Pl.'s Cross-Mot.  The matter is now ripe for review.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law."  *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin*., 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* FED. R. CIV. P. 56(a).  "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'"  *Aguiar v. Drug Enf't Admin*., 865 F.3d 730, 734–35 (D.C. Cir. 2017) (quoting *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)).  Most FOIA cases "can be resolved on summary judgment."  *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. U.S. Army* ("*DiBacco I*"), 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)).  Agencies are therefore statutorily mandated to "make . . . records promptly available to any person" who submits a request that "reasonably describes such records" and "is made in accordance with [the agency's] published rules."  5 U.S.C. § 552(a)(3)(A).  To balance the public's interest in governmental transparency and "legitimate governmental and private interests [that] could be harmed by release of certain types of

information," *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1108 (D.C. Cir. 2019) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)), FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive' and must be 'narrowly construed,'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973); and then quoting *Abramson*, 456 U.S. at 630); *see also Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW I*"), 746 F.3d 1082, 1088 (D.C. Cir. 2014). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). When an agency invokes an exemption to disclosure, district courts must "determine *de novo* whether non-disclosure was permissible." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015). The statute "places the burden 'on the agency to sustain its action,' and the agency therefore bears the burden of proving that it has not 'improperly' withheld the requested records." *CREW v. U.S. Dep't of Justice* ("*CREW II*"), 922 F.3d 480, 487 (D.C. Cir. 2019) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) ("The Government bears the burden of establishing that the exemption applies."); *DiBacco v. U.S. Dep't of Army* ("*DiBacco II*"), 926 F.3d 827, 834 (D.C. Cir. 2019) ("'An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions,' typically through affidavit or declaration." (quoting *DiBacco I*, 795 F.3d at 195)). This burden does not shift even when the requester files a cross-motion for summary judgment because the agency ultimately "bears the

burden to establish the applicability of a claimed exemption to any records or portions of records it seeks to withhold," *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016), while "[t]he burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Rsch. Grp. v. U.S. Food & Drug Admin.*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

FOIA Exemption 3 applies to matters "specifically exempted from disclosure by statute" if that statute either (1) "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or (2) "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A)(i)–(ii).  The D.C. Circuit has explained that "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."  *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007) (quoting *Ass'n of Retired R.R. Workers v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987)).  Thus, the defendant "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute."  *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 761–62 (D.C. Cir. 1990)).

## III.    DISCUSSION

The parties do not dispute that the Crime Control Act's Title I confidentiality provision is an exemption that qualifies for withholding under FOIA's Exemption 3—rightfully so, because it undoubtedly is.  Thus, the dispositive question, which no court has apparently yet encountered, is

whether the requested records submitted to DOJ, as required by the DCRA, are covered by the
Title I confidentiality provision, *i.e.*, whether those requested records are "furnished under" Title
I of the Crime Control Act.

Plaintiff argues that the requested information was "furnished under" the DCRA to DOJ,
not under Title I of the Crime Control Act, and so the confidentiality provision is inapplicable to
exempt categorically a response to plaintiff's FOIA request, as defendant has justified the
withholdings in this case. *See* Pl.'s Mem. at 7–19. Conversely, DOJ defends the use of
Exemption 3 because "States are required to furnish [the requested information] only be virtue of
their voluntary participation in a Title I program, the Edward Byrne Memorial Justice Assistance
Grant program" and because states "furnish[]" that information to a Title I entity, BJS, the
relevant data is "furnished under" Title I of the Crime Control Act and so the confidentiality
provision applies. *See* Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") at 10,
ECF No. 12-1. Defendant's reading of the statute is far too strained. The confidentiality
provision's plain text applies to information and data "furnished under" Title I and because the
requested information was "furnished under" or "pursuant to" the DCRA, the confidentiality
provision is inapplicable to the requested data and thus defendant may not withhold the DCRA
documents under Exemption 3.

In interpreting a statute, a court "begins 'with the language of the statute itself' and, if
necessary, 'may turn to other customary statutory interpretation tools, including structure,
purpose, and legislative history.'" *In re: Rail Freight Fuel Surcharge Antitrust Litig. - MDL No.
1869*, 34 F.4th 1, 9 (D.C. Cir. 2022) (citing *Genus Med. Techs. LLC v. U.S. Food & Drug
Admin.*, 994 F.3d 631, 637 (D.C. Cir. 2021)). The following analysis proceeds in that fashion.

A.      **Statutory Text**

Starting with the text, the key language of Title I's confidentiality provision is as follows: "[N]o officer or employee of the Federal Government, and no recipient of assistance under the provisions *of this title* shall use or reveal any research or statistical information *furnished under this title* by any person and identifiable to any specific private person for any purpose other than the purpose for which it was obtained *in accordance with this title*."  Crime Control Act § 818(a), 93 Stat. at 1213.  "Of this title" most clearly refers to Title I, so the plain text of the provision states that its confidentiality requirement only applies to information "furnished under" Title I.  Taking into account that a statute's words are interpreted according to their "ordinary, contemporary, common meaning," *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019), the plain and ordinary meanings of "furnish" and "under" are instructive.

"Furnish" means "provide or supply with what is needed, useful, or desirable," "equip," "accomplish, complete, fulfil," or "bring about, ensure," *Furnish*, MERRIAM-WEBSTER UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/furnish (last visited Mar. 22, 2023); *Furnish*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/75677?rskey=6iAKkb&result=2&isAdvanced=false#eid (last visited Mar 22, 2023), while "under" means "in or into a condition of subjection, regulation, or subordination" or "in a subordinate or inferior position," *Under*, MERRIAM-WEBSTER UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/under (last visited Mar. 22, 2023); *Under*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/211394?rskey=FlKjsQ&result=4#eid (last visited Mar 22, 2023).  Read together, "furnished under" in the context of Title I is understood to mean that information "provided or equipped subject to" Title I must adhere to the confidentiality requirement.  Otherwise phrased, "furnished under" is equivalent to the phrase "pursuant to."

11

The statistics plaintiff requests are "furnished under" the DCRA because they were provided by state and federal law enforcement agencies subject to the requirements of that statute.  The DCRA mandated the submission of such death-in-custody information to DOJ, the timeframe for such submissions, the specific details necessary for reporting, and the penalty for states' failure to comply with the DCRA's requirements.  Information provided to DOJ is thus subject to the DCRA's requirements.  Those reporting requirements were not enacted as an amendment to the Crime Control Act but as stand-alone legislation and thus are not even codified as part of Title I, and so the sought-after information is not provided pursuant to Title I. *Accord Ardestani v. INS*, 502 U.S. 129, 134–37 (1991) (interpreting the statutory phrase regarding proceedings brought "under section 554" in the Equal Access to Justice Act ("EAJA") to mean proceedings brought subject to the EAJA's specific category of proceedings mentioned in section 554, not proceedings brought under other statutes).

DOJ's reading of the statute—explained only in its opposition to plaintiff's cross-motion and not in defendant's motion itself, *see* Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. & Reply in Supp. of Def.'s Mot. Summ. J. ("Def's Opp'n") at 2–6, ECF No. 17—is unsupported by the confidentiality provision's plain text.  The definitions defendant provides do not differ greatly from those provided by plaintiff.  *Compare* Def.'s Opp'n at 2–3, *with* Pl.'s Mem. at 7–9. Their key point of divergence is their interpretation of "under" in the context of the confidentiality provision.  Defined by defendant as "subject to," as did plaintiff, defendant seizes on the DCRA's enforcement mechanism to argue that "[s]tates are subject to the reporting requirement of DCRA only because of their participation in, and the requirements of, the Byrne Grant program."  *See* Def.'s Opp'n at 3.  Yet, Congress's choice of the DCRA's enforcement mechanism does not do the work defendant wishes with the result of overlaying the rest of the

Crime Control Act's Title I on the DCRA.  Such a reading is simply neither apparent nor supported by the confidentiality provision's clear text.

Nothing in Title I, let alone in its confidentiality provision, requires reporting on the specific type of data the DCRA mandates, and so that information is furnished under or subject only to the DCRA's requirements.  As noted, the DCRA's reference to Title I funds merely piggy-backs on this funding source as an enforcement scheme Congress crafted for states that fail to comply with the DCRA reporting requirements.  Furthermore, defendant draws a false distinction between the U.S. Code version and the Statutes at Large version of the confidentiality provision, with the former codification substituting "chapter" for "title," when that substitution does not change the substantive effect of the statute.  *See Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227 (1957) ("For it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect, unless such intention is clearly expressed."); *Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9, 20 (2006) (quoting that language from *Fourco*); *United States v. Spears*, 449 F.2d 946, 952 n.33 (D.C. Cir. 1971) ("The Revised Statutes were not generally intended to work a change in existing law.").

Defendant's only other argument somewhat related to the statute's text is to compare Title I's language with the statutory text of a wholly different statute discussed in *Seymour v. Barabba*, 559 F.2d 806 (D.C. Cir. 1977), but that comparison is inapt.  In *Seymour*, the D.C. Circuit held that a provision in the Census Act prohibiting the "use [of] the information furnished under the provisions of this Title for any purpose other than the statistical purposes for which it is supplied" applied to prevent disclosure of requested census information under Exemption 3. 559 F.2d at 807–08.  The Circuit interpreted "furnished" to mean "gathered" and reasoned that the requested information was "gathered by the Census Bureau; . . . categorized and assembled

for the Census Bureau purposes[;]" and "is sufficiently related to the statistical data which the firms eventually are called upon to report" such that the information "were gathered for the Bureau's statistical purposes under the provisions of this Title" and thus were protected by the confidentiality provision.  *Id.* at 808–09.

The holding in *Seymour* does not dictate a similar outcome in this case.  First, *Seymour*'s dispute involved the interpretation of "furnished" but not "furnished *under*," as is critical here.  *Seymour* did not address the instant occurrence in which information is gathered under a statute separate from Title I and that title's confidentiality provision, and without a similar confidentiality provision of its own.  The Circuit noted that the requested information in *Seymour* was gathered under the provisions of the title that included the confidentiality provision—all falling under the purview of the Census Act's mandates both to collect the data and protect it from disclosure.  *See* 559 F.2d at 808–09.  Here, the Crime Control Act does not mandate the death-in-custody reporting requirements; rather the DCRA does.  Second, as discussed *infra* in Section III.C, the purpose of the Census Act, to collect individuals' personal information and keep it out of the public sphere, matched the Circuit's interpretation of the confidentiality provision, that census information should be kept private.  *See* 559 F.2d at 809.  In comparison, the purposes of the Crime Control Act and the DCRA are separate, distinct, and divergent.  The former is focused on federal funding of law enforcement at the state and local level, and the latter on oversight, transparency, and accountability in law enforcement actions.  Put simply, the plain text of the Crime Control Act's Title I's confidentiality provision is not impacted by *Seymour*'s holding and thus is inapplicable to information collected pursuant to the DCRA.

### B.   Structure

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *West*

*Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  In context, Title I of the Crime Control Act does not cover the specific death-in-custody reporting requirements provided in the DCRA—Title I's purview includes financial assistance to state law enforcement programs, independent from the DCRA's reporting requirements.  Additionally, reading Title I as the vehicle for the production of death-in-custody information to DOJ, as defendant seeks to do, impermissibly expands Title I's scope in that the statute provides funding for state and local governments whereas the DCRA imposes reporting requirements on both state *and* federal governments.  *See* DCRA § 2(a), 128 Stat. at 2861 (outlining state reporting requirements); *accord* 34 U.S.C. 60105(a) (codification of such); *see also* DCRA § 3(a), 128 Stat. at 2861 (outlining federal law enforcement reporting requirements). Thus, to interpret the requested records as being "furnished under" Title I when non-Title I entities must also comply with the DCRA's requirements is a puzzle defendant fails to acknowledge, let alone resolve.

Defendant's reading of the statute also does not account for its incompatible effect on related provisions.  *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) ("[Courts] must normally seek to construe Congress's work so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal citation omitted)); *Genus Medical Technologies*, 994 F.3d at 638 ("[A] statute should be construed to give effect to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal citation omitted)).  As plaintiff raises, *see* Pl.'s Mem. at 16–19, Congress incorporated explicit reference to Title I's confidentiality provision in two statutes that are otherwise independent of Title I, namely, the Juvenile Justice and Delinquency Prevention Act and the Justice Assistance Act, thereby making clear that those statutes were subject to the statutory

exemption in the Crime Control Act.  *See* Pub. L. No. 98-473, tit. II, § 641, 98 Stat. 1837, 2122 (1984) (amending the Juvenile Justice and Delinquency Prevention Act to read, "Sections 809(c), 811(a), 811(b), 811(c), 812(a) [the confidentiality provision], 812(b), and 812(d) of the Omnibus Crime Control and Safe Streets Act of 1968, as so designated by the operation of the amendments made by the Justice Assistance Act of 1984, shall apply with respect to the administration of and compliance with this Act"); *id.*, § 609Q, 98 Stat. at 2105 (amending the Justice Assistance Act to read, "Section 812 [the confidentiality provision] of part H of title I of the Omnibus Crime Control and Safe Streets Act of 1968 . . . shall apply with respect to . . . information furnished under this subdivision . . . except that the terms "this title" and "this section", as such terms appear in such section 812, shall be deemed to be references to this subdivision and this section, respectively, of this Act").

Defendant now asks this Court to accept that Congress saw no need for such explicit reference in the DCRA because of the "necessarily and inextricably intertwined" nature of the DCRA and Title I of the Crime Control Act by the DCRA's cross-reference to a Title I program. *See* Def.'s Mem. at 11.  That logic does not hold water and instead undermines Congress's deliberate choice to add such statutory reference in two statutes and notably not in the DCRA, enacted in 2014, long after enactment of the Juvenile Justice and Delinquency Prevention Act and the Justice Assistance Act.  While the lack of explicit statutory reference to the confidentiality provision in the DCRA is not conclusive of Title I's meaning, *cf. Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018) ("If the text is clear, it needs no repetition in the legislative history; and if the text is ambiguous, silence in the legislative history cannot lend any clarity."), it surely supports the confidentiality provision's plain-text meaning as reaching no further than Title I and other statutes expressly made subject to its terms.

### C.      Purpose

Although "policy concerns cannot trump the best interpretation of the statutory text,"

*Patel v. Garland*, 142 S. Ct. 1614, 1627 (2022), courts "'must avoid an interpretation that

undermines congressional purpose considered as a whole when alternative interpretations

consistent with the legislative purpose are available,'" *United States v. Cordova*, 806 F.3d 1085,

1099 (D.C. Cir. 2015) (quoting *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C.

Cir. 2002)).  As stated, the text of Title I's confidentiality provision is plain and clear, and for

good measure, the divergent purposes of the Crime Control Act and the DCRA confirm that

interpretation.

The Crime Control Act aimed "[t]o assist State and local governments in reducing the

incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement

and criminal justice systems at all levels of government, and for other purposes."  Pub. L. No.

90-351, 82 Stat. 197 (1968).  Its 1979 amendment, which provided the exact language of the

confidentiality provision in dispute, further stated its purpose "to restructure the Federal Law

Enforcement Assistance Administration, to assist State and local governments in improving the

quality of their justice systems, and for other purposes."  Pub. L. No. 96-157, 97 Stat. 1167

(1979).  The text of the confidentiality provision reveals Congress's desire to keep private "any

research or statistical information furnished under this title by any person and identifiable to any

specific private person," meant to restrict access to the personal information of individuals.  *Id.*,

§ 818(a), 93 Stat. at 1213.

Conversely, the DCRA sought to "encourage States to report to the Attorney General

certain information regarding the deaths of individuals in the custody of law enforcement

agencies."  Pub. L. No. 113-242, 128 Stat. 2860 (2014).  The information the DCRA requires to

be reported to the Attorney General includes personal, identifying information about individuals

17

arrested, incarcerated, detained, or in the process of which, including, *inter alia*, their names, gender, race, age, date and time of their death, and the circumstances surrounding their death. *Id.*, § 2(b), 128 Stat. at 2860. *See, e.g.*, 160 Cong. Rec. S6579-80 (daily ed. Dec. 10, 2014) (statement of Sen. Patrick Leahy) ("The Death in Custody Reporting Act, which will provide important transparency to law enforcement efforts and our prison system. The Death in Custody Reporting Act will require that State and Federal law enforcement officials report deaths in their custody, including those that occur during arrest. The Justice Department will then have the opportunity to analyze the data and see what we can learn from it. The American people deserve as much."); 159 Cong. Rec. H8048 (daily ed. Dec. 12, 2013) (statement of Rep. Doug Collins) (stating that the DCRA "will also provide important information to Congress on any need to improve Federal custody procedures."); 155 Cong. Rec. H887 (daily ed. Feb. 3, 2009) (statement of Rep. Mike Honda) ("The data that will be reported under the bill will allow public officials and those in the nonprofit sector to track mortality rates as related to illness, suicide, homicide, drug and alcohol use, and other causes of death."); 154 Cong. Rec. H428 (daily ed. Jan. 23, 2008) (statement of Rep. Nancy Pelosi) (referring to the DCRA: "Its purpose is to provide continued and improved oversight over the conduct of law enforcement officials during arrest and imprisonment of fellow citizens."). That information-gathering spoke to Congress's desire to hold states and federal law enforcement entities accountable, to allow for congressional oversight of those entities' processes and outcomes, and to provide transparency in state and federal entities tasked with holding a person in custody and to draw back the curtain on the oftentimes controversial instances when those in law enforcement custody subsequently die. With this understanding, to interpret Title I's confidentiality provision to exempt disclosure of information gathered pursuant to the DCRA forces a reading of the Crime Control Act that

undermines the accountability, oversight, and transparency Congress intended to establish in the DCRA.

Defendant contends that BJS, a subdivision within DOJ, "collected and published statistics on deaths in custody under its Title I authority for decades prior to the enactment of DCRA in 2000" and so "[t]hose data have therefore historically been protected from unauthorized disclosure by the Title I confidentiality statute."  Def.'s Opp'n at 6.  This contention seemingly posits that the Crime Control Act exhibits a purpose to collect statistics, such as those described in the DCRA.  *See id.* at 7 (citing as support for that authority 34 U.S.C. § 10132(c), which describes BJS's duties to include the compilation and analysis of "national statistics concerning all aspects of criminal justice").  That argument is unpersuasive.  DOJ does not cite any provision of the Crime Control Act that requires certain statistical recordkeeping and reporting, let alone of death-in-custody instances.  Rather, DOJ cites various statistical tables on mortality in jails and prisons that BJS has produced since 1980 as well as BJS's general authority to collect statistics; but DOJ's seemingly voluntary and independent effort to compile that information is quite different from a statutorily mandated reporting requirement with a 10%-funding-reduction penalty for states required to comply but fail to do so.  Second, as plaintiff notes, the information independently collected by BJS is not the exact type that the DCRA requires, so it is inaccurate to say that the death-in-custody information plaintiff seeks is the kind BJS collected on its own—that data would not be fully responsive to plaintiff's FOIA request.

Overall, though not dispositive, the stark difference between the purpose of Title I's confidentiality provision in the Crime Control Act, to assist law enforcement, and the focus on transparency, accountability, and oversight of custodial institutions at the heart of the DCRA

further supports the plain text of the provision and its inability to exempt release of plaintiff's requested data.

### D.       Legislative History

As a final note, the legislative history of Title I of the Crime Control Act further confirms the statute's plain text meaning.  *See Carlson v. Postal Regul. Comm.*, 938 F.3d 337, 350 (D.C. Cir. 2019) ("[W]hen the statutory text is clear, legislative history should not be used to muddy its meaning."); *Milner*, 562 U.S. at 574 ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").  Since its enactment in 1968, Title I has been amended numerous times and in those instances, Congress has not mentioned any applicability of the Title's confidentiality provision to the DCRA.[2]  Additionally, the DCRA in its original form enacted in 2000 made no reference to Title I, Pub. L. 106-297, 114 Stat. 1045 (Oct. 13, 2000) (now codified at 34 U.S.C.A. § 12104), showing that Congress intended this law to stand as its own set of requirements regardless of Title I's requirements and structure.  When the DCRA was reauthorized in 2014, the reference to Title I was merely to establish its enforcement mechanism, which impacted the allocation of Title I funds—Title I played no greater role in the DCRA in 2014 than it did in 2000.[3]  Of course, "silence in the legislative history, 'no matter how clanging,' cannot defeat the better reading of the text and statutory context."  *Encino Motorcars*,

---

[2]       Plaintiff cites eight instances when Title I has been amended in the last four years.  *See* Pl.'s Mem. at 20 n.2.  In addition to those amendments, Title I has also been amended numerous times since its enactment. *See, e.g.*, Pub. L. 114-155, 130 Stat. 389 (May 16, 2016); Pub. L. 110-421, 122 Stat. 4778 (Oct. 15, 2008); Pub. L. 110-416, 122 Stat. 4352 (Oct. 14, 2008); Pub. L. 106-110, 113 Stat. 1497 (Nov. 24, 1999); Pub. L. 102-354, 106 Stat. 3542 (Oct. 27, 1992); Pub. L. 102-520, 106 Stat. 3402 (Oct. 25, 1992); Pub. L. 94-503, 90 Stat. 2407 (Oct. 15, 1976); Pub. L. 93-83, 87 Stat. 197 (Aug. 6, 1973).

[3]       Both parties acknowledge that the DCRA was originally enacted in 2000, Pl.'s Mem. at 1; Def.'s Opp'n at 6, but that statute expired in December 2006, *see* H.R. Rep. No. 113-285, at 2 (2013).  Yet plaintiff's FOIA request includes information collected by DOJ from 2010 to 2014—a period of time when no DCRA authority existed, before the reauthorization of the DCRA in 2014.  *See* Pl.'s Statement of Facts at 1; Def.'s Statement of Facts at 1. Neither party raises that plaintiff requests information during a time when no DCRA reporting requirement was in effect, and therefore, the Court will not address that point either.

138 S. Ct. at 1143 (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 n.13 (1985)).

Nonetheless, in this instance, the legislative history supports the text and statutory context.

## IV.    CONCLUSION

Employing all tools of statutory construction, the clear text of the confidentiality

provision in Title I of the Crime Control Act plainly does not exempt release of information

"furnished under" or gathered pursuant to the Death in Custody Reporting Act.  As such, DOJ

wrongfully withheld information requested by plaintiff under FOIA Exemption 3.  Consequently,

plaintiff's cross-motion for summary judgment is granted and defendant's motion for summary

judgment is denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:   March 29, 2023

_____
BERYL A. HOWELL
District Judge