# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GANNETT SATELLITE INFORMATION NETWORK,

*Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE,

*Defendant*.

Case No. 22-cv-475-BAH

## REPLY IN  SUPPORT OF  PARTIAL MOTION FOR RECONSIDERATION OF PARTIAL SUMMARY JUDGMENT WITH RESPECT TO EXEMPTION 3

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.      RULE 54 PERMITS RECONSIDERATION HERE ........................................... 2

II.     RECONSIDERATION IS WARRANTED IN THIS CASE .................................. 7

       A.    Title I's confidentiality provision applies to all MCI data collected when DCRA was not in effect ......................................................................... 7

       B.    Title I's confidentiality provision applies to all MCI data collected from local governments ........................................................................................ 10

III.    WHETHER AND TO WHAT EXTENT FEDERAL BUREAU OF PRISONS DATA ARE RESPONSIVE TO PLAINTIFF'S FOIA REQUEST IS A QUESTION OF SEARCH ADEQUACY WHICH THE COURT HAS NEVER ADDRESSED AND WHICH THE RECONSIDERATION MOTION DOES NOT PRESENT ...................... 14

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Am. Ctr. for Law & Justice v. DOJ,*
  325 F. Supp. 3d 162 (D.D.C. 2018) ................................................................... 6

*Charles v. Office of Armed Forces Medical Examiner,*
  730 F. Supp. 2d 205 (D.D.C. 2010) ................................................................. 14

*Cobell v. Jewell,*
  802 F.3d 12 (D.C. Cir. 2015) ............................................................................. 3

*Corley v. United States,*
  556 U.S. 303 (2009) ......................................................................................... 11

*DeFraia v. CIA,*
  311 F. Supp. 3d 42 (D.D.C. 2018) ..................................................................... 6

*Greene v. Union Mutual Life Ins. Co. of Am.,*
  764 F.2d 19 (1st Cir. 1985) ................................................................................ 3

*Kucana v. Holder,*
  558 U.S. 233 (2010) ......................................................................................... 10

*Landstar Express Am., Inc. v. Fed. Maritime Comm'n,*
  569 F.3d 493 (D.C. Cir. 2009) ......................................................................... 11

*Muttitt v. Dep't of State,*
  No. 10-cv-202 (BAH), 2013 WL 12318039 (D.D.C. July 30, 2013) ................. 3

*Oglesby v. U.S. Dep't of Army,*
  920 F.2d 57 (D.C. Cir. 1990) ........................................................................... 15

*Project on Gov. Oversight, Inc. v. DHS,*
  --- F. Supp. 3d ---, No. 1:18-cv-2015-RCL, 2023 WL 2139380 (D.D.C. Feb. 21, 2023) .......... 6

*Rapanos v. United States*,

    547 U.S. 715 (2006) ........................................................................................ 11

*United States v. Thorne*,

    548 F. Supp. 3d 70 (D.D.C. 2021) ................................................................... 3

*Valencia-Lucena v. U.S. Coast Guard*,

    180 F.3d 321 (D.C. Cir. 1999) ....................................................................... 15

*W. Minn. Mun. Power Agency v. FERC*,

    806 F.3d 588 (D.C. Cir. 2015) ....................................................................... 11


**Statutes**

5 U.S.C. § 552 ..................................................................................................... 14

18 U.S.C. § 4001 note .......................................................................................... 15

34 U.S.C. § 10132 ................................................................................................. 9

34 U.S.C. § 60105 ............................................................................................... 13


**Other Authorities**

Report of the Attorney General  to Congress Pursuant to the Death in Custody Reporting Act .. 12

Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074: Department

    of Justice Implementation of the Death in Custody Reporting Act of 2013 ............................ 12

Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting

    Program ........................................................................................................ 14

Bureau of Justice Statistics, MCI Program (Formerly Deaths in Custody Reporting Program

    (DCRP)) ....................................................................................................... 14

## INTRODUCTION

The Court previously held that information submitted to the Bureau of Justice Statistics' ("BJS") Mortality in Correctional Institutions program ("MCI") under the statutory reporting mandate of the Death in Custody Reporting Act of 2013 ("DCRA 2013") was "furnished under" DCRA. ECF 21 at 21. As a result, the Court held, the confidentiality provision of Title I of the Omnibus Crime Control and Safe Streets Act of 1968 ("Crime Control Act") did not apply to shield such information from disclosure under the Freedom of Information Act's ("FOIA") Exemption 3. *Id.*

The Court's holding was expressly limited, however: Plaintiff's FOIA request included "a period of time when no DCRA authority existed," but "[n]either party," in the Court's judgment, had sufficiently raised the issue, and so the Court "[did] not address that point either." *Id.* at 20 n.3. Defendant seeks partial reconsideration to fill that acknowledged gap in the Court's holding, and to resolve the analogous issue presented by local government records that were not submitted under DCRA's reporting requirement not because DCRA was not in effect at the time they were submitted to BJS, but rather because DCRA's reporting mandate never extended to local governments. Although Defendant maintains its respectful disagreement with the Court's holding as to records that were required to be submitted under DCRA, nothing in its argument on reconsideration is inconsistent with the Court's prior holding or its reasoning. Defendant merely seeks to answer the remaining questions left open on Exemption 3 in this case. Federal Rule of Civil Procedure 54 permits reconsideration in the interests of justice, and reconsideration is warranted here to protect statistical information voluntarily submitted under Title I that Congress never intended to be made public.

Plaintiff opposes on two fronts. First, it argues that Rule 54 does not permit reconsideration in the circumstances of this case, because Defendant's arguments could have been raised before,

and allegedly contradict its previous position, and because Plaintiff claims that Defendant has affirmatively waived its right to seek reconsideration. Plaintiff's position misstates Rule 54's requirements, which do not categorically bar arguments that could have been raised before, and misunderstands Defendant's arguments, which are fully consistent with its previous briefing. Nor has Defendant waived its right to seek reconsideration.

Second, Plaintiff opposes reconsideration on the merits. It argues that this Court's prior holding forecloses the argument that Title I's confidentiality provision applies to any of the information Plaintiff seeks, even if it was not required to be submitted under DCRA. But that argument contradicts the Court's express limitations on its holding. Plaintiff also argues that some of the material on which Defendant seeks reconsideration—namely information submitted by local governments—was in fact submitted on behalf of states, and thus submitted pursuant to DCRA. That argument, however, is entirely speculative.

Finally, Plaintiff argues that Defendant has attempted surreptitiously to redefine the scope of its request in two footnotes in the reconsideration motion concerning federal data in the MCI collection. Plaintiff is mistaken: Whether federal material is responsive to Plaintiff's request is a matter of search adequacy, which the Court has yet to address, and on which Defendant consequently does not seek reconsideration.

## ARGUMENT

### I.   RULE 54 PERMITS RECONSIDERATION HERE

Plaintiff does not dispute that reconsideration under Rule 54 is possible here and agrees that the ultimate question on reconsideration is whether "justice requires" it. ECF 29 at 10. Plaintiff argues that reconsideration is inappropriate under that standard for two primary reasons: First, because Defendant failed to raise its arguments on reconsideration in the first round of summary

judgment briefing; and second, because Plaintiff understands Defendant to have explicitly waived its right to seek reconsideration. Neither reason is persuasive.

Plaintiff's first argument turns on what it contends to be a "well-established" rule that reconsideration under Rule 54 "cannot be used as an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier." *Id.* (quoting *Muttitt v. Dep't of State*, No 10-cv-202, 2013 WL 12318039, at *2 (D.D.C. July 30, 2013). But Plaintiff ignores the D.C. Circuit's clarification, issued after the opinion Plaintiff primarily relies upon, that Rule 54 contains no "strict prohibition" on "raising new arguments post-judgment," and instead follows an "approach to the interlocutory presentation of new arguments as the case evolves that can be more flexible, reflecting the 'inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'" *Cobell v. Jewell*, 802 F.3d 12, 25-26 (D.C. Cir. 2015) (quoting *Greene v. Union Mutual Life Ins. Co. of Am.*, 764 F.2d 19, 22 (1st Cir. 1985) (Breyer, J.)); *see also United States v. Thorne*, 548 F. Supp. 3d 70, 92 (D.D.C. 2021) ("[M]otions for reconsideration of interlocutory orders may be granted at any time before the entry of final judgment 'as justice requires.'" (quoting *Cobell*, 802 F.3d at 25)).

Plaintiff suggests that Defendant's particular reconsideration arguments in this case should still be disregarded, because they "would have undermined an argument it made in the first instance," and thus "may evidence a strategic decision the party should in fairness have to live with." ECF 29, at 10. Defendant does not dispute the general principle that such strategic maneuvering may be relevant to whether justice requires granting reconsideration, but that principle has no relevance here, because Defendant's reconsideration arguments are fully consistent with its initial arguments.

The particular inconsistency that Plaintiff alleges to exist is that Defendant initially "argued that the death-in-custody data was 'furnished under' Title I at all times relevant to this case," but now "asserts the opposite: that the data was furnished under Title I when and only when DCRA was not in effect." *Id.* There is no contradiction in Defendant's position, however: Defendant's earlier briefs advanced the position that all MCI data were "furnished under Title I" at all times, even when some of that data were also subject to DCRA's statutory reporting mandate. *See generally* ECF 12-1 at 14-17; ECF 17 at 6-12. The Court's opinion rejected that position—but only as to "information 'furnished under' or gathered pursuant to the Death in Custody Reporting Act," ECF 21 at 21, expressly leaving to one side the issue of information furnished "during a time when no DCRA reporting requirement was in effect," *id.* at 20 n.3. Defendant thus now argues on reconsideration that information that was not subject to DCRA's statutory reporting mandate— either because DCRA was not in effect at the time, or because DCRA never required local governments to report—was necessarily "furnished under" Title I on any reasonable understanding of that term, including the Court's. Plaintiff faults Defendant for not making "both arguments in the alternative" in its earlier briefing. ECF 29 at 12. But the arguments are not alternatives. Defendant has made one argument consistently: "whether collected in connection with DCRA or prior to the passage of DCRA, the deaths-in-custody information has always been 'furnished under' Title I because BJS itself is an entity established by *and* with the authority to collect such information under Title I of the Crime Control Act, independent of DCRA." ECF 17 at 11. Defendant certainly accepts fault for failing to more clearly and explicitly raise that argument specifically as to information that was not subject to DCRA's reporting mandate, *see* ECF 27 at 17, but the argument as developed on reconsideration is fully consistent with Defendant's position all along.

Plaintiff's second argument rests on the parties' joint status report of July 28, 2023, in which Plaintiff claims that Defendant, "[a]fter stating in the four prior filings that it was deciding whether to seek reconsideration, . . . dropped that language and instead 'agree[d]' to process all the responsive records by October 26, 2023." ECF No. 29 at 12. As Plaintiff notes, the four previous joint status reports filed by the parties after the Court issued its partial summary judgment decision referenced the fact that Defendant was continuing to evaluate its options in light of the Court's decision, including seeking reconsideration. ECF Nos. 22, 23, 24, 25. But the parties were also at the same time conferring about a schedule for processing potentially responsive records, *id*., and the July 14, 2023 joint status report indicated that Defendant had begun processing the records while still continuing to evaluate its options, "including to seek reconsideration." ECF No. 25. The next joint status report, filed two weeks later on July 28, referenced that "previous joint status report," and explained that as discussed in it, "the parties began conferring about the processing of records. The parties agree that Defendant will complete processing and production of responsive records by October 26, 2023 (i.e., 90 days). While the parties have been unable to reach an agreement on the scope of exemptions, the parties agree to address those disputes through cross-motions for summary judgment after Defendant completes production." ECF 26 at 1.

Thus, the context of the joint status reports shows that Defendant was processing the records, agreeing to complete processing and production by October 26, while still considering whether to seek reconsideration of the Court's decision, not instead of doing so. Defendant did not expressly give up the right to seek reconsideration in the July 28 report, and the full context of the reports weighs against finding an implicit waiver in that report. When Defendant filed its motion for reconsideration, it acknowledged that it would need a stay of its obligation to produce any records at issue in the reconsideration motion by October 26 while the Court considered its motion.

In other words, it could no longer pursue both paths simultaneously (seeking reconsideration and processing the records) because of the impending October 26 deadline.

Plaintiff further argues that Defendant "agree[d] at the outset of the case that the Court's Exemption 3 decision would control," ECF 29 at 13, but the agreement Plaintiff refers to was merely the parties' agreement to proceed with partial summary judgment briefing limited to Exemption 3 without thereby waiving "the opportunity subsequently to rely on other exemptions as applicable." ECF 10 at 2. Nothing in that proposal suggests any intention on Defendant's part to waive its right to seek reconsideration under Rule 54 if necessary (or for that matter to waive any of its other rights under the federal rules).

The cases Plaintiff relies on do not change the analysis. One case concerned an express agreement in a joint status report limiting the scope of a request to certain specified documents. *DeFraia v. CIA*, 311 F. Supp. 3d 42, 47 (D.D.C. 2018). No such agreement exists here. Others concerned waivers of challenges to the adequacy of agencies' searches in status reports that noted ongoing disputes between the parties about the propriety of withholdings, but were silent on any disputes about the adequacy of the agency's search. *See Am. Ctr. for Law & Justice v. DOJ*, 325 F. Supp. 3d 162, 169 (D.D.C. 2018); *Project on Gov. Oversight, Inc. v. DHS*, --- F. Supp. 3d ---, No. 1:18-cv-2015-RCL, 2023 WL 2139380, at *5 (D.D.C. Feb. 21, 2023).[1] Here, the series of joint status reports suggests that Defendant's consideration of its options, including seeking reconsideration, was happening concurrently with, and not instead of, its processing of the records,

---

[1] If anything, those cases suggest that the strongest candidate for waiver in the July 28 joint status report is of Plaintiff's right to challenge the adequacy of Defendant's search—the report, after all, notes the existence of ongoing disputes "on the scope of exemptions," but like the reports in the cases Plaintiff relies on, is silent about any disputes about search adequacy. Nevertheless, Defendant does not understand the report to contain an agreement between the parties that no further dispute exists as to search adequacy, and will not attempt to hold Plaintiff to such a waiver.

and that it did not, therefore, implicitly waive its right to seek reconsideration by not explicitly reserving it while agreeing to a production deadline.

There is thus nothing on the face of Defendant's motion that would make reconsideration under Rule 54 contrary to the interests of justice. Rule 54 contains no absolute barrier to raising or refining arguments that were previously available, and Defendant has engaged in no gamesmanship or strategic maneuvering that would warrant denying the motion. Nor has Defendant waived its rights under Rule 54. The Court should thus determine on the merits whether reconsideration here is in the interests of justice. For the reasons set out in Defendant's reconsideration motion and below, it is.

## II.     RECONSIDERATION IS WARRANTED IN THIS CASE

### A.     Title I's confidentiality provision applies to all MCI data collected when DCRA was not in effect

The core of Plaintiff's opposition to reconsideration is its contention that the Court has already held "that Title I does not apply to the data Plaintiff requested." ECF 29 at 14. Thus, Plaintiff claims, the Court has already determined that "the data was not furnished under Title I, whether or not it was furnished under DCRA." *Id.* at 15. Plaintiff does not make any direct argument that Title I (along with its confidentiality provision) is inapplicable to MCI data that were not subject to DCRA's statutory mandate. Instead, Plaintiff relies exclusively on the supposed previous holding of the Court. But the Court could not have been clearer that there was no such holding: "Neither party raises that plaintiff requests information during a time when no DCRA reporting requirement was in effect, and therefore, *the Court will not address that point either*." ECF 21 at 20 n.3 (emphasis added).

Undeterred, Plaintiff insists that the Court "implicitly" ruled on what the Court explicitly declined even to address. ECF 29 at 14. Plaintiff's argument, however, is circular. As Plaintiff

notes, the Court observed that the "key question" in this case is "whether the text of the Crime Control Act's confidentiality provision exempts the disclosure of the requested information under FOIA Exemption 3." *Id.* (quoting ECF 21 at 1-2). Plaintiff thus posits that the Court's opinion must have reached beyond information required to be submitted under DCRA, because "[o]therwise whatever DCRA requires would not matter" to that "key question." *Id.* In other words, the Court's opinion must have addressed MCI data that were not submitted under DCRA, because otherwise, it would not have fully resolved the "key question" in this case—by not addressing MCI data that were not submitted under DCRA. But the Court expressly limited its holding in just that way.

Plaintiff's attempt to locate "factors specific to Title I" in the Court's holding fares no better. ECF 29 at 15. Plaintiff points to the Court's observation that Title I does not "require[] certain statistical recordkeeping and reporting, let alone of death-in-custody instances." ECF 29 at 15 (quoting ECF 21 at 19). But as the Court noted in the same paragraph, "DOJ's seemingly voluntary and independent effort to compile [death-in-custody] information is quite different from a statutorily mandated reporting requirement with a 10% funding-reduction penalty for states required to comply but fail to do so." ECF 21 at 19. Title I plainly does not *mandate* the collection of death-in-custody information, and the Court held that when DCRA does mandate such collection, the resulting data are "furnished under" DCRA.[2] *Id.* at 21 ("the clear text of the confidentiality provision in Title I of the Crime Control Act plainly does not exempt release of information 'furnished under' or gathered pursuant to" DCRA). That holding, however, does not resolve the status of the information subject to the present reconsideration motion, which was *not*

---

[2] Defendant continues to respectfully disagree with that holding, but does not ask the Court to reconsider it in the present motion.

collected under any statutory mandate and was instead collected on a voluntary basis—an issue "quite different" from the one the Court considered. *Id.* at 19.

BJS undoubtedly has authority to collect data about deaths in custody on a voluntary basis under Title I of the Crime Control Act, which authorizes it to "collect and analyze statistical information, concerning the operations of the criminal justice system at the Federal, State, tribal, and local levels," and to "compile, collate, analyze, publish, and disseminate uniform national statistics concerning all aspects of criminal justice." 34 U.S.C. § 10132(c)(4), (7). Information about deaths in custody is unquestionably information "concerning the operations of the criminal justice system," and Plaintiff does not argue otherwise. Nor does Plaintiff suggest any other possible statutory basis, beyond Title I, for BJS's collection of death-in-custody information that was not mandated by DCRA. There is none: Congress created BJS in Title I, and all of BJS's authority to conduct voluntary data collections comes from Title I. *See generally* 34 U.S.C. §§ 10132-34. Thus, any death-in-custody information that BJS collected when DCRA was not in effect was necessarily collected under its Title I authority.

Plaintiff asserts that "DCRA's temporary lapse is irrelevant," but—with good reason— does not go so far as to directly argue that MCI data collected when DCRA was not in effect were nevertheless somehow collected under DCRA. ECF 29 at 15. Instead, Plaintiff merely claims that "it is illogical" to think that BJS collected deaths-in-custody information under DCRA when that statutory mandate was in place, but that it continued to collect such information on a voluntary basis when DCRA's mandate had lapsed. *Id.* at 16. But there is nothing illogical about it. Plaintiff's own brief provides the explanation: BJS "simply continued collecting the data because it found it valuable." *Id.* As was its practice for decades before the enactment of DCRA, BJS did so using the only authority available to it, namely its Title I authority to conduct voluntary data collections; as

a result, Title I's confidentiality provision applies. And BJS's changes to the MCI data collection after 2006 confirm that it was operating under its own independent authority; contrary to Plaintiff's assertion, changes such as moving from the quarterly reporting required by DCRA 2000 to an annual reporting cycle, *see* ECF 27 at 9, were neither "trivial" nor consistent with DCRA 2000's requirements, ECF 29 at 16.

Finally, Plaintiff's opposition is silent on the issue of when DCRA 2013 took effect. As the reconsideration motion demonstrates, and as Plaintiff does not dispute, DCRA 2013 did not take effect until October 1, 2015. *See* ECF 27 at 11. Thus, all responsive records from the 2010 start date specified in Plaintiff's FOIA request to that date were submitted voluntarily under Title I and are subject to Title I's confidentiality provision.

### B.     Title I's confidentiality provision applies to all MCI data collected from local governments

As set forth in Defendant's opening brief, both versions of DCRA required states, but not local governments, to submit data on deaths in local jails. Thus, any information submitted to BJS's MCI program *by local governments* that is responsive to Plaintiff's FOIA request (*i.e.*, from 2010 through 2019 when BJS's MCI collection ended) was not submitted pursuant to DCRA 2013 (or DCRA 2000, which had lapsed by then) and was instead necessarily submitted on a voluntary basis under BJS's Title I authority—and is thus subject to Title I's confidentiality provision. ECF 27 at 17-19.

In opposition, Plaintiff speculates that local governments submitted information to BJS's MCI program on behalf of their states—i.e., that the states "delegat[ed] their own reporting requirements to their subordinate local governments." ECF 29 at 17. Plaintiff cites nothing in support of this hypothesis and concedes that it is true that "DCRA only requires reporting by states." *Id*. Thus, even if DCRA 2013's definitional provision leaves open the *possibility* that a

state could delegate its reporting obligation to local governments, Plaintiff's argument would still fail, because a local government could be subject to a state's delegated reporting requirement only if the state *actually* delegated that requirement. Otherwise, a local government's decision to report—or not report—death in custody information to MCI would remain voluntary, and thus subject to Title I rather than DCRA. Plaintiff does not identify any such delegations.

Plaintiff's remaining arguments amount to policy disputes with Congress's decision to impose DCRA's reporting requirement on states rather than on local governments. Plaintiff claims that "[s]uch a statute would be absurd," ECF 29 at 18, but does not even attempt to engage with the extraordinarily "high threshold" necessary for courts to "rewrite [a] statute" under the absurdity doctrine, *W. Minn. Mun. Power Agency v. FERC*, 806 F.3d 588, 596 (D.C. Cir. 2015). To invoke that doctrine, a party must "demonstrate that the plain meaning of the statutory text "defies rationality" and "would render [the] statute 'nonsensical and superfluous.'" *Landstar Express Am., Inc. v. Fed. Maritime Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). Short of such a drastic failure of statutory draftsmanship, "[a]s the Supreme Court has repeatedly explained, however, neither courts nor federal agencies can rewrite a statute's plain text to correspond to its supposed purposes." *Id.* Indeed, the Supreme Court has emphasized that "the textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." *Kucana v. Holder*, 558 U.S. 233, 252-53 (2010) (quoting *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (internal quotation marks omitted)).

The deficiencies Plaintiff identifies in DCRA's state-only reporting mandate are real (although much exaggerated in Plaintiff's telling) but far from sufficient to render the statute "absurd" in the relevant sense. Plaintiff notes, for example, that relying on states to "serve as a middleman" for local data could result in less "'oversight, transparency, and accountability'" for

local law enforcement. ECF 29 at 18 (quoting ECF 21 at 14). DOJ has been making much the same point to Congress since at least 2016: "BJS's experience with its Death in Custody Reporting Program . . . has shown that where it collects the information directly from the agencies that have it, from prisons and jails, it can achieve a reasonably comprehensive and reliable data collection. But where BJS must go through states to collect information that the states do not independently possess . . . the data quality is likely to suffer without significant proactive oversight by the Department." Report of the Attorney General to Congress Pursuant to The Death in Custody Reporting Act, at 8 (Dec. 16, 2016) ("2016 Report").[3]

Plaintiff also notes the possibility of "needless duplication of submissions of local government data." ECF 29 at 18. But that is precisely why "the MCI program was discontinued": "to prevent duplication with state reporting as required by DCRA of 2013." Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074: Department of Justice Implementation of the Death in Custody Reporting Act of 2013, at 3-4 ("AG Report").[4] The separate DCRA data collection, under the Bureau of Justice Assistance ("BJA"), began collecting data on October 1, 2019, and BJS terminated MCI three months later, at the end of calendar year 2019. *Id.* Plaintiff asserts that DOJ "does not claim to have received such duplicate data," and attempts to invoke the presumption of regularity to conclude that DOJ must therefore have treated data submissions from local governments to MCI as having satisfied the respective state's DCRA reporting requirement. ECF 29 at 18. In fact, however, DOJ *did* receive duplicate data on deaths in local facilities under both MCI and BJA's DCRA data collection, during the three-month period when those two

---

[3] Available at https://www.justice.gov/archives/page/file/918846/download (last accessed October 24, 2023).

[4] Available at https://bja.ojp.gov/doc/DOJ-Implementation-of-DCRA-of-2013.pdf (last accessed October 24, 2023).

separate collections overlapped. *See* AG Report at 8. Indeed, those three months of overlap allowed BJS to quantitatively assess the degree of underreporting in BJA's DCRA collection—from states alone—relative to MCI, which collected data from state and local authorities. *See id.* That overlap, and the ensuing partial duplication of data, helped DOJ more precisely to pinpoint areas for potential improvement in BJA's DCRA data collection. *Compare* 2016 Report at 8 (noting general concerns about data quality) *with* AG Report at 8-13 (noting both qualitative and quantitative evidence of underreporting in BJA's DCRA data collection, and listing specific proposed legislative fixes).[5]

In short, Plaintiff is surely correct that DCRA 2013's reporting requirement and its enforcement mechanism are imperfect as a matter of policy, and DOJ has suggested several possible legislative improvements to Congress. *See* AG Report at 12-13. But none of that is to say that DCRA 2013's design is so wholly irrational that this Court should have license to simply ignore it. There are obvious reasons—for example, concerns about administrability, or federalism, or the limits of its powers under the Spending Clause—why Congress may have preferred to limit DCRA's reporting mandate to the states. Whatever the reasons for that choice, however, it was Congress's to make. DCRA 2013's reporting requirement applies only to states, and BJS collected

---

[5] Plaintiff's concerns about duplicate data and the risk of loss of grant funding are also unpersuasive for the period between DCRA 2013's effective date of October 1, 2015, and the start of BJA's DCRA data collection on October 1, 2019. DCRA 2013 requires states to submit data "pursuant to guidelines established by the Attorney General," 34 U.S.C. § 60105(a), and those guidelines required states to report data to BJA—not BJS—starting in the last quarter of 2019, *see* AG Report at 5. Moreover, Congress expressly left the imposition of any penalty under DCRA to "the discretion of the Attorney General," 34 U.S.C. § 60105(c)(2), so Plaintiff's concern about the arbitrary imposition of financial penalties on states for failing to submit redundant data during the transition from BJS's MCI collection to BJA's DCRA collection is, at best, overblown.

MCI data from local governments solely on a voluntary basis under its Title I authority—and subject to Title I's confidentiality provision.

### III. WHETHER AND TO WHAT EXTENT FEDERAL BUREAU OF PRISONS DATA ARE RESPONSIVE TO PLAINTIFF'S FOIA REQUEST IS A QUESTION OF SEARCH ADEQUACY WHICH THE COURT HAS NEVER ADDRESSED AND WHICH THE RECONSIDERATION MOTION DOES NOT PRESENT

In the course of setting out the factual details relevant to the motion for reconsideration, Defendant included two observations, in footnotes, about the scope of MCI's data collection with respect to federal data. First, Defendant noted that, although responsibility for collecting state data under DCRA 2013 was transferred to BJA, BJS retained responsibility for collecting federal data. ECF 27 at 11 n.10. It does so through the "Federal Law Enforcement Agency Deaths in Custody Reporting Program" ("FDCRP"), which debuted in fiscal year 2016. *See* BJS, FDCRP.[6] FDCRP is not, and never was, part of MCI. *See id.*; *see also* BJS, MCI.[7] Second, Defendant noted that "[d]ata collected from federal law enforcement agencies is not responsive to the FOIA request because it was not collected under the MCI program." ECF 27 at 15 n.11.

Plaintiff takes those two footnotes as an attempt to surreptitiously, and "dramatically[,] shrink the scope of the request." ECF 29 at 19. Plaintiff is mistaken: Defendant is not seeking reconsideration of any holding about the scope of Plaintiff's FOIA request, because there has been no such holding.

"The FOIA establishes that agency determinations regarding document responsiveness are part of the search process." *Charles v. Office of Armed Forces Medical Examiner*, 730 F. Supp. 2d

---

[6] Available at https://bjs.ojp.gov/data-collection/federal-law-enforcement-agency-deaths-custody-reporting-program-fdcrp (last accessed October 24, 2023).

[7] Available at https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program (last accessed October 24, 2023).

205, 213 (D.D.C. 2010) (citing 5 U.S.C. § 552(a)(3)(D)). As a result, the Court "reviews disputes regarding the responsiveness of a document under its authority to evaluate the reasonableness and adequacy of the agency's search." *Id.* (citing *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999); *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 67 n.13 (D.C. Cir. 1990)).

Defendant argued in its initial summary judgment motion that its search was adequate, *see* ECF 12-1 at 11-12, but Plaintiff itself expressly declined to argue the matter, instead "reserv[ing] its right to challenge the adequacy of Defendant's search" at a later date, ECF 13-1 at 7, and disputing that "the adequacy of Defendant's search is material to the instant motions," ECF 13-4 at 1. The Court's opinion did not address the adequacy of Defendant's search, nor did it hold that federal Bureau of Prisons ("BOP") data is responsive to Plaintiff's FOIA request by merely summarizing the FOIA request in the first line of its opinion. *See* ECF 29 at 20. There is thus no holding about whether and to what extent BOP records are responsive on which Defendant could have sought reconsideration. Nor does any argument in the reconsideration motion turn on whether the data that BOP undisputedly was required to submit to BJS under DCRA 2013 after October 1, 2015, *see* 18 U.S.C. § 4001 note, were "submitted to BJS under the [MCI] program," as Plaintiff's FOIA request specifies, ECF 21 at 5, or were instead submitted under the FDCRP program and are thus non-responsive. There is no reason to resolve that isolated and irrelevant question of search adequacy now, rather than resolving all questions of search adequacy together on a full summary judgment record after Defendant asserts all remaining applicable FOIA exemptions.

## CONCLUSION

For the foregoing reasons, the Court should grant reconsideration, and enter summary judgment in favor of Defendant on its claim that responsive information submitted to BJS between 2010 and October 1, 2015, and responsive information submitted to BJS by local agencies, is protected from disclosure by FOIA's Exemption 3.

15

Dated: October 24, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cormac A. Early*
CORMAC A. EARLY
D.C. Bar No. 1033835
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 616-7420
cormac.a.early@usdoj.gov

*Counsel for Defendants*