**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GANNETT SATELLITE INFORMATION NETWORK,

         *Plaintiff*,

   v.

U.S. DEPARTMENT OF JUSTICE,

         *Defendant*.

Case No. 22-cv-475-BAH

**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
SECOND MOTION FOR SUMMARY JUDGMENT AND FOR PARTIAL
RECONSIDERATION</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.     THE DEATH IN CUSTODY REPORTING ACT AND THE MORTALITY IN
CORRECTIONAL INSTITUTIONS PROGRAM ........................................... 2

II.    PLAINTIFF'S FREEDOM OF INFORMATION ACT REQUEST .................. 7

III.   THIS CASE ...................................................................................................... 8

IV.   THE "K-ANONYMITY" METHOD FOR MAKING REDACTIONS PURSUANT
TO EXEMPTIONS 6 AND 7(C) .................................................................... 10

LEGAL STANDARDS ................................................................................................. 14

ARGUMENT ................................................................................................................ 7

I.     DEFENDANT CONDUCTED AN ADEQUATE SEARCH FOR DOCUMENTS ........ 15

II.    DEFENDANT PROPERLY INVOKED FOIA EXEMPTIONS 6 AND 7(C) ............... 17

     A.    Disclosure of the records Plaintiff seeks would constitute a clearly unwarranted
invastion of personal privacy ................................................................. 19

     B.    Any public interest in disclosure does not outweigh the privacy interests at
stake ......................................................................................................... 21

     C.    BJS appropriately redacted the records ................................................ 23

III.   DEFENDANT PROPERLY INVOKED EXEMPTION 3 AS TO RECORDS THAT
WERE NOT SUBMITTED UNDER DCRA, AND RECONSIDERATION IS
WARRANTED TO THE EXTENT THAT THE COURT'S PREVIOUS
EXEMPTION 3 HOLDING APPLIES TO SUCH RECORDS ........................ 28

     A.    The law of the case doctrine does not bar reconsideration here ........... 28

     B.    Rule 54 permits reconsideration of interlocutory orders "as justice requires" ...... 29

i

C.      Reconsideration is warranted as to state data submitted when DCRA was not in
        effect ....................................................................................................................31

D.      Reconsideration is warranted as to local data that was never required to be
        submitted under DCRA............................................................................................32

E.      Reconsideration is warranted to avoid substantial harm to BJS ............................33

CONCLUSION.................................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. DOJ,*
 655 F.3d 1 (D.C. Cir. 2011) .................................................................................. 18

*ACLU v. DOJ,*
 750 F.3d 927 (D.C. Cir. 2014) .............................................................................. 20

*Agostini v. Felton,*
 521 U.S. 203 (1997) ........................................................................................ 10, 28

*Alaska v. FERC,*
 980 F.3d 761 (D.C. Cir. 1992) .............................................................................. 29

*Amiri v. Nat'l Sci. Found.,*
 664 F. Supp. 3d 1 (D.D.C. 2021) .......................................................................... 28

*August v. FBI,*
 328 F.3d 697 (D.C. Cir. 2003) .............................................................................. 14

*Bast v. DOJ,*
 665 F.2d 1251 (D.C. Cir. 1981) ............................................................................ 19

*Beck v. DOJ,*
 997 F.2d 1489 (D.C. Cir. 1993) ...................................................................... 18, 19

*Brayton v. Office of U.S. Trade Rep.,*
 641 F.3d 521 (D.C. Cir. 2011) .............................................................................. 15

*Campbell v. DOJ,*
 164 F.3d 20 (D.C. Cir. 1998) ................................................................................ 20

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*,

    630 F.3d 217 (D.C. Cir. 2011) ................................................................... 29

*Carter, Fullerton & Hayes LLC v. FTC*,

    520 F. Supp. 2d 134 (D.D.C. 2007) ........................................................... 23

*Carter v. U.S. Dep't of Commerce*,

    830 F.3d 388 (D.C. Cir. 1987) ................................................................... 25

*Chacoty v. Pompeo*,

    392 F. Supp. 3d 1 (D.D.C. 2019) ............................................................... 33

*Chien Fan Chu v. Brownell*,

    247 F.2d 790 (D.C. Cir. 1957) ................................................................... 33

*CIA v. Sims*,

    471 U.S. 159 (1985) ................................................................................... 14

*Citizens for Resp. & Ethics in Washington v. DOJ*,

    746 F.3d 1082 (D.C. Cir. 2014) ................................................................. 14

*Cobell v. Jewell*,

    802 F.3d 12 (D.C. Cir. 2015) ..................................................................... 30

*Cobell v. Norton*,

    224 F.R.D. 266 (D.D.C. 2004) ............................................................. 30, 31

*Cobell v. Norton*,

    355 F. Supp. 2d 531 (D.D.C. 2005) ........................................................... 30

*Consumers' Checkbook Ctr. for Study of Servs. v. HHS*,

    554 F.3d 1046 (D.C. Cir. 2009) ................................................................. 25

*Dep't of Air Force v. Rose*,

    435 U.S. 352 (1976)..................................................................24, 27, 28

*Dep't of State v. Wash. Post. Co.*,

    456 U.S. 595 (1982)...........................................................................19

*DOJ v. FLRA*,

    964 F.2d 26 (D.C. Cir. 1992).............................................................22

*DOJ v. Reporters Comm. for Freedom of the Press*,

    489 U.S. 749 (1989)...........................................................17, 19, 22, 24

*Duffin v. Carlson*,

    636 F.2d 709 (D.C. Cir. 2009)...........................................................17

*Elec. Priv. Info. Ctr. v. DOJ*,

    18 F.4th 712 (D.C. Cir. 2021)............................................................18

*Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*,

    772 F. Supp. 2d 218 (D.D.C. 2011)..............................................30, 31

*First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*,

    477 F.3d 616 (8th Cir. 2007).............................................................29

*FBI v. Abramson*,

    456 U.S. 615 (1982).....................................................................17, 18

*Gilliam v. DOJ*,

    128 F. Supp. 3d 134 (D.D.C. 2015)...................................................15

*Greene v. Union Mutual Life Ins. Co. of Am.*,

    764 F.2d 19 (1st Cir. 1985)................................................................29

*Holt v. DOJ,*

    734 F. Supp. 2d 28 (D.D.C. 2010) ........................................................................ 18

*In Defense of Animals v. NIH,*

    543 F. Supp. 2d 70 (D.D.C. 2008) ........................................................................ 19

*Institute for Energy Research v. FERC,*

    2023 WL 6121878 (D.D.C. Sept. 19, 2023) .......................................................... 27

*John Doe Agency v. John Doe Corp.,*

    493 U.S. 146 (1989) .............................................................................................. 14

*Judicial Watch. v. U.S. Dep't of Army,*

    466 F. Supp. 2d 112 (D.D.C. 2006) ...................................................................... 30

*Judicial Watch. v. DOJ,*

    365 F.3d 1108 (D.C. Cir. 2004) ............................................................................ 19

*Keepseagle v. Perdue,*

    856 F.3d 1039 (D.C. Cir. 2017) ............................................................................ 29

*Landano v. U.S. Dep't of Justice,*

    956 F.2d 422 (3d Cir. 1992) ................................................................................. 21

*Larson v. U.S. Dep't of State,*

    565 F.3d 857 (D.C. Cir. 2009) .............................................................................. 15

*LaShawn A. v. Barry,*

    87 F.3d 1389 (D.C. Cir. 1996) .............................................................................. 28

*Liberty Mutual Ins. Co. v. Wetzel,*

    424 U.S. 737 (1976) .............................................................................................. 29

*McMillan v. BOP*,

    2004 WL 4953170 (D.D.C. July 23, 2004) ................................................ 21

*Mead Data Cent. v. U.S. Dep't of Air Force*,

    566 F.3d 242 (D.C. Cir. 1977) ................................................................... 23

*Mingo v. DOJ*,

    793 F. Supp. 2d 447 (D.D.C. 2011) ........................................................... 18

*Mobley v. CIA*,

    924 F. Supp. 2d 24 (D.D.C. 2013) ............................................................. 15

*Moore v. Hartman*,

    332 F. Supp. 2d 252 (D.D.C. 2004) ........................................................... 30

*Morley v. CIA*,

    508 F.3d 1108 (D.C. Cir. 2007) ................................................................. 15

*Nat'l Archives & Records Admin v. Favish*,

    541 U.S. 157 (2004) ............................................................................. 20, 21

*National Association of Retired Federal Employees v. Horner*,

    879 F.2d 873 (D.C. Cir. 1989) ............................................... 18, 21, 22, 23, 24

*Nat'l Whistleblower Ctr. v. HHS*,

    849 F. Supp. 2d 13 (D.D.C. 2012) ............................................................. 24

*Oglesby v. U.S. Dep't of Army*,

    920 F.2d 57 (D.C. Cir. 1990) ................................................................... 15

*Paintinf & Drywall Work Preservation Fund v. HUD*,

    936 F.2d 1300 (D.C. Cir. 1991) ................................................................. 19

*PETA v. NIH,*

    745 F.3d 535 (D.C. Cir. 2014) ............................................................... 19

*Pinson v. DOJ,*

    236 F. Supp. 3d 338 (D.D.C. 2017) ........................................................ 18

*Pub. Employees for Envt'l Resp. v. U.S. Section, Int'l Boundary & Water Comm'n,*

    740 F.3d 195 (D.C. Cir. 2014) ............................................................... 17

*Reed v NLRB,*

    927 F.2d 1249 (D.C. Cir. 1991) ............................................................. 15

*Rep. Comm. for Freedom of the Press v. FBI,*

    3 F.4th 350 (D.C. Cir. 2021) .................................................................. 28

*Rimmer v. Holder,*

    700 F.3d 246 (6th Cir. 2012) ........................................................... 21, 28

*Roseberry-Andrews v. DHS,*

    299 F. Supp. 3d 9 (D.D.C. 2018) ........................................................... 19

*Rosenberg v. U.S. Dep't of Defense,*

    442 F. Supp. 3d 240 (D.D.C. 2020) ........................................................ 30

*SafeCard Servs., Inc. v. SEC,*

    926 F.2d 1197 (D.C. Cir. 1991) ............................................................. 17

*Schrecker v. DOJ,*

    349 F.3d 657 (D.C. Cir. 2003) ............................................................... 21

*Shaw v. FBI,*

    749 F.2d 58 (D.C. Cir. 1984) ................................................................. 17

*Singh v. George Washington Univ.*,

    383 F. Supp. 2d 99 (D.D.C. 2005) ........................................................................ 30

*Stephan v. United States*,

    319 U.S. 423 (1943) ............................................................................................... 32

*Union Leader Corp. v. DHS*,

    749 F.3d 45 (1st Cir. 2014) .................................................................................. 21

*United States v. All Assets Held at Bank Julius Baer & Co. Ltd.*,

    308 F. Supp. 3d 186 (D.D.C. 2019) ..................................................................... 30

## **Statutes**

Death in Custody Reporting Act 2000, Pub. L. 106-297, 114 Stat. 1045 (Oct. 13, 2000) ............. 2

Death in Custody Reporting Act 2013, Pub. L. 113-242, 128 Stat. 2860 (Dec. 18, 2014) ........ 5, 6

1 U.S.C. § 112 ....................................................................................................... 32

1 U.S.C. § 204 ....................................................................................................... 32

5 U.S.C. § 552 ...................................................................................... 1, 10, 14, 17, 19

18 U.S.C. § 4001 note ............................................................................................. 7

31 U.S.C. § 1102 ................................................................................................ 6, 31

34 U.S.C. § 10132 ........................................................................................... 4, 5, 31

34 U.S.C. § 10134 ................................................................................................... 7

34 U.S.C. § 10231 ................................................................................................. 32

34 U.S.C. § 10251 ................................................................................................. 33

34 U.S.C. § 12104 ................................................................................................. 32

34 U.S.C. § 60105 ....................................................................................... 6, 31, 32, 33

42 U.S.C. § 13704 (2000) ...................................................................................... 32

**Rules**

Fed. R. Civ. P. 54 ........................................................................................... 29

Fed. R. Civ. P. 56 ........................................................................................... 15

**Other Authorities**

H.R. Rep. No. 113-285 (2013) ........................................................................... 3

Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074: Department
of Justice Implementation of the Death in Custody Reporting Act of 2013 ............. 3, 4, 6, 7, 33

Bureau of Justice Statistics, Corrections ........................................................... 5

Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting
Program ........................................................................................................ 7

Bureau of Justice Statistics, MCI Program (Formerly Deaths in Custody Reporting Program
(DCRP)) ................................................................................................ 3, 4, 23

Bureau of Justice Statistics, National Corrections Reporting Program ......................... 6

Bureau of Justice Statistics, National Prisoner Statistics Program ............................. 5

Bureau of Justice Statistics, Prisoners in 2021, Statistical Tables ............................. 5

Bureau of Justice Statistics, Prisoners in State and Federal Institutions on December 31, 1978,
NCJ-64671 ................................................................................................... 5

S. Garfinkel, De-Identification of Personal Information, Nar'l Inst. of Stds. & Tech. (2015) 11, 12

L. Sweeney, k-anonymity: a model for protecting privacy, Int'l J. on Uncertainty, Fuzziness and
Knowledge-based Systems (2002) ................................................................... 11

Office of Management and Budget, Statistical Policy Directive 1: Fundamental Responsibilities
of Federal Statistical Agencies and Recognized Statistical Units, 79 Fed. Reg. 71,610 (Dec. 2,
2014) ................................................................................................................................ 7

## INTRODUCTION

This Freedom of Information Act case concerns a request for death-in-custody records submitted to the Bureau of Justice Statistics' ("BJS") Mortality in Correctional Institutions program ("MCI"). MCI is related to—but does not entirely overlap with—the Death in Custody Reporting Act of 2013 ("DCRA 2013"), and an earlier version of the statute ("DCRA 2000") that lapsed in 2006.

In an earlier round of summary judgment briefing, this Court found that MCI data submitted to BJS under DCRA 2013 was not "furnished under" BJS's organic statute, Title I of the Omnibus Crime Control and Safe Streets Act of 1968 ("Crime Control Act"), and so did not qualify for that Title's confidentiality provision—or, therefore, for FOIA's Exemption 3, which applies to information exempt from disclosure by statute. Defendant moved for partial reconsideration of that holding as to MCI information that was *not* submitted under DCRA 2013, whether because that statute did not take effect as to anyone until October 1, 2015, or because it never required local governments, as distinct from states, to directly submit death-in-custody information. The Court stayed Defendant's production obligation as to records subject to its reconsideration motion, but later denied that motion without prejudice to raising the same arguments in the second round of summary judgment briefing, which will also address BJS's invocation of FOIA Exemptions 6 and 7(C), each of which protects against "unwarranted invasion[s] of personal privacy." 5 U.S.C. § 552(b)(6), (7)(C).

Those issues are now ready for decision. Defendant has produced all records not subject to a stay of production to Plaintiff, with redactions under Exemptions 6 and 7(C), and intends to apply the same redaction algorithm in the same manner to invoke those exemptions as to all remaining records should the stay be lifted.

Summary judgment is warranted for Defendant on the privacy exemptions. The records at issue concern highly sensitive details about deceased inmates' medical and criminal histories, as well as manner of death, and thus implicate privacy interests that persist even after death. BJS' redactions were appropriate and necessary to preserve those privacy interests. On the other side of the ledger, release of the records cannot possibly advance any cognizable public interest under FOIA. FOIA aims to shed light on the operations of the federal government, but the records Plaintiff seeks exclusively concern state and local governments, an interest categorically beyond FOIA's public interest ambit. *Any* invasion of personal privacy is thus unwarranted here.

Reconsideration is likewise warranted as to MCI records that were not submitted under DCRA 2013. Rule 54, not the law-of-the-case doctrine, provides the correct framework for analyzing reconsideration in circumstances such as these, and permits reconsideration as justice requires. That is the case here, because the Court expressly declined to consider MCI records submitted when DCRA 2013 was not in effect in its earlier summary judgment opinion. The same reasoning applies to records that were not submitted under DCRA 2013 because that statute never obliged local governments to report information to BJS. Finally, reconsideration is warranted in the interests of justice because removing BJS's ability to shield information it collected voluntarily under its own authority under Title I would deal a devastating blow to BJS's ability to credibly promise confidentiality to data providers, and thus to its ability to carry out its functions as a federal statistical agency.

## BACKGROUND

## I.   THE DEATH IN CUSTODY REPORTING ACT AND THE MORTALITY IN CORRECTIONAL INSTITUTIONS PROGRAM

As first enacted in 2000, the Death in Custody Reporting Act ("DCRA 2000"), Pub. L. 106-297, 114 Stat. 1045 (Oct. 13, 2000), required states, to be eligible for certain federal law-

enforcement grants, to "provide[] assurances that [they would] follow guidelines established by the Attorney General in reporting, on a quarterly basis, information regarding the death of any person who is in the process of arrest, is en route to be incarcerated, or is incarcerated at a municipal or county jail, State prison, or other local or State correctional facility." 42 U.S.C. § 13704(a)(2) (2000) (current version at 34 U.S.C. § 12104).[1] DCRA 2000 did not apply to federal agencies, and it did not require local authorities to report directly to DOJ. *Id.* BJS launched the Mortality in Correctional Institutions ("MCI") program, formerly known as the Deaths in Custody Reporting Program, following the passage of DCRA 2000. *See* Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074: Department of Justice Implementation of the Death in Custody Reporting Act of 2013, at 2 ("AG Report").[2] MCI collected data on deaths in custody consistent with DCRA 2000 but also more broadly. MCI collected data directly from each of the nation's 50 state prison systems, and approximately 2,800 local jail jurisdictions, whereas DCRA 2000 only required reporting by states. BJS, MCI Program (Formerly Deaths in Custody Reporting Program (DCRP)).[3]

---

[1] DCRA 2000 was enacted as an amendment to the program statute that authorized the making of Violent Offender Incarceration ("VOI") and Truth-in-Sentencing ("TIS") grant awards. Specifically, DCRA 2000 added eligibility requirements for states that sought to receive TIS awards. *See* 34 U.S.C. § 12104(a)(2). When the VOI/TIS program authorization expired, DCRA 2000 expired along with it. *See, e.g.*, H.R. Rep. No. 113-285, at 1-4 (2013) (report on the bill that ultimately became DCRA of 2013, stating that the bill "reauthorizes the Death in Custody Reporting Act of 2000 which expired in 2006.").

[2] Available at https://bja.ojp.gov/doc/DOJ-Implementation-of-DCRA-of-2013.pdf (last accessed March 15, 2024).

[3] *Available at* https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program (last accessed March 15, 2024).

DCRA 2000 "expired in 2006," *id.*, after which time, as this Court has noted, "no DCRA authority existed, before the reauthorization of the DCRA in 2014," ECF 21 at 20 n.3. BJS nevertheless "decided that mortality of individuals within the criminal justice system was of great importance and made MCI one of its standard annual data collections on correctional institutions." AG Report at 2. Although DCRA 2000's expiration meant that there was no statutory mandate requiring the submission of death-in-custody information, BJS's organic statute—part of Title I of the Crime Control Act, *see* Pub. L. 96-157, Title I, §§ 301-05, 93 Stat. 1176-79 (Dec. 27, 1979)— allows it to collect information about all aspects of the criminal justice system on a voluntary basis. *See* 34 U.S.C. § 10132(c)(4) (BJS "is authorized to . . . collect and analyze statistical information, concerning the operations of the criminal justice system at the Federal, State, tribal, and local levels"). After DCRA 2000 expired, BJS continued independently to determine the details of the MCI data collection, such as the timeframe for reporting and the information requested. For example, starting in 2007, BJS gave respondents "the option to report throughout the collection year as death investigations are finalized" rather than on a quarterly basis as had previously been required under DCRA 2000. *See* BJS, MCI Program (Formerly Deaths in Custody Reporting Program (DCRP)), Changes Over Time.[4] BJS also "changed and added several items on the data collection forms after receiving feedback from the field," and "dropped the item asking for legal status because nearly all prisoners are convicted at the time of death." *Id.*

BJS's decision to continue MCI as a voluntary data collection after 2006 was consistent with a long history of collecting such data on a voluntary basis. Since its establishment over forty years ago, BJS has collected statistics regarding deaths in state and federal prisons. *See, e.g.*, BJS,

---

[4] *Available at* https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program#changes-over-time-0 (last accessed March 15, 2024).

*Prisoners in State and Federal Institutions on December 31, 1978*, NCJ-64671, May 1980 ("1978 State and Federal Survey").[5] BJS generally undertook those data collections based on voluntary reporting, also pursuant to its statutory authority under Title I of the Crime Control Act to "compile, collate, analyze, publish, and disseminate uniform national statistics concerning all aspects of criminal justice." 34 U.S.C. § 10132(c)(7); *see also, e.g.*, 1978 State and Federal Survey, Preface at iii (statistics "based on voluntary reporting").

More generally, BJS "maintains over 30 corrections-related data collections" on aspects of corrections ranging from "basic population counts and offender demographic characteristics to facility capacity, programs, staff, and resources." BJS, Corrections.[6] For those collections, "[a]ll data collection is voluntary." *Id.*, Why Does Data Take So Long to Collection and Publish. The National Prisoner Statistics ("NPS") Program, for example, "[p]roduces annual national- and state-level data on the number of prisoners in state and federal prison facilities." BJS, National Prisoner Statistics Program.[7] "BJS depends on voluntary participation" by state departments of corrections and the federal Bureau of Prisons for NPS data. BJS, Prisoners in 2021 – Statistical Tables, at 44.[8] Likewise, the National Corrections Reporting Program "collects offender-level administrative data," including demographic information, conviction offenses, sentence length, and time served.

---

[5] *Available at* https://bjs.ojp.gov/content/pub/pdf/psfi78.pdf (last accessed March 15, 2024).

[6] *Available at* https://bjs.ojp.gov/topics/corrections (last accessed March 15, 2024).

[7] *Available at* https://bjs.ojp.gov/data-collection/national-prisoner-statistics-nps-program (last accessed March 15, 2024).

[8] *Available at* https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/p21st.pdf (last accessed March 15, 2024).

BJS, National Corrections Reporting Program.[9] Because participation in that program is voluntary, "the number of states submitting data . . . has varied over the years, but at least 38 states have provided some data since 2000." *Id.*

Congress reenacted DCRA, with certain modifications, in 2014. Death in Custody Reporting Act of 2013, Pub. L. No. 113-285, 128 Stat. 2860 ("DCRA 2013"). DCRA 2013, however, did not take effect immediately upon enactment. Instead, its requirement for states to report death-in-custody information started in the "fiscal year after the expiration of the period specified in subsection (c)(1)." 34 U.S.C. § 60105(a). Subsection (c)(1), in turn, specifies a period ending "120 days from December 18, 2014," *i.e.*, April 17, 2015. *Id.* § 60105(c)(1). The federal fiscal year "begins on October 1 of each year and ends on September 30 of the following year." 31 U.S.C. § 1102. Accordingly, DCRA 2013's reporting requirement did not kick in until October 1, 2015.

One crucial difference between DCRA 2000 and DCRA 2013 was the creation of a penalty for states that fail to comply with DCRA 2013's reporting requirements, in the form of a potential loss of federal law-enforcement grant funds. *See* 34 U.S.C. § 60105(c)(2). As a result of that change, DOJ determined that BJS was not the appropriate component to collect state information under DCRA 2013, because "the additional [Justice Assistance Grant] enforcement and reporting compliance requirements under DCRA of 2013 are incompatible with BJS's authorizing statute as a federal statistical agency." AG Report at 4.[10] To comply with DCRA 2013, DOJ thus established

---

[9] *Available at* https://bjs.ojp.gov/data-collection/national-corrections-reporting-program-ncrp (last accessed March 15, 2024).

[10] BJS's authorizing statute provides that "data collected by the Bureau shall be used only for statistical or research purposes and shall be gathered in a manner that precludes their use for law enforcement or any purpose relating to a private person or public agency other than statistical or

a new DCRA data collection under the Bureau of Justice Assistance ("BJA"), the DOJ component responsible for Justice Assistance Grants, rather than BJS. *See id.* at 5. BJA began collecting data on reportable deaths on October 1, 2019. *Id.* BJA collects DCRA data only from the state agencies responsible for administering federal criminal-justice grants, whereas BJS collected MCI data directly from both state corrections departments and local jails. *See id.* at 8.

The MCI program continued collecting data, including voluntary data collection from local jails, "until the end of calendar year 2019, when the MCI program was discontinued to prevent duplication with state reporting as required by DCRA of 2013." *Id.* at 3-4.

## II.   PLAINTIFF'S FREEDOM OF INFORMATION ACT REQUEST

On April 9, 2021, Plaintiff submitted a FOIA request to the Office of Justice Programs seeking "all information submitted to BJS under the Mortality in Correctional Institutions program," including "information contained in submissions of BJS Forms CJ-9 and CJ-10 and any other data elements states are required to provide under 34 U.S.C. 60105," from 2010 through the

---

research purposes." 34 U.S.C. § 10134. Participating in DCRA's enforcement and reporting compliance requirements would also conflict with directives from the Office of Management and Budget ("OMB") that BJS "must function in an environment that is clearly separate and autonomous from the other administrative, regulatory, law enforcement, or policy-making activities" of DOJ. OMB, Statistical Policy Directive No. 1: Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units, 79 Fed. Reg. 71,610 71,615 (Dec. 2, 2014).

The limitations arising from BJS's role as a statistical agency are "specific to reporting by states" because of DCRA 2013's enforcement mechanism through potential loss of federal grant money, but "BJS is able to receive reports by federal agencies because they are for statistical and research purposes only and unrelated to program administration or compliance requirements." AG Report at 6 n.13. DCRA 2013, unlike DCRA 2000, included a reporting requirement for federal law enforcement agencies. *See* 18 U.S.C. § 4001 note. For federal information under DCRA 2013, BJS created the "Federal Law Enforcement Agency Deaths in Custody Reporting Program" ("FDCRP"), which covers arrest-related deaths and deaths in custody information from federal law-enforcement agencies from federal fiscal year 2016 onwards. *See* BJS, FDCRP, *available at* https://bjs.ojp.gov/data-collection/federal-law-enforcement-agency-deaths-custody-reporting-program-fdcrp (last accessed March 15, 2024).  However, that collection is distinct from the MCI data collection specified in Plaintiffs' FOIA request, and thus is not at issue in this case.

date of processing the request.  Declaration of Elizabeth Ann Carson ¶ 4.  The request specified that it sought "data on the deaths of individual inmates, not the summaries of inmate deaths published on the BJS website." *Id.*  Plaintiff also requested "a copy of any data dictionary, record layout or other documentation that describes elements contained in the electronic database requested above." *Id.*

BJS conducted a search in response to Plaintiff's request and located 236,568 pages of potentially responsive documents.  *Id.* ¶ 9.  BJS determined that because the records contain research or statistical information identifiable to specific private persons, the records were exempt from disclosure under the confidentiality provision of the Crime Control Act, codified at 34 U.S.C. § 10231.  *Id.* ¶ 10.  The Office of Justice Programs responded to Plaintiff on April 13, 2021, stating that all of the records located by BJS were exempt from disclosure under 34 U.S.C. § 10231 and FOIA Exemption 3.  *Id.* ¶ 11.

Plaintiff appealed the withholding decision to the Office of Information Policy ("OIP") on April 14, 2021.  *Id.* ¶ 12.  BJS subsequently conducted a further search for documents responsive to the second part of Plaintiff's request and determined that responsive records were publicly available on the website of the National Archive of Criminal Justice Data.  *Id.* ¶ 13.  The second part of Plaintiff's request is not at issue in this case. ECF 1 at 2. Plaintiff subsequently filed suit challenging the withholding of the responsive records. *Id.*

## III.  THIS CASE

Pursuant to an agreement of the parties, *see* ECF 10, the Court permitted initial cross-motions for summary judgment limited to the question of whether Defendant properly withheld all potentially responsive documents under FOIA Exemption 3, with Defendant permitted to subsequently assert other applicable exemptions on a document-by-document basis in the event

that the Court concluded that Exemption 3 does not apply, *see* Minute Order, June 1, 2022; *see also generally* ECF 12, 13, 17, 19 (parties' cross-motions). In an opinion issued March 29, 2023, the Court denied Defendant's motion and granted Plaintiff's motion, concluding that the requested data was "gathered pursuant to the Death in Custody Reporting Act," and thus not "furnished under" Title I within the meaning of that Title's confidentiality provision, ECF 21 at 21.

In a footnote, the Court pointed out that "[b]oth parties acknowledge that the DCRA was originally enacted in 2000 . . . but that statute expired in December 2006," and that "plaintiff's FOIA request includes information collected by DOJ from 2010 to 2014—a period of time when no DCRA authority existed, before the reauthorization of DCRA in 2014." *Id.* at 20 n.3. Nevertheless, the Court concluded that "[n]either party raises that plaintiff requests information during a time when no DCRA reporting requirement was in effect, and therefore, the Court will not address that point either." *Id.*

On September 29, 2023, Defendant moved for partial reconsideration of the Court's Exemption 3 decision, limited to information submitted to MCI by local authorities and information submitted to MCI by state authorities between the 2010 start date specified in Plaintiff's request and DCRA 2013's operative date of October 1, 2015. *See* ECF 27 at 21. Defendant also sought a stay of its obligation to produce records subject to its partial reconsideration motion. *Id.* The Court granted the requested stay by Minute Order dated October 3, 2023.

Meanwhile, Defendant produced the records that were not subject to the partial reconsideration motion and stay on January 31, 2024, with redactions pursuant to FOIA Exemptions 6 and 7(C). Defendant's method for making those redactions is detailed below. The parties agreed that further summary judgment motions on Defendant's application of Exemptions

6 and 7(C) to the records produced to date would be sufficient to resolve the remaining substantive issues in this case, because Defendant would invoke those exemptions in the same manner for all remaining records if ultimately ordered to produce the records subject to the partial reconsideration motion. *See* ECF 33.

The Court denied the motion for partial reconsideration without prejudice by Minute Order dated February 22, 2024. The Court determined, based on the acknowledged availability of Defendant's reconsideration argument in the initial round of summary judgment briefing, the Court's own footnote raising the issue on which Defendant seeks reconsideration, and Defendant's delay in seeking reconsideration, that resolving the reconsideration motion with additional motions on other withholdings forthcoming would pose a tax on judicial resources. The Court thus denied Defendant's reconsideration motion without prejudice but kept the stay in place and allowed Defendant to renew its arguments in this summary judgment motion. The Court specifically invited Defendant to address the law of the case doctrine, citing *Agostini v. Felton*, 521 U.S. 203, 236 (1997).

## IV.   THE "K-ANONYMITY" METHOD FOR MAKING REDACTIONS PURSUANT TO EXEMPTIONS 6 AND 7(C)

BJS employed a method known as "k-anonymity" to partially redact the MCI records produced to Plaintiff pursuant to Exemptions 6 and 7(C), each of which protects against "unwarranted invasion[s] of personal privacy." 5 U.S.C. § 552(b)(6), (7)(C).

"K-anonymity" is one of several "statistical disclosure avoidance methods" that can be used to "meet confidentiality standards" for "statistical datasets" such as the MCI records produced to Plaintiff. Declaration of Amy Lauger ¶¶ 4-5. The method was first developed in academic literature over twenty years ago, and is one of the "de-identification methods" discussed in the National Institute of Standards and Technology's "De-Identification of Personal Information"

reference guide. *Id.* ¶¶ 4-6. (citing S. Garfinkel, De-Identification of Personal Information, Nat'l Inst. of Stds. & Tech. (2015)).[11] "K-anonymity" is a "suppression" method of data de-identification, meaning that it works by suppressing (*i.e.*, redacting) certain cells in a database, as distinct from methods such as "swapping" or "perturbation" that work by "alter[ing] the record in some way." *Id.* ¶ 5. BJS selected the k-anonymity method as "an efficient and objective optimization method that minimizes the number of redacted cells while protecting against the unwarranted invasion of privacy." *Id.*

As described in the original paper proposing the method, k-anonymity protects the privacy of "person-specific, field structured data" by ensuring that "the information for each person contained in the release cannot be distinguished from at least k-1 individuals whose information also appears in the release." *Id.* ¶ 6 (quoting L. Sweeney, k-anonymity: a model for protecting privacy. Int'l J. on Uncertainty, Fuzziness and Knowledge-based Systems, 10(5); 557-570 (2002)).[12] The data-holder can select the value of "k" depending on the degree of protection desired; higher values of "k" mean each individual record is indistinguishable from a larger number of additional records, but at the price of redacting more of the information that could distinguish the record. Here, BJS selected a "k" value of 2 (the lowest possible value), meaning that the relevant variables for any given individual record are identical to at least one other record. *Id.* ¶ 11.

A real-life example from work by Latanya Sweeney, the creator of k-anonymity, illustrates the intuition behind the method. During the 1990s, the Massachusetts state government made

---

[11] *Available at* https://nvlpubs.nist.gov/nistpubs/ir/2015/NIST.IR.8053.pdf (last accessed March 15, 2024).

[12] *Available at* https://epic.org/wp-content/uploads/privacy/reidentification/Sweeney_Article.pdf (last accessed March 15, 2024).

available a research dataset containing insurance records of state employees who had been hospitalized. Garfinkel, at 18; Lauger Decl. ¶ 7. To protect the employees' privacy, their names were redacted from the dataset, but their date of birth, zip code, and sex were all included to allow for statistical analysis. Garfinkel, at 18. Sweeney knew that then-governor William Weld had recently been treated at a Massachusetts hospital, and could confirm his date of birth, sex, and zip code from voter registration records. *Id.* Because only one record in the dataset had the right combination of age, sex, and zip code, and because Sweeney knew Weld was included in the dataset, she was able to conclusively link Weld to the supposedly "de-identified" insurance records, which included highly sensitive information such as diagnoses, medications, and procedures. Lauger Decl. ¶ 7. That linkage would not have been possible if the dataset were sufficiently redacted to ensure that at least one other record would be indistinguishable from Weld's along the relevant variables of age, sex, and zip code. K-anonymity works by redacting datasets in just that way.

BJS applied the k-anonymity algorithm as follows. First, it redacted all "direct identifiers" in the dataset—specifically, the cells containing each inmate's full name and full date of birth. *Id.* ¶ 25. BJS then identified the variables that it considered to be "quasi-identifiers," meaning "variables in a dataset that could be used to identify an individual when combined with other information, either on the MCI dataset or any other available data sources" (equivalent to age, sex, and zip code in the Weld example above). *Id.* ¶ 9. The goal of k-anonymity is to ensure that no record contains a unique combination of quasi-identifiers.

BJS considered two primary sources that could be used to identify an individual in conjunction with the MCI dataset, namely online inmate search directories and press releases and news articles. *Id.* BJS thus identified the following quasi-identifiers: the state of incarceration; the

month and day of death; the name and location of the correctional facility; the variables for race; the month, day, and year of admission to the correctional facility; and the variables for the offense(s) of incarceration. *Id.* ¶ 10. BJS opted for algorithm settings relating to the treatment of blank cells that minimized the overall number of redactions, and likewise instructed the algorithm to treat all cells as equally important, which "minimize[d] the number of cell suppressions." *Id.* ¶¶ 12-17. In addition, before running the algorithm, BJS first redacted any quasi-identifier "value that was unique within its column," in order to limit the effect of "rare values on the overall redaction results." *Id.* ¶ 19, 25.

BJS ran the k-anonymity algorithm using "sdcMicro version 5.7.5," a standard software package, in the statistical software program "RStudio." *Id.* ¶ 24. Next, BJS redacted all the columns directly related to any quasi-identifier that was redacted by the algorithm, which was necessary to preserve the value of the redaction. *Id.* ¶¶ 20-21. For example, if the "state" variable were redacted but the "facility name" of "San Quentin State Prison" were to remain unredacted, the initial redaction would be worthless because the identity of the state would be obvious. *Id.*

Finally, after all redactions were applied, BJS randomized the order of the rows. *Id.* ¶ 22-23. Because the underlying Excel file was sorted by column values (*e.g.*, in the "year" column, all the "2018"s followed by all the "2019"s), there would be little value in redacting a single "year" cell when the redacted value would be obvious from its surroundings. *Id.* (Any information lost concerning the initial order of the rows in the dataset was created by BJS in assembling the dataset rather than "submitted . . . under the [MCI] program," Carson Decl. ¶ 4, and is thus not responsive to Plaintiff's FOIA request).

The full production to Plaintiff is available on OJP's online FOIA reading room, including a codebook defining the variables in the dataset.[13] Given the nature of the k-anonymity method, BJS's justifications for nondisclosure turn on the relationships between the quasi-identifier cells rather than on the particular contents of any specific cell. As result, BJS relies on the Lauger Declaration to "describe the justifications for nondisclosure with reasonably specific detail," and has not separately submitted an affidavit in "the form of a 'Vaughn index.'" *Citizens for Resp. & Ethics in Washington v. DOJ*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).

## LEGAL STANDARDS

FOIA reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citations omitted). "Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166–67 (1985). Accordingly, although FOIA "strongly favors prompt disclosure, its nine enumerated exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency*, 493 U.S. at 152). Thus, the exemptions must be given "meaningful reach and application" in order to achieve the "workable balance" that Congress has struck "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency*, 493 U.S. at 152 (citations omitted). The agency bears the burden of justifying the withholding of material responsive to a FOIA request, and a court reviews the agency's response to the request *de novo*. 5 U.S.C. § 552(a)(4)(B).

---

[13] *Available at* https://www.ojp.gov/program/ojp-freedom-information-act/ojp-reading-room (last accessed March 15, 2024).

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. DOJ*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A court may award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).  This is not a high bar: "[u]ltimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.*; *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (agencies' FOIA declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims.").

## ARGUMENT

## I.   DEFENDANT CONDUCTED AN ADEQUATE SEARCH FOR DOCUMENTS

After receiving a request under FOIA, "an agency's search obligations are dictated by whether the scope of the search is reasonably calculated to uncover relevant documents." *Mobley v. CIA*, 924 F. Supp. 2d 24, 44 (D.D.C. 2013) (quoting *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)).  At the summary judgment stage, a court may rely on "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

As described in the Carson Declaration, BJS conducted a thorough search that could reasonably be expected to uncover all records responsive to Plaintiff's request.  *See* Carson Decl. ¶¶ 6-7.  Plaintiff's request is phrased broadly, seeking "*all* information submitted to BJS under the Mortality in Correctional Institutions program."  *Id.* ¶ 4 (emphasis added).  BJS accordingly conducted a broad search of the Mortality in Correctional Institutions databases, including the databases for CJ-9 forms (Death Report on Inmates Under Jail Jurisdiction) and CJ-10 forms (Death Report on Inmates in Private and Multi-Jurisdictional Jails)—both of which are specifically mentioned in the request— and NPS-4A forms (State Prison Inmate Death Report), as well as the personal folders of all MCI project managers and unit chiefs to determine whether they had retained any documents responsive to the FOIA request. *Id.* ¶ 6. The search terms BJS applied were "2010-2019," "jail," "prison," and the individual form designations (e.g., "CJ-9" and "CJ-10"). *Id.* ¶ 8. BJS's search identified 236,568 pages of potentially responsive records, counting by the number of pages "if BJS were required to produce PDF files of each death requested." *Id.* ¶ 9. BJS searched the databases that store information submitted to BJS under the Mortality in Correctional Institutions program, and thus searched all locations reasonably likely to contain responsive records. *Id.* ¶ 7.

Because Plaintiff requested that information "stored in a tabular database format" be provided in "tabular, searchable form such as comma-separated values (CSV)," *see* Carson Decl. ¶ 4, BJS generated "two [Microsoft] Excel spreadsheets of all deaths in prisons and jails from 2010 to 2019," which contained "in tabular database format all of the data collected from state departments of corrections and local jail administrators on the MCI forms." *Id.* ¶ 15.

## II.      DEFENDANT PROPERLY INVOKED FOIA EXEMPTIONS 6 AND 7(C)

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 thus "protect[s] individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982). Courts "construe the phrase 'similar files' broadly," and thus apply Exemption 6 "to any Government records on an individual which can be identified as applying to that individual." *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991) (internal quotation marks omitted). Plaintiff's FOIA request expressly seeks "data on the deaths of individual inmates," ECF 1-1 at 1, and the records at issue thus satisfy Exemption 6's threshold requirement.

Exemption 7(C) similarly protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §552(b)(7)(C). "[I]nformation initially contained in a record made for law enforcement purposes continues to meet the threshold requirements of Exemption 7" even when "that recorded information is reproduced or summarized in a new document for a non-law-enforcement purpose." *FBI v. Abramson*, 456 U.S. 615, 631-32 (1982). The phrase "law enforcement" in Exemption 7 is not "limited to federal law enforcement." *Shaw v. FBI*, 749 F.2d 58, 64 (D.C. Cir. 1984). Nor is it limited to criminal law enforcement: "[t]he term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal." *Pub. Employees for Envt'l Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014).

Departments of corrections and other state or local agencies that operate correctional facilities are law enforcement agencies. *Cf. Duffin v. Carlson*, 636 F.2d 709, 713 (D.C. Cir. 1980) (Federal Bureau of Prisons is "a criminal law enforcement authority."). And information compiled

pursuant to the "law enforcement mission of protecting inmates, staff, and the community" qualifies for protection under Exemption 7's threshold inquiry. *Pinson v. DOJ*, 236 F. Supp. 3d 338, 365 (D.D.C. 2017) (applying Exemption 7 to "administrative remedy index," which "collects records pertaining to wrongful conduct within the prison that were affirmatively created by BOP to fulfill its law enforcement responsibility of protecting inmates."); *see also, e.g.*, *Mingo v. DOJ*, 793 F. Supp. 2d 447, 453 (D.D.C. 2011) (records pertaining to an altercation among inmates were compiled for a law enforcement purpose because they were "created in connection with the BOP's responsibility to protect[] inmates, staff, and the community"); *Holt v. DOJ*, 734 F. Supp. 2d 28, 41 (D.D.C. 2010) (same). Correctional facilities likewise compile information on deaths in custody, such as is at issue here, as part of their law enforcement responsibility of protecting inmates, staff, and the community—even if the information is subsequently reproduced for a non-law-enforcement purpose, such as statistical research. *Abramson*, 456 U.S. at 632.

Under both exemptions, the court must first determine whether disclosure would implicate "a substantial, as opposed to a *de minimis*, privacy interest." *National Association of Retired Federal Employees v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) (Exemption 6); *ACLU v. DOJ*, 655 F.3d 1, 12 (D.C. Cir. 2011) (Exemption 7(C)). If such an interest is present, the court must "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Beck v. DOJ*, 997 F.2d 1489, 1491 (D.C. Cir. 1993). To establish "that Exemption 7(C) applies, the agency must demonstrate that (1) disclosure could reasonably be expected to constitute an unwarranted invasion of privacy and (2) the personal privacy interest is not outweighed by the public interest in disclosure." *Elec. Priv. Info. Ctr. v. DOJ*, 18 F.4th 712, 718 (D.C. Cir. 2021) (internal quotation marks omitted). The test for Exemption 6 is similar, albeit more stringent: Exemption 6 applies when disclosure "*would* constitute *a clearly* unwarranted

invasion of personal privacy, whereas Exemption 7(C) requires only a showing that disclosure "could reasonably be expected to" constitute "*an* unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6), (7)(C); *see also Beck*, 997 F.2d at 1491. When, as here, all the records at issue are law enforcement records, a court thus need not separately consider Exemption 6, and can "confine [its] analysis to Exemption 7(C)." *PETA v. NIH*, 745 F.3d 535, 541 (D.C. Cir. 2014). Likewise, when Exemption 6 protects a record, a court need not consider Exemption 7(C). *See Roseberry-Andrews v. DHS*, 299 F. Supp. 3d 9, 29 n.9 (D.D.C. 2018).

### A. Disclosure of the records Plaintiff seeks would constitute a clearly unwarranted invasion of personal privacy

Personal privacy, as protected by Exemptions 6 and 7(C), encompasses "the individual's control of information concerning his or her person." *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989). "That information includes the prosaic (*e.g.*, place of birth and date of marriage) as well as the intimate and potentially embarrassing." *Painting & Drywall Work Preservation Fund v. HUD*, 936 F.2d 1300, 1302 (D.C. Cir. 1991). Exemption 6 (and, *a fortiori*, Exemption 7(C)) allows an agency to withhold "personal identifying information, such a 'place of birth, date of birth, date of marriage, employment history, and comparable data." *In Defense of Animals v. NIH*, 543 F. Supp. 2d 70, 80 (D.D.C. 2008) (quoting *Wash. Post. Co.*, 456 U.S. at 600). Criminal history records are likewise protected, even if "much of the content" is already "a matter of public record." *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1125 (D.C. Cir. 2004) (citing *Reporters Comm.*, 489 U.S. at 753 (protecting FBI rap sheets)). And of course, "the privacy interest" in details of medical conditions and medical treatment "is well recognized." *Bast v. DOJ*, 665 F.2d 1251, 1254 (D.C. Cir. 1981).

By definition, the records Plaintiff seeks here concern individuals who are no longer living. That fact affects the analysis—"the deceased by definition cannot personally suffer the privacy-

related injurie that may plague the living,"—but it is not dispositive, because "certain reputational interests and family-related privacy expectations survive death." *Campbell v. DOJ*, 164 F.3d 20, 33 (D.C. Cir. 1998). The Supreme Court has thus held that "FOIA recognizes surviving family members' right to personal privacy with respect to their close relative's death-scene images," and noted that its holding "ensures" that "child molesters, rapists, murderers, and other violent criminals" could not use FOIA to obtain "autopsies, photographs, and records of their deceased victims." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 170 (2004). Likewise, the D.C. Circuit has held that "[d]eceased defendants never convicted of a crime retain a reputational interest in keeping information concerning their prosecutions out of the public eye." *ACLU v. DOJ*, 750 F.3d 927, 936 (D.C. Cir. 2014).

As the codebook for the partially redacted records released to Plaintiff reveals, the records at issue here contain precisely the kind of highly sensitive and potentially embarrassing information about the subjects of the records that merits protection even post-mortem.[14] Along with the full name, date of birth, and date of death of the deceased inmate, the records Plaintiff seeks include information on the deceased inmate's race and ethnicity, the date of their admission to the correctional facility, and their crime(s) of conviction. They also specify whether the deceased inmate stayed overnight at a mental facility; the inmate's place of death and the location of the incident causing the death (including in a segregation unit, an on- or off-site medical center, and an on- or off-site mental health center); the cause of death (with specific variables for causes including AIDS-related illness, accidental alcohol or drug intoxication, suicide, and homicide); and details about the inmate's medical and surgical care. The privacy interest of the deceased and

---

[14] *Available at* https://www.ojp.gov/sites/g/files/xyckuh241/files/media/document/mciprisons codebook20231026.xlsx

their relatives in keeping such highly intimate and sensitive details out of the public eye is plainly

more than *de minimis*, and thus must be balanced against the public interest in disclosure. *See, e.g.*,

*Horner*, 879 F.2d at 874.

> **B.   Any public interest in disclosure does not outweigh the privacy interests at stake**

Because "privacy concerns addressed by" Exemptions 6 and 7(C) "are present," Plaintiff

bears the burden of showing "that the public interest sought to be advanced is a significant one, an

interest more specific than having the information for its own sake," and that "the information is

likely to advance that interest." *Favish*, 541 U.S. at 172. "The public interest in disclosure must be

evaluated in light of FOIA's central purpose: 'to open agency action to the light of public

scrutiny.'" *Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003) (quoting *Reporters Comm.*, 489

U.S. at 772)). Crucially, however, "FOIA is concerned only with shedding light on misconduct of

the *federal* government, not *state* governments." *Rimmer v. Holder*, 700 F.3d 246, 258 (6th Cir.

2012). Thus, "just as there is no FOIA-recognized public interest in discovering evidence in federal

government files of a private party's violation of the law, *see Reporters Comm.*, 489 U.S. at 774,

there is no FOIA-recognized public interest in discovering wrongdoing by a *state* agency."

*Landano v. U.S. Dep't of Justice*, 956 F.2d 422, 430 (3d Cir. 1992), *vacated on other grounds*, 508

U.S. 165 (1993); *accord Union Leader Corp. v. DHS*, 749 F.3d 45, 56 n.8 (1st Cir. 2014) (same,

quoting *Landano*); *Rimmer*, 700 F.3d at 259 (same); *McMillian v. BOP*, 03-cv-1201-GK, 2004

WL 4953170, at *7 n.11 (D.D.C. July 23, 2004) (same).

The public interest inquiry, "moreover, should focus not on the general public interest in

the subject matter of the FOIA request, but rather on the incremental value of the specific

information being withheld." *Schrecker*, 349 F.3d at 661. It is thus appropriate, in assessing the

public interest, to consider "the extent to which there are alternative sources of information

available that could serve the public interest in disclosure." *DOD v. FLRA*, 964 F.2d 26, 29 (D.C. Cir. 1992). In *National Association of Retired Federal Employees v. Horner*, 879 F.2d 873 (D.C. Cir. 1989), for example, the D.C. Circuit held that an agency could withhold the names and addresses of retired or disabled federal employees under Exemption 6. Although "the percentage of the federal budget devoted to annuities, the amount of the benefit an average annuitant receives, or other aggregate data might be of public interest, disclosures of those facts would not be entailed in (and could be accomplished without) releasing" individual name-and-address records sought in that case. *Horner*, 879 F.2d at 879. But "unless the public would learn something directly about the working of the *Government* by knowing the names and addresses of its annuitants, their disclosure is not affected with the public interest." *Id.*

Here, the public interest considerations weigh decisively against disclosure. Most importantly, the records Plaintiff seeks come from state and local, rather than federal, correctional facilities. Although obviously relevant to a general public interest in the operation of state and local government, such records are not relevant to the specific public interest that FOIA is concerned with, namely shedding light on the operations of the *federal* government. MCI collected deaths-in-custody information from state and local facilities, but that data does not reflect any activity or conduct by the federal government; the only federal activity even arguably implicated is BJS's role as a federal statistical agency in assembling the data, but the individual records Plaintiff seeks would not shed any light on BJS's activities. Any public interest in the MCI records thus "falls outside the ambit of the public interest that the FOIA was enacted to serve." *Reporters Comm.*, 489 U.S. at 775. Given the strong privacy interests at stake in these records, the balance

necessarily tips against disclosure: "something, even a modest privacy interest, outweighs nothing every time." *Horner*, 879 F.2d at 879.[15]

Moreover, even if the records at issue here were relevant to a cognizable public interest under FOIA, the *marginal* public interest in the raw data that Plaintiff seeks would be minimal, because BJS already publishes comprehensive statistical reports derived from that data. *See* BJS, MCI Program (Formerly Deaths in Custody Reporting Program (DCRP)), Publications and Products.[16] As in *Horner*, aggregate statistical information about deaths in state and local correctional facilities may shed light on the operation of state and local governments, but that information is already publicly available. Disclosure of personally identifying information and medical details about particular individual decedents, in contrast, would provide minimal, if not zero, additional public benefit, but would impose grave privacy costs.

### C.     BJS appropriately redacted the records

An agency must disclose "any reasonably segregable" non-exempt portions of the requested records. 5 U.S.C. § 552(b); *see also Mead Data Cent. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."). In certain cases, merely redacting directly identifying information, such as names and addresses, is sufficient to permit disclosure of the remainder of a record while avoiding an unwarranted invasion of personal privacy. *See, e.g.*, *Carter, Fullerton & Hayes LLC v. FTC*, 520 F. Supp. 2d 134, 144-45 (D.D.C. 2007) (permitting redaction, under Exemption 6, of the "names, addresses, and telephone numbers of consumers who

---

[15] Plaintiff is, of course, free to seek state and local records under applicable state or local freedom of information statutes.

[16] *Available at* https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program#2-0

filed complaints with the FTC," when the agency otherwise released all information contained in the complaints). However, neither exemption "limits such withholdings to names, social security numbers, phone numbers, and other discrete personally identifiable information." *Nat'l Whistleblower Ctr. v. HHS*, 849 F. Supp. 2d 13, 30 (D.D.C. 2012) (Exemption 7(C)); *see also Dep't of Air Force v. Rose*, 435 U.S. 352, 380 (1976) (Exemption 6). Thus, in a case involving a FOIA request for case summaries of honors and ethics hearings at a military service academy, the Supreme Court noted that "what constitutes identifying information regarding a subject cadet must be weighed not only from the viewpoint of the public, but also from the vantage of those who would have been familiar, as fellow cadets or Academy staff, with other aspects of his career at the Academy." *Rose*, 435 U.S. at 380. The Supreme Court thus instructed the District Court, on remand, that "if in its opinion deletion of personal references and other identifying information is not sufficient to safeguard privacy, then the summaries should not be disclosed." *Id.* (internal citation and quotation marks omitted). As the Supreme Court subsequently put it, "even with names redacted, subjects of such summaries can often be identified through other, disclosed information." *Reporters Comm.*, 489 U.S. at 769. *Rose* was thus concerned not "with the number of steps that must be taken to get to the threatened effect," but rather "the likelihood that the effect will ever come to pass." *Horner*, 879 F.2d at 878. "Where there is a substantial probability that disclosure will cause an interference with personal privacy, it matters not that there may be two or three links in the causal chain." *Id.*

Applying similar reasoning in a case involving a request for files containing records of dismissed Patent & Trademark Office disciplinary investigations, the D.C. Circuit held that the agency appropriately withheld information regarding court cases involving the attorney subjects of the investigations, as well as the names of their business associates and clients. *See Carter v.*

*U.S. Dep't of Commerce*, 830 F.2d 388, 390-91 (D.C. Cir. 1987). Because court cases "are already in the public domain, release of certain portions of them, even with names redacted, could easily lead to the revelation of the documents in their entirety, including the identities of the attorneys involved." *Id.* at 391. And, absent any evidence to the contrary, the court credited the agency's assessment that, in the context of the patent bar, disclosing "client and associate names would lead to identification of investigation targets." *Id.*

Likewise, in a case concerning a request for data pertaining to Medicare claims submitted by physicians in several localities during 2004, the D.C. Circuit held that the records were properly withheld under Exemption 6 because, combined with information "publicly available on the internet," the data requested could reveal private financial information about the physicians' finances. *Consumers' Checkbook Ctr. for Study of Servs. v. HHS*, 554 F.3d 1046, 1049 (D.C. Cir. 2009). Specifically, the plaintiff sought "data elements includ[ing] the diagnosis, the type and place of service and the Unique Physician Identifying Number (UPIN) of the physician who performed the services." *Id.* "A physician's name, office zip code, medical or surgical specialty and UPIN are publicly available on the internet," as are "[t]he fees a physician receives from Medicare for performing a specific service or procedure." *Id.* Putting that information together with the data requested by the plaintiff, it would be possible "to calculate the total payments Medicare made to any individually identified physician for claims submitted in 2004," which would compromise "a substantial privacy interest" in the physicians' finances. *Id.*

The "k-anonymity" method that BJS used to redact the records released to Plaintiff fits squarely within the logic of *Rose*, *Carter*, and *Consumers' Checkbook*. As in those cases, BJS sought to protect personal privacy by redacting certain variables in the dataset that could be combined with other, publicly available information to identify an individual (in BJS's

terminology, "quasi-identifiers"). Specifically, BJS determined that variables for the state of incarceration and the correctional facility name and location, as well as information about the inmate's month and day of death, race, admission date, and offense of incarceration constituted "quasi-identifiers" because a unique combination of those variables in the dataset could be used to identify an exact individual. *See* Lauger Decl. ¶ 10. For example, suppose that only a single inmate incarcerated for armed robbery died in a given month in a given state. Combining that information with publicly available information (such as from news reports or an online inmate search directory) it may be possible to confirm that inmate's name and date of birth, and thus to associate that identified individual with other details in the MCI dataset, for instance that the inmate died by suicide, or by accidental drug or alcohol intoxication. Thus, even without releasing "direct identifiers (*i.e.*, the inmate's name and date of birth, *see id.* ¶ 25), the release of quasi-identifier data would nevertheless result in the release of extremely sensitive personal information about the deceased inmate.

Rather than wholesale redacting all quasi-identifiers, however, as in *Carter* and *Consumers' Checkbook*, the k-anonymity method allowed BJS to redact quasi-identifiers only to the extent necessary to protect personal privacy. Thus, in the example above, rather than redacting the "month of death" variable for the entire dataset, the k-anonymity algorithm might redact it only for that one individual, to produce a combination of quasi-identifier variables that relates to at least two individual records. *Id.* ¶ 11. With the month of death redacted, the remaining combination of a given crime (such as armed robbery) and a given state would now be present in at least two records, making it impossible to identify a single specific individual in the dataset using the quasi-identifier variables. *Id.* ¶¶ 11-14.

The k-anonymity method was first developed in academic literature over twenty years ago, and is a standard method recognized in the National Institute of Science and Technology's "De-Identification of Personal Information" reference guide. *See* Lauger Decl. ¶¶ 4-7. As applied here, k-anonymity solves the problem of quasi-identifiers by making the smallest number of redactions necessary to ensure that no individual record contains a unique (and thus identifiable to the particular inmate) combination of quasi-identifiers. *Id.* ¶¶ 11-12. BJS implemented the algorithm using a standard software package, *id.* ¶ 24, and optimized for the fewest possible redactions (rather than, for example, prioritizing certain variables for release, even at the expense of making more redactions overall), *id.* ¶ 12.

The resulting pattern of redactions may appear arbitrary if viewed in isolation—BJS has, for example, redacted the "month of death" variable for some rows but not for all. But any such surface-level inconsistencies are merely an artefact of BJS's good-faith compliance with its obligation to release reasonably segregable information, by redacting quasi-identifiers only as necessary. A given variable may be identifying in the context of one row but not another, depending on the overall relationships between all of the variables in the dataset as a whole. The k-anonymity method thus comports with the Supreme Court's admonition in *Rose* to consider context in assessing the potential privacy implications of releasing information. *Rose*, 435 U.S. at 380.

Requiring BJS to fully un-redact the quasi-identifiers (or worse, the entire dataset including full names and dates of birth) would produce manifest harms to privacy concerns of the most sensitive and intimate nature. The profoundly "private nature of Exemption 6 [and 7(C)] redactions" in these records "is obvious, with concomitant obvious risks to privacy by disclosure." *Institute for Energy Research v. FERC*, 22-cv-2114 (BAH), 2023 WL 6121878, at *12 (D.D.C.

Sept. 19, 2023). In these circumstances, a "court may find the foreseeable-harm requirement" of 5

U.S.C. § 558(a)(8)(A)(i)(I) satisfied if "'the very context and purpose of' the withheld material

'make[s] the foreseeability of harm manifest.'" *Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1, 21

(D.D.C. 2021) (quoting *Rep. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 372 (D.C. Cir.

2021)). But revealing such private information would do nothing to advance any cognizable public

interest under FOIA in bringing to light the operations of the federal government. *See Rose*, 425

U.S. at 380-81; *Rimmer*, 700 F.3d at 258. BJS properly withheld identifying and quasi-identifying

information under Exemptions 6 and 7(C), and the k-anonymity method ensured that the redactions

were no greater than necessary.

## III.   DEFENDANT PROPERLY INVOKED EXEMPTION 3 AS TO RECORDS THAT WERE NOT SUBMITTED UNDER DCRA, AND RECONSIDERATION IS WARRANTED TO THE EXTENT THAT THE COURT'S PREVIOUS EXEMPTION 3 HOLDING APPLIES TO SUCH RECORDS

### A.   The law of the case doctrine does not bar reconsideration here

In its Minute Order denying reconsideration without prejudice, the Court invited Defendant

to discuss the law of the case doctrine. As the Supreme Court has explained, "[u]nder this doctrine,

a court should not reopen issues decided in earlier stages of the same litigation." *Agostini*, 521

U.S. 203, 236 (1997). The doctrine does not absolutely bar reconsideration, if the court is

"convinced that [its prior] decision is clearly erroneous and would work a manifest injustice." *Id.*

(internal citation and quotation marks omitted).

Here, however, the Court need not apply that standard to grant reconsideration, because

the D.C. Circuit has unequivocally foreclosed the application of the law of the case doctrine to

circumstances such as this. "When there are multiple appeals taken in the course of a single piece

of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not

be revisited on later trips to the appellate court." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C.

Cir. 1996). But it "is simply mistaken" to treat a "District Court's initial decision" as "binding" under law-of-the-case doctrine if "it was not embodied in any final judgment." *Keepseagle v. Perdue*, 856 F.3d 1039, 1048 (D.C. Cir. 2017). The law of the case doctrine "does not apply to interlocutory orders . . . for they can always be reconsidered and modified by a district court prior to entry of a final judgment." *Id.* (quoting *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 620 (8th Cir. 2007)).

Grants of partial summary judgment that do not fully resolve the merits—such as this Court's grant of partial summary judgment on Exemption 3—"are by their terms interlocutory." *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976); accord, e.g., *Alaska v. FERC*, 980 F.3d 761, 764 (D.C. Cir. 1992) ("[G]rants of partial summary judgment are generally considered interlocutory orders . . ."). The law-of-the-case doctrine thus has no role to play at this point in the case—particularly when the Court's decision, on its own terms, declined to address MCI records submitted before the effective date of DCRA 2013. *See* ECF 21 at 20 n.3; Part III.C, *infra*.

### B.  Rule 54 permits reconsideration of interlocutory orders "as justice requires"

Instead, the applicable standard comes from Rule 54, which provides that "any order or other decision, however designated, that adjudicates fewer than all the claims" before the court "does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and responsibilities." Fed. R. Civ. P. 54(b).

Rule 54(b) "recognizes [the district court's] inherent power to reconsider an interlocutory order 'as justice requires.'" *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (quoting *Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 22-23 (1st Cir. 1985)). The "standard for reconsideration of interlocutory orders under Rule 54(b) is distinct from the standard applicable to motions for reconsideration of final judgments," and "'[c]ourts

have more flexibility in applying Rule 54(b)' than in determining whether reconsideration is appropriate under Rule 59(e) and 60(b)." *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005) (quoting *Moore v. Hartman*, 332 F. Supp. 2d 252, 256 (D.D.C. 2004)). Thus, while Rule 59(e) "sets a high threshold for parties to raise a new argument for the first time after judgment has already been entered," Rule 54(b) does not entail the same "strict prohibition." *Cobell v. Jewell*, 802 F.3d 12, 25-26 (D.C. Cir. 2015). A court "may grant a Rule 54(b) motion for reconsideration so long as there are 'good reasons for doing so,'" *Rosenberg v. U.S. Dep't of Defense*, 442 F. Supp. 3d 240, 252 (D.D.C. 2020) (quoting *United States v. All Assets Held at Bank Julius Baer & Co. Ltd.*, 308 F. Supp. 3d 186, 193 (D.D.C. 2019), "such as where the court failed to consider 'data[] that might reasonably be expected to alter the conclusion reached by the court," *id.* (quoting *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)), or "where the movant presents new information that 'constitute[s] a change in the court's awareness of the circumstances,' even though it 'may not constitute a change in the actual facts of the case,'" *id.* (quoting *Judicial Watch v. U.S. Dep't of Army*, 466 F. Supp. 2d 112, 114 (D.D.C. 2006)).

As this Court's Minute Order recognized, the "'[a]s justice requires'" standard for reconsideration under Rule 54(b) "indicates concrete considerations of whether the court 'has patently misunderstood a party, has made a decision outside the adversarial issues presented to the [c]ourt by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the court." *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 223 (D.D.C. 2011) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 277 (D.D.C. 2004) (alteration in original)). Despite the Court's inclination to the contrary in its Minute Order, however, "[t]hese considerations leave a great deal of room for the court's discretion and, accordingly, the 'as justice

30

requires' standard amounts to determining 'whether [relief upon] reconsideration is necessary under the relevant circumstances." *Id.* (quoting *Cobell*, 224 F.R.D. at 277)). In any case, those circumstances do pertain, and reconsideration is accordingly warranted.

**C.    Reconsideration is warranted as to state data submitted when DCRA was not in effect**

The Court's partial summary judgment order as to Exemption 3 expressly stated that "[n]either party raises that plaintiff requests information during a time when no DCRA reporting requirement was in effect, and therefore, the Court will not address that point either." ECF 21 at 20 n.3. To nevertheless apply the Court's Exemption 3 holding to responsive records submitted before DCRA 2013 took effect would thus necessarily be to "ma[k]e a decision outside the adversarial issues presented to the [c]ourt by the parties." *Estate of Botvin*, 772 F. Supp. 2d at 223.

The Court rightly recognized that "no DCRA authority existed" between the expiration of DCRA 2000 in 2006 and "the reauthorization of DCRA in 2014." ECF 21 at 20 n.3. Moreover, DCRA 2013 specified that its state reporting requirement started in the "fiscal year after the expiration of the period specified in subsection (c)(1)." 34 U.S.C. § 60105(a). Subsection (c)(1), in turn, specifies a period ending "120 days from December 18, 2014," *i.e.*, April 17, 2015. *Id.* § 60105(c)(1). And because the federal fiscal year is defined by statute to begin on October 1, *see* 31 U.S.C. § 1102, DCRA 2013 did not impose any reporting requirement on states until October 1, 2015.

From 2010, the start date for Plaintiff's FOIA request, until that date, BJS necessarily relied on its own statutory authority under Title I to collect data on a voluntary basis. *See* 34 U.S.C. § 10132(c)(7) (authorizing BJS to "compile, collate, analyze, publish, and disseminate uniform national statistics concerning all aspects of criminal justice."). Title I's confidentiality provision "undoubtedly is" an exemption that qualifies for withholding under FOIA's Exemption 3. ECF 20

31

at 9. That provision protects information "furnished under" Title I from disclosure. 34 U.S.C. § 10231(a).[17] Because Title I is the only possible authority under which BJS could have collected MCI data between 2010 and DCRA 2013's effective date, all such data was "furnished under" Title I and is thus subject to its confidentiality provision—and with it, Exemption 3.

### D.     Reconsideration is warranted as to local data that was never required to be submitted under DCRA

The same is true of responsive information submitted to BJS under the MCI program that was not required to be submitted by DCRA 2013. In particular, the MCI program collected death-in-custody information on deaths in local jails directly from the local jails themselves, rather than from state departments of corrections. *See* AG Report at 8. But neither DCRA 2000 nor DCRA 2013 requires local jails to submit death-in-custody information to DOJ; rather, local agencies' participation in MCI was voluntary under BJS's Title I authority to engage in voluntary data collections.  DCRA 2000 imposed a requirement on states to report information on deaths in custody, including deaths in "municipal or county jail[s]" and "local or State correctional facilit[ies]," but it did not impose any requirement on municipalities, counties, or localities to report information to DOJ. 42 U.S.C. § 13704(a)(2) (2000) (current version at 34 U.S.C. § 12104).

Likewise, DCRA 2013 provides that "the State shall report to the Attorney General . . . information regarding the death of any person" in custody. 34 U.S.C. § 60105(a). It also specifies that the term "State" has the meaning given in Section 901(a) of the Crime Control Act, now

---

[17] As Defendant's initial summary judgment motion argued, the current codification of Title I's confidentiality provision, at 34 U.S.C. § 10231(a), says "furnished under this chapter," rather than "furnished under this title," as in the Statutes at Large. *See* Pub. L. 90-351, Title I, § 812(a), *formerly* § 818, *as added* Pub. L. 96-157, § 2, 93 Stat. 1213 (Dec. 27, 1979), *redesignated as* § 812 *by* Pub. L. 98-473, Title II, § 609(f), 98 Stat. 2093 (Oct. 12, 1984), *amended by* Pub. L.109-162, Title XI, § 1115(c), 119 Stat. 3104 (Jan. 5, 2006). Because Congress enacted the language in the statute at large, including the phrase "furnied under this title," but has not enacted Title 34 of the U.S. Code as positive law, the language of the statutes at large prevails when the two are inconsistent. *See Stephan v. United States*, 319 U.S. 423, 426 (1943); 1 U.S.C. §§ 112, 204(a).

codified at 34 U.S.C. § 10251(a). *Id.* § 60105(e). That provision, in turn, defines "State" to mean "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands," *id.* § 10251(a)(2), and the immediately following provision separately defines a "unit of local government," *id.* § 10251(a)(3). The "fact that Congress differentiated between" the two terms implies that Congress did not intend for them to refer to the same thing. *Chacoty v. Pompeo*, 392 F. Supp. 3d 1, 18 (D.D.C. 2019); *see also Chien Fan Chu v. Brownell*, 247 F.2d 790, 796 (D.C. Cir. 1957) ("We are bound to conclude that when Congress used these differing terms in the same act . . . making each word applicable to a different thing, it did not intend the carefully distinguished and separately defined words to mean the same thing." (internal quotations omitted)).

Thus, although both versions of DCRA required states to submit data on deaths in local jails, *see* 34 U.S.C. § 60105(a), the statute has never required local jails themselves to directly submit that information to DOJ. Indeed, DOJ has specifically requested Congress to consider legislation that would "[e]liminate the requirement for centralized state reporting, thus permitting [BJA's DCRA data collection] to collect information directly from state and local correctional and law enforcement agencies, open sources, and other public sources." AG Report at 12.

As a result, any information submitted to BJS's MCI program by local jails that is responsive to the FOIA request (*i.e.*, from 2010 through 2019 when BJS's collection ended) was not "furnished under" or submitted pursuant to DCRA 2013's (or DCRA 2000's, which had lapsed anyway) reporting requirement; instead, it was voluntarily "furnished under" BJS's independent Title I authority, and is protected from disclosure by Title I's confidentiality provision.

### E.    Reconsideration is warranted to avoid substantial harm to BJS

Disclosure of data voluntarily submitted to BJS under the MCI program, beyond what was required by DCRA 2013, risks significantly impeding BJS's ability to execute its mission as a

federal statistical agency. *See* Declaration of Kevin M. Scott, Ph.D. Not only does BJS have statutory obligations to preserve confidentiality, including under the Title I confidentiality provision at issue here, but it also has "fundamental responsibilities [as] a federal statistical agency," including a duty to "protect the trust of the public and its data providers by ensuring BJS data will be protected and used appropriately, consistent with its confidentiality and data use obligations." *Id.* ¶¶ 7, 14.

BJS relies on "the cooperation of jail administrators and leaders of State Departments of Corrections to provide data or provide access to people in their care," and in order to secure that cooperation, "BJS promises that the data collected will only be used for research and statistical purposes and the confidentiality of the data will be protected." *Id.* ¶ 11. "These are the same assurances that BJS provided the data-providers in its MCI data collection," and a "breach of the assurances made by BJS to these data providers in the context of MCI would fundamentally undermine the credibility of its assurances . . . for other data collections." *Id.* ¶ 12. Indeed, "BJS expects some of them to refuse cooperation with ongoing data collections," and such refusals would "impair—and in some cases eliminate—BJS's ability to provide the statistics that the nation needs to inform policy decisions related to criminal justice." *Id.* ¶¶ 12, 13. Reconsideration is thus warranted to avert "a serious threat that undermines [BJS's] statutory independence, autonomy, and authority . . . as a statistical agency." *Id.* ¶ 14.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Defendant as to Exemptions 6 and 7(C), and as to Exemption 3 for the records subject to Defendant's motion for partial reconsideration.

Dated: March 15, 2024                    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cormac A. Early*
CORMAC A. EARLY
D.C. Bar No. 1033835
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 616-7420
cormac.a.early@usdoj.gov

*Counsel for Defendants*