UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GANNETT SATELLITE INFORMATION NETWORK,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:22-cv-00475<br>)<br>)<br>)<br>)<br>)<br>) |

### DECLARATION OF KEVIN M. SCOTT, PH.D.

I, Kevin M. Scott, declare the following to be true and correct:

1. I am the Principal Deputy Director and Acting Director of the Bureau of Justice Statistics (BJS). I have served in those roles since March 2023 and August 2023, respectively, I have worked for BJS since 2017 in a variety of supervisory roles. In those roles, I have overseen all aspects of several BJS data collections, including design of data collection, sampling, administration protocols, and analysis and reporting of collected data.

2. As the United States' primary source for criminal justice statistics, the Bureau of Justice Statistics (BJS) is concerned about the grave harm that will likely come from being required to release the Mortality in Correctional Institutions data ("MCI data") under the Freedom of Information Act. BJS predicts that the release of the MCI data (as with any privileged dataset) will have negative impacts on the central mission of BJS, the ability of BJS to meet its statutory obligations, and the broader mission of the federal statistical system.

    **I.**    **Releasing the data at issue in this FOIA lawsuit will harm the central mission of BJS**

3. The mission of BJS is to collect, analyze, publish, and disseminate information on crime, criminal offenders, victims of crime, and the operation of justice systems at all levels of government. BJS also provides financial and technical support to state, local, and tribal governments to improve both their statistical capabilities and the quality and utility of their criminal history records.

4. The agency's ability to fulfill this mission is greatly dependent upon the willingness of its data providers to provide the data necessary for BJS to conduct its statistical activities. Nearly all of BJS data collections, including the MCI collection, are voluntary. BJS relies on the willingness of individuals, law enforcement agencies, courts, jails, prisons, and other entities to provide data for BJS collections, including sensitive information they are required to protect as well that they entrust to BJS to safeguard. Since its inception in 1979, BJS has spent a significant amount of human and social capital cultivating and maintaining its relationships with data providers to sustain an acceptable response rate in an ever-increasingly challenging environment to get responses and maintain public trust in its official statistics. During its 45-year history, BJS has never released – nor has it been compelled to release – a privileged dataset to the public.

5. BJS data are vital to the U.S. Department of Justice's mission to uphold the rule of law, to keep our country safe, and to protect civil rights. Many other stakeholders depend on the data, including other components of the U.S. government, state, local and tribal agencies, advocacy groups, researchers, and others. It is vital for BJS to maintain the trust of its data providers in order to produce high-quality data to further the missions of all of these groups.

## II. Fulfilment of the statutory obligation imposed on BJS to protect respondent data would be jeopardized by releasing the MCI data

6. BJS has four primary statutory responsibilities, all of which would be jeopardized by release of the MCI data: (1) produce and disseminate relevant and timely statistical information; (2) conduct credible and accurate statistical activities; (3) conduct objective statistical activities; and (4) protect the trust of information providers by ensuring the confidentiality and exclusive statistical use of their responses. 44 U.S.C. §§ 3563(a)(1)(A)-(D).

7. Regarding this fourth statutory responsibility, public trust in federal statistics is essential to their value and use in informing decisions across public and private sectors. The foundation of this trust is two-fold: trust that statistical agencies must uphold their obligations to data providers by ensuring confidentiality, and trust in the accuracy and objectivity of the data that federal statistical agencies produce. This is achieved by following strict data use and confidentiality requirements and providing – and keeping – assurances of these obligations to data providers. BJS has a fundamental legal responsibility to protect the trust of the public and its data providers by ensuring BJS data will be protected and used appropriately, consistent with its confidentiality and data use obligations.

8. The failure of BJS to protect the trust of its MCI information providers via a compelled disclosure will likely result in a loss of their voluntary cooperation with BJS in the future. This failure to cooperate will significantly jeopardize the ability of BJS to meet its other three statutory obligations: (1) produce and disseminate relevant and timely statistical information; (2) conduct credible and accurate statistical activities[1]; and (3) conduct objective statistical activities.

---

[1] Compelled disclosure of the MCI data would run directly counter to the statutory obligation imposed on BJS to produce credible and accurate statistics. BJS has already published data from the states that have been cleaned and

3

### III.  Releasing the MCI data will likely cause a loss of public trust and harm the broader mission of the federal statistical system

9.  BJS anticipates that there is a high likelihood that loss of public trust resulting from a disclosure of data collected under promises of confidentiality will spill over to its other data collections and to the larger federal statistical system. This could result in increased public skepticism of and decreased confidence in the ability of federal statistical agencies to be responsible stewards of sensitive information.[2]

10. Several of the most important data collections conducted by BJS involve jails, prisons, and people in incarcerated settings. Those data collections include—

   a.  National Prisoner Statistics program,[3] which provides the only comprehensive source of information on the size and composition (age, sex, race/ethnicity, commitment offense) of the nation's prison population;

   b.  National Corrections Reporting Program,[4] which provides inmate-level data on people admitted to, held in, and released from, the nation's prisons and serves as the starting point for recidivism studies conducted by BJS;

---

verified from the states for the same time period that the FOIA request seeks raw, unverified data that was provided to BJS.  Thus, if compelled to disclose the data sought under the FOIA request, there would be two (likely very different) statistics from the same jurisdiction for the same reference year on the same subject.

[2] To the point, on January 27, 2021, President Biden sought to overcome public distrust of data and science with the Administration's issuance of a presidential memorandum to strengthen scientific integrity and evidence-based decision-making. Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking (Jan. 27, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/memorandum-on-restoring-trust-in-government-through-scientific-integrity-and-evidence-based-policymaking/. This memorandum instructed agencies to make Federal data available, as appropriate and consistent with applicable law, "in a manner that protects privacy and confidential or classified information, and any other information protected from disclosure by law."

[3] https://bjs.ojp.gov/data-collection/national-prisoner-statistics-nps-program.

[4] https://bjs.ojp.gov/data-collection/national-corrections-reporting-program-ncrp.

    c. Survey of Prison Inmates,[5] which provides information on the background, criminal history, drug use, mental health, educations, and program participation of those incarcerated in the nation's prisons;

    d. Census of Jails[6] and Annual Survey of Jails,[7] which provide the only comprehensive source of information on the size and composition (age, sex, race/ethnicity, conviction status) of the nation's jail population; and

    e. Survey of Inmates in Local Jails,[8] which provides information on the background, criminal history, drug use, mental health, educations, and program participation of those incarcerated in the nation's jails.

11. Because nearly all of BJS data collections are voluntary, BJS relies on the cooperation of jail administrators and leaders of State Departments of Corrections to provide data or to provide access to the people in their care. To secure this participation, BJS promises that the data collected will only be used for research and statistical purposes and the confidentiality of the data will be protected. These are the same assurances that BJS provided the data-providers in its MCI data collection.

12. Breach of the assurances made by BJS to these data providers in the context of MCI would fundamentally undermine the credibility of its assurances to these data providers for other data collections, and BJS expects at least some of them to refuse cooperation with ongoing data collections.

13. These refusals would impair—and in some cases eliminate—the ability of BJS to provide the statistics that the nation needs to inform policy decisions related to criminal justice.

---

[5] https://bjs.ojp.gov/data-collection/survey-prison-inmates-spi.
[6] https://bjs.ojp.gov/data-collection/census-jails-coj.
[7] https://bjs.ojp.gov/data-collection/annual-survey-jails-asj.
[8] https://bjs.ojp.gov/data-collection/survey-inmates-local-jails-silj.

14. In summary, BJS, and the Director of BJS, must adhere to the fundamental responsibilities of a federal statistical agency, as codified in law and including as articulated in the National Academies of Sciences, Engineering, and Medicine's Principles and Practices for a Federal Statistical Agency[9] report, within which trust among the public and data providers is central. Failing to deliver on the pledges of data confidentiality and privacy made by BJS is a serious threat that undermines the statutory independence, autonomy, and authority necessary for it as a statistical agency.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this  14th  day of March, 2024.

*Kevin M. Scott*
Kevin M. Scott

---

[9] National Academies of Sciences, Engineering, and Medicine, Principles and Practices for a Federal Statistical Agency, 7th Ed. (2021), *available at* https://nap.nationalacademies.org/catalog/25885/principles-and-practices-for-a-federal-statistical-agency-seventh-edition. *See, e.g.,* page 31 ("The value of a statistical agency rests fundamentally on the accuracy and credibility of its data products. … Credibility therefore stems from the respect and trust of users and stakeholders in the statistical agency."); page 35 ("Federal statistical agencies must have the trust of those whose information thy obtain"); page 37 ("Data providers must be able to trust that a statistical agency will scrupulously honor its pledge of confidentiality"); and page 85 ("To maintain a relationship of respect and trust with survey participants and other data providers, a statistical agency should respect their privacy, minimize the reporting burden imposed on them, and respect their autonomy when they are asked to participate in a voluntary program to collect data.").