**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GANNETT SATELLITE
INFORMATION NETWORK,

      Plaintiff,

      v.

U.S. DEPARTMENT OF JUSTICE,

      Defendant.

Case No. 22-cv-475 (BAH)

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS SECOND CROSS-MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S SECOND
<u>MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL RECONSIDERATION</u>**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ...................................................................................................... 2

    A.   **DOJ's collection of death-in-custody data under the MCI Program** ........................ 2

    B.   **Federal involvement with state and local jails and prisons** .................................... 5

    C.   **Procedural history** ............................................................................................... 7

    D.   **DOJ's heavily redacted production** ....................................................................... 9

III.    LEGAL STANDARD ............................................................................................ 10

IV.    ARGUMENT ......................................................................................................... 11

    A.   **The death-in-custody data are not exempt** ........................................................... 11

        1.   **Exemption 6, not Exemption 7(C), provides the governing standard** ................... 11

        2.   **FOIA's foreseeable harm requirement augments the agency's burden** ............... 14

        3.   **Any privacy interests are minimal at best** ...................................................... 15

           i.     *Death reduces privacy* ................................................................................ 16

           ii.    *Deceased inmates' relatives overwhelmingly support disclosure* ...................... 16

           iii.   *Most states make the data available* ........................................................... 19

        4.   **The public interests are substantial** ............................................................... 20

           i.     *The data would shed light on DOJ's implementation and enforcement of DCRA* .......................................................................................................... 21

           ii.    *The data would shed light on DOJ's collaboration with state and local governments* ............................................................................................... 22

        5.   **DOJ's k-anonymity redactions are too broad** ................................................. 25

    B.   **DOJ conducted an inadequate search for BOP data** .............................................. 28

    C.   **The Court should not reconsider its decision on Exemption 3** ................................. 29

        1.   **DOJ bears a heavy burden to justify reconsideration** ....................................... 29

        2.   **DOJ has no excuse for failing to make its arguments the first time** ..................... 31

3.   **DOJ has no excuse for delaying six months to file its motion**...............................**32**

4.   **Any prejudice from the Court's summary judgment order is illusory and unsupported**.......................................................................................**33**

5.   **The Court should not reconsider its decision as to data submitted before DCRA 2013's effective date**.........................................................................**34**

6.   **The Court should not reconsider its decision as to data submitted by local governments**.............................................................................................**35**

**V.   CONCLUSION** .............................................................................................**38**

# **TABLE OF AUTHORITIES**

*Page*

**Cases**

*ACLU v. DOJ*, 252 F. Supp. 3d 217 (S.D.N.Y. 2017) ................................................................30

*ACLU v. DOJ*, 655 F.3d 1 (D.C. Cir. 2011) ...........................................................................11

*Agostini v. Felton*, 521 U.S. 203 (1997) ...............................................................................29

*Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505 (4th Cir. 2003) .............................31

*Anand v. HHS*, No. 21-cv-1635, 2022 WL 4231981 (D.D.C. Apr. 27, 2022) .......................29

*Armstrong v. Exec. Off. of the President*, 97 F.3d 575 (D.C. Cir. 1996) .............................15

*Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141 (D.D.C. 2011) .................................13

*Brick v. DOJ*, 293 F. Supp. 3d 9 (D.D.C. 2017) ...................................................................16

*Campbell v. DOJ*, 164 F.3d 20 (D.C. Cir. 1998) ......................................................12, 13, 16

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217 (D.C. Cir. 2011) .............31

*Carr v. O'Leary*, 167 F.3d 1124 (7th Cir. 1999) ...................................................................31

*Charles v. Off. of the Armed Forces Med. Exam'r*, 979 F. Supp. 2d 35 (D.D.C. 2013) ...............30

*Citizens for Resp. & Ethics in Washington v. DOJ*, 45 F.4th 963 (D.C. Cir. 2022) .....................32

*Citizens for Resp. & Ethics in Washington v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014) ...................20

*Citizens for Resp. & Ethics in Washington v. DOJ*, 854 F.3d 675 (D.C. Cir. 2017) ....................32

*Cobell v. Jewell*, 802 F.3d 12 (D.C. Cir. 2015) ....................................................................31

*Davis v. DOJ*, 460 F.3d 92 (D.C. Cir. 2006) .......................................................................16

*DOD v. FLRA*, 510 U.S. 487 (1994) ....................................................................................20

*DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749 (1989) .....................................11

*Est. of Gaither ex rel. Gaither v. D.C.*, 771 F. Supp. 2d 5 (D.D.C. 2011) .....................29, 31

*Fleming v. Medicare Freedom of Info. Grp.*, No. 15-cv-1135, 2019 WL 2462814
(D.D.C. June 13, 2019) ................................................................................30

*Fox v. D.C.*, 923 F. Supp. 2d 302 (D.D.C. 2013) ........................................29

*Geo-Grp. Commc'ns, Inc. v. Shah*, No. 15-cv-1756, 2020 WL 5743516
(S.D.N.Y. Sept. 25, 2020) ............................................................................32

*Hall & Assocs. v. EPA*, 956 F.3d 621 (D.C. Cir. 2020) ................................11

*Int'l Couns. Bureau v. U.S. DOD*, 723 F. Supp. 2d 54 (D.D.C. 2010) ..........19

*Jefferson v. Dep't of Just., Off. of Pro. Resp.*, 284 F.3d 172 (D.C. Cir. 2002) ............14

*Jud. Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006) ............................15

*Keepseagle v. Perdue*, 856 F.3d 1039 (D.C. Cir. 2017) ..............................30

*Keys v. DOJ*, 830 F.2d 337 (D.C. Cir. 1987) ..............................................12

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) ...........................29, 30

*Leopold v. DOJ*, 94 F.4th 33 (D.C. Cir. 2024) ..........................11, 14, 15, 25

*Maydak v. DOJ*, 254 F. Supp. 2d 23 (D.D.C. 2003) ....................................13

*Mingo v. DOJ*, 793 F. Supp. 2d 447 (D.D.C. 2011) ....................................13

*Muttitt v. Dep't of State*, No. 10-cv-202, 2013 WL 12318039 (D.D.C. July 30, 2013) ..........29, 31

*Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157 (2004) ..................16

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002) ................11, 17

*Negley v. FBI*, 825 F. Supp. 2d 58 (D.D.C. 2011) ......................................29

*Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57 (D.C. Cir. 1990) ................28

*Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982) ........................................12

*Prison Legal News v. Samuels*, 787 F.3d 1142 (D.C. Cir. 2015) ................15

*Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021) ................14, 15

*Schrecker v. DOJ*, 254 F.3d 162 (D.C. Cir. 2001) ......................................16

*Shaw v. FBI*, 749 F.2d 58 (D.C. Cir. 1984) ...................................................................13

*Shteynlyuger v. Ctrs. for Medicare & Medicaid Servs.*, No. 20-cv-2982,
2023 WL 6389139 (D.D.C. Sept. 30, 2023) ..................................................................28

*Story of Stuff Project v. U.S. Forest Serv.*, 366 F. Supp. 3d 66 (D.D.C. 2019) ...........................19

*Truitt v. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990) ...................................................28

*Valencia-Lucena v. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999) ...............................................28

*Washington Post Co. v. HHS*, 690 F.2d 252 (D.C. Cir. 1982) ......................................................22

*Wessler v. DOJ*, 381 F. Supp. 3d 253 (S.D.N.Y. 2019) ..........................................................18, 20

*Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009) ............................................................36

**Statutes**

34 U.S.C. § 10134 ....................................................................................................4, 12

5 U.S.C. § 552(a)(4)(B) ..............................................................................................11

5 U.S.C. § 552(b)(6) ............................................................................................11, 12, 15

5 U.S.C. § 552(b)(7)(C) .........................................................................................11, 12, 15

**Other Authorities**

2023 Residential Substance Abuse Treatment (RSAT) grant program, Bureau of Justice
Assistance (2023) ...................................................................................................6, 22

Comprehensive Opioid, Stimulant, and Substance Use Program (COSSUP) Award
Information (2023) ....................................................................................................23

Custodial Death Report, Texas Office of the Attorney General ...................................................19

Death in Custody Reporting Act of 2000, Pub. L. No. 106-297, 114 Stat. 1045 (2000) ...........3, 36

E. Ann Carson, Mortality in Local Jails, 2000-2019 – Statistical Tables, Bureau of Justice
Statistics, 1 (Dec. 2021) .............................................................................................1

E. Ann Carson, Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables,
Bureau of Justice Statistics (Dec. 2021) .............................................................................1

Executive Order 14074 (May 25, 2022) ...........................................................................5, 24

Fed. R. App. P. 4(a)(1)(B)(ii) ........................................................................33

Fed. R. Civ. P. 54(b) ....................................................................................29

Fed. R. Civ. P. 56(a) ....................................................................................10

FY 2023 Comprehensive Opioid, Stimulant, and Substance Use Site-based Program (2023)..........................................................................................................23

FY 2023 Invited to Apply – Prison Rape Elimination Act (PREA Reallocation Funds Program, Bureau of Justice Assistance (2023) ...........................................6, 22

FY23 Texas JAG Program, Bureau of Justice Assistance (2023) .............................6, 22

Gina Barton, Deaths in Detention: Improper, inadequate treatment results in deaths of sick prisoners, *Milwaukee Journal Sentinel* (Feb. 4, 2014) ................................17

HMCC & WWCC Residential Treatment Program Award Information (2023)..........................23

Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)), Changes Over Time ...................................................................3

Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)), Bureau of Justice Statistics (2019) ..........................................4, 28

Pub. L. No. 113-242, 128 Stat. 2860 (2014).................................................3, 4, 21, 36

Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074 (Sept. 16, 2022)........................................................................3, 4, 5, 21, 33, 36

Uncounted Deaths in America's Prisons & Jails: How the Department of Justice Failed to Implement the Death in Custody Reporting Act, Permanent Subcommittee on Intelligence (Sept. 20, 2022).................................................4, 5, 6, 7, 21, 22, 23, 24

# I.    INTRODUCTION

Thousands of inmates die each year.  Most deaths occur in state or local facilities.[1]  The Department of Justice has collected decades worth of data about them.  The data includes who the people are, where they were incarcerated, and how they died.  Seeing this data would allow governments, researchers, the press, and the public to identify trends in how and why inmates are dying in such large numbers.  Knowing and fixing those trends would save lives.  DOJ tracks this information for that very purpose, and the data would allow the public to determine how good of a job it is doing at reducing deaths in custody at the state and local level.

Plaintiff Gannett Satellite Information Network ("USA TODAY") thus sought this data under the Freedom of Information Act.  After the Court rejected DOJ's argument that the data is exempt under Title I of the Crime Control Act, DOJ produced a heavily redacted dataset—in more than 20 percent of cases redacting even the state where the inmate died.  It made these redactions under FOIA's privacy exemptions.  But it fails to establish, as it must, that the at-most minimal privacy interests in the records outweigh the public's strong interests in disclosure—particularly since the more disclosure-friendly Exemption 6 applies to the records, and agency's burden is augmented by FOIA's foreseeable harm requirement.

Indeed, as shown below, states routinely disclose the kind of information DOJ now withholds, and deceased inmates' families have overwhelmingly supported disclosing it.  And though the data relates to state and local inmate deaths, the federal government has made it a priority to monitor those deaths and help states and localities reduce them, including by issuing

---

[1] E. Ann Carson, Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables, Bureau of Justice Statistics, 1 (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf; E. Ann Carson, Mortality in Local Jails, 2000-2019 – Statistical Tables, Bureau of Justice Statistics, 1 (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf.

millions of dollars of grants each year to improve inmates' health outcomes.  This data would inform whether the federal government is doing its job and how it can improve.

Next, DOJ conducted an inadequate search.  According to its own sources, DOJ's Mortality in Correctional Institutions Program—about which the request sought "all information"—collected data from the federal Bureau of Prisons.  Yet DOJ neither searched for nor produced any such data.  Its search was plainly inadequate.

DOJ finally reprises its motion for reconsideration, arguing that the Court erred by ordering it to disclose data provided when the Death in Custody Reporting Act ("DCRA") was not in effect, as well as data provided by local governments.  As the Court noted in its order denying DOJ's motion without prejudice, no circumstance that would justify reconsideration pertains here, particularly since, as DOJ acknowledged, it could have made these arguments in its first summary judgment motion yet waited until the eve of production to raise the issue.  Minute Order (Feb. 22, 2024).  The Court correctly intimated that reconsideration is inappropriate, and DOJ offers no reason to second-guess that conclusion.

The Court should grant summary judgment to USA TODAY, deny summary judgment to DOJ, deny DOJ's reconsideration motion, and order DOJ to conduct an adequate search and produce the records in full.

## II.        BACKGROUND

### A.        DOJ's collection of death-in-custody data under the MCI Program.

USA TODAY's FOIA request seeks "all information submitted to BJS [DOJ's Bureau of Justice Statistics] under the Mortality in Correctional Institutions program" from 2010 to the date of the request.  Caruso Decl. Ex. 1.  Some background on the MCI Program ("MCI" or the "Program") is in order.

BJS launched the Program in 2000 after Congress passed the first iteration of DCRA.  *See* Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074, 2 (Sept. 16, 2022), https://bja.ojp.gov/doc/DOJ-Implementation-of-DCRA-of-2013.pdf ("AG Report"). DCRA required states to report to the Attorney General certain data about inmates who died in custody.  That information includes "the name, gender, race, ethnicity, and age of the deceased; the date, time, and location of death; and a brief description of the circumstances surrounding the death."  Death in Custody Reporting Act of 2000, Pub. L. No. 106-297, 114 Stat. 1045 (2000), ¶2 ("DCRA 2000").  BJS collected that data under the Program.  *See* AG Report at 2.

Though DCRA expired in 2006, BJS continued collecting essentially the same data under the Program.  It made that decision because "mortality of individuals within the criminal justice system was of great importance" to BJS.  AG Report at 2.  Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)), Changes Over Time, https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program#changes-over-time-0 (noting additions to questionnaires of "whether the death was incident to use of force by facility staff" and asking respondents "to specify the type of intoxication that led to the death").

The Program continued apace until Congress reauthorized DCRA in 2013.  That reauthorization added three provisions relevant here.  First, it authorized the Attorney General to deduct 10 percent of federal enforcement grants to states that violated their reporting requirements—though the Attorney General has not exercised that authority to date.  *See* Pub. L. No. 113-242, 128 Stat. 2860, ¶ 2 (2014) ("DCRA 2013"); *see also* AG Report at 11.  Second, it required the Attorney General to submit a report to Congress.  The report was to determine how the information provided by state and federal law enforcement agencies "can be used to reduce the

number of such deaths," and "examine the relationship, if any, between the number of such deaths and the actions of management of such jails, prisons, and other specified facilities relating to such deaths."  DCRA 2013 ¶ 2.  The report was due within two years.  *Id*.  Third, it required federal law enforcement agencies to report deaths in similar circumstances to states.  *See id*. ¶ 3.

DOJ collected data under the MCI Program from three sources.  First, it collected some data from local jail facilities.  Second, it collected other data from state prisons.  And third, it collected still other data from the federal Bureau of Prisons.  *See* Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)), Bureau of Justice Statistics (2019), https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program#0-0 ("MCI Webpage").

DOJ discontinued the Program at the end of 2019.  AG Report at 2.  It did so after concluding that BJS was the wrong agency component to handle data collection for a program that authorized the Attorney General to reduce law enforcement grant funding.  AG Report at 4.  It reached that conclusion because BJS's enabling statute expressly forbids it from compiling data for law enforcement purposes, which DOJ judged to be incompatible with law enforcement grant-making.  *See id*.; *see also* 34 U.S.C. § 10134 ("Data collected by the Bureau shall be used only for statistical or research purposes, and shall be gathered in a manner that precludes their use for law enforcement or any purpose relating to a private person or public agency other than statistical or research purposes.").

DOJ's implementation of the Program has been controversial.  In 2022, the Senate Permanent Subcommittee on Investigations found that "DOJ is failing to effectively implement DCRA 2013."  Uncounted Deaths in America's Prisons & Jails: How the Department of Justice Failed to Implement the Death in Custody Reporting Act, Permanent Subcommittee on

Intelligence, 1 (Sept. 20, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-09-20%20PSI%20Staff%20Report%20-%20Uncounted%20Deaths%20in%20America's%20Prisons%20and%20Jails.pdf ("PSI Report"). Among those failures was the agency's delinquency in producing the report DCRA required it to submit to Congress addressing how the federal government could assist states and localities in reducing inmate deaths—a report it still has not released.  *Id*. at 5; *see also* Caruso Decl. ¶ 14.

B.     **Federal involvement with state and local jails and prisons.**

Though the Program involves state reporting, it reflects a close collaborative relationship between federal and state authorities in reducing carceral deaths.  President Biden emphasized that relationship in a recent executive order aimed at "provid[ing] State, Tribal, local, and territorial law enforcement agencies with the guidance and support they need to advance their own efforts to strengthen public trust and improve public safety."  Executive Order 14074, § 1 (May 25, 2022). The same executive order directed the Attorney General to "issue guidance to State, Tribal, local, and territorial law enforcement agencies (LEAs) regarding best practices for conducting independent criminal investigations of deaths in custody that may involve conduct by law enforcement or prison personnel."  *Id*. § 2.  It also ordered the Attorney General to prepare a report on what steps DOJ had taken to "fully implement the Death in Custody Reporting Act of 2013." *Id*. § 6(e).  In the resulting report, DOJ acknowledged that deaths in custody is "a profoundly important issue," that growing awareness of it "has increased demands for criminal and juvenile justice reform," and that complete and accurate data is essential to understand why deaths in custody occur and enact "policies and practices that may reduce deaths in custody."  AG Report at 1.

Indeed, the federal government has enmeshed itself in state and local correctional efforts by issuing grants to address issues likely correlated with inmate mortality.  For instance, last year

DOJ solicited and awarded over $2.5 million to states to support state and local facilities "to prevent, detect, and respond to sexual abuse and sexual harassment, as well as implement the National Prison Rape Elimination Act (PREA) Standards."[2]  It awarded over $3 million to the California Board of State and Community Corrections to address inmates' substance use issues.[3] And it gave over $16 million to Texas that the state could spend on any number of issues, including, "jail or prison-based treatment programs," among others.[4]  The list goes on.

The legislative branch has also emphasized the federal government's role in helping state and local governments reduce carceral deaths.  It explained that "disclosure of facility-level death can help identify troubling trends in prisons and jails."  PSI Report at 17.  For example, the Permanent Subcommittee on Investigations related a tragic story of an individual who committed suicide after being denied psychotropic medications.  It turned out that the facility in which he was incarcerated had "more than double the national average of jail deaths."  *Id*. at 18.  The Subcommittee thus concluded that, with federal government data, DOJ and the facility could have together "identified the trend" and "take[n] corrective measures."  *Id*.

The Subcommittee, however, did not reach this conclusion by examining DOJ's own data. That is because DOJ has not released it—which the Subcommittee lamented as "a missed opportunity to prevent avoidable deaths."  PSI Report at 6.  Instead, it learned of this story through

---

[2] FY 2023 Invited to Apply – Prison Rape Elimination Act (PREA Reallocation Funds Program, Bureau of Justice Assistance (2023), https://bja.ojp.gov/funding/opportunities/o-bja-2023-171782 ("Rape Prevention Grant").
[3] 2023 Residential Substance Abuse Treatment (RSAT) grant program, Bureau of Justice Assistance (2023), https://bja.ojp.gov/funding/awards/15pbja-23-gg-01500-rsat ("California Grant").
[4] FY23 Texas JAG Program, Bureau of Justice Assistance (2023), https://bja.ojp.gov/funding/awards/15pbja-23-gg-03034-jagx ("Texas grant").

news reports.  *Id*. at 17.  The PSI Report thus recognized the press's critical role in "stepp[ing] in to attempt the data collection that DOJ is statutorily obligated and best situated to do."  *Id*.

### C.      Procedural history.

To that end, USA TODAY filed a FOIA request with DOJ for "all information submitted to BJS under the Mortality in Correctional Institutions program" from 2010 to the date of the request.  Caruso Decl. Ex. 1.  DOJ denied the request under FOIA Exemption 3 via Title I of the Crime Control Act, 34 U.S.C. §10231.  Caruso Decl. Ex. 2.  USA TODAY timely administratively appealed that denial, which DOJ affirmed.  Caruso Decl. Exs. 3, 4.  USA TODAY sued.  Compl., ECF No. 1.

The parties proposed a bifurcated summary judgment procedure in which they would first address the applicability of Exemption 3, and then address any other exemptions should the Court find Exemption 3 inapplicable.  Joint Status Report (May 20, 2022), ECF No. 10.  The Court adopted that proposal.  *See* Minute Order (May 31, 2022).  The parties then filed cross-motions for summary judgment solely on Exemption 3.  *See* Defendant's Motion for Summary Judgment (June 30, 2022), ECF No. 12; Plaintiff's Cross-Motion for Summary Judgment (July 29, 2022), ECF No. 13.

The Court granted summary judgment to USA TODAY and denied DOJ's motion.  *See* Order (Mar. 29, 2023), ECF No. 20; Mem. Op. (Mar. 29, 2023), ECF No. 21.  The "key question" in the case, the Court recognized, was "whether the text of the Crime Control Act's confidentiality provision exempts disclosure of the requested information under FOIA Exemption 3."  Mem. Op. at 1-2.  It addressed that question from four related angles: Title I's text, structure and relation with other statutes, purpose, and legislative history.  In its analysis of all but legislative history, the Court held unambiguously that Title I does not apply to the type of death-in-custody data at issue in USA TODAY's request:

- Text: "Nothing in Title I, let alone in its confidentiality provision, requires reporting on the specific type of data the DCRA mandates."  Mem. Op. at 13.

- Structure: "In context, Title I of the Crime Control Act does not cover the specific death-in-custody reporting requirements provided in the DCRA."  *Id*. at 15.

- Purpose: "DOJ does not cite any provision of the Crime Control Act that requires certain statistical recordkeeping and reporting, let alone of death-in-custody instances."  *Id*. at 19.

The Court also understood that USA TODAY's request sought data collected between 2010 and 2014, "a period of time when no DCRA authority existed."  Mem. Op. at 20 n.3.  But it declined to consider that fact because "[n]either party raises that plaintiff requests information during a time when no DCRA reporting requirement was in effect."  *Id.*

In four monthly joint status reports following the Court's summary judgment order, DOJ stated that it was "continuing to evaluate its options in light of the Court's Order, including to seek reconsideration."  Joint Status Report (Apr. 12, 2023), ECF No. 22; Joint Status Report (May 12, 2023), ECF No. 23; Joint Status Report (June 12, 2023), ECF No. 24; Joint Status Report (July 14, 2023), ECF No. 25.  Then, in a July 28 status report, the parties reported their "agree[ment] that Defendant will complete processing and production of responsive records by October 26, 2023," and to address any remaining disputes about "the scope of the exemptions … through cross-motions for summary judgment after Defendant completes production."  Joint Status Report (July 28, 2023), ECF No. 26.

Instead of honoring that agreement, DOJ waited another two months before moving for reconsideration, now less than a month before its agreed production deadline.  *See generally* Partial Motion for Reconsideration of Partial Summary Judgment with Respect to Exemption 3 and for a Partial Stay of Production, (Sept. 29, 2023), ECF No. 27 ("MPR").  That motion asked the Court to revisit its Exemption 3 ruling for most of the records.  Specifically, it sought to apply Exemption 3 to (a) all death-in-custody data collected before October 1, 2015 because DCRA was not in

- 8 -

effect, and (b) all death-in-custody data reported by local governments because, supposedly, DCRA does not require them to report data.  MPR at 15.  DOJ also sought a partial stay of its production deadline as to the documents referenced in its reconsideration motion, which the Court granted.  MPR at 14-15; Minute Order (Oct. 3, 2023).

The Court denied DOJ's reconsideration motion without prejudice.  It held that none of the circumstances ordinarily warranting reconsideration pertains here.  Minute Order (Feb. 22, 2024).  It also observed that, as DOJ had acknowledged, all the arguments it made for reconsideration "were available during the briefing on the parties' cross-motions for partial summary judgment."  *Id*. (quoting MPR at 11).  It noted that, despite this, DOJ delayed six more months in making its motion.  *See id*.  And it concluded that addressing the motion would impose a "tax on judicial resources," given the parties' anticipated summary judgment motions on other issues.  *Id*.  It thus permitted DOJ to make its reconsideration arguments again, inviting it to address the law of the case doctrine.  *See id*.  The Court maintained the stay from its prior order.  *See id*.

### D.    DOJ's heavily redacted production.

While the Court was adjudicating DOJ's motion for reconsideration, the agency made its production, which did not include any data from the federal Bureau of Prisons.  *See* Carson Decl. ¶ 15, ECF No. 35-3 (stating that agency searched only for "all of the data collected from state departments of corrections and local jail administrators on the MCI forms, plus some additional metadata that was appended to the records upon their submission").  The production consisted of a spreadsheet with the following fields: name, date of birth, state, date of death, the facility where they died, gender, race, date of admission, offenses committed, whether they had stayed in a mental facility, where the inmate died (e.g., if they died in general housing, a medical center, etc.), whether their cause of death was evaluated, what the cause of death was, additional information about the cause of death (*e.g.*, if an illness, what the illness was), medical treatment received, and a short

narrative.[5]  Caruso Decl. ¶ 27.  The spreadsheet was heavily redacted; DOJ even redacted the state

of death in 22 percent of the entries.  *Id*. ¶ 21.

DOJ chose its redactions by employing a method called k-anonymity.  This method

provides "scientific guarantees that the individuals who are the subjects of the data cannot be re-

identified."  Lauger Decl. ¶ 6, ECF No. 35-4.  It does so by first isolating data fields that DOJ

judged could identify a person, and second by redacting at least some of those fields when a

combination of them applies to one unique individual.  *See id*. ¶¶ 9-11.  DOJ chose a set of fields

as potentially identifying based on information it thought available in online inmate search

directories, press releases, and news articles.  *See id*. ¶ 9.

The result is a spreadsheet so heavily redacted as to substantially reduce its usefulness.  *See*

Caruso Decl. ¶ 16.  In 58 percent of cases, DOJ redacted the facility where the inmate died, making

it impossible to identify trends with respect to specific prisons and jails.  *See id*. ¶ 23.  It redacted

many of the specifics regarding cause of death—for example, it redacted 11,499 of the 13,504

illnesses inmates died from.  *See id*. ¶ 25.  Plus, it redacts all the inmates' names and narrative

descriptions of their deaths, making it difficult for reporters to tell their individual stories.  *See id*.

¶ 27.

## III.    LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  Thus, in FOIA cases as in all others, "if any reasonable view of the record would permit

---

[5] The data are available for download on DOJ's Office of Justice Programs FOIA reading room.
*See* https://www.ojp.gov/program/ojp-freedom-information-act/ojp-reading-room. The reading
room spreadsheet appears identical to the version produced to USA TODAY except that it does
not contain the entirely-redacted "Notes" column, which presumably contains a narrative
description of the death.  *See* Caruso Decl. ¶ 27.

resolution of a factual dispute in favor of the non-movant, and that fact is material to the outcome, summary judgment must be denied." *Hall & Assocs. v. EPA*, 956 F.3d 621, 630 (D.C. Cir. 2020).

Under FOIA, the agency bears the sole burden to establish whether an exemption applies or the search was adequate, and the Court reviews the agency's determination *de novo*. *See* 5 U.S.C. § 552(a)(4)(B) ("In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action."). In making that determination, the Court must liberally construe FOIA's disclosure provisions and narrowly construe its exemptions. *See Leopold v. DOJ*, 94 F.4th 33, 36 (D.C. Cir. 2024).

### IV. ARGUMENT

#### A. The death-in-custody data are not exempt.

##### 1. Exemption 6, not Exemption 7(C), provides the governing standard.

DOJ invokes FOIA Exemptions 6 and 7(C) for all its redactions. Both require the Court to balance the privacy interests in the records with the public interest in disclosure. *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011). But they differ in the bar the agency must meet to withhold the records. *See id.* Exemption 6 requires the agency to show that disclosure "would constitute a clearly unwarranted invasion of personal privacy," while Exemption 7(C) requires proof that disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(6), 7(C). Thus, FOIA's "presumption favoring disclosure" is "at its zenith under Exemption 6," *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 37 (D.C. Cir. 2002), while Exemption 7(C) has a "somewhat broader" allowance for withholding, *DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 756 (1989).

Each exemption applies only to certain types of records.  Exemption 6 applies to "personnel and medical files and similar files."  5 U.S.C. § 552(b)(6).  USA TODAY does not dispute that the death-in-custody data meet this threshold.  Exemption 7(C), in contrast, applies only to "records or information compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7)(C).  Thus, the bar DOJ must meet to redact the death-in-custody data depends on whether that data was "compiled for law enforcement purposes."  It was not.

The agency bears the burden to demonstrate the "threshold law enforcement purpose." *Keys v. DOJ*, 830 F.2d 337, 340 (D.C. Cir. 1987).  To meet that burden, it mut supply declarations that "identify a law enforcement purpose," "establish a rational 'nexus between the investigation and one of the agency's law enforcement duties,'" and show "a connection between an 'individual or incident and a possible security risk or violation of federal law.'"  *Campbell v. DOJ*, 164 F.3d 20, 32 (D.C. Cir. 1998) (quoting *Pratt v. Webster*, 673 F.2d 408, 420-21 (D.C. Cir. 1982)).

As an initial matter, DOJ does not argue that *it* compiled the data for law enforcement purposes.  Nor could it.  As DOJ admits, the data was compiled by its Bureau of Justice Statistics. *See* D. Br. at 2-4.  And as it also admits, BJS is statutorily forbidden from using that data for law enforcement purposes: it provides that BJS shall gather its data "in a manner that precludes their use for law enforcement."  *Id*. at 6 n.10 (quoting 34 U.S.C. § 10134).  DOJ therefore did not compile the data for law enforcement purposes and does not argue otherwise.

Instead, DOJ argues that *states* compiled the data for law enforcement purposes.  *See* D. Br. at 17-18  But it introduces no evidence for that proposition.  It simply argues, without citing any record evidence, that state correctional facilities "compile information on deaths in custody, such as is at issue here, as part of their law enforcement responsibility of protecting inmates, staff, and the community."  D. Br. at 18.  But given the history of the MCI Program detailed above, it is

entirely plausible that states compiled that data only because federal law required them to or the federal government asked it to.  There is simply no evidence that the states compiled or used any of the data for law enforcement purposes.

DOJ also suggests state correctional facilities collected data for law enforcement purposes because they are "law enforcement agencies."  D. Br. at 17.  Perhaps state facilities **can** compile data for law enforcement purposes in some specific instances, such as to investigate an altercation among inmates.  *See, e.g.*, *Mingo v. DOJ*, 793 F. Supp. 2d 447, 453 (D.D.C. 2011).[6]  But even if so, not everything they compile **is** for those purposes.  For instance, the federal Bureau of Prisons failed to make the threshold showing for data from its Inmate Central File, which maintained "information concerning the day-to-day activities and events occurring during the confinement of an inmate."  *Maydak v. DOJ*, 254 F. Supp. 2d 23, 38 (D.D.C. 2003).  That type of high-level, inmate-specific data is closely analogous to the death-in-custody data here.  In neither case did DOJ show a "rational nexus" between the data and any law enforcement function.  *Campbell*, 164 F.3d at 32.  *See also Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141, 146-47 (D.D.C. 2011) (holding that BOP documents are not compiled for law enforcement purposes simply because BOP is a law enforcement agency and that agency failed to meet its burden with respect to inmate's telephone conversations).

Finally, even if some data were compiled for law enforcement purposes, most were not. Records are compiled for law enforcement purposes only if they "relate to anything that can fairly

---

[6] The one case DOJ cites for this proposition does not support it.  In *Shaw v. FBI*, 749 F.2d 58, 65 (D.C. Cir. 1984), the court considered whether documents were compiled for law enforcement purposes if done as part of a collaborative effort between federal and state authorities to investigate state law violations.  It held that it did because Exemption 7 "treats authorized federal investigations into violations of federal law and of state law on a part."  *Id*. That holding does not apply here because, as argued above, there is no federal investigation at all.

be characterized as an enforcement proceeding." *Jefferson v. Dep't of Just., Off. of Pro. Resp.*, 284 F.3d 172, 177 (D.C. Cir. 2002). But here, according to DOJ's redacted spreadsheet, the vast majority of deaths were caused by factors that could not reasonably relate to an enforcement proceeding. For example, 13,504 of the 16,625 inmates died due to illness, which almost certainly would not result in enforcement proceedings. *See* Caruso Decl. ¶ 25. Ditto for, presumably, nearly all deaths other than homicides. So these records could not have been compiled for law enforcement purposes.

For these reasons, Exemption 6, not Exemption 7(C), provides the framework for the following analysis. Regardless, the records are not exempt under either balancing test. The strong public interest in the death-in-custody data far outweighs any minimal privacy interest that might inhere in them.

### 2. FOIA's foreseeable harm requirement augments the agency's burden.

On top of establishing an exemption, the agency must also show that disclosure "would foreseeably harm an interest protected by the exemption." *Leopold v. DOJ*, 94 F.4th 33, 37 (D.C. Cir. 2024). This requirement applies to "all exemptions, except Exemption 3," *id.*, and thus to both privacy exemptions. To satisfy this burden, the agency must show how disclosure "would," not "could," harm an interest protected by the exemption. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369-70 (D.C. Cir. 2021). It must make that showing with a "focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually" harm an interest protected by the exemption. *Id.* at 370.

Though the privacy exemptions contain a built-in harm analysis, the foreseeable harm requirement augments the burden an agency must meet. This is clearest with Exemption 7(C), should the Court find it applicable, which it should not for the reasons discussed above. That

exemption applies if disclosure "***could*** reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C) (emphasis added).  But as *Reporters Committee* teaches, "could" is not good enough for foreseeable harm: the agency must show that disclosure "would" cause harm.  *Reps. Comm.*, 3 F.4th at 369-70.  And as *Leopold* holds, the "would" showing applies to Exemption 7(C), since an agency must show foreseeable harm for "all exemptions, except Exemption 3."  *Leopold*, 94 F.4th at 37.  Finally, since Exemption 7(C) evidently protects against "unwarranted invasion[s] of personal privacy," 5 U.S.C. § 552(b)(7)(C), the foreseeable harm requirement mandates that an agency show that that harm "would" result, not merely that it could reasonably be expected to.  Thus, while there remains a gap between this exemption and Exemption 6—the latter requires the privacy invasion to be "clearly unwarranted," 5 U.S.C. § 552(b)(6)—the foreseeable harm requirement shrinks it.

### 3. Any privacy interests are minimal at best.

DOJ argues that there are substantial privacy interests in the death-in-custody data because it would identify deceased inmates and specify certain facts about them, such as race, gender, what they were convicted of, and how they died.  *See* D. Br. at 20-21.  But  "Exemption 6 'does not categorically exempt individuals' identities.'"  *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (quoting *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 153 (D.C. Cir. 2006)).  That is because the "privacy interest at stake may vary depending on the context in which it is asserted." *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 582 (D.C. Cir. 1996).  Here, three pieces of context show that any privacy interests in the death-in-custody data are minimal at best: the inmates are deceased, their family members overwhelmingly want their stories to be told, and most states make available much of the data DOJ has withheld.

*i.*        *Death reduces privacy.*

"[D]eath clearly matters" to privacy interests, since the deceased "by definition cannot personally suffer the privacy-related injuries that may plague the living." *Campbell*, 164 F.3d at 33. Indeed, death of the subject diminishes those interests significantly: whether an individual is dead or alive can alone determine the outcome of the public-private balance. This is clear from multiple cases holding that the court could not assess the agency's privacy balance without knowing the living status of the relevant people. *See Schrecker v. DOJ*, 254 F.3d 162, 167 (D.C. Cir. 2001) ("Without confirmation that the Government took certain basic steps to ascertain whether an individual was dead or alive, we are unable to say whether the Government reasonably balanced the interests in personal privacy against the public interest in release of the information at issue."); *Davis v. DOJ*, 460 F.3d 92, 98 (D.C. Cir. 2006) (same); *id.* at 105 (remanding for agency to ascertain the living status of relevant individuals and redo its balance); *Brick v. DOJ*, 293 F. Supp. 3d 9, 12 (D.D.C. 2017) (K.B. Jackson, J.) (declining to address privacy balance and ordering agency to supply supplemental declaration describing steps taken to ascertain living status of relevant individuals). Here, all the inmates are deceased, which automatically diminishes any privacy interests in the records.

*ii.*        *Deceased inmates' relatives overwhelmingly support disclosure.*

While family members might sometimes retain a privacy interest in their deceased relative's information, the existence and strength of that interest is a matter of context. For instance, the Supreme Court held that Exemption 7(C)'s privacy protection "extends to family members who object to the disclosure of graphic details," provided the public interest does not outweigh the relatives' privacy. *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004). It thus found a cognizable privacy interest in death-scene images of Vince Foster, deputy counsel to President Clinton, in part because his family swore to having been harassed by "political

- 16 -

and commercial opportunists" and on that basis "opposed the disclosure of the disputed pictures." *Id*. at 167.

This case has diametrically opposite facts. Gina Barton is a veteran USA TODAY investigative journalist with decades of experience reporting on carceral deaths. Barton Decl. ¶¶ 4-5. Over her career she has "contacted dozens of people whose loved ones died in jails and prisons." *Id*. ¶ 6. Not one complained that she was invading their privacy, and all wanted the public to know the truth about what happened to their family members. *Id*. In that vein, they all supported Barton's disclosing the very type of information DOJ continues to redact, such as the inmate's name, age at death, cause of death, and past convictions. *Id*. In several cases, Barton's reporting has helped hold accountable people responsible for the inmates' deaths, an outcome the relatives fully support. *Id*.

For example, Barton reported on the death of Jeremy Cunningham. *Id*. ¶ 7. That included telling the story of the details surrounding Cunningham's death, including that he had "turned himself in" for a parole violation and "told nurses he had used both alcohol and narcotics within the past eight hours." Gina Barton, Deaths in Detention: Improper, inadequate treatment results in deaths of sick prisoners, *Milwaukee Journal Sentinel* (Feb. 4, 2014) https://www.jsonline.com/story/archives/2021/08/23/deaths-detention-inadequate-treatment-leads-death-sick-prisoners-milwaukee/1291637001. Due to his drug and alcohol use, Barton reported, nurses instructed that he be monitored every four hours for 72 hours. *Id*. But that did not happen, even after his cellmate pressed an emergency button. *Id*. Cunningham passed away shortly thereafter. *Id*.

Cunningham's mother, Cynthia Telford, has provided a sworn declaration in this case. Telford was "happy Gina contacted me" because she "wanted the information about my son's

death to be made public." Telford Decl. ¶ 7. Telford fully supported Barton's including in her story all the details surrounding Cunningham's death, and provided an on-the-record interview. *Id*. ¶ 8. Indeed, after Barton's story was published, Telford viewed as a "positive outcome[]" that she "received phone calls from parents all over the country who wanted to know how they could connect with journalists to get their children's stories out to the public." Telford Decl. ¶¶ 9-10. She also viewed as a "positive outcome[]" that the Wisconsin legislature enacted a statute that has prevented others from dying in similar ways. *Id*. ¶¶ 9-10. The stories also helped her secure legal representation and seek justice against individuals responsible for Cunningham's death. *Id*. ¶ 11.

Barton's and Telford's declarations show that this case is completely unlike *Favish*, where the relatives of a politically prominent figure objected to disclosure because they had been harassed about his death. Here, deceased inmates' relatives overwhelmingly find positive value in reporting on the death of their loved ones and actively encourage that reporting. This shows that their privacy interests are substantially reduced at best.

Indeed, this case compares favorably to *Wessler v. DOJ*, 381 F. Supp. 3d 253 (S.D.N.Y. 2019), which reached just that conclusion. In *Wessler*, a reporter sought the "full medical records" of inmates who died while in custody of the U.S. Marshals Service—information far more sensitive than the demographic and cause-of-death information USA TODAY seeks here. *Id*. at 260. In assessing the privacy interests of the deceased inmates' relatives, the court found those interests diminished because, in the requester's "past reporting on medical neglect in prisons, the families of the deceased have 'expressed gratitude' when [the requester] 'contacted them in the process of investigating and/or before publishing stories about their relative.'" *Id*. at 259 (quoting requester's declaration). USA TODAY has made essentially the same showing here but on stronger proof: declarations not only of an award-winning reporter who has covered inmate deaths

for 30 years, but also a relative of a deceased inmate who has personally decided that reporting on the precise details sought here would not invade her privacy.

### iii.     Most states make the data available.

Privacy interests in the death-in-custody data are further reduced because much of that data is readily available—a fact that diminishes privacy interests.  *See, e.g.*, *Int'l Couns. Bureau v. U.S. DOD*, 723 F. Supp. 2d 54, 66 (D.D.C. 2010) (holding privacy interests "slight" in the names and photographs of Guantanamo Bay detainees because this information was "already publicly available"); *Story of Stuff Project v. U.S. Forest Serv.*, 366 F. Supp. 3d 66, 80 (D.D.C. 2019) (holding privacy interests "not substantial" in the names and photographs of engineering and environmental consultants who submitted reports to the government because that information was "publicly available").

As explained in USA TODAY's declarations, most states release, as a matter of course, much of the information DOJ now redacts.  For instance, a UCLA study on COVID-19 deaths in state and local facilities found that 29 of 42 states released the deceased inmate's name.  Caruso Decl. ¶ 29.  Beyond that, many states issue press releases shortly after an inmate dies that conveys the precise information DOJ now withholds, typically including the inmate's name, age, cause of death, facility at death, and past convictions.  *See, e.g.*, Barton Decl. Exs. 2, 3, 5, 7, 10, 16, 20, 29, 41, 46.  Indeed, several states even publish extensive databases containing the same type of information that DOJ now withholds.  *See* Barton Decl. ¶ 9.  For example, the Texas Attorney General's Office hosts a "Custodial Death Report" database containing nearly 20,000 entries.  *See* Custodial    Death    Report,    Texas    Office    of    the    Attorney    General, https://oag.my.site.com/cdr/cdrreportdeaths.  The main database lists the decedent's name and date of death.  Clicking on the decedent's name then reveals substantial information about the decedent and their cause of death.  *See id.*

While state practices vary, that most states release the very type of information DOJ has withheld shows that carceral death information has a diminished privacy value. The court reached an analogous conclusion in *Wessler*. There, the federal Bureau of Prisons had voluntarily released deceased inmates' "full medical records," which the court found "certainly relevant" to assessing the U.S. Marshals Service's asserted privacy interests in the same type of record. *Wessler*, 381 F. Supp. 3d at 261. Indeed, the BOP's practices in that case are relevant here too, since an inmate's "full medical records" are far more sensitive than the high-level information at issue in this case.

***

Separately, but especially together, the deceased status of the inmates, their families' overwhelming support for disclosure, and the public availability of much of the withheld information all serve to substantially reduce any privacy interests in the death-in-custody data.

### 4. The public interests are substantial.

The public interest for FOIA purposes is to "shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Citizens for Resp. & Ethics in Washington v. DOJ*, 746 F.3d 1082, 1093 (D.C. Cir. 2014) (cleaned up) (citing *DOD v. FLRA*, 510 U.S. 487, 497 (1994)). DOJ argues that the death-in-custody data cannot serve a cognizable FOIA public interest because, supposedly, they would only illuminate the activities of state and local governments. *See* D. Br. at 22-23. That argument rests on a myopic view of the public interests at stake and ignores the role that DOJ plays in reducing deaths in state and local custody. In fact, the data would shed substantial light on DOJ's implementation and enforcement of DCRA and enable the public to assess DOJ's collaboration with state and local governments, including through millions of dollars of annual grant funding. And contrary to DOJ's assertion, the statistical analyses it has published do not reduce the incremental value of the death-in-custody data.

> i.      *The data would shed light on DOJ's implementation and*
>         *enforcement of DCRA.*

Records disclosing a federal agency's implementation and enforcement of a federal program plainly sheds light on the agency's performance of its statutory duties.  The death-in-custody data at issue here would shed light on DOJ's implementation and enforcement of DCRA—a federal statute—in two main ways.

First, the data would allow the public to weigh in on the two issues DOJ was supposed to report on within two years of DCRA 2013's enactment: the "means by which [information collected under DCRA] can be used to reduce the number of [deaths in custody]" and "the relationship, if any, between the number of such deaths and the actions of management of such jails, prisons, and other specified facilities related to such deaths."  DCRA 2013, ¶ 2.  DOJ's report is now many years past due, which the Senate Permanent Select Committee on Investigations found to be one reason "DOJ is failing to effectively implement DCRA 2013."  PSI Report at 1.  Absent the report, only the public can fill in the gaps necessary to make these assessments, which Congress entrusted to a federal agency and hence obviously sheds light on federal government activity.   Indeed, the Permanent Select Committee expressly recognized the press's role in plugging holes in the government's delinquencies, which is a primary purpose of USA TODAY's FOIA request.  *See id*. at 17; Caruso Decl. ¶ 15.  And contrary to DOJ's argument that the death-in-custody data is cumulative of public information, the only information it could potentially replicate is the report that does not exist.

Second, the redacted data would advance public debate about DOJ's decision not to exercise its authority under DCRA 2013 to reduce grant funding for states that do not report as required.  *See* AG Report at 11 ("The Department has not implemented this penalty to date.").  Clearly, that debate should be informed by the extent to which particular states are complying with

DCRA's reporting requirements.  The data produced thus far are insufficient for that purpose since DOJ has redacted the state for 22 percent of the deaths.  *See* Caruso Decl. ¶ 21.  And producing **only** the states would be insufficient too, since that would not enable an analysis of whether particular states have produced all the data fields, and with sufficient quality, to satisfy DCRA, and hence whether the Attorney General should have reduced grant funding for those states. Further, there is no public information that could replicate the data at issue, since, as the PSI Report found, DOJ "has not assessed state compliance with DCRA reporting."  PSI Report at 10.

Thus, the death-in-custody data would shed light on DOJ's implementation and enforcement of DCRA.

   ii.  *The data would shed light on DOJ's collaboration with state and local governments.*

While the death-in-custody data addresses state- and local-level deaths, the federal government is directly involved in state- and local-level carceral efforts.  The redacted data would reveal that involvement, and facilitate public discussion about it, in at least two ways.

First, DOJ provides grants to state and local agencies to address issues affecting inmates' physical and mental health, from rape prevention[7] to substance use.[8]  Some grants are earmarked for those purposes while others give states more discretion.[9]

Shedding light on federal government grantmaking is obviously cognizable as a FOIA public interest.  *See Washington Post Co. v. HHS*, 690 F.2d 252, 264 (D.C. Cir. 1982) (holding public had a strong interest in knowing whether consultants involved in allocating cancer research funds had a conflict of interest).  Further, inmates' mortality is surely a relevant factor in assessing whether to create, continue, modify, or abandon grants designed to improve inmates' health

---

[7] *See* Rape Prevention Grant.
[8] *See* California Grant.
[9] *See* Texas Grant.

outcomes.  For example, knowing what illnesses inmates die from—particularly in which facilities—could inform how the federal government should allocate funds to prevent those illnesses.  But the public cannot assess that with the data DOJ produced, since it redacted nearly all the illnesses and most of the facility names.  *See* Caruso Decl. ¶¶ 23, 25.  And other information in the records, such as the inmate's age at death, is integral to that type of resource allocation—the federal government might choose to allocate funds differently as between facilities where inmates die of heart disease at 40 versus 90.

DOJ argues that BJS has already analyzed these types of issues (which, incidentally, confirms that the data obviously pertains to federal activity, as discussed above) and thus that redacted data would be merely cumulative.  *See* D. Br. at 23.  But it merely points to BJS's website without identifying any particular analyses that it says replicate how the public might analyze it. *See id*. n.16.  Regardless, its argument fails.  That is because DOJ can and often does issue grants to particular state or local governments or facilities,[10] whereas "DOJ has never before publicly reported facility-level death data."  PSI Report at 17.  There are simply no public, comprehensive data that can inform to which facilities DOJ should be allocating grant funding in light of inmate deaths that occur there.  Only the data, once unredacted, can fill that gap.

---

[10] *See, e.g.*, FY 2023 Comprehensive Opioid, Stimulant, and Substance Use Site-based Program (2023), https://bja.ojp.gov/funding/opportunities/o-bja-2023-171527 (providing for "[l]ocal [a]pplications" for funding to address opiate-related problems);  Comprehensive Opioid, Stimulant, and Substance Use Program (COSSUP) Award Information (2023), https://bja.ojp.gov/funding/awards/15pbja-23-gg-02368-coap (awarding nearly a million dollars to Amador County, CA under the Comprehensive Opioid, Stimulant, and Substance Use Site-based Program); HMCC & WWCC Residential Treatment Program Award Information (2023), https://bja.ojp.gov/funding/awards/15pbja-23-gg-01492-rsat (awarding over $200,000 for substance use treatment programs at the Hiland Mountain Correctional Center and Wildwood Correctional Center).

Second, the federal government also provides other types of resources to state and local governments to address inmate deaths.  For instance, President Biden recently ordered the Attorney General to "issue guidance to State, Tribal, local, and territorial law enforcement agencies (LEAs) regarding best practices for conducting independent criminal investigations of deaths in custody that may involve conduct by law enforcement or prison personnel."  Executive Order 14074, § 2 (May 25, 2022).  The federal government may also help state and local governments identify trends in inmate deaths and collectively "take corrective measures" to address them.  PSI Report at 18. For instance, the PSI Report found that, using death-in-custody data, the federal government could have helped a local prison learn that it had "more than double the national average of jail deaths," and help mitigate problems at that facility.  *Id*.  The death-in-custody data, once unredacted, would enable the public to assess how well the federal government is doing at helping address deaths in state and local facilities.  And for reasons given above, BJS's analysis is too coarse-grained to be up to that task.

Finally, it bears emphasizing that all the data is critical for these accountability purposes, including the deceased inmates' names.  DOJ's data fields do not paint the full picture of why inmates are dying in prison and thus whether the federal government is adequately addressing the issue through grants and other interventions.  The full picture depends on more granular information that the public can only obtain by investigating specific deaths.  *See* Caruso Decl. ¶¶ 19-26.  For instance, the unredacted data might show that particular inmates committed suicide by drug overdose, but would not show how the inmates obtained the drugs—information obviously relevant to whether the federal government is helping facilities prevent drug-related suicides.[11]

---

[11] Perhaps the currently redacted narrative fields could provide some additional information here, but that would not be a complete substitute for fully-fledged investigative journalism.

That information resides only with people with knowledge of relevant events. *Id*. ¶ 19.  And it is impossible for reporters to identify those people without knowing who the inmates were.  *Id*.

***

Given these substantial public interests, and in light of the miniscule privacy interests, the privacy balance favors disclosure.  None of the withheld data is exempt under either Exemption 6 or Exemption 7(C).

### 5. DOJ's k-anonymity redactions are too broad.

For reasons given above, the public interest in disclosure outweighs the privacy interests in the death-in-custody data.  So the Court should order it all released.  If, *arguendo*, it finds the privacy interests justify withholding information that would identify an inmate, it still must determine whether DOJ's redactions are narrow enough to accomplish that purpose given the agency's duty to segregate and produce all information that is either not exempt or would not cause foreseeable harm.  *See Leopold*, 94 F.4th at 37 ("The segregability requirement thus extends to both steps of FOIA's sequential inquiry: Even if an exemption covers an entire agency record, the agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects.").

DOJ proffers k-anonymity as a method for segregating the data.  As the agency explains, k-anonymity guarantees that it is impossible to learn anything about a person in the dataset based on combining the dataset with publicly available information.  To apply k-anonymity, DOJ first decided which fields in the dataset are "quasi-identifiers"—information that also exists in the public domain.  D. Br. at 25-26.  The quasi-identifiers it chose were "state of incarceration and the correctional facility name and location, as well as information about the inmate's month and day of death, race, admission date, and offense of incarceration."  *Id*. at 26.  It then redacted the data

- 25 -

to prevent any unique combination of quasi-identifiers from appearing in it, on the theory that such a unique combination would identify a person and enable the public to infer new information about them from the dataset.  *See id.*

There are two flaws with DOJ's application of the k-anonymity method to this data.

First, DOJ's choice of quasi-identifiers is illogical.  It chose its list based on information in inmate search directories, press releases, and news articles.  *See* Lauger Decl. ¶ 9.  But many of these sources often contain virtually ***all*** the sensitive information DOJ has redacted.  *See* Barton Decl. ¶ 8; Barton Decl. Exs. 1-50.  Thus, if a curious person reads a press release or news article about a deceased inmate, they will already know everything DOJ might disclose about that inmate. So redacting the inmate's information would serve no privacy-protecting purpose.

The Barton Declaration contains a sample press release or news article from each state. Every single one discloses the inmate's name and facility at death, while the majority also include all three of the inmate's convictions or charges (if held pretrial), age at death, and cause or manner of death.[12]  *See* Barton Decl. Exs. 1-50.  This constitutes virtually all the purportedly sensitive information in the data.

By way of illustration, a recent press release from the Arizona Department of Corrections reports the following:

> James Walker, 44, (ADCRR #127828) died on March 02, 2024, from an apparent act of self-harm by hanging.
>
> Prison staff discovered Walker unresponsive in his housing unit on March 02, 2024, and conducted life-saving measures until paramedics arrived onsite. Responding paramedics in consultation with medical staff pronounced Walker deceased.

---

[12] Still others contain some combination of these three pieces of data.  In some cases, the cause or manner of death was reported without an official autopsy, such as if an inmate was found hanging in their cell or another inmate was charged with their death.

> Inmate Walker was admitted to ADCRR custody in 2018 after he was sentenced out of Maricopa County for Aggravated Assault, Armed Robbery, and a Dangerous Drug Violation.
>
> His assigned housing location was Arizona State Prison Complex-Tucson.

Barton Decl. Ex. 3.  If a person has read this press release and already knows all this information about Mr. Walker, seeing the same information in DOJ's death-in-custody data will cause Mr. Walker and his relatives no incremental privacy harm.  Conversely, if a person has not read this press release, DOJ can disclose it all (apart from Mr. Walker's name) without posing any risk that it will identify him.  The same goes for databases produced either by states or nonprofit organizations based on public records requests.  *See* Barton Decl. ¶ 9.

Second, DOJ fails to explain why k-anonymity would require it to redact each of the over 16,000 narrative descriptions of the inmates' deaths.  It does not claim that a narrative description of an inmate's death is a quasi-identifier.  So if has already fully anonymized the inmates, as it claims to have done, then releasing all the narrative descriptions should cause no incremental privacy harm.

Finally, if the Court accepts k-anonymity as sufficient for segregability but declines to reconsider its decision on Exemption 3, it should order DOJ to redo the k-anonymity analysis.  As DOJ explains, the information it redacts about one inmate depends on whether that inmate shares characteristics with other inmates in the dataset.  If DOJ expands its dataset to include other inmates, inmates in the current dataset will become less unique.  And that should justify removing some redactions.[13]

---

[13] For example, DOJ posits an example where only one inmate who committed armed robbery died in a given month in a given state, and argues that certain information should be redacted due to the uniqueness of that inmate in the dataset.  *See* D. Br. at 26.  But because DOJ has withheld data provided by local governments, it may be that the local government data add a second inmate from the same state who committed armed robbery and who died in the same month as

B.       **DOJ conducted an inadequate search for BOP data.**

DOJ bears the burden to establish the adequacy of its search.  *See Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) ("An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'") (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).  To meet that burden, it must show that it searched all locations likely to contain the records.  *See Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ("[T]he agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested."); *Shteynlyuger v. Ctrs. for Medicare & Medicaid Servs.*, No. 20-cv-2982, 2023 WL 6389139, at *17 (D.D.C. Sept. 30, 2023) ("[T]he question is not whether the agency searched the ***most likely*** places to maintain responsive records; the question is whether the agency searched ***all*** places where records were reasonably likely to be found.") (emphasis in original).

DOJ failed to meet that burden because it did not search for MCI data submitted by the federal Bureau of Prisons even though the request seeks "all information" submitted to the MCI Program.  Caruso Decl. Ex. 1.  Such data plainly exists according to DOJ's own description of the Program.  According to DOJ, the Program collected "inmate death records from each of the nation's 50 state prison systems, ***Federal Bureau of Prisons***, and approximately 2,800 local jail jurisdictions."  MCI Webpage (emphasis added).  But DOJ did not search for the federal data. Instead, its declarant claims only to have searched for "all of the data collected from state departments of corrections and local jail administrators on the MCI forms, plus some additional metadata that was appended to the records upon their submission."  Carson Decl. ¶ 15.  Since DOJ

_____

the first.  By adding the second inmate, the first inmate's data is no longer unique, and k-anonymity provides no reason to redact it.

did not search for responsive data it claims to possess, its search is necessarily inadequate.  The

Court should order it to produce all BOP data submitted to the MCI Program.

### C.     The Court should not reconsider its decision on Exemption 3.

#### 1.     DOJ bears a heavy burden to justify reconsideration.

Rule 54(b) provides that an interlocutory decision "may be revised at any time before the

entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R.

Civ. P. 54(b).  Courts grant these motions only if "justice requires."  *Muttitt v. Dep't of State*, No.

10-cv-202, 2013 WL 12318039, at *1 (D.D.C. July 30, 2013) (Howell, J.).  In general, justice may

require reconsideration in three circumstances: "(1) an intervening change in the law; (2) the

discovery of new evidence not previously available; or (3) a clear error in the first order."  *Id*.

Thus, it is well-established that reconsideration under Rule 54(b) "cannot be used as an opportunity

to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting

theories or arguments that could have been advanced earlier."  *Id*. at *2 (cleaned up).  *See also,*

*e.g.*, *Est. of Gaither ex rel. Gaither v. D.C.*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011); *Negley v. FBI*,

825 F. Supp. 2d 58, 62 (D.D.C. 2011*); Fox v. D.C.*, 923 F. Supp. 2d 302, 305 (D.D.C. 2013);

*Anand v. HHS*, No. 21-cv-1635, 2022 WL 4231981, at *1 (D.D.C. Apr. 27, 2022).

The "law of the case" doctrine informs the reconsideration analysis.  That doctrine provides

that, generally, "a court should not reopen issues decided in earlier stages of the same litigation."

*Agostini v. Felton*, 521 U.S. 203, 236 (1997).  *See also LaShawn A. v. Barry*, 87 F.3d 1389, 1393

(D.C. Cir. 1996) (describing the doctrine as providing that "the *same* issue presented a second time

in the *same* case in the *same* court should lead to the *same* result") (emphases in original).  But

the law of the case is not absolutely binding: a court may revisit its prior decision if that decision

"is clearly erroneous and would work a manifest injustice."  *Agostini*, 521 U.S. at 236.

The "law of the case" doctrine applies here.  The Court already decided that Exemption 3 does not apply to any of the data DOJ withheld—thus, *a fortiori*, to the subset of the data about which DOJ seeks reconsideration.  In moving for reconsideration, DOJ is asking for the "same issue presented a second time in the same case in the same court" to lead to a ***different*** result.  *LaShawn A.*, 87 F.3d at 1393.  This is the exact scenario the doctrine is meant to avoid absent manifest injustice.

DOJ argues that the "law of the case" doctrine does not apply because the Court's holding was embodied in a decision granting USA TODAY partial summary judgment, partial summary judgment orders are interlocutory, and the "the law of the case" doctrine supposedly does not apply to interlocutory orders.  D. Br. at 28-29.  It relies for the last proposition on *Keepseagle v. Perdue*, 856 F.3d 1039 (D.C. Cir. 2017), which rejected a claim that a district court's prior ordering was "binding" as law of the case because it was not "embodied in any final judgment," and thus that the district court had the power to reconsider it.  *Id*. at 1048.

While *Keepseagle* might establish that the Court is not absolutely bound by its prior decision, it says nothing to suggest that *Agostini* provides the wrong framework for deciding whether to overturn a prior legal decision in the same case.  Indeed, plenty of courts have applied "law of the case" principles consistent with *Agostini* in a similar posture.  *See, e.g.*, *Charles v. Off. of the Armed Forces Med. Exam'r*, 979 F. Supp. 2d 35, 41-42 & n.9 (D.D.C. 2013) (K.B. Jackson, J.) (adopting "as law of the case" prior partial summary judgment rulings in a FOIA case while noting *Agostini* exception); *ACLU v. DOJ*, 252 F. Supp. 3d 217, 226 (S.D.N.Y. 2017) (declining to reconsider holding that a FOIA exemption applied because court's prior opinion "constitute[s] the law of the case"); *Fleming v. Medicare Freedom of Info. Grp*., No. 15-cv-1135, 2019 WL 2462814, at *3 (D.D.C. June 13, 2019) (declining to reconsider prior ruling because plaintiff

presented the same arguments in a prior motion for partial summary judgment, and "[t]he law of the case applies"); *see also, e.g.*, *Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999) (Posner, C.J.) ("The ruling granting partial summary judgment in favor of Carr was the law of the case. The district judge therefore could not change it without a good reason.").

Plus, whether or not the doctrine applies as a formal matter, the principles animating it—chiefly, "finality and judicial economy"—make it a useful "means of guiding" a court's decision on whether to grant reconsideration. *Am. Canoe Ass'n v. Murphy Farms, Inc*., 326 F.3d 505, 515 (4th Cir. 2003). They show that a party seeking reconsideration bears a heavy burden to justify it.

### 2. DOJ has no excuse for failing to make its arguments the first time.

As discussed, reconsideration under Rule 54(b) generally "cannot be used as an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier." *Muttitt*, 2013 WL 12318039, at *2 (cleaned up). While Rule 54 might impose no "strict prohibition," on raising new arguments, *Cobell v. Jewell*, 802 F.3d 12, 26 (D.C. Cir. 2015), a court has discretion to deny reconsideration on these grounds, *see Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc*., 630 F.3d 217, 227 (D.C. Cir. 2011). Thus, the moving party should at least offer some reason for imposing this "waste of the limited time and resources of the litigants and the judicial system," *Estate of Gaither*, 771 F. Supp. 2d at 10.

As the Court noted in its Minute Order, however, DOJ offers no such reason. DOJ acknowledged that its arguments were available in the first round of briefing and that it simply failed to make them. *See* Minute Order (Feb. 22, 2024). Still now it offers no basis for failing to make its arguments the first time. That weighs heavily against reconsideration.

**3.     DOJ has no excuse for delaying six months to file its motion.**

Courts also consider the timeliness of a reconsideration motion.  *See, e.g.*, *Geo-Grp. Commc'ns, Inc. v. Shah*, No. 15-cv-1756, 2020 WL 5743516 (S.D.N.Y. Sept. 25, 2020). Timeliness is especially important in FOIA cases like this one, for which the D.C. Circuit has held that enforcing a "robust timeliness rule encourages the Government to present all its arguments the first time around" and thus "serves FOIA's goal of a prompt and efficient process." *Citizens for Resp. & Ethics in Washington v. DOJ*, 854 F.3d 675, 680 (D.C. Cir. 2017).  For this reason, courts in FOIA cases are not required to consider "a new legal theory justifying the withholding" of records under an exemption the agency has already cited, *Citizens for Resp. & Ethics in Washington v. DOJ*, 45 F.4th 963, 979 (D.C. Cir. 2022)—exactly what DOJ is asking the Court to do here.

As the Court also recognized in its Minute Order, DOJ waited a full six months to make its first reconsideration motion even though the Court's summary judgment order specifically identified "the point of clarification that defendant now seeks to use as a basis for reconsideration." Minute Order (Feb. 22, 2024).  Indeed, DOJ waited until approximately one month before its production was due, making it impossible for the Court to decide the motion in time for the agency to meet its deadline.  That in turn led to more piecemeal litigation.  And it even likely increased the extent of the agency's redactions to the records that it has already produced—as explained above, a larger dataset would likely have led to fewer redactions.  *See* Section IV.A.5, *supra*.  That has in turn harmed USA TODAY's ability to report on the federal government's role in mitigating state and local inmate deaths.  *See* Caruso Decl. ¶ 16.

Even though the Court's Minute Order cites DOJ's delay as a reason for denying reconsideration without prejudice, DOJ does not even try to justify or excuse it.  The only inklings of an explanation come from joint status reports filed after the Court's summary judgment order.

- 32 -

In the first two, DOJ stated that it was deciding whether to seek reconsideration or appeal.  *See* Joint Status Report (Apr. 12, 2023), ECF No. 22; Joint Status Report (May 12, 2023), ECF No. 23.  The next two status reports whittled that decision down to reconsideration, presumably because the interlocutory appeal clock had run.  *See* Joint Status Report (June 12, 2023), ECF No. 24; Joint Status Report (July 14, 2023), ECF No. 25; *see also* Fed. R. App. P. 4(a)(1)(B)(ii).  Then DOJ omitted any reference to reconsideration in the next status report, suggesting it had decided ***not*** to seek reconsideration.  *See* Joint Status Report (July 28, 2023), ECF No. 26.  All this reflects mere indecision (at best) on the agency's part, which has resulted in prejudice to the Court, USA TODAY, and the public.  This, too, bolsters the case against reconsideration.

> **4.    Any prejudice from the Court's summary judgment order is illusory and unsupported.**

DOJ next argues that a parade of horribles will supposedly result if the Court denies reconsideration.  Specifically, it says that, if ordered to release the records at issue, others will perceive it as a breach of confidentiality and refuse to volunteer information for BJS's statistical purposes.  *See* D. Br. at 33-34.  This argument has three main flaws.

The first derives from a conspicuous omission in DOJ's argument: it does not articulate ***any*** anticipated negative results for its collection of death-in-custody data: the data at issue in its motion.  Presumably that is because BJS, which collected all the data DOJ has withheld, no longer plays any role in death-in-custody data collection.  DOJ's Bureau of Justice Assistance has taken its place.  *See* AG Report at 2-5.  Instead, DOJ focuses on assurances of confidentiality purportedly given to different people submitting different data under different legal regimes.  Any supposed prejudice is thus substantially attenuated.

Second, DOJ identifies no way in which the Court's ruling on Exemption 3 in this case could extend to any of the other data collections it identifies.  Absent any such a connection, no

submitter would have any reason to doubt BJS's confidentiality assurance, since all it will have done here is comply with a court order based on an unrelated statute—it is not as if BJS will have voluntarily released the information.  Thus, it is illogical that upholding the Court's ruling on Exemption 3 would have any appreciable impact on submitters' expectations of confidentiality.

Third, DOJ's argument is entirely speculative.  The Court decided summary judgment over a year ago, and DOJ provides no examples of anyone refusing to volunteer information to BJS because of that decision.  Especially noteworthy is the six-month period immediately following the Court's summary judgment order, before DOJ had moved to reconsider and before the Court had stayed its production obligations.  If the summary judgment order was going to cause any difficulties, presumably they would have been apparent by now.

Absent any excuse for failing to raise its arguments the first time, justification for delay, or demonstration of prejudice, there is no reason to even entertain DOJ's arguments.  Regardless, for the following reasons, they lack merit.

### 5.    The Court should not reconsider its decision as to data submitted before DCRA 2013's effective date.

DOJ first argues that the Court should reconsider its decision as to data submitted while DCRA was not in effect.  DOJ argues that, during that period, the data cannot have been furnished under DCRA.  *See* D. Br. at 31-32.  But the dispositive question is not whether the data was furnished under DCRA.  It is whether the data was furnished under Title I of the Crime Control Act—the Exemption 3 statute DOJ invokes.  The gravamen of DOJ's argument is that, if the data was not furnished under DCRA, it was necessarily furnished under Title I.  But that is false for reasons already given in the Court's prior opinion.

As the Court has already held, the death-in-custody data was not furnished under Title I.  Though it reached that conclusion in part based on the interplay between Title I and DCRA, it also

relied on Title I-specific factors.  For instance, when expounding Title I's structure, the Court held that, "[i]n context, Title I of the Crime Control Act does not cover the specific death-in-custody reporting requirements provided in the DCRA."  Mem. Op. at 15.  *See also id*. at 13 ("Nothing in Title I, let alone in its confidentiality provision, requires reporting on the specific type of data the DCRA mandates."); *id*. at 19 ("DOJ does not cite any provision of the Crime Control Act that requires certain statistical recordkeeping and reporting, let alone of death-in-custody instances.").

DOJ's only response is to argue that BJS "necessarily relied on its own statutory authority under Title I to collect data on a voluntary basis."  D. Br. at 31.  But this simply ignores the Court's analysis of DOJ's argument for that proposition: the Court rejected DOJ's argument that "the Crime Control Act exhibits a purpose to collect statistics, such as those described in the DCRA." Mem. Op. at 19.  In other words, because the Crime Control Act does ***not*** exhibit such a purpose, death-in-custody data cannot have been furnished under that statute, whether or not it happened to be furnished under DCRA.  And because the data was not furnished under Title I of the Crime Control Act, that statute's confidentiality provision does not apply, and neither does Exemption 3.

### 6.    The Court should not reconsider its decision as to data submitted by local governments.

DOJ also argues that the Court should reconsider its decision as to data submitted by local government.  It posits that, because DCRA does not require local governments to submit data, such data must have been furnished under Title I.  This argument fails for two independent reasons.

First is the one just discussed: even if local government data was not furnished under DCRA, it does not follow that it was furnished under Title I.

Second, local government data actually was furnished under DCRA.[14]  Both versions expressly require the submission of local government data.  *See* DCRA 2000, § 2; DCRA 2013; § 2(a).  True, DCRA does not say that the local governments have to submit it themselves; it only refers to submissions by states.  *See* DCRA 2000, § 2; DCRA 2013; § 2(a).  But there are strong reasons to conclude that submissions by local governments are attributable to the relevant state and thus furnished under DCRA whoever takes the clerical step of submitting them—be it the state or the local government.

For one, the statute is silent on what entity within a state must submit the data under DCRA. All presumably agree that data submitted by a state department of corrections, for instance, is attributable to the state.  *See* AG Report at 8 ("BJS collected data directly from state corrections departments and local jails.").  But DCRA does not specify that such submissions are attributable to the state.  Instead, the statute evidently assumes that data will be submitted by subordinate units of state government.  Yet that is exactly what local governments are: like state agencies, they are "subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions."  *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009).  There is no statutory basis to treat local governments any differently from state correctional agencies in this respect.

Further, DOJ's reading—that data is not furnished under DCRA if a local government physically submits it to DOJ—would lead to a perverse result totally at odds with DCRA's statutory scheme.  In particular, it would mean that a state can be subject to a 10 percent reduction in grant funding even if DOJ possesses a perfect set of data about every death occurring in the

---

[14] DOJ does not appear to dispute that it would be required to disclose the data if it was furnished under DCRA, since it has not challenged that aspect of the Court's summary judgment order. Indeed, its entire argument is that the data was not furnished under DCRA.  *See* D. Br. at 32-33.

state's borders.  This would occur if, in a given state, some or all local governments submitted data to DOJ themselves rather than through some centralized state middleman, and the state did not duplicate those submissions.  And since the evident purpose of the 10 percent provision is to ensure that DOJ has the data it needs, DOJ's interpretation is fundamentally at odds with the 10 percent provision.  The Court can avoid this result by reading the statute naturally to provide that submissions by local governments are attributable to the state and thus furnished under DCRA.

DOJ has two responses.  First, it points out that DCRA incorporates terms that define "State" separately from "unit of local government" and argues that the use of different terms suggests a meaningful variation.  D. Br. at 33.  Of course "State" and "local government" mean different things.  But that does not advance DOJ's reading.  For USA TODAY's reading does not equate the two so as to destroy meaningful variation.  It simply provides that, if a local government happens to physically transmit data to DOJ, that data is attributable to the relevant state and thus furnished under DCRA.  That follows from the subordinate nature local of governments, not some equation between them and their state.

Second, DOJ argues that DCRA "has never required local jails themselves to directly submit that information to DOJ."  D. Br. at 33.[15]  This, too, is true but irrelevant.  The issue is not whether local jails are *required* to submit information, but whether the information they do submit is attributable to their state.  For the reasons above, it is.

---

[15] DOJ points out that it has repeatedly asked Congress to eliminate what it sees as a centralized state reporting requirement, but Congress has not done that.  *See* D. Br. at 33.  There are many possible explanations for Congress's inaction, but one may be that DOJ has misread the statute to impose such a requirement.

**V.      CONCLUSION**

The Court should grant summary judgment to USA TODAY, deny summary judgment to DOJ, deny DOJ's reconsideration motion, and order DOJ to conduct an adequate search and produce the records in full.

Dated: April 19, 2024                    Respectfully submitted,

                                         */s/ Stephen Stich Match*
                                         Matthew Topic, D.C. Bar No. IL0037
                                         Stephen Stich Match, D.C. Bar No. MA0044
                                         Merrick Wayne, D.C. Bar No. IL0058
                                         LOEVY & LOEVY
                                         311 N. Aberdeen, Third Floor
                                         Chicago, IL 60607
                                         Tel. (520) 488-0486
                                         match@loevy.com
                                         foia@loevy.com

                                         *Attorneys for Plaintiff*