IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GANNETT SATELLITE INFORMATION NETWORK,<br><br>*Plaintiff*,<br>v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>*Defendant*. | Case No. 22-cv-475-BAH |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS SUPPORT OF ITS SECOND CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h)(1), Defendant United States Department of Justice respectfully submits the following responses to Plaintiff's statement of material facts:

1.  On April 9, 2021, USA TODAY filed a FOIA request with the Department of Justice for "all information submitted to BJS under the Mortality in Correctional Institutions program" from 2010 to the date of the request. Caruso Decl. Ex. 1.

    **Response:** Undisputed.

2.  On April 13, 2021, DOJ denied the request under FOIA Exemption 3 via Title I of the Crime Control Act, 34 U.S.C. § 10231. Caruso Decl. Ex. 2.

    **Response:** Undisputed.

3.  On April 14, 2021, USA TODAY administratively appealed that denial. Caruso Decl. Ex. 3.

**Response:** Undisputed.

4. On December 3, 2021, DOJ affirmed its denial. Caruso Decl. Ex. 4.

**Response:** Undisputed.

5. After the Court granted USA TODAY's first summary judgment motion and denied DOJ's first summary judgment motion, DOJ produced records in response to USA TODAY's request. Caruso Decl. ¶ 10.

**Response:** Undisputed.

6. The production consisted of a spreadsheet with the following fields: name, date of birth, state, date of death, the facility where they died, gender, race, date of admission, offenses committed, whether they had stayed in a mental facility, where the inmate died (e.g., if they died in general housing, a medical center, etc.), whether their cause of death was evaluated, what the cause of death was, additional information about the cause of death (e.g., if an illness, what the illness was), medical treatment received, and a short narrative. Caruso Decl. ¶ 27. See also DOJ's FOIA reading room, https://www.ojp.gov/program/ojp-freedom-information-act/ojp-reading- room.

**Response:** Undisputed, except that Defendant notes that several of the fields Plaintiff mentions are spread over more than one column (*e.g.*, "date of birth" includes separate columns for month, day, and year).

7. The spreadsheet contains information regarding 16,625 inmates. Caruso Decl. ¶ 16.

**Response:** Undisputed.

8. DOJ redacted the state of death in 22 percent of the entries. Caruso Decl. ¶ 21.

**Response:** Undisputed.

9. DOJ redacted the facility of death in 58 percent of the entries. Caruso Decl. ¶ 23.

**Response:** Undisputed.

10. DOJ redacted the illness in 11,499 out of the 13,504 entries where the inmate died of an illness. Caruso Decl. ¶ 25.

**Response:** Undisputed.

11. DOJ redacted all the names, ages, and narrative descriptions of the inmates' deaths. Caruso Decl. ¶¶ 18, 27.

**Response:** Undisputed, except that Defendant notes that there was no single variable for "age" in the dataset, and that the redacted notes column is not necessarily a "narrative" description of the inmates' deaths. The dataset includes the month, day, and year of the inmate's birth and death, from which age at death can be derived.

12. Other fields, such as cause of death and criminal convictions, are also heavily redacted. Caruso Decl. ¶ 25; *see also* DOJ's FOIA reading room, https://www.ojp.gov/program/ojp-freedom-information-act/ojp-reading-room.

**Response:** Undisputed that other fields are also redacted; Plaintiff's assessment that the redactions were "heavy" is a statement of opinion, not fact.

13. The currently-redacted information is necessary for reporters to follow up on specific deaths, identify trends in particular facilities, and determine whether the neediest facilities are receiving adequate federal government resources. Caruso Decl. ¶¶ 19-26.

**Response:** Undisputed that Caruso states that the name field is necessary for reporters to follow up on specific deaths; that the facility name is needed to tally deaths at specific facilities; that the date of birth field is necessary for his assessment of the types of aid the federal government "should" give to state and local correctional facilities; that the state field is necessary, in his opinion, to public understanding of whether the federal government is properly directing resources to the states that need them most; and that is it difficult to understand whether unspecified "federal interventions" are effective in preventing inmate deaths without knowing inmates' causes of death. Caruso does not offer an opinion about any other currently redacted fields in the paragraphs cited.

14. BJS did not compile the data responsive to USA TODAY's FOIA request for law enforcement purposes. Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074, 4 (Sept. 16, 2022), https://bja.ojp.gov/doc/DOJ-Implementation-of-DCRA-of-2013.pdf ("AG Report").

**Response:** Undisputed.

15. 13,504 of the 16,625 inmates referenced in the responsive data died due to illness. Caruso Decl. ¶ 25.

**Response:** Undisputed.

16. All the inmates referenced in the responsive data are deceased. Carson Decl. ¶ 6,

ECF No. 35-3.

**Response:** Undisputed.

17. Gina Barton is a veteran USA TODAY investigative journalist with decades of experience reporting on carceral deaths. Barton Decl. ¶¶ 4-5.

**Response:** Undisputed.

18. Over her career Barton has "contacted dozens of people whose loved ones died in jails and prisons." Barton Decl. ¶ 6.

**Response:** Undisputed.

19. Not one complained that she was invading their privacy, and all wanted the public to know the truth about what happened to their family members. Barton Decl. ¶ 6.

**Response:** Undisputed.

20. All the family members Barton contacted supported Barton's disclosing the very type of information DOJ continues to redact, such as the inmate's name, age at death, cause of death, and past convictions. Barton Decl. ¶ 6.

**Response:** Disputed. Barton states that the family members she contacted supported disclosing the inmate's name, age, cause of death, and the crimes they had been convicted of. She does not state that they supported disclosing any other particular information (such as private medical information).

21. In several cases, Barton's reporting has helped hold accountable people

responsible for the inmates' deaths, an outcome the relatives fully support. Barton Decl. ¶ 6.

**Response:** Undisputed that Barton states that the family members she contacted hoped that her reporting would help hold accountable those responsible for the deaths of their relatives, and that "in many cases, it did." Disputed to the extent that Barton does not provide any further specifics to substantiate her claims about the effects of her reporting.

22. Barton reported on the death of Jeremy Cunningham. Barton Decl. ¶ 7.

**Response:** Undisputed.

23. In her reporting, Barton told the story of the details surrounding Cunningham's death, including that he had "turned himself in" for a parole violation and "told nurses he had used both alcohol and narcotics within the past eight hours." Due to his drug and alcohol use, Barton reported, nurses instructed that he be monitored every four hours for 72 hours. But that did not happen, even after his cellmate pressed an emergency button. Cunningham passed away shortly thereafter. Gina Barton, Deaths in Detention: Improper, inadequate treatment results in deaths of sick prisoners, *Milwaukee Journal Sentinel* (Feb. 4, 2014) https://www.jsonline.com/story/archives/2021/08/23/deaths-detention-inadequate-treatment-leads-death-sick-prisoners-milwaukee/1291637001.

**Response:** Undisputed.

24. Cynthia Telford, the mother of Jeremy Cunningham, was happy Barton contacted her because Telford "wanted the information about my son's death to be made public." Telford Decl. ¶¶ 4, 7.

**Response:** Undisputed.

25. Telford fully supported Barton's including in her story all the details surrounding Cunningham's death, and provided an on-the-record interview. Telford Decl. ¶ 8.

**Response:** Undisputed.

26. After Barton's story was published, Telford viewed as a "positive outcome[]" that she "received phone calls from parents all over the country who wanted to know how they could connect with journalists to get their children's stories out in public." Telford Decl. ¶¶ 9, 10.

**Response:** Undisputed.

27. Telford viewed as a "positive outcome[]" that the Wisconsin legislature enacted a statute that has prevented others from dying in similar ways. Telford Decl. ¶¶ 9, 10.

**Response:** Undisputed that Telford expressed that opinion. Disputed in so far as Telford does not specify the statute, or provide any information on its effects.

28. Barton's stories also helped Telford secure legal representation and seek justice against individuals responsible for Cunningham's death. Telford Decl. ¶ 11.

**Response:** Undisputed.

29. A UCLA study on COVID-19 deaths in state and local facilities found that 29 of 42 states released the deceased inmate's name. Caruso Decl. ¶ 29.

**Response:** Disputed. The link cited in Caruso's declaration leads to a folder containing what appears to be several spreadsheets, and does not state that 29 or 42 states released the

deceased inmate's name. The website for the project Caruso references states that 27 states provided a name for individual deaths in their prisons. *See* https://github.com/uclalawcovid19behindbars/custodial_mortality_project/tree/main.

30. Many states issue press releases shortly after an inmate dies that conveys the precise information DOJ now withholds, typically including the inmate's name, age, cause of death, facility at death, and past convictions. *See, e.g.*, Barton Decl. Exs. 2, 3, 5, 7, 10, 16, 20, 29, 41, 46.

**Response:** Undisputed that some states have issued press releases containing the information Plaintiff references. Disputed to the extent Plaintiff seeks to imply that states issue such press releases in all cases or routinely, or that such press releases always or routinely contain the information specified.

31. Several states even publish extensive databases containing the same type of information DOJ now withholds. Barton Decl. ¶ 9.

**Response:** Undisputed that Florida, Illinois, Montana, and Texas publish some death-in-custody information. The evidence Plaintiff cites does not show that those states publish the information that Defendant has redacted in this case. Defendant also notes that its redactions in this case prevent other, unredacted information released to Plaintiff from being identified to a particular decedent; the evidence Plaintiff cites does not show that any state publishes the full information Plaintiff seeks in a form identifiable to particular individuals. The evidence Plaintiff cites also does not establish that any other states publish any death-in-custody information.

32. The Texas Attorney General's Office hosts a "Custodial Death Report" database

containing nearly 20,000 entries. The main database lists the decedent' name and date of death. Clicking on the decedent's name then reveals substantial information about the decedent and their cause of death. *See* Custodial Death Report, Texas Office of the Attorney General, https://oag.my.site.com/cdr/cdrreportdeaths.

**Response:** Undisputed that the Texas Attorney General's Office hosts the referenced database. Disputed in so far as Plaintiff's assessment that the information provided is "substantial" is a matter of opinion not fact.

33. Thousands of inmates die each year, most in state or local facilities. See E. Ann Carson, Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables, Bureau of Justice Statistics, 1 (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf; E. Ann Carson, Mortality in Local Jails, 2000-2019 – Statistical Tables, Bureau of Justice Statistics, 1 (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf.

**Response:** Undisputed.

34. The Bureau of Justice Statistics launched the Mortality in Correctional Institutions Program ("MCI" or the "Program") in 2000 after Congress passed the first iteration of the Death in Custody Reporting Act ("DCRA").  AG Report at 2.

**Response:** Undisputed.

35. Under the MCI Program, BJS collected the following data as required by DCRA: the name, gender, race, ethnicity, and age of the deceased; the date, time, and location of death; and a brief description of the circumstances surrounding the death; AG Report at 2; *see also* Death in Custody Reporting Act of 2000, Pub. L. No. 106-297, 114 Stat. 1045 (2000), ¶2 ("DCRA

2000").

**Response:** Undisputed.

36. BJS continued collecting essentially the same data under the Program after DCRA 2000 expired in 2006. It made that decision because "mortality of individuals within the criminal justice system was of great importance" to BJS. AG Report at 2; *see also* Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)), Changes Over Time, https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths- custody-reporting-program#changes-over-time-0 (noting additions to questionnaires of "whether the death was incident to use of force by facility staff" and asking respondents "to specify the type of intoxication that led to the death").

**Response:** Undisputed.

37. Pub. L. No. 113-242, 128 Stat. 2860, ¶ 2 (2014) ("DCRA 2013") requires states to report death-in-custody data and authorizes the Attorney General to deduct ten percent of certain federal law enforcement grants to states that violated their reporting requirements.

**Response:** Undisputed, except that the penalty is "not more than" 10%, and the requirements of DCRA 2013 are an issue of law not fact.

38. The Attorney General has not exercised that authority to date. AG Report at 11.

**Response:** Undisputed.

39. DOJ has not assessed state compliance with DCRA reporting. PSI Report at 10.

**Response:** Disputed. *See* AG Report 8-13.

40. DCRA 2013 required the Attorney General to produce, within two years, a report that was to determine how the information provided by state and federal law enforcement agencies "can be used to reduce the number of such deaths," and "examine the relationship, if any, between the number of such deaths and the actions of management of such jails, prisons, and other specified facilities relating to such deaths." DCRA 2013 ¶ 2.

**Response:** Undisputed, except that the requirements of DCRA 2013 are an issue of law not fact.

41. The Attorney General has not produced the report to date. Uncounted Deaths in America's Prisons & Jails: How the Department of Justice Failed to Implement the Death in Custody Reporting Act, Permanent Subcommittee on Intelligence, 5 (Sept. 20, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-09-20%20PSI%20Staff%20Report%20-%20Uncounted%20Deaths%20in%20America's%20Prisons%20and%20Jails.pdf ("PSI Report"); Caruso Decl. ¶ 14.

**Response:** Disputed. The Attorney General, through the National Institute of Justice, issued a report to Congress pursuant to DCRA 2013's report requirement in December 2022, and is working on a second report which is anticipated to be delivered to DOJ for review in September 2024. *See* https://www.ojp.gov/pdffiles1/nij/305802.pdf.

42. In 2022, the Senate Permanent Subcommittee on Investigations found that "DOJ is failing to effectively implement DCRA 2013." PSI Report at 1.

**Response:** Undisputed.

43. One reason for this finding was DOJ's failure to issue the report required by DCRA 2013. PSI Report at 1, 5.

**Response:** Undisputed. Defendant notes that DOJ submitted a report to Congress pursuant to DCRA 2013's report requirement in December 2022, after the PSI report.

44. In the AG Report, DOJ acknowledged that deaths in custody is "a profoundly important issue," that growing awareness of it "has increased demands for criminal and juvenile justice reform," and that complete and accurate data is essential to understand why deaths in custody occur and enact "policies and practices that may reduce deaths in custody." AG Report at 1.

**Response:** Undisputed.

45. In 2023, DOJ solicited and awarded over $2.5 million to states to support state and local facilities "to prevent, detect, and respond to sexual abuse and sexual harassment, as well as implement the National Prison Rape Elimination Act (PREA) Standards." FY 2023 Invited to Apply – Prison Rape Elimination Act (PREA Reallocation Funds Program, Bureau of Justice Assistance (2023), https://bja.ojp.gov/funding/opportunities/o-bja-2023-171782.

**Response:** Undisputed.

46. In 2023, DOJ awarded over $3 million to the California Board of State and Community Corrections to address inmates' substance use issues. 2023 Residential Substance Abuse Treatment (RSAT) grant program, Bureau of Justice Assistance (2023), https://bja.ojp.gov/funding/awards/15pbja-23-gg-01500-rsat.

**Response:** Undisputed.

47. In 2023, DOJ gave over $16 million to Texas that the state could spend on any number of issues, including, "jail or prison-based treatment programs," among others. FY23 Texas JAG Program, Program, Bureau of Justice Assistance (2023), https://bja.ojp.gov/funding/awards/15pbja-23-gg-03034-jagx.

**Response:** Undisputed that DOJ made the referenced award, and that funds from the award may be used to support jail or prison-based treatment programs. Defendant disputes Plaintiff's characterization that Texas could spend the award on "any number of issues." The purposes for which the grant may be spent are described at the link provided.

48. In 2023, DOJ solicited local applications for funding to address opiate-related problems. FY 2023 Comprehensive Opioid, Stimulant, and Substance Use Site-based Program (2023), https://bja.ojp.gov/funding/opportunities/o-bja-2023-171527.

**Response:** Undisputed.

49. In 2023, DOJ awarded nearly a million dollars to Amador County, CA under the Comprehensive Opioid, Stimulant, and Substance Use Site-based Program. Comprehensive Opioid, Stimulant, and Substance Use Program (COSSUP) Award Information (2023), https://bja.ojp.gov/funding/awards/15pbja-23-gg-02368-coap.

**Response:** Undisputed.

50. In 2023, DOJ awarded over $200,000 for substance use treatment programs at the Hiland Mountain Correctional Center and Wildwood Correctional Center. HMCC &

WWCC Residential Treatment Program Award Information (2023), https://bja.ojp.gov/funding/awards/15pbja-23-gg-01492-rsat.

**Response:** Undisputed.

51. Disclosure of facility-level death can help identify troubling trends in prisons and jails. PSI Report at 17.

**Response:** Undisputed that the PSI Report reached that conclusion.

52. The federal government may help state and local governments identify trends in inmate deaths and collectively "take corrective measures" to address them. PSI Report at 18.

**Response:** Undisputed.

53. For example, the Senate Permanent Subcommittee on Investigations related a tragic story of an individual who committed suicide after being denied psychotropic medications. It turned out that the facility in which he was incarcerated had "more than double the national average of jail deaths." The Subcommittee thus concluded that, with federal government data, DOJ and the facility could have together "identified the trend" and "take[n] corrective measures." PSI Report at 18.

**Response:** Undisputed that the PSI Report described the referenced incident and reached the referenced conclusion.

54. DOJ has never before publicly reported facility-level death data. PSI Report at 17.

**Response:** Undisputed.

55. According to the Senate Permanent Select Committee on Investigations, DOJ's refusal to release death-in-custody data is "a missed opportunity to prevent avoidable deaths." PSI Report at 6.

**Response:** Undisputed that the PSI Report includes that conclusion.

56. The press has a critical role in "stepp[ing] in to attempt the data collection that DOJ is statutorily obligated and best situated to do." PSI Report at 17.

**Response:** Disputed. The PSI Report states that journalists and non-profit organizations "have stepped in to attempt the data collection that DOJ is statutorily obligated and best situated to do." PSI Report at 17. It does not state that the press has a "critical role" in doing so. Any such conclusion in the PSI Report about the role of the press is a matter of opinion rather than fact.

57. DOJ chose quasi-identifiers based on information it believed would be contained in inmate search directories, press releases, and news articles. Lauger Decl. ¶ 9, ECF No. 35-4.

**Response:** Undisputed.

58. DOJ's chosen quasi-identifiers are state, release/death date, facility, rate, admission date, and offense. Lauger Decl. ¶ 10.

**Response:** Undisputed, except that DOJ also processed the notes column as a quasi-identifier. Second Lauger Decl. ¶ 7.

59. For all 50 states, there are press releases and/or news articles containing deceased inmates' name and facility at death. Barton Decl. Exs. 1-50.

**Response:** Undisputed that at least one such press release or news article exists for all

states. Disputed to the extent that Plaintiff seeks to imply that such press releases or news articles exist for all or most deaths in custody, or that states routinely publish such information.

60. For most states, there are press releases and/or news articles also containing deceased inmates' convictions or charges, age at death, and cause or manner of death. Barton Decl. Exs. 1-50.

**Response:** Undisputed that at least one such press release or news article exists for some states. Disputed to the extent that Plaintiff seeks to imply that such press releases or news articles exist for all or most deaths in custody, or that states routinely publish such information

61. For several states, either the state itself, or a nonprofit consulting public records, has published a database containing much of the information DOJ withheld. Barton Decl. ¶ 9.

**Response:** Undisputed that Florida, Illinois, Montana, and Texas publish some death-in-custody information, and that nonprofits in Louisiana, South Carolina, and Missouri have published records containing some death-in-custody information.

62. DOJ collected data under the MCI Program from each of the nation's 50 state prison systems, Federal Bureau of Prisons, and approximately 2,800 local jail jurisdictions. See Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)), Bureau of Justice Statistics (2019), https://bjs.ojp.gov/data-collection/mortality-correctional- institutions-mci-formerly-deaths-custody-reporting-program#0-0.

**Response:** Undisputed that BJS' MCI website states that MCI collected data from the sources listed. Disputed in so far as the reference to the "Federal Bureau of Prisons" on the MCI website is a clerical error. Second Carson Decl. ¶ 5. BJS never collected MCI data from the

Federal Bureau of Prisons. *Id.*

63. DOJ did not search for data submitted to the MCI Program by the federal Bureau of Prisons. Carson Decl. ¶ 15, ECF No. 35-3.

**Response:** Undisputed. Defendant notes that it did not search for data submitted to the MCI Program by the federal Bureau of Prisons because the MCI Program never collected data from the Bureau of Prisons.

64. USA TODAY's FOIA request seeks "all information" submitted to the MCI Program between 2010 and the date of the request. Caruso Decl. Ex. 1.

**Response:** Undisputed.

Dated: June 7, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cormac A. Early*
CORMAC A. EARLY
D.C. Bar No. 1033835
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 616-7420
cormac.a.early@usdoj.gov

*Counsel for Defendants*