**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GANNETT SATELLITE INFORMATION NETWORK, <br><br> *Plaintiff,* <br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, <br><br> *Defendant.* | Case No. 22-cv-475-BAH |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF DEFENDANT'S SECOND MOTION FOR
SUMMARY JUDGMENT AND FOR PARTIAL RECONSIDERATION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 3

I.     DEFENDANT PROPERLY INVOKED FOIA EXEMPTIONS 6 AND 7(C) .................. 3

      A.     The withheld information implicates substantial privacy interests ......................... 6

      B.     No public interest in disclosure identified by Plaintiff outweighs the privacy interests at stake ..................................................................................................... 12

      C.     BJS appropriately redacted the records ................................................................. 16

II.     DEFENDANT PROPERLY INVOKED EXEMPTION 3 AS TO RECORDS THAT WERE NOT SUBMITTED UNDER DCRA, AND RECONSIDERATION IS WARRANTED TO THE EXTENT THAT THE COURT'S PREVIOUS EXEMPTION 3 HOLDING APPLIES TO SUCH RECORDS ....................................... 20

      A.     Reconsideration is permitted here "as justice requires" ........................................ 20

      B.     Reconsideration is warranted as to state data submitted when DCRA was not in effect ..................................................................................................................... 23

      C.     Reconsideration is warranted as to local data that was never required to be submitted under DCRA .......................................................................................... 24

      D.     Reconsideration is warranted to avoid substantial harm to BJS ........................... 26

III.     DEFENDANT CONDUCTED AN ADEQUATE SEARCH FOR DOCUMENTS ......... 28

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

### Cases

*Agostini v. Felton*,

 521 U.S. 203 (1997) ........................................................................................ 21

*Amiri v. Nat'l Sci. Found.*,

 664 F. Supp. 3d 1 (D.D.C. 2021) ................................................................... 5

*Amuso v. DOJ*,

 600 F. Supp. 2d 78 (D.D.C. 2009) ................................................................. 9

*Benavides v. BOP*,

 774 F. Supp. 2d 141 (D.D.C. 2011) ............................................................... 4

*Buzzfeed, Inc. v. U.S. DHS*,

 610 F. Supp. 3d 139 (D.D.C. 2022) ............................................................... 6

*Campbell v. DOJ*,

 164 F.3d 20 (D.C. Cir. 1998) ......................................................................... 6

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*,

 630 F.3d 217 (D.C. Cir. 2011) ..................................................................... 22

*Chien Fan Chu v. Brownell*,

 247 F.2d 790 (D.C. Cir. 1957) ..................................................................... 25

*Cobell v. Jewell*,

 802 F.3d 12 (D.C. Cir. 2015) ................................................................. 21, 22

*Consumers' Checkbook Ctr. for Study of Servs. v. HHS*,

 554 F.3d 1046 (D.C. Cir. 2009) ................................................................... 15

*Diemert & Assocs. Co. v. FAA,*

    218 F. App'x 479 (6th Cir. 2007) ........................................................................ 9

*DOJ v. Reporters Comm. for Freedom of the Press,*

    489 U.S. 749 (1989)............................................................................ 4, 9, 15, 16

*First Union Nat'l Bank v. Pictet Overseas Tr. Corp.,*

    477 F.3d 616 (8th Cir. 2007) ............................................................................ 21

*Institute for Energy Research v. FERC,*

    2023 WL 6121878 (D.D.C. Sept. 19, 2023) ...................................................... 5

*Keepseagle v. Perdue,*

    856 F.3d 1039 (D.C. Cir. 2017)........................................................................ 21

*Landstar Express Am., Inc. v. Fed. Maritime Comm'n,*

    569 F.3d 493 (D.C. Cir. 2009) ......................................................................... 26

*Maydak v. DOJ,*

    254 F. Supp. 2d 23 (D.D.C. 2003) ..................................................................... 4

*Mingo v. DOJ,*

    793 F. Supp. 2d 447 (D.D.C. 2011) ................................................................... 3

*Muttitt v. Dep't of State,*

    2013 WL 12318039 (D.D.C. July 30, 2013)..................................................... 22

*Nat'l Archives & Records Admin. v. Favish,*

    541 U.S. 157 (2004)................................................................................... 7, 8, 9

*Nat'l Ass'n of Retired Fed. Employees v. Horner,*

    879 F.2d 873 (D.C. Cir. 1989) ..................................................................... 7, 15

*Pub. Employees for Envt'l Resp. v. U.S. Section, Int'l Boundary & Water Comm'n,*

740 F.3d 195 (D.C. Cir. 2014) ........................................................................... 4

*Reporters Comm. for Freedom of the Press v. FBI,*

    3 F.4th 350 (D.C. Cir. 2021) ........................................................................... 5

*Reporters Comm. for Freedom of the Press v. U.S. CBP,*

    567 F. Supp. 3d 97 (D.D.C. 2021) ................................................................... 6

*Sussman v. U.S. Marshals Serv.,*

    494 F.3d 1106 (D.C. Cir. 2007) ....................................................................... 8

*Wessler v. DOJ,*

    381 F. Supp. 3d 253 (S.D.N.Y. 2019) .............................................................. 8

*Winston & Strawn, LLP v. McLean,*

    843 F.3d 503 (D.C. Cir. 2016) ....................................................................... 23

## **Statutes**

34 U.S.C. § 10132 ............................................................................................. 23

34 U.S.C. § 10251 ............................................................................................. 25

34 U.S.C. § 60105 ...................................................................................... 12, 25

5 U.S.C. § 552a .................................................................................................. 4

## **Other Authorities**

Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074: Department

of Justice Implementation of the Death in Custody Reporting Act of 2013, at 8-12 (Sept. 16,

2022) ................................................................................................................ 14

## INTRODUCTION

Plaintiff asks this Court to order the release of detailed information about tens of thousands of deaths in state and local correctional facilities, without any redactions to protect highly sensitive and personally identifying information, including information about inmates' medical histories, the circumstances of their deaths, and the reasons for their incarceration. But the public interest in full disclosure is minimal, and cannot outweigh the privacy interests at stake.

The records Plaintiff seeks contain such highly sensitive private information that disclosure of comparable records would be inconceivable if the subjects of the records were alive. Because the records instead concern the dead, the privacy interest is diminished, although by no means eliminated entirely. Plaintiff points to the facts that family members of some deceased inmates have supported disclosing the details of their loved ones' deaths, and that most states release some death-in-custody information, as further diminishing the privacy interests at stake, but neither those families nor states can waive the privacy interests of the thousands of families with a stake in the withheld information. In addition, the death-in-custody data that states make available are far more scattered and less comprehensive than the data collection at issue here. Because the privacy interests at stake are sufficiently substantial, the Court must balance them against the public interest in disclosure of the withheld information. The only public interest that would meaningfully be advanced by disclosure of the withheld information is the public interest in scrutinizing the activities of state and local governments where the deaths occurred. But under the federal Freedom of Information Act, the only public interest in disclosure that matters is shedding light on the activities of the federal government. Plaintiff 's efforts to conjure up hypothetical federal interests from potential statistical analyses that access to the raw data could facilitate fall flat, particularly when the Bureau of Justice Statistics ("BJS") already performed its own statistical analyses on the withheld information and make those analyses public.

Plaintiff cannot and does not take issue with the "k-anonymity" method Defendant employed to redact the records under FOIA's privacy exemptions. And its main objection to the application of that method in this case betrays a fundamental misunderstanding of how it functions to protect personal privacy. Plaintiff claims that the Bureau of Justice Statistics ("BJS") chose the wrong information in the dataset to de-identify because states commonly release such information to the public. But BJS chose those variables to redact precisely because they are the most likely to be publicly available, and thus easiest to match with the dataset in an attempt to re-identify individuals. By selectively redacting those variables, BJS broke the link between the MCI dataset it released and other public sources of information, which protects the privacy interest in the remaining information in the dataset.

Plaintiff also asks this Court to enter final judgment on the application of FOIA Exemption 3 to records that BJS collected when the Death in Custody Reporting Act ("DCRA") was not in effect, or from entities that DCRA never required to report information. BJS collected those records under its own statutory authority to engage in voluntary data collections, and such records are protected from disclosure by statute. Plaintiff contends that the Court's earlier opinion determined that such records were not submitted under Title I, but the Court expressly declined to consider the issue of records collected when DCRA was not in effect. Nor did the Court consider records submitted by entities that were never subject to DCRA's reporting mandate. Plaintiff argues that such submissions can be attributed to the states, but that suggestion is incompatible with the statutory text. The Court should grant Defendants' request for reconsideration on this issue

The Court should thus enter summary judgment for Defendant on its application of Exemption 6 and 7(C) to the records produced so far, grant reconsideration as to the remaining

records, and enter summary judgment for Defendant on its application of Exemption 3 to those records.

## ARGUMENT

## I.   DEFENDANT PROPERLY INVOKED FOIA EXEMPTIONS 6 AND 7(C)

Defendant's opening brief established that Defendant properly withheld private information about deaths in custody under both Exemptions 6 and 7(C) because disclosure of that information implicates substantial privacy interests that are not outweighed by the public interest in disclosure. ECF 35-1 at 17-28. Before it addresses the balancing test, Plaintiff makes two threshold arguments in opposition, both of which pertain only to Exemption 7(C).

Plaintiff first argues that Defendant failed to establish that the withheld information was compiled for law enforcement purposes, as is required by Exemption 7(C). More specifically, Plaintiff argues that Defendant failed to introduce evidence that states compiled the death-in-custody data for law enforcement purposes and that "the vast majority of deaths were caused by factors that could not reasonably relate to an enforcement proceeding," such as death due to illness. ECF 36-1 at 19-21. But Plaintiff does not dispute the two propositions in Defendant's motion – that state agencies that operate correctional facilities are law enforcement agencies and that information compiled pursuant to the law enforcement mission of protecting inmates, correctional staff, and the community qualifies for protection under Exemption 7. ECF 35-1 at 17-18. Indeed, Plaintiff concedes that records of an investigation into an altercation among inmates are compiled for law enforcement purposes. ECF 36-1 at 20 (citing *Mingo v. DOJ*, 793 F. Supp. 2d 447, 453 (D.D.C. 2011)). Records concerning the circumstances of an inmate's death obviously and necessarily are linked to a particular individual and incident subject to investigation. They are not analogous to more routine records like those "'concerning the day-to-day activities and events occurring during the confinement of an inmate,'" *id.* (quoting *Maydak v. DOJ*, 254 F. Supp. 2d 23,

38 (D.D.C. 2003)), or inmate phone calls automatically recorded by a computer system without any connection to a particular individual or incident subject to an investigation, *id*. (citing *Benavides v. BOP*, 774 F. Supp. 2d 141, 146-47 (D.D.C. 2011)).

Nor does it matter that "the vast majority of deaths were caused by factors that could not reasonably relate to an enforcement proceeding," such as death due to illness. ECF 36-1 at 21. The "law enforcement purpose" protected by Exemption 7 can be civil as well as criminal law enforcement, *Pub. Employees for Envt'l Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014), and there is no question that the law enforcement mission of protecting inmates, correctional staff, and the community extends to investigating the circumstances surrounding an inmate's death, even if the cause was illness rather than homicide. Indeed, one of Plaintiff's own declarants notes that her investigatory work prompted "the revision of a medical examiner's report that changed the manner of an in-custody death from natural to homicide." Declaration of Gina Barton ¶ 6, ECF 36-4 at 2.

Second, Plaintiff argues that in enacting the requirement that an agency show that it "reasonably foresees that disclosure would harm an interest protected by an exemption," 5 U.S.C. § 552a(a)(8)(a)(i), Congress effectively repealed Exemption 7(C)'s protection against disclosures that "could reasonably be expected to constitute an unwarranted invasion of personal privacy" and replaced it with a "mandate[] that an agency show that that harm 'would' result, not merely that it could reasonably be expected to.'" ECF 36-1 at 22.[1] Plaintiff fails to cite any case so holding and

_____

[1] Other than Exemption 7(B) and part of Exemption 7(E), the 1986 FOIA amendments changed the requirement that agencies demonstrate that disclosure "would" cause the harm each subsection seeks to prevent, by replacing that standard with a new standard that disclosure "could reasonably be expected to" cause the specified harms (including Exemption 7(C)).  Pub. L. No. 99-570, § 1802; *see also DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 n.9 (1989) (recognizing that shift from "would constitute" standard to "could reasonably be expected to

relies only on cases applying the foreseeable harm standard to Exemptions 5 and 8, neither of which have comparable language to Exemption 7(C).  And the decision Plaintiff relies on expressly situated its holding in Exemption 5: "In the context of withholdings made under the deliberative process privilege [under Exemption 5], the foreseeability requirement means that agencies must concretely explain how disclosure "would"—not "could"—adversely impair internal deliberations." *Reporters Comm. for Freedom of the Press v. FBI* 3 F.4th 350, 369-70 (D.C. Cir. 2021). Plaintiff's cases also say that "whether a requested record falls within an exemption and whether the disclosure of that record would foreseeably harm an interest protected by the exemption are distinct, consecutive inquiries." *Leopold v. DOJ*, 94 F.4th 33, 37 (D.C. Cir. 2024) (citing *Reporters Comm.*, 3 F.4th at 369). That further supports giving independent vitality to Exemption 7(C)'s language.

In any event, Plaintiff's fixation on "could" versus "would" is ultimately irrelevant in light of the obvious nature of the foreseeable harm here. "The very context and purpose" of the withheld material can "make the foreseeability of harm manifest" sufficient to satisfy the foreseeable-harm requirement. *Reporters Comm.*, 3 F.4th at 372; *see also, e.g.*, *Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1, 21 (D.D.C. 2021) (foreseeable harm satisfied when disclosure of withheld material would "identify the person" and "might subject them to ridicule."). As this Court put it, "[t]he private nature of Exemption 6 redactions" protecting details such as "contact information for private citizens" and "information related to family member activities . . . is obvious, with concomitant obvious risks to privacy by disclosure." *Institute for Energy Research v. FERC*, 22-cv-2114 (BAH), 2023 WL 6121878, at *12 (D.D.C. Sept. 19, 2023). *Cf.*, *e.g.*, *Buzzfeed, Inc. v.*

---

constitute" standard "represents a congressional effort to ease considerably a Federal law enforcement agency's burden in invoking [Exemption 7]").

*U.S. DHS*, 610 F. Supp. 3d 139, 148 n.1 (D.D.C. 2022) ("no further foreseeable harm analysis is needed because 'Exemption 7(E) by its own terms already requires that an agency show a risk of foreseeable harm.'" (quoting *Reporters Comm. for Freedom of the Press v. U.S. CBP*, 567 F. Supp. 3d 97, 128 (D.D.C. 2021)).

### A.    The withheld information implicates substantial privacy interests

As Defendant's opening brief established, Exemptions 6 and 7(C) protect a broad conception of personal privacy, ranging from the prosaic to the intimate and potentially embarrassing. Even information that already exists in the public domain can merit protection. And any privacy interest that rises above the level of *de minimis* is sufficiently substantial to require the Court to weigh that interest against the public interest in disclosure. The withheld information easily meets that standard. ECF 35-1 at 31-33.

Plaintiff does not dispute that the records it seeks contain both prosaic details, such as the inmate's full name and date of birth, and highly sensitive and potentially embarrassing information, including details of the inmate's medical, surgical, and mental health care as well as the inmate's cause of death (such as suicide, accidental alcohol or drug intoxication, and AIDS-related illness). But Plaintiff argues that the privacy interest in such information is nevertheless "minimal at best," because the subjects of the records are, by definition, dead; because the subjects' families allegedly support disclosure; and because most states make some death-in-custody information publicly available. ECF 36-1 at 22.

Defendant acknowledged in its opening brief that the fact that the records necessarily pertain to deceased individuals reduces the privacy interest at stake. *See* ECF 35-1 at 31-32. It does not resolve the analysis, however, because "certain reputational interests and family-related privacy expectations survive death." *Campbell v. DOJ*, 164 F.3d 20, 33 (D.C. Cir. 1998). For example, FOIA "recognizes surviving family members' right to personal privacy with respect to

their close relative's death-scene images." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 170 (2004). And the Supreme Court explained that its holding on that point was broad enough to "ensure[]" that "autopsies, photographs, and records" of crime victims are not available under FOIA. *Id.* Because "withholding information under FOIA cannot be predicated on the identity of the requester," and because requesters may include "child molesters, rapists, murderers, and other violent criminals," FOIA permits agencies to withhold such records from *any* requester. *Id.* Indeed, the Supreme Court found it "*inconceivable* that Congress could have intended a definition of 'personal privacy' so narrow" that it would require agencies to release such records. *Id.* (emphasis added).

The privacy interests at stake here are similarly weighty, and far in excess of the *de minimis* interest needed to trigger the next stage of the Court's analysis, in which it must weigh the privacy interest against any public interest in disclosure. *See Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). Plaintiff does not argue to the contrary; instead, it cites cases in which courts were unable to determine the privacy interest at stake because it was unknown whether the relevant people were still alive—an issue not present here. *See* ECF 36-1 at 23.

Plaintiff next argues that "[d]eceased inmates' relatives overwhelmingly support disclosure," which "shows that their privacy interests are substantially reduced at best." ECF 36-1 at 23-25. But Plaintiff conflates the privacy interests of the families of the thousands of deceased individuals whose private information has been withheld from disclosure, with the privacy interests of the "dozens of people" who conveyed to an investigative journalist their desire to tell the public the details of the deaths of their loved ones who died in jails and prisons. Privacy interests, under FOIA, "may be waived." *Computer Pros. for Soc. Resp. v. U.S. Secret Serv.*, 72

F.3d 897, 904 (D.C. Cir. 1996). *Cf. Favish*, 541 U.S. at 167, 171 (noting that family of deceased objected to disclosure of graphic details of their relative's death). But a waiver by one person "has no effect on the privacy interests of others." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007). And even a waiver of a person's own privacy rights must be "knowing, intelligent, and voluntary." *Id.* Thus, for example, the D.C. Circuit held that a declaration stating that "I do not object to the disclosure of information about me to Sussman" did not clearly "amount[] to a full-scale waiver" of the declarant's "privacy interest under FOIA, where disclosure could release the contested materials to *the world at large*, not just Sussman," and remanded for fact-finding on the scope of the waiver. *Id.*

Here, Plaintiff relies on a single declaration from a relative of a deceased inmate, *see* Telford Decl., ECF 36-6, and the experience of a single investigative journalist who states that she has contacted "dozens" of relatives of deceased inmates, *See* Barton Decl. ¶ 6, ECF 36-4 at 2. Even if the Court could assume that Cynthia Telford, whose son died in a state correctional facility, intended to waive any FOIA privacy rights over his records with her declaration that she "wanted [his] story to be told," that leaves 16,624 inmates with no comparable waiver just in the data released to Plaintiff so far, and tens of thousands more if the Court denies reconsideration. Gina Barton's recollection of unnamed "dozens" of relatives of deceased inmates who "wanted the public to know the truth about what happened," meanwhile, is plainly inadequate to waive the privacy rights of her unidentified sources, let alone the rights of thousands of others about whom the Court has no information whatsoever. Barton Decl. ¶ 6, ECF 36-4 at 2.

Plaintiff seems to have fashioned this argument based on *Wessler v. DOJ*, 381 F. Supp. 3d 253 (S.D.N.Y. 2019), a case about a FOIA request for the "full medical records" of inmates who died in the custody of the U.S. Marshals Service. While the plaintiff reporter in that case similarly

submitted a declaration explaining that in his past reporting on medical neglect in prisons, the families of the deceased had expressed gratitude to the reporter for reporting on their stories, the court nonetheless found a sufficiently substantial privacy interest to require balancing against the public interest in disclosure. *Id.* at 259-60. The Court should do the same here. In assessing that balance, moreover, the Court should not find the interest in privacy reduced based on unspecified hearsay by an unknown number of unidentified relatives of decedents. To the extent that *Wessler* might support such an approach, it is inconsistent with this circuit's law on waivers of privacy rights.

Plaintiff's argument that the privacy interests at issue here are further diminished by the alleged fact that most states release some death-in-custody information is similarly flawed, because states cannot waive individuals' privacy rights. Only individuals can. *See Diemert & Assocs. Co. v. FAA*, 218 F. App'x 479, 482 (6th Cir. 2007); *Amuso v. DOJ*, 600 F. Supp. 2d 78, 93 (D.D.C. 2009). Even if that were not the case, the state disclosures that Plaintiff points to are not the same as the information withheld here.  As the Supreme Court has recognized, "there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *Reporters Comm.*, 489 U.S. at 764. Likewise, "the fact that other pictures [of the decedent] had been made public" did not "detract[] from the weighty privacy interests involved" in *Favish*. 541 U.S. at 171. The mere public availability of information— particularly if it is not the precise information withheld—does not eliminate a privacy interest that would otherwise support withholding.

To be sure, the internet has made courthouse files, county archives, and police station records vastly more accessible than at the time of the *Reporters Committee* decision. But the

evidence Plaintiff relies on shows that, even considering online sources, the death-in-custody data that states make available are far more scattered and far less comprehensive than the MCI data collection. The harm to individuals' privacy from releasing those data in "a single clearinghouse of information" is thus correspondingly more severe.

For example, Plaintiff cites a UCLA study on COVID-19 deaths in state and local facilities. ECF 36-1 at 26. The website for the study claims that the project has gathered data through 2020 for 49 states and the federal BOP. *See* UCLA Law CBBDP Custodial Mortality Project Data – Data Collection Procedures.[2] Of those: only "[t]wenty-seven states provided a name for individual deaths in their prisons"; only "[f]orty-three states provided the facilities in which deaths occurred"; only "[t]wenty-nine states provided the sex of the decedents, and twenty-three states provided the race of decedents"; and only "[t]hirty-seven states provided descriptions of circumstances of deaths." *Id.* According to the summary sheet demonstrating which variables are available by prison agency, not a single state provides all of those variables. In contrast, as the codebook for the partially redacted records released to Plaintiff reveals, MCI data contain all of those variables and more.[3]

The 50 press releases and media articles attached to Gina Barton's declaration, hand-picked to show the amount of information already publicly available, likewise confirm that nothing comparable to MCI exists to document deaths in state and local correctional facilities. In many cases, for example, the information came from the family of the deceased, rather than from state or local authorities. *See, e.g.*, Barton Decl. Exs. 12, 22, 35, 37, 40, 47, 48, 49. Even if those stories

---

[2] Available at https://github.com/uclalawcovid19behindbars/custodial_mortality_project/tree/main (last accessed June 7, 2024).

[3] Available at https://www.ojp.gov/sites/g/files/xyckuh241/files/media/document/mciprisonscodebook20231026.xlsx (last accessed June 7, 2024).

arguably make a tiny dent in the number of waivers that would be necessary to release the full MCI dataset, they offer no support to Plaintiff's contention that *states* are routinely making death-in-custody information comparable to MCI publicly available. Many offer no details on the cause of death beyond boilerplate along the lines that the decedent was "found unresponsive." *See id.* Exs. 9, 13, 14, 38, 39. Others are similarly vague. *See, e.g.*, *id.* Exs. 8 (decedent was "receiving monitoring and care for chronic medical conditions"); 15 (decedent "appeared to have suffered some type of medical episode"); 20 (homicide; decedent was "found in his cell with multiple injuries"); 24 ("the killing appears to be gang related," with no additional details provided); 27 (decedent "was being treated for a medical condition"); 39 (a second decedent "appeared to be in medical distress"); 44 (homicide; "[o]fficials provided no information about how [decedent] dies, where his body was found, or if investigators have identified a suspect or suspects."). Still others provide no cause of death. *See id.*, Exs. 25, 28, 31 ("possible homicide," with no additional details provided); 50 ("suspected suicide," with no additional details provided). And others do not say why the decedent was incarcerated. *See id.*, Exs. 26, 30, 42, 46. Only a single article even hints that the decedent had received in-patient mental health care while incarcerated, a standard variable in the MCI data collection. *See id.* Ex. 45.

All in all, the evidence Plaintiff marshals makes it clear that publicly available information on deaths in state and local correctional facilities remains fragmentary and incomplete. Plaintiff has conspicuously failed to allege that *any* state routinely makes comprehensive data with the same scope as the MCI collection available to the public. The release of the MCI dataset would thus impose unparalleled privacy harms.

**B.      No public interest in disclosure identified by the Plaintiff outweighs the privacy interests at stake**

Because the implications of this case for privacy are undeniably substantial, this Court must weigh the privacy interests at stake against the public interest in disclosure. Three key points guide that inquiry, none of which Plaintiff has disputed: First, the burden rests on *Plaintiff* to establish a sufficient public interest, not on Defendant to negate it. Second, the relevant public interest under FOIA is in understanding the activities and operations of the federal government; FOIA does not recognize any separate public interest in shedding light on the workings of state or local governments. And third, Plaintiff must show the incremental value of the specific information being withheld, not merely a general public interest in the subject matter.

Viewed in light of those guiding principles, Plaintiff's arguments in opposition come up short. The obvious interest that Plaintiff openly seeks to advance by obtaining MCI data is in shedding light on state and local governments, rather than the federal government. *See* ECF 36-1 at 1. The federal interests that Plaintiff identifies in its brief are tenuous at best, and certainly do not justify such a drastic invasion of personal privacy.

The first federal interest Plaintiff identifies is in shedding light on DOJ's implementation and enforcement of DCRA. *Id*. at 28-29. Plaintiff identifies the study required by DCRA as a particular item of public interest, which it claims is "many years past due." *Id.* at 28; *see also* 34 U.S.C. § 60105(f). But DOJ has in fact submitted a report to Congress as required by DCRA. *See* National Institute of Justice, Literature Review and Data Analysis on Deaths in Custody, Report to Congress (Dec. 2022).[4] As that report explains, DOJ has determined to undertake two distinct studies to satisfy DCRA's mandate, the first contained in DOJ's December 2022 report to Congress, and the second expected to be delivered to DOJ for review by the end of September

---

[4] Available at https://www.ojp.gov/pdffiles1/nij/305802.pdf (last accessed June 7, 2024).

2024. *Id.* at 2-3. No doubt, reports to Congress in December 2022 and September 2024 (or later) do not fall within the December 18, 2016, deadline set by DCRA. But that information is plain from the face of the statute and the reports; Plaintiff offers no reason why releasing particular details of inmates who died in state or local prisons would shed any additional light on DOJ's implementation of DCRA's study requirement.

Perhaps Plaintiff's position is that the public must have access to all raw data relied on by, or available to, DOJ in compiling its report, to ensure that DOJ has fully and correctly analyzed the available data. *See* ECF 36-1 at 28 (touting the "press's role in plugging holes in the government's delinquencies."). But the ways DOJ did (and did not) parse the available data are clear from the report itself. The raw data might allow Plaintiff to conduct its own statistical analyses, but the value of further statistical slicing and dicing would be only to shed additional light on state and local governments; the public already has all the information it needs to evaluate DOJ's own implementation of DCRA.

Plaintiff next turns to DOJ's *enforcement* of DCRA, through the statute's financial penalty mechanism. Plaintiff posits that public debate over DOJ's enforcement decisions might "be informed by the extent to which particular states are complying with DCRA's reporting requirements." ECF 36-1 at 28-29. But Plaintiff does not attempt to argue that particular details such as an inmate's name or medical history would have any bearing on informing public assessment of DOJ's assessment of state compliance with DCRA.

In any case, DOJ has been transparent about the many issues with state data-reporting under DCRA, and about its concerns with implementing DCRA's financial penalty mechanism. *See* Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074: Department of Justice Implementation of the Death in Custody Reporting Act of 2013, at 8-12

(Sept. 16, 2022) ("AG Report"). As DOJ has made clear, with ample statistical support, under-reporting is "widespread, and not the result of a small number of lagging or uncooperative states." *Id.* at 11. As a result, and in light of the factors contributing to the underreporting problem, DOJ "is concerned that implementing the [financial] penalty may have unintended, negative consequences." *Id.* In that real-world context, Plaintiff cannot show that a USA Today exposé of particular underreporting issues with certain states or facilities would meaningfully contribute to public debate.

The second public interest Plaintiff identifies is shedding light on grantmaking, and general assistance to state and local governments, by the federal government. ECF 36-1 at 29. The long and short of Plaintiff's argument is that the federal government makes many grants to states, some of which go to "address issues likely correlated with inmate mortality," *id.* at 5, and also provides guidance to states on best practices for criminal investigations of deaths in custody involving law enforcement personnel, so therefore the public must have access to all death-in-custody data—even including names—to be able to evaluate the federal government's performance of those tasks.

Plaintiff offers little detail about how the particular information it seeks would advance any particular public interest in understanding the federal government's operations. The closest it gets is the observation that "DOJ can and often does issue grants to particular state or local government facilities" but has never publicly reported facility-level death data. ECF 36-1 at 30. As a result, Plaintiff complains that "there is simply no public, comprehensive data that can inform to which facilities DOJ should be allocating grant funding in light of inmate deaths that occur there." *Id.*

But that is precisely the point: DOJ *does not consider facility-level death data (or any other non-public data) from the MCI data collection in awarding grants to state or local government facilities*. *See* Second Declaration of Elizabeth Ann Carson ¶ 7. Perhaps Plaintiff is

right that, "[f]or example, knowing what illnesses inmates die from . . . could inform how the federal government should allocate funds to prevent those illnesses." ECF 36-1 at 30. But in fact, it does not inform how the federal government actually *does* allocate funds. That fact alone is sufficient for the public to evaluate what the federal government is up to, which is what the public interest demands under FOIA.

Plaintiff's more expansive conception of the public interest—covering not just what the government *is* up to, but also what it *could* or *should* be up to—is impossible to square with precedent. In *Reporters Committee*, for example, the Supreme Court was clear that "[t]here is, unquestionably, *some* public interest in providing interested citizens with answers to their questions" about the criminal history of any given private citizen among "the 24 million persons for whom the FBI has a rap sheet." *Reporters Comm.*, 489 U.S. at 775. A member of the public might want access to someone else's rap sheet "whether for writing a news story, for deciding whether to employ [someone], to rent a house to him, to extend credit to him, or simply to confirm or deny a suspicion." *Id.* Or in terms closer to Plaintiff's argument here, there may be some public interest in knowing whether the federal government employs, or provides housing to, or extends credit to (etc., etc.) individuals with rap sheets. Releasing all 24 million rap sheets (presumably, by now, many more) would doubtlessly open up all kinds of possibilities for statistical analysis that could shed light on any number of federal functions. Nevertheless, that kind of interest "falls outside the ambit of the public interest that FOIA was enacted to serve." *Id.* The same is true, for example, for the names and addresses of retired or disabled federal employees, *see Horner*, 879 F.2d at 879, and for records of Medicare claims submitted by physicians, *see Consumers' Checkbook Ctr. for Study of Servs. v. HHS*, 554 F.3d 1046, 1051-56 (D.C. Cir. 2009). Plaintiff cannot satisfy its burden to show that disclosure would advance the public interest by

hypothesizing potential statistical inferences that might be available from "information about *private citizens* that happens to be in the warehouse of the Government." *Reporters Comm.*, 489 U.S. at 774.

### C.    BJS appropriately redacted the records

As Defendant's opening brief demonstrated, the "k-anonymity" method employed here to protect personal privacy in the MCI dataset is a well-established technique developed in academic literature and recognized by the National Institute of Science and Technology as a standard means of de-identifying personal information in large datasets. It protects privacy by selectively redacting variables in a dataset to make it more difficult to link entries in the dataset to other publicly available sources of information. BJS appropriately used the k-anonymity method here to redact the MCI data only to the extent necessary to protect personal privacy. ECF 35-1 at 22-26, 35-40.

In opposition, Plaintiff does not challenge the k-anonymity method itself in any way. Instead, its argument is limited to two purported "flaws with DOJ's *application* of the k-anonymity method to this data." ECF 36-1 at 33 (emphasis added).

Plaintiff first challenges BJS's selection of "quasi-identifiers," variables in the dataset that could be combined with other publicly available information to identify an individual. Plaintiff claims that BJS's choice of quasi-identifiers was "illogical" because the sources it relied on to select quasi-identifiers, such as press releases and news articles, "often contain virtually *all* the sensitive information DOJ has redacted." ECF 36-1 at 33. Plaintiff thus argues that "if a curious person reads a press release or news article about a deceased inmate, they will already know everything DOJ might disclose about that inmate." *Id.* As a result, according to Plaintiff, "redacting the same information from DOJ's data will cause no additional harm to the inmate's family's privacy interests. *Id.* That objection fundamentally misunderstands the k-anonymity method and the role of quasi-identifiers in protecting sensitive information.

The purpose of redacting quasi-identifiers is to produce a dataset wherein, as redacted, each possible combination of quasi-identifiers will relate to at least two individuals records (as applied here; higher values of "k" are also possible, but were not used here, *see* Lauger Decl. ¶ 11, ECF 35-4 at 5). That is necessary to do because quasi-identifiers are the variables that present the greatest risk of linking an individual in the dataset to other information that is publicly available. Plaintiff's argument goes astray because it incorrectly assumes that quasi-identifiers are the most (or even only) *sensitive* information in the dataset, rather than the information most likely to definitively link an individual to other public sources of information. Those two categories are not necessarily identical.

Thus, in the example Plaintiff provides, a press release from a state department of corrections publicly identified an inmate's name, age, and date and means of death, as well as the correctional facility in which he died, and the crime he was convicted of. *See* ECF 36-1 at 33-34. On Plaintiff's understanding, that press release has already released "virtually all the purportedly sensitive information in the data," and "seeing the same information in DOJ's death-in-custody data will cause [the decedent] and his family no incremental privacy harm." *Id.*

But Plaintiff's example actually illustrates why BJS chose the correct set of quasi-identifiers. In the jargon of k-anonymity, the state department of corrections released a particular combination of quasi-identifiers linked to a specific, identified person. If that combination of quasi-identifiers were to be unique in the publicly released redacted MCI dataset, anyone with access to that press release could use it to learn other, potentially highly sensitive, information about that person contained in the MCI data set but not the press release. For example, the MCI data associated with that unique combination of quasi-identifiers might show that the decedent had received in-patient psychiatric treatment while incarcerated if such a fact was part of the MCI data.

Because of k-anonymity, however, it is not possible to definitively link the decedent in the press release to one particular entry in the redacted MCI dataset. Instead, there are at least two entries in the redacted dataset that fit the information released by the state equally well.

But if BJS had chosen the wrong quasi-identifiers, such assurance may not be possible. If BJS had wrongly assumed, for example, that departments of corrections would be unlikely to publicly release the offenses for which the decedent was incarcerated and thus not treated that variable as a quasi-identifier, the press release that Plaintiff quotes could have resulted in a definitive match with a particular entry in the redacted MCI dataset. At least two entries in the dataset would fit the remaining combination of quasi-identifiers equally well, but it would be possible to break the tie by checking the "offense" variable. Only one entry would match all the information in the press release, and the public would thus know all the other information about that particular decedent contained in the non-quasi-identifier variables.

In other words, BJS chose the right quasi-identifiers precisely *because* they cover the kinds of information that state or local governments are most likely to release publicly. What Plaintiff flags as a flaw in BJS's application of k-anonymity is actually the reason that k-anonymity successfully protects privacy.

Plaintiff's second objection is to the redactions in the "notes" column containing narrative descriptions of the circumstances of the inmates' deaths. Dkt. 36-1 at 34. Plaintiff notes that Defendant's explanation of the k-anonymity method did not "claim that a narrative description of an inmate's death is a quasi-identifier." *Id.* However, as the Second Declaration of Amy Lauger clarifies, BJS did in fact treat the notes column as a quasi-identifier, "which was mistakenly not noted in [her] previous declaration." Second Lauger Decl. ¶ 7. Narrative descriptions of the circumstances of death are a clear candidate for quasi-identifier status, because, as the example

Plaintiff relies on demonstrates, press releases and other such statements that state government may release about a death in custody may frequently contain narrative information that would otherwise not be fully captured in the dataset. For example, the press release Plaintiff cites reports that the decedent was discovered by "[p]rison staff." ECF 36-1 at 33. Another statement, quoted in an exhibit to one of Plaintiff's declarations, states that the decedent's cell mate notified staff of the decedent's medical distress. *See* ECF 36-4 at 85 (Barton Decl., Ex. 39). If the quasi-identifiers for those two incidents were the same after the application of the k-anonymity method, but the notes column was unredacted, a narrative description revealing who discovered the decedent would break the tie and allow for definitive identification. Accordingly, it would undermine the entire purpose of applying k-anonymity to the other quasi-identifiers.

As Lauger explains, it is to be expected that narrative notes, which are by nature often unique, would be heavily redacted under the k-anonymity method, but the particular sequencing of productions in this case may have resulted in an "even higher" likelihood of redaction. Second Lauger Decl. ¶ 7. Defendant initially produced records to Plaintiff, redacted using the k-anonymity method, on October 26, 2023. *See* ECF 31 at 1. At that time, Defendant understood Plaintiff to have agreed to omit the notes column from the production, so the version of the dataset to which BJS initially applied the k-anonymity method did not include the notes column. Second Lauger Decl. ¶ 4.

The parties subsequently agreed that Defendant would also process the notes column subject to any applicable exemptions, by January 31, 2024. *See* ECF 32 at 1. For that production, BJS re-processed the data with the notes column included. Second Lauger Decl. ¶ 5. However, because the earlier production had already been released to Plaintiff, it was necessary to preserve all of the redactions from that production. *Id.* ¶ 6. Otherwise, if the entire dataset including the

notes column were to have been entirely reprocessed, some previously redacted information could have been revealed to Plaintiff. *Id.* Plaintiff would then have been able to compare the different redactions in the two versions of the data, and thus re-identify some of the entries in the dataset, thereby defeating the k-anonymity method for those entries.

## II.   DEFENDANT PROPERLY INVOKED EXEMPTION 3 AS TO RECORDS THAT WERE NOT SUBMITTED UNDER DCRA, AND RECONSIDERATION IS WARRANTED TO THE EXTENT THAT THE COURT'S PREVIOUS EXEMPTION 3 HOLDING APPLIES TO SUCH RECORDS

### A.   Reconsideration is permitted here "as justice requires"

Plaintiff does not dispute that the Court's partial summary judgment decision was an interlocutory order, and that Rule 54(b) thus provides the relevant standard for reconsideration. As Defendant's opening brief established, under Rule 54, reconsideration is available "as justice requires," including, for example, when the Court has made a decision outside the adversarial issues presented by the parties. ECF 35-1 at 40-43.

Defendant's opening brief also established that this case meets that standard. *Id.* The Court's partial summary judgment decision noted that Plaintiff's FOIA request covered a period of time when no DCRA authority existed, and the Court expressly declined to consider that point because neither party had adequately addressed it. *Id.* at 43. Likewise, neither the parties nor the Court expressly considered whether DCRA's reporting mandate extended to local governments. The Court's Order nevertheless granted summary judgment to Plaintiff on all withholdings pursuant to Exemption 3 in this case, and thus made a decision outside the adversarial issues presented to by the parties. *See* ECF 35-1 at 43. Justice requires relief from that judgment.

Plaintiff nevertheless argues that Defendant must satisfy an undefined "heavy burden to justify reconsideration," apparently beyond merely showing that "justice requires" it. ECF 46-1 at 36. Plaintiff offers three reasons for the Court to impose this additional burden: First, that the "law

of the case" doctrine applies here; second, that Defendant could have raised its reconsideration arguments in the initial round of summary judgment briefing; and third, that Defendant delayed too long in seeking reconsideration. None of those arguments should prevent the Court from reaching the merits.

First, Plaintiff's argument that the law of the case doctrine applies here "is simply mistaken." *Keepseagle v. Perdue*, 856 F.3d 1039,1048 (D.C. Cir. 2017). The "law-of-the-case doctrine '*does not apply* to interlocutory orders,'" which "'can always be reconsidered and modified by a district court prior to entry of final judgment.'" *Id.* (quoting *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 620 (8th Cir. 2007)) (emphasis added). Plaintiff admits that the doctrine might not apply here "as a formal matter," but nevertheless urges the Court to seek guidance in the "principles animating it," specifically "finality and judicial economy." ECF 36-1 at 38. But those are not the only considerations at stake, and it would be an error to assign them too much weight. *See, e.g.*, *Cobell v. Jewell*, 802 F.3d 12, 26 (D.C. Cir. 2015). Instead, the Court should look to the well-established standard for reconsideration under Rule 54 "as justice requires," which appropriately balances the interests in finality and judicial economy with the imperative to get the decision right.

In any event, the need for finality and the interests of judicial economy are at their nadir in a circumstance such as this, where the Court never rendered a reasoned decision on the issues for which reconsideration is sought, and indeed, expressly declined to do so. Whether a court should generally be willing to "reopen issues *decided* in earlier stages of the same litigation," *Agostini v. Felton*, 521 U.S. 203, 236 (1997) (emphasis added), the question presented here is quite different: what to do when the Court's *opinion* expressly did not decide an important issue, but its

interlocutory *order* nevertheless resolved that issue. Even if the law of the case doctrine had anything to say here, it would still permit reconsideration to avoid "a manifest injustice." *Id.*

Second, Plaintiff claims that it is "well established" that reconsideration under Rule 54 "generally 'cannot be used as an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier.'" ECF 36-1 at 38 (quoting *Muttitt v. Dep't of State*, No 10-cv-202, 2013 WL 12318039, at *2 (D.D.C. July 30, 2013)). But as Plaintiff acknowledges, there is no such "'strict prohibition'" under Rule 54. *Id.* (quoting *Cobell*, 802 F.3d at 26). Plaintiff claims that the Court can nevertheless exercise its discretion to deny reconsideration on that basis, but the case it relies on stands for precisely the opposite: there, the district court was within its discretion to deny reconsideration under Rule 54 because the plaintiff *failed* to raise new arguments. *See Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (plaintiff "raised no arguments for reconsideration the court had not already rejected on the merits").

Third, Plaintiff faults Defendant's delay in seeking reconsideration. Defendant has accepted responsibility for failing to more clearly and explicitly raise its reconsideration arguments earlier, *see* ECF 27 at 17, ECF 30 at 8, but any delay in seeking reconsideration has not prejudiced Plaintiff and does not warrant denying reconsideration in the circumstances of this case. The interval between the Court's interlocutory judgment and Defendant's reconsideration motion did not delay the Court's eventual entry of final judgment by even a day. The parties mutually agreed to a bifurcated summary judgment schedule, with Exemption 3 to be resolved first and all other exemptions to be resolved later. *See* ECF 10. After the Court resolved the first round of partial summary judgment motions, Defendant had to determine how to process databases containing hundreds of thousands of data points for the application of FOIA's privacy exemptions. Defendant

produced responsive records on a mutually agreed schedule, *see* ECF 26, and the parties subsequently agreed on a schedule for the second round of summary judgment briefing, *see* ECF 33, 38. None of the time between the Court's decision on the first round of summary judgment briefing and the completion of the second round of briefing is attributable to any delay on Defendant's part in seeking reconsideration. Instead, that interval was determined entirely by the time necessary to process several complex datasets and to brief cross-motions for summary judgment, both of which occurred on schedules agreed to by Plaintiff, and both of which needed to happen regardless of whether or when Defendant sought reconsideration.

Ultimately, as the Court recognized, the initial round of summary judgment briefing did not support a complete resolution of the Exemption 3 issue in favor of either party. The Court should not enter a complete final judgment for Plaintiff on Exemption 3 without considering the additional arguments on the merits of Defendant's reconsideration motion that Plaintiff, by the completion of briefing, will have had three briefs to respond to. In such a circumstance, it would be manifestly unjust for the Court not to address Defendant's arguments on the merits.[5]

### B.   Reconsideration is warranted as to state data submitted when DCRA was not in effect

The argument for applying Exemption 3 to MCI data collected when DCRA was not in effect is straightforward: (1) BJS could not have relied on DCRA authority to collect those data, because DCRA was not in effect; (2) BJS instead necessarily relied on its statutory authority under Title I to collect "statistics concerning all aspects of criminal justice," 34 U.S.C. § 10132(c)(7); (3) data collected under Title I are subject to Title I's confidentiality provision, 34 U.S.C.

---

[5] Rule 56 also counsels in favor of considering Defendant's reconsideration arguments on the merits rather than dismissing them at the threshold. *See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506 (D.C. Cir. 2016) (requiring courts to "determine[e] whether [the moving party's assertions] warrant[] judgment" before granting a motion under Rule 56).

§ 10231(a); and (4) Title I's confidentiality provision qualifies as a withholding statute under Exemption 3. *See* ECF 35-1 at 31-32.

Plaintiff contests only the second link in that chain, arguing that the Court held that Title I does not *require* death-in-custody reporting. ECF 36-1 at 41-42 (quoting the Court's statements that "[n]othing in Title I, let alone its confidentiality provision, requires reporting of the specific type of data that DCRA mandates," that "Title I of the Crime Control Act does not cover the specific death-in-custody reporting requirements provided by DCRA," and that "DOJ does not cite any provision of the Crime Control Act that requires certain statistical recordkeeping and reporting, let alone of death-in-custody instances."). ECF 21 at 13, 15, 19. The Court noted that Title I does not *require* death-in-custody reporting and that DCRA does, but it did *not* conclude that BJS cannot collect it on a voluntary basis pursuant to its Title I statutory authority (as it has long done for a host of corrections-related data, *see* ECF 27 at 9-10). To the contrary, the Court referred to DOJ's "seemingly voluntary and independent effort to compile" death-in-custody information and "BJS's general authority to collect statistics" under Title I. ECF 21 at 19.  In remarking that it was "unpersuasive" to argue "that the Crime Control Act exhibits a purpose to collect statistics, such as those described in the DCRA," the Court was again getting at this distinction between required and voluntary data collection, as the Court's next sentence made clear:  "DOJ does not cite any provision of the Crime Control Act that requires certain statistical recordkeeping and reporting, let alone of death-in-custody instances." *Id*.

### C.     Reconsideration is warranted as to local data that were never required to be submitted under DCRA

The argument for data that BJS collected directly from local governments is also straightforward: DCRA has never required local governments to directly report death-in-custody

data; thus any such data reporting to the MCI program from local jails themselves were reported voluntarily pursuant to BJS's Title I authority.  *See* ECF 35-1 at 44-45.

Plaintiff concedes that DCRA "only refers to [data] submissions by states," and that, under DCRA, "'State' and 'local government' mean different things." ECF 36-1 at 43, 44. Plaintiff nonetheless argues that the Court should attribute those submissions to the state—that is, treat "state" as meaning "unit of local government" despite Congress' assigning those terms separate and distinct meanings. *See* ECF 36-1 at 43; *Chien Fan Chu v. Brownell*, 247 F.2d 790, 796 (D.C. Cir. 1957) (when Congress uses "differing terms in the same act . . . making each word applicable to a different thing, it did not intend the carefully distinguished and separately defined words to mean the same thing.").

 Plaintiff's argument starts from the premise that DCRA "is silent on what entity within a state must submit data." *Id.* From there, Plaintiff reasons that "the statute evidently assumes that data will be submitted by subordinate units of state government." *Id.* And if submission by a state department of corrections is good enough, why not submission directly by local governments? *Id.* The short answer is that Congress said so. Congress directed that "the State shall report" the required information, and it specifically provided that the term "State" has the meaning given in Section 901(a) of the Crime Control Act.  34 U.S.C. § 60105(a), (e). It did not say "the State or units of local government." Nor did it impose the reporting duty on a "public agency," which the Crime Control Act defines to mean "any State, unit of local government, combination of such States or units, or any department, agency, or instrumentality of any of the foregoing." 34 U.S.C. § 10251(a).

Despite Plaintiff's protestations, automatically attributing local government data submissions to the State *does*, in this specific context, "equate the two [terms] so as to destroy

meaningful variation." ECF 36-1 at 44. Congress specifically assigned the reporting duty to "the State," and it specifically defined "the State" as being distinct from a "unit of local government." The other attributions that Plaintiff relies on—such as attributing a report from a state department of corrections to the state itself—present no such problem, because unlike with local governments, Congress did not specifically rule out such attributions.

Plaintiff's only other objection to the plain meaning of the statute is that it could "lead to a perverse result" if a state were subject to a reduction in grant funding for failing to report local death-in-custody data even if all local governments in the state had fully reported their own data directly to DOJ. ECF 36-1 at 43-44. That scenario is a makeweight. DCRA is clear that any financial penalty on a State for failure to report is "at the discretion of the Attorney General," and the Court should not assume bad faith on the part of the Attorney General to support Plaintiff's strained reading of the statute. And in any event, the mere theoretical possibility of that "perverse result," *id.* at 43, is far from the kind of drastic failure of statutory draftsmanship that is necessary before a court "can rewrite a statute's plain text to correspond to its supposed purposes." *Landstar Express Am., Inc. v. Fed. Maritime Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009).

### D.    Reconsideration is warranted to avoid substantial harm to BJS

As Defendant's opening brief established, almost all of BJS's data collections are voluntary, and BJS relies on cooperation from a host of entities to voluntarily report data, many of which are subject to their own mandatory data-protection obligations. BJS secures that cooperation by promising that the data it collects will  be used only for research and statistical purposes, and that the confidentiality of the data will be protected. BJS provided those assurances when it collected the MCI data, and breaching those assurances, which the order Plaintiff seeks would require, would fundamentally undermine the credibility of those same assurances for BJS's other data collections. ECF 35-1 at 45-46.

Plaintiff attempts to downplay the potential harm to BJS in three ways. First, it notes that BJS does not foresee any anticipated negative results for its collection of death-in-custody data because the MCI data collection has concluded, thus any harm would come to "different people submitting different data under different legal regimes" and be "substantially attenuated." ECF 36-1 at 40. BJS's concern is in fact that it made promises of confidentiality to the MCI data-providers, and that it makes the same promises to many of the same providers to secure their cooperation with its other—ongoing—voluntary data collections. If BJS is required to breach those assurances for MCI, it would undermine all the other data collections that rely on voluntary cooperation secured by those same assurances. There is nothing attenuated about that.

Relatedly, Plaintiff argues that "DOJ identifies no way in which the Court's ruling on Exemption 3 in this case could extend to any of the other data collections it identifies," and that "a court order based on an unrelated statute" would not give data-providers "any reason to doubt BJS's confidentiality assurance." ECF 36-1 at 40-41. Plaintiff does not specify the "unrelated statute" it has in mind, but it cannot be DCRA—Defendant has already released the data that the Court held were furnished under DCRA, and Defendant's reconsideration request is limited to data that *were not* furnished under DCRA.

That leaves Exemption 3 and Title I's confidentiality provision. The risk to BJS from Plaintiff's construction of those statutes is undeniable. Plaintiff's position, after all, is that Title I's confidentiality provision—and thus Exemption 3—does not apply to *any* statistical data that BJS collects unless *Title I itself* provides the specific recordkeeping and recording requirements for the data collection, even if no other statute applies. ECF 36-1 at 42. The implications of this position are obvious, and would be catastrophic for BJS. Title I grants BJS broad authority to collect statistical information on the criminal justice system, but it does not specify the requirements of

any particular data collection with the level of detail that Plaintiff demands. Plaintiff's argument would thus strip *all* of BJS's voluntary data collections of protection under Title I's confidentiality provision.

Finally, Plaintiff faults BJS for providing "no examples of anyone refusing to volunteer information to BJS" since the Court's partial summary judgment decision. ECF 36-1 at 41. But the nature of voluntary data collections is that BJS cannot force anyone to participate, and it certainly cannot require anyone to provide their reasons for declining to participate. Moreover, BJS to date has released only data that were furnished under DCRA; the prospect of also having to release information that was *not* collected under DCRA, as Plaintiff demands, presents a much more substantial risk to BJS's activities in general precisely because such an order would not be cabined to the particular statutory context of DCRA.[6]

## III.    DEFENDANT CONDUCTED AN ADEQUATE SEARCH FOR DOCUMENTS

BJS searched "*all* databases that contained information submitted to the MCI program" without limitation, "*including* the databases for the CJ-9 (Death Report on Inmates Under Jail Jurisdiction), CJ-10 (Death Report on Inmates in Private and Multi-Jurisdictional Jails), and NPS-4A (State Prison Inmate Death Report) forms." Declaration of Elizabeth Ann Carson, ¶ 6, ECF 35-4 at 2 (emphasis added). BJS also searched "the personal folders of all MCI project managers and unit chiefs to determine whether they had retained any documents responsive to the FOIA request," with the search terms "2010-2019," "jail," "prison," and "the individual form designations," such as "CJ-9." *Id.* ¶¶ 6, 8. The manager of the MCI collection from 2019 to 2023 conducted BJS's search, and based on her "experience with BJS, discussions with knowledgeable

---

[6] Defendant respectfully maintains that data "furnished under" DCRA were *also* "furnished under" Title I, and are thus subject to Title I's confidentiality provision, but Defendant has not sought reconsideration on that basis.

staff, as well as [her] understanding of the scope of Plaintiff's FOIA request," she "determined that there were no other locations reasonably likely to contain responsive records." *Id.* ¶ 7.

Plaintiff challenges the adequacy of the search based on the fact that it did not identify data submitted by the federal Bureau of Prisons. ECF 36-1 at 35. As part of its implementation of DCRA 2013, BJS created the "Federal Law Enforcement Agency Deaths in Custody Reporting Program," which covers arrest-related deaths and deaths in custody information from federal law-enforcement agencies from federal fiscal year 2016 onwards, and that collection is distinct from the MCI data collection.  ECF 27 at 11-12 n.10. Prior to that, BJS had collected aggregate counts of deaths from the federal Bureau of Prisons ("BOP"), but not individual-level data, until 2015. Second Declaration of Elizabeth Ann Carson ¶ 5. This collection of aggregate death counts was not part of the MCI data collection. *Id.* The aggregate death counts in federal prisons are publicly available.[7]

Plaintiff's argument that Defendant's search was incomplete is based on a single line on the BJS website for the MCI data collection, stating that MCI collected data from "each of the nation's 50 state prison systems, *Federal Bureau of Prisons*, and approximately 2,800 local jail jurisdictions." ECF 36-1 at 35 (quoting BJS, MCI).[8] As the Second Carson Declaration confirms, however, that statement is simply a clerical error. Second Carson Decl. ¶ 5. BJS never collected MCI data from BOP. *Id.*

---

[7] *See* https://bjs.ojp.gov/library/publications/mortality-state-and-federal-prisons-2001-2019-statistical-tables (last accessed June 6, 2024).
[8] Available at https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program (last accessed June 6, 2024).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Defendant as to Exemptions 6 and 7(C), and as to Exemption 3 for the records subject to Defendant's motion for partial reconsideration.


Dated: June 7, 2024                         Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            MARCIA BERMAN
                                            Assistant Branch Director

                                            */s/ Cormac A. Early*
                                            CORMAC A. EARLY
                                            D.C. Bar No. 1033835
                                            Trial Attorney, U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, N.W.
                                            Washington, D.C. 20005
                                            Tel.: (202) 616-7420
                                            cormac.a.early@usdoj.gov

                                            *Counsel for Defendants*