**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GANNETT SATELLITE INFORMATION NETWORK, | Case No. 22-cv-475 (BAH) |
| Plaintiff, | |
| v. | |
| U.S. DEPARTMENT OF JUSTICE, | |
| Defendant. | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**SECOND CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................1

II.    ARGUMENT ...................................................................................................2

    A.  DOJ has not met its Exemption 7(C) burden to identify a threshold law
        enforcement purpose ..............................................................................2

    B.  If Exemption 7(C) applied, FOIA's foreseeable harm requirement would
        augment the required showing ...............................................................4

    C.  Any privacy interests are minimal at best ...............................................6

    D.  The public interests are substantial ........................................................9

       1.  The data would reveal the effectiveness of DOJ's grantmaking ...........9

       2.  The data would reveal the effectiveness of DOJ's support to state and
           local governments ..........................................................................11

       3.  The data would shed light on DOJ's implementation of DCRA ...........13

       4.  The data would enable the public to scrutinize the Attorney General's
           decision not to apply DCRA's penalty provision ...............................15

    E.  The k-anonymity redactions are too broad ..........................................17

    F.  DOJ must produce federal Bureau of Prison data ...............................21

III.   CONCLUSION .............................................................................................24

## <u>TABLE OF AUTHORITIES</u>

*Page*

*Cases*

*Am. Immigr. Council v. U.S. Immigr. & Custom Enf't*, 464 F. Supp. 3d 228 (D.D.C. 2020) .......19

*Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1 (D.D.C. 2021)...........................................................5

*Bartko v. DOJ*, 898 F.3d 51 (D.C. Cir. 2018).................................................................................3

*Buzzfeed, Inc. v. DHS*, 610 F. Supp. 3d 139 (D.D.C. 2022) ...........................................................5

*Consumers Checkbook Ctr. for the Study of Servs. v. HHS*, 554 F.3d 1046
(D.C. Cir. 2009) .............................................................................................................................11

*DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749 (1989)................................................10

*Hall & Assocs. v. EPA*, 956 F.3d 621 (D.C. Cir. 2020)................................................................24

*Inst. for Energy Research. v. FERC*, 22-cv-2114, 2023 WL 6121878
(D.D.C. Sept. 19, 2023) ...................................................................................................................5

*Keys v. DOJ*, 830 F.2d 337 (D.C. Cir. 1987)..................................................................................3

*L. Ortik Ltd. v. Helme Prods. Inc.*, 427 F. Supp. 771 (S.D.N.Y. 1977)........................................24

*Leopold v. DOJ*, 94 F.4th 33 (D.C. Cir. 2024) ...............................................................................5

*Lepelletier v. FDIC*, 164 F.3d 37 (D.C. Cir. 1999)........................................................................7

*NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F. 2d 131 (D.C. Cir. 1985) ...................23

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) .............................11

*News-Press v. DHS*, 489 F.3d 1173 (11th Cir. 2007)....................................................................14

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978)............................................................1

*Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81 (D.D.C. 2004) ..........23

*Pavement Coatings Tech. Council v. United States Geological Surv.*, 995 F.3d 1014
(D.C. Cir. 2021) .............................................................................................................................14

*Reps Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97 (D.D.C. 2021) ................5, 11

*Schrecker v. DOJ*, 254 F.3d 162 (D.C. Cir. 2001)..........................................................................5

*Tuffly v. DHS*, 870 F.3d 1086 (9th Cir. 2017)....................................................................10, 11

*Washington Post Co. v. HHS*, 690 F.2d 252 (D.C. Cir. 1982)......................................................10

*Wessler v. DOJ*, 381 F. Supp. 3d 253 (S.D.N.Y. 2019)..........................................................7, 8

**Statutes**

5 U.S.C. § 552(a)(8)(A)(i)(I) ...................................................................................................4, 5

5 U.S.C. § 552(b) .......................................................................................................................21

5 U.S.C. § 552(b)(6) ....................................................................................................................4

5 U.S.C. § 552(b)(7)(C) ......................................................................................................2, 4, 5

**Other Authorities**

2020 Edward Byrne Memorial JAG Grant (2023) .......................................................................17

Executive Order 14074, § 2 (May 25, 2022) .............................................................................13

Funding Awards, DOJ Bureau of Justice Assistance...................................................................17

Grant Duwe, Literature Review and Data Analysis on Deaths in Custody: Report to Congress, 14, *DOJ Office of Justice Programs* (Dec. 2022).........................................................14

Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)), Bureau of Justice Statistics (2019) ...............................................................21

Press Release: Justice Department Announces Investigation into Conditions in Fulton County, Georgia Jail, *DOJ Office of Public Affairs* (July 13, 2023) ......................................11, 12

Press Release: Justice Department Reaches Agreement with Los Angeles County to Implement Sweeping Reforms on Mental Health Care and Use of Force Throughout the County Jail System (Aug. 5, 2015).................................................................................................12, 13

Pub. L. No. 113-242, 128 Stat. 2860, § 2 (2014)..............................................................13, 14, 15

Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074 (Sept. 16, 2022)...........................................................................................................................16, 17

*Uncounted Deaths in America's Prisons and Jails: How the Department of Justice Failed to Implement the Death in Custody Reporting Act: Hearing before the Permanent Subcommittee on Investigations*, 117th Cong, 21 (2022) (Testimony of Maureen A. Henneberg, Deputy Assistant Attorney General) .................................................................11, 12

## I.    INTRODUCTION

It is hard to overstate the public's interest in understanding why thousands of inmates die each year in state and local facilities and whether the federal government is meeting its obligations to monitor and address these deaths.  DOJ does not dispute, because it is indisputable, that it is deeply enmeshed in state and local efforts to reduce inmate deaths, or that the responsive death-in-custody data would show whether its interventions have been effective.  So it pivots to an unprecedentedly narrow conception of what qualifies as a FOIA public interest: if records do not explain the ***reasons*** for an agency's action, the public has no business assessing that action's ***outcome***.  So much for "hold[ing] the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  Under the actual precedent applicable to this case, the public has an interest in both.  It also has a strong interest in understanding how DOJ has implemented and enforced the Death in Custody Reporting Act.

These interests dwarf anything remaining on the privacy side of the ledger—particularly since Exemption 6's particularly strong pro-transparency provision governs the privacy balance, and because FOIA's foreseeable harm requirement augments DOJ's required showing under Exemption 7(C).  As DOJ admits, the privacy interests are diminished from the start because the deceased inmates are, by definition, deceased.  And these interests are smaller still given the unrebutted evidence that their relatives overwhelmingly support disclosure and many states do not treat similar information privately.  Contrary to DOJ's suggestion, USA TODAY does not introduce these facts to argue that anyone waived privacy.  Instead, they show that the interests are far weaker than DOJ claims them to be.

Even if the balance favored DOJ, though, its redactions are too broad.  DOJ imposed them under the assumption that viewers of its data might be able to identify inmates based on public sources, and thus learn new information about them.  But it neglects that the public sources

themselves typically contain virtually all the sensitive information found in the data.  So redacting the data accomplishes virtually nothing.  And even if the public record were to lack isolated categories of sensitive information, leaving something to be learned from the database, DOJ should have responded by redacting that discrete category of information rather than miscellaneous entries across the data that have stymied USA TODAY's attempts to make optimal use of it.

Finally, DOJ justifies failing to search for federal Bureau of Prison data on the ground that it supposedly is not responsive to USA TODAY's request.  The request seeks "all information" submitted to DOJ's MCI Program, which DOJ argues does not include BOP data.  But for the entire pendency of this litigation, DOJ has maintained a website claiming that the MCI Program ***does*** include BOP data, and even endorsed that claim in one of its briefs.  Yet DOJ now vaguely claims for the first time, years into the litigation, that the statement on its website is a "clerical error."  Whether nefarious or negligent, DOJ's "clerical error" has prejudiced USA TODAY by inducing it not to file a separate FOIA request for BOP data.  In these circumstances, fairness requires holding DOJ to its representation that the MCI Program includes BOP data.  And under that assumption, DOJ should have searched for it.

## II.    ARGUMENT

### A.    DOJ has not met its Exemption 7(C) burden to identify a threshold law enforcement purpose.

Before balancing the deceased inmates' privacy with the public interests in disclosure, the Court must decide what burden the agency bears.  If Exemption 6 applies, the agency has a higher burden; if Exemption 7(C) applies, the agency has a lower burden.  So far, the parties agree.  *See* P. Br. at 11-12, ECF No. 37; D. Opp. at 3, ECF No. 39.

The parties depart on whether DOJ has met its burden to show that Exemption 7(C) applies to the data—that the data were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(C).

*See Keys v. DOJ*, 830 F.2d 337, 340 (D.C. Cir. 1987) (holding that the agency bears the burden to demonstrate the "threshold law enforcement purpose"). As DOJ's opposition confirms, the agency claims only that states, not DOJ itself, compiled the data for those purposes. *See* D. Opp. at 3-4.

Despite bearing the burden, DOJ introduces no evidence—such as a declaration from a state correctional agency—about why states compiled the data. It does not even acknowledge let alone refute the plausible explanation proffered in USA TODAY's opening brief: that states compiled the data simply because federal law required them to, or the federal government requested it. *See* P. Br. at 12-13. That alone defeats its claim to have made the threshold showing.

The most DOJ musters is an argument that "the circumstances of an inmate's death obviously and necessarily are linked to a particular individual and incident subject to investigation." D. Opp. at 3. But even if one assumes that every inmate death is subject to some investigation—speculation DOJ does not substantiate with evidence—it does not follow that such an investigation was conducted for law enforcement purposes as required by Exemption 7(C). That is because, "[t]o qualify as law-enforcement records, the documents must arise out of investigations ***which focus directly on specifically alleged illegal acts*** which could, if proved, result in civil or criminal sanctions." *Bartko v. DOJ*, 898 F.3d 51, 64 (D.C. Cir. 2018) (cleaned up, emphasis added). For at least the vast majority of deaths, such as those that occurred due to natural causes, there is no plausible connection to any violation of law. And while perhaps one could contrive contrary examples, that cannot carry DOJ's burden. After all, "the mere possibility of a legal violation" is not sufficient to qualify an investigation as one undertaken for law enforcement purposes. *Id.* There must instead be a "connection between an individual or incident and a violation of … law," which DOJ has not even attempted to establish here. *Id.* (cleaned up). Exemption 6, not Exemption 7(C), governs the privacy balance.

**B.    If Exemption 7(C) applied, FOIA's foreseeable harm requirement would augment the required showing.**

In its opening brief, USA TODAY argued that FOIA's foreseeable harm burden augments the required showing under Exemption 7(C).  Specifically, it argued that the agency reasonably foresees that disclosure ***would*** unwarrantedly invade personal privacy—in contrast with the text of Exemption 7(C), which an agency may satisfy by the more liberal showing that disclosure "***could reasonably be expected to*** constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C) (emphasis added).  This argument follows from the text of the foreseeable harm requirement, under which an agency may withhold information only if it "reasonably foresees that disclosure ***would*** harm an interest protected by an exemption."  5 U.S.C. § 552(a)(8)(A)(i)(I) (emphasis added).  DOJ offers two meritless responses.

First, DOJ straw mans USA TODAY's argument by casting it to mean that "Congress effectively repealed Exemption 7(C)'s protection" and drained it of "independent vitality."  D. Opp. at 4-5.  But as USA TODAY has already explained, that is false.  Exemption 7(C) even, as augmented by FOIA's foreseeable harm requirement, is still broader than Exemption 6.  That is because the foreseeable harm augmentation only affects one of the two differences between the exemptions: that disclosure "would," not "could," cause an unwarranted privacy invasion.  *Compare* 5 U.S.C. § 552(b)(6) ("would constitute") *with* 5 U.S.C. § 552(b)(7)(C) ("could reasonably be expected to constitute").  But the exemptions also differ in the severity of the privacy invasion they protect: Exemption 7(C) applies to all "unwarranted invasion[s] of personal privacy," while for Exemption 6 the invasion must be "***clearly*** unwarranted."  *See* 5 U.S.C. § 552(b)(7)(C); 5 U.S.C. § 552(b)(6) (emphasis added).  So suppose that an agency seeks to withhold a law enforcement record that it reasonably foresees would constitute an ***unwarranted*** invasion of

personal privacy, but not an invasion that is ***clearly unwarranted***. Exemption 7(C) allows this; Exemption 6 does not. So Exemption 7(C) retains independent force.

Second, DOJ argues that this distinction makes no difference because of "the obvious nature of the foreseeable harm here." D. Opp. at 5. But the harm is not at all obvious. DOJ apparently locates that harm solely in the privacy interests of the deceased inmates and their families—which, for reasons discussed below and in USA TODAY's opening brief, are weak at best. Exemption 7(C), however, does not protect against invasions of privacy *simpliciter*, but only those that are "unwarranted." 5 U.S.C. § 552(b)(7)(C). And as the case law establishes, a privacy invasion is "unwarranted" only if the privacy interests outweigh the public interest in disclosures. *See Schrecker v. DOJ*, 254 F.3d 162, 166 (D.C. Cir. 2001) ("In determining whether release of particular information is an 'unwarranted' invasion of privacy, an agency must balance the type of privacy interest at stake against the public interest in release of the type of information involved."). So disclosure can cause foreseeable harm only if, after balancing the interests, the Court concludes that disclosure "would" result in an unwarranted invasion of personal privacy. 5 U.S.C. § 552(a)(8)(A)(i)(I).[1]

---

[1] DOJ's cases say nothing to the contrary. In both, the Court found that there were substantial privacy interests but no public interest disclosure. Thus, the balance to determine an unwarranted invasion necessarily favored the privacy interests. *See Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1, 21 (D.D.C. 2021); *Inst. for Energy Research. v. FERC*, 22-cv-2114, 2023 WL 6121878, at *12 (D.D.C. Sept. 19, 2023). The agency also cites cases decided under Exemption 7(E) holding that the foreseeable harm requirement does not apply to that exemption because that exemption has a built-in harm analysis. *See Buzzfeed, Inc. v. DHS*, 610 F. Supp. 3d 139, 148 n.1 (D.D.C. 2022); *Reps Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 128 (D.D.C. 2021). But these cases lacked the benefit of the D.C. Circuit's holding that the foreseeable harm requirement applies to all exemptions other than Exemption 3 and mandates a "distinct, consecutive inquir[y]" from whether the record satisfies the exemption. *See Leopold v. DOJ*, 94 F.4th 33, 37 (D.C. Cir. 2024). After *Leopold*, these holdings can no longer be good law.

In any case, the Court need not decide this issue if it concludes that Exemption 6, not Exemption 7(C), applies to the records. And whatever exemption applies, the balance ultimately favors disclosure.

### C.    Any privacy interests are minimal at best.

USA TODAY has identified three features that, separate and together, substantially diminish the privacy interests. The parties agree on the first: the inmates' death reduces privacy, but not to zero. *See* P. Br. at 16; D. Opp. at 6. They disagree on the other two: inmates' families' overwhelming support for disclosure, and the fact that states make similar information publicly available.

First, USA TODAY argued that families overwhelmingly support disclosure. It presented evidence in the form of two declarations, one by a veteran reporter who has spoken to dozens of family members who have uniformly supported disclosure, the other by the mother of a deceased inmate who supports it herself—including the follow-on reporting that included vivid details about how her son died. *See* Barton Decl. ¶¶ 6-7, ECF No. 37-3; Telford Decl. ¶¶ 4-11, ECF No. 37-5. This evidence shows that, contrary to what DOJ supposes, the information it has redacted is not actually the type that families typically want to be kept private. And that shows that the privacy interests are weak at best. *See* P. Br. at 16-19.

DOJ does not dispute any of this. It instead responds to an argument USA TODAY did not make: that these two declarations waive every deceased inmate's privacy interests. *See* D. Opp. at 7-9; *see also generally* P. Br. (not referencing waiver). Of course they don't. But that is not the point. The point is that they inform the privacy interest's ***weight***. And they do that by demonstrating that family members overwhelmingly support disclosure of the type of information DOJ has withheld. After all, if the class of affected individuals overwhelmingly supports disclosure, their privacy is a weak rationale for withholding. Thus, as the D.C. Circuit held in a

related context, it is "overly paternalistic to insist upon protecting an individual's privacy interest" when the individual would rather the information be disclosed, including when the individuals owning the interest did not participate in the litigation or otherwise waive their privacy. *Lepelletier v. FDIC*, 164 F.3d 37, 48 (D.C. Cir. 1999).[2]

The Southern District of New York took just this approach in *Wessler v. DOJ*, 381 F. Supp. 3d 253 (S.D.N.Y. 2019). There, a reporter submitted his own declaration averring that family members had expressed gratitude for his reporting on their deceased relatives' medical care while in prison—a declaration that, unlike Barton's here, was not corroborated by that of a family member making the same point from her perspective. The court found that the reporter's declaration relevant to the privacy interests not by waiving them, but by showing that families generally support disclosure. *See id*. at 259. The Court should reach the same conclusion.

Of course, *Wessler* found the privacy interests at least strong enough to balance against the public interest in disclosure—though not strong enough to overcome those interests. *See id*. at 260-61. *Wessler*'s privacy interests were stronger than those implicated here: *Wessler* involved deceased inmates' "full medical records," which likely included all the information at issue here, plus far more. *Id*. at 260. But even if the Court concludes that the evidence in the Barton and Telford declarations does not prove that the privacy interests are zero, it should at least hold that the privacy interests are weak in light of the families' pro-disclosure perspective.

---

[2] Though the individuals in *Lepelletier* had a pecuniary stake in the information's release, there is no basis in FOIA to limit their preferences to those motivated by money. The considerations that likely motivate many families to support disclosure—such as holding accountable those responsible and preventing others from dying in similar ways—might well be more important. *See* Telford Decl. ¶¶ 7-10 (citing these factors). Further, some individuals here might actually have a pecuniary interest in release. Indeed, Cynthia Telford averred to obtaining a settlement related to her son's death, which was made possible only by Gina Barton's reporting on it. *See id*. ¶ 11.

Second, USA TODAY pointed out that many states have released much of the same information that DOJ now withholds. It introduced this evidence for similar reasons to the last: these state disclosures are evidence that privacy interests in the death-in-custody data are not as strong as DOJ makes them out to be. *See* D. Opp. at 6 (arguing that the data are "highly sensitive and potentially embarrassing"). After all, states' release of similar data is evidence that the data are not especially private. *See Wessler*, 381 F. Supp. 3d at 261 (holding that the Bureau of Prisons' release of full medical records "certainly relevant" when assessing the strength of the privacy interests in similar records withheld by the Marshals Service).

Apart from (again) attacking a waiver-based argument USA TODAY never made, DOJ responds that the information states have released is not identical to what it has withheld, and not all collected in the same place. *See* D. Opp. at 9-10. That is largely true—though DOJ fails to contend with the fact that at least one state, Texas, has a central database containing all the sensitive information DOJ has withheld, plus more.[3] *See* P. Br. at 19 (citing Texas database). But again, the point is not that states' disclosures "eliminate" deceased inmates' privacy interests. D. Opp. at 9. Instead, state disclosures are evidence that these interests are weak from the start—after all, if states saw the interests as strong, they would be loath to release the data.

---

[3]    Texas's "Custodial Death Report" database is at the following URL: https://oag.my.site.com/cdr/cdrreportdeaths. Clicking on any of the entries will provide detailed information about the relevant inmate. For example, like DOJ's withheld data, these entries contain the decedent's full name, sex, race, date of birth, date they were taken into custody, date and time of death, manner and cause of death, location of death, charges and/or convictions, whether the decedent exhibited signs of intoxication or mental health problems, and a summary of the incident. *See, e.g.*, https://oag.my.site.com/cdr/VIPForm__VIP_FormWizardPDF?id=a2Ct0000003BdrqEAC&templateId=a2x5A000001M2UWQA0. They also contain further, arguably sensitive details that DOJ's data omits, such as whether the decedent made suicidal statements, attempted to flee, or tried to injure others. *See id*.

To be sure, some states do not release some data at issue here. That might be for privacy reasons, though other explanations are just as likely. Maybe they perceive it as not worth the effort. In any event, at best for DOJ, states have varying perspectives about the sensitivity of this type of data. Thus, far from being "unparalleled," the privacy interests here are at most uncertain. D. Opp. at 11.

***

While none of these factors suffice alone to diminish the privacy interests to zero, the Court could well conclude that the privacy interests are negligible considering them all together. But even if the Court finds the privacy interests more than *de minimis*, and thus sufficient to trigger the public interest balancing, the foregoing considerations show that the interests are entitled to little weight. And as argued below, they are easily eclipsed by the public interests in disclosure.

**D.    The public interests are substantial.**

USA TODAY has identified four important matters on which the redacted data would shed light: (1) DOJ's grantmaking on issues correlated with inmate deaths, (2) DOJ's provision of other support to state and local governments, (3) DOJ's implementation of DCRA's study requirement, and (4) the Attorney General's decision not to enforce DCRA's penalty against any state.[4] DOJ disputes that these interests justify producing the data. It is wrong on each count.

**1.    The data would reveal the effectiveness of DOJ's grantmaking.**

First, as USA TODAY argued, the death-in-custody data, in conjunction with publicly available information about DOJ's grantmaking, would shed light on whether DOJ is properly allocating funding on matters correlated with inmate mortality. *See* P. Br. at 22-23. DOJ does not dispute that the redacted data would shed light on whether it is properly allocating that funding. It

---

[4] In its opening brief, USA TODAY grouped these interests into two categories. It discusses them separately here for ease of exposition.

responds instead that USA TODAY has not asserted a valid public interest because DOJ's allocation decisions did not consider the death-in-custody data.  *See* D. Opp. at 14-16.[5]

DOJ's argument rests on a myopic view of what qualifies as a public interest under FOIA. The interest is not simply in understanding the ***basis*** for an agency's decision, but also the decision's ***effects***.  So much is clear from the Ninth Circuit's decision in *Tuffly v. DHS*, 870 F.3d 1086 (9th Cir. 2017).  There the court found that the requested records "would do nothing to further illuminate the government's decision" or expose negligence or misconduct.  *Id*. at 1095.  But it held that there was a "significant enough public interest in examining the ***success or failure*** of governmental programs to reach the balancing stage of the analysis."  *Id* (emphasis added).  And it specifically held that there was a substantial interest in "[d]iscovering that a government policy had deleterious consequences," even if those consequences were "unforeseeable" to the people formulating that policy.  *Id*.  It reached this conclusion because understanding "what the[] government is up to" includes understanding whether the government is making good decisions. *See id*.  Plus, this holding jibes with case law in this circuit, according to which "the purpose of FOIA is to permit the public to decide for itself whether government action is proper." *Washington Post Co. v. HHS*, 690 F.2d 252, 264 (D.C. Cir. 1982).  And it is fully consistent with the Supreme Court's articulation of the public interest, which includes "shed[ding] light on an agency's performance of its statutory duties."  *DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989).  That light is shed not only by the bare fact of why an agency did what it did, but whether it is doing it well.

---

[5] In its opening brief, USA TODAY also refuted DOJ's argument that certain unidentified statistical analyses, already published by DOJ, suffice for this purpose.  *See* D. Br. at 23, ECF No. 35-1; P. Br. at 23.  In its opposition, DOJ does not defend the sufficiency of its statistical analyses.

DOJ's cases neither support its myopic view of the public interest nor undermine *Tuffly*'s reasoning.  In each, the courts held that the specific records at issue would shed no light on the government.  *See Reps. Comm. For Freedom of Press*, 489 U.S. at 775 (rap sheets); *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989) (identities of federal annuitants); *Consumers Checkbook Ctr. for the Study of Servs. v. HHS*, 554 F.3d 1046, 1051-56 (D.C. Cir. 2009) (physicians' Medicare claims).  And in none did the court hold that the records would inform the public about the effects of a decision.

Thus, even allowing that DOJ does not consider death-in-custody in its grantmaking, the public interest in this case mirrors that in *Tuffly* and so qualifies as substantial.  After all, while the death-in-custody data might not explain **why** DOJ allocated grant funding, it would certainly reveal whether that funding had the "deleterious consequences" of failing to stop preventable inmate deaths—again, a point even DOJ does not dispute.  *Tuffly*, 870 F.3d at 1095.  The public interest is substantial.

## 2. The data would reveal the effectiveness of DOJ's support to state and local governments

Next, the federal government, including DOJ, is enmeshed in states' efforts to reduce carceral deaths.  *See Uncounted Deaths in America's Prisons and Jails: How the Department of Justice Failed to Implement the Death in Custody Reporting Act: Hearing before the Permanent Subcommittee on Investigations*, 117th Cong, 21 (2022) (Testimony of Maureen A. Henneberg, Deputy Assistant Attorney General), https://www.congress.gov/117/chrg/CHRG-117shrg50237/CHRG-117shrg50237.pdf ("PSI Hearing") (referring to DOJ's "work with our State, local, and tribal partners to improve the conditions of incarceration").  For instance, DOJ can and does investigate state facilities that allegedly fail to meet inmates' needs.  *See* Press Release: Justice Department Announces Investigation into Conditions in Fulton County, Georgia

Jail, *DOJ Office of Public Affairs* (July 13, 2023), https://www.justice.gov/opa/pr/justice-department-announces-investigation-conditions-fulton-county-georgia-jail ("Press Release").  It also provides training to state and local facilities to help them reduce deaths.  *See* PSI Hearing at 30 (Testimony of Gretta L. Goodwin, Director of Homeland Security and Justice, U.S. Government Accountability Office).

The death-in-custody data would, for one, allow the public to evaluate whether the federal government is sufficiently investigating state and local facilities.  For example, DOJ initiated an investigation of Georgia's Fulton County Jail after receiving "credible allegations that an incarcerated person died covered in insects and filth."  Press Release.  This is precisely the kind of information that could well be contained in the entirely redacted narrative field of the death-in-custody data, along with the facility field.  But if it is not contained in that field, then one effective way to surface these allegations is the precise on-the-ground investigative reporting that USA TODAY intends to conduct with the data—which requires knowing the identities of the deceased inmates.  *See* First Caruso Decl. ¶ 19, ECF No. 37-4.  Thus, the data will inform the public whether DOJ is adequately choosing which state and local facilities to investigate.  For instance, USA TODAY could identify instances of suspicious deaths in particular facilities and then determine whether DOJ has initiated investigations. Or it could identify instances in which DOJ initiated investigations based on facts that do not seem to warrant them.

The data would likewise inform whether DOJ's enforcement actions have been effective.  For instance, in 2015 DOJ reached an agreement with Los Angeles County to improve mental health conditions in the county's jail system.  *See generally* Press Release: Justice Department Reaches Agreement with Los Angeles County to Implement Sweeping Reforms on Mental Health Care and Use of Force Throughout the County Jail System (Aug. 5, 2015),

https://www.justice.gov/opa/pr/justice-department-reaches-agreement-los-angeles-county-

implement-sweeping-reforms-mental.  Data on suicides in Los Angeles County jails would shed

light on whether that agreement was effective.  Further, disclosing inmates' names would allow

USA TODAY and others to report on whether more qualitative aspects of the agreement have

borne fruit, such as the requirement to increase out-of-cell time.  *See id.*

The death-in-custody data would also help the public evaluate whether DOJ is effectively

assisting state and local facilities in other ways.  For instance, if in the past DOJ provided training

to a specific facility on how minimize deadly confrontations between inmates and prison staff, the

public can assess the effectiveness of that training by examining data surrounding homicides in

that facility before and after the training.  *Cf.* Executive Order 14074, § 2 (May 25, 2022) (requiring

DOJ to issue such guidance).

Understanding the effectiveness of DOJ's interventions is plainly a cognizable public

interest.  The death-in-custody data would advance that understanding.  The public interest here is

immense.

### 3.    The data would shed light on DOJ's implementation of DCRA.

USA TODAY further argued that the data would shed light on DOJ's implementation of

DCRA's requirement that the agency publish a report to Congress on how information furnished

under DCRA can be used to reduce deaths in custody, and "the relationship, if any, between the

number of such deaths and the actions of management of such jails, prisons, and other specified

facilities related to such deaths."  Pub. L. No. 113-242, 128 Stat. 2860, § 2 (2014) ("DCRA 2013").

USA TODAY argued that DOJ had not issued the required report by the deadline DCRA specified,

and that it was therefore incumbent on the press to fill the gaps.  *See* P. Br. at 21.

- 13 -

DOJ responds primarily that disclosing the data would be cumulative of a report it published in December 2022. *See* D. Opp. at 12-13.[6] But despite bearing the burden to show cumulativeness, DOJ has not cited any part of the study that purportedly obviates the usefulness of the raw data. *See News-Press v. DHS*, 489 F.3d 1173, 1192 (11th Cir. 2007) (holding that once the requester has identified a substantial public interest, the agency bears the burden that that interest is already served by its "disclosure of the … data already released") (cleaned up). Nor could it. But its findings on carceral deaths are admittedly "based on analyses of only one year of facility census data." Grant Duwe, Literature Review and Data Analysis on Deaths in Custody: Report to Congress, 14, *DOJ Office of Justice Programs* (Dec. 2022), https://www.ojp.gov/pdffiles1/nij/305802.pdf. It is thus insufficient to show trends over time. And because it is based on a small time slice, it is quite possibly unrepresentative of the recent past writ large.

Only the raw data can confirm or deny if DOJ's analysis was thorough enough to determine the relationship between the "number of such deaths and the actions of management of such jails, prisons, and other specified facilities related to such deaths." DCRA 2013, § 2. And assessing the adequacy of analysis by a federal agency specifically mandated by Congress is a quintessential public interest. *Cf. Pavement Coatings Tech. Council v. United States Geological Surv.*, 995 F.3d 1014, 1024 (D.C. Cir. 2021) (holding additional disclosures would not serve the public interest only because requester "has all the data it needs to replicate the [agency's] scientists' analysis").

---

[6] This is one of two reports DOJ intends to submit. There is no apparent timetable for the other's release. While DOJ says that it is "expected to be delivered to DOJ for review by the end of September 2024," DOJ has not said when it intends to publish the report. D. Opp. at 12.

**4.    The data would enable the public to scrutinize the Attorney General's decision not to apply DCRA's penalty provision.**

Last, USA TODAY argued that the data would enable the public to scrutinize the Attorney General's decision not to apply a provision in DCRA authorizing—but not requiring—him to reduce grant funding to states that do not comply with DCRA's reporting mandate.  *See* P. Br. at 21-22; *see also* DCRA 2013 § 2.  DOJ does not dispute that scrutinizing this decision represents a substantial public interest.  It argues only that releasing the data would not advance that interest.

DOJ first responds that USA TODAY has not shown that the data fields it redacted would enable that scrutiny.  This response ignores that DOJ has redacted the state for 22 percent of deaths. *See* P. Br. at 22 (making this point in connection with the public interest).  And the public cannot assess the Attorney General's decision not to enforce the penalty provision against delinquent states without knowing how delinquent they are.

The remaining data fields would also meaningfully advance this scrutiny.  For instance, the public might well understand and evaluate the Attorney General's decision differently if noncompliance is a statewide issue rather than one limited to particular facilities.  But the data do not allow that evaluation because the facility is redacted in 58 percent of the deaths.  *See* First Caruso Decl. ¶ 23.  Further, DCRA mandates that states accurately report ***all*** the fields.  *See* DCRA 2013 § 2.  So the extent of each state's compliance—and hence the extent to which the Attorney General is justified in declining to enforce the penalty provision against them—cannot be fully ascertained without a grasp of all the data.  And because much of the information is public via other sources, such as state-run databases, press releases, and news reports, the press can readily check if the states have reported the data accurately.[7]

---

[7] DOJ cannot fall back on the presumption of regularity to suggest that states have complied with DCRA.  It itself argues that there are widespread compliance problems.  *See* D. Opp. at 14.

Second, DOJ argues that disclosure would add nothing because "DOJ has been transparent about the many issues with state data-reporting under DCRA, and about its concerns with implementing DCRA's financial penalty mechanism." D. Opp. at 13. As to the state underreporting, it cites only a passage of an Attorney General's report discussing underreporting to its **Bureau of Justice Assistance**, which is not the entity that operated the MCI Program at issue in this case. *See* Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074, 11 (Sept. 16, 2022), https://bja.ojp.gov/doc/DOJ-Implementation-of-DCRA-of-2013.pdf ("AG Report"). That argument is a red herring.

As to DOJ's concerns with implementing the penalty, the AG Report claims that, "[i]n general," state-level agencies have less knowledge about deaths than local jurisdictions, and that "[m]ost states" lack the ability to compel local agencies to report deaths to the state agency. *Id*. Because of this dynamic, and because DCRA only authorizes the Attorney General to penalize states, the penalty would have "no influence on non-compliant units of government that do not otherwise receive passthrough JAG funding." *Id*. at 12. It further speculates that "the amount of JAG funding that reaches many agencies (e.g., smaller agencies) is relatively small and may be viewed as an insufficient incentive or deterrent to compel compliance from those local agencies." *Id*. So it concludes that, in these instances, enforcing the penalty provision might not be productive.

This explanation raises multiple questions that underscore the need for the data. Here is one: We are told that **most** state agencies cannot compel local agencies to give them the data. But what about the states that **can**, to which DOJ's nonenforcement rationale does not apply? Have they complied with DCRA? If not, that would raise questions about DOJ's decision not to penalize them.

Another: DOJ says that, because some small agencies receive small amounts of funding, that funding "***may be viewed*** as an insufficient incentive or deterrent to compel compliance."  AG Report at 12 (emphasis added).  But is the penalty ***actually*** an insufficient incentive or deterrent?  DOJ cites no evidence for that proposition.  Yet its speculation can easily be tested by comparing the quality of data submitted with respect to local facilities with the publicly available information about the funding these localities have received.  If small facilities that receive funding submit better data, for instance, that would contradict DOJ's speculation.[8]

Yet another:  Some jurisdictions are not "small," and receive enough funding that DOJ insinuates should operate as a deterrent.  AG Report at 12.  For instance, the City of Albuquerque recently received over $550,000 in JAG funding.[9]  So to what extent, if any, is Albuquerque complying with DCRA?  And if it is not complying, perhaps DOJ should reconsider its decision not to penalize New Mexico.

In short, far from obviating the need for the death-in-custody data, DOJ's past disclosures accentuate that need.  The public interest here is manifest.

***

Even if there are non-*de minimis* privacy interests in the death-in-custody data, any one of these public interests would outweigh them.  DOJ has not met its burden to withhold the data.  The Court should order it released in full.

### E.    The k-anonymity redactions are too broad.

The next issue is whether DOJ met its segregability obligations in employing the k-anonymity method to redact the data—which the Court need not reach if it finds that DOJ has not

---

[8] The grants are easily accessible online, and those that received JAG funding are listed as such. *See* Funding Awards, DOJ Bureau of Justice Assistance, https://bja.ojp.gov/funding/awards/list.
[9] *See* 2020 Edward Byrne Memorial JAG Grant (2023), https://bja.ojp.gov/funding/awards/15pbja-24-ag-00002-jagx.

met its burden under the privacy exemptions.  *See* P. Br. at 25.  Two issues regarding k-anonymity remain in dispute: DOJ's choice of quasi-identifiers, and its redaction of the narrative descriptions.

First, the quasi-identifiers.  Quasi-identifiers are variables that, in conjunction with publicly available information, could identify an individual in the dataset.  *See* First Lauger Decl. ¶ 9, ECF No. 35-4.  If the dataset contains other information about the individual, then a viewer of the dataset could learn that additional information.  To prevent the viewer from learning that information, DOJ redacted the dataset to preclude any unique combination of quasi-identifiers.  DOJ chose the quasi-identifiers it did—state, date of death, facility, race, admission date, and offense—because it concluded that such information appears in inmate search directories, press releases, and news articles that name the inmates.  *See id*.  But, as USA TODAY argued, if a viewer learned the inmate's name from one of these sources, then the viewer would probably already know virtually all the sensitive information they might have learned from the dataset.  And that is because inmate databases, press releases, and news articles often contain all the sensitive information.  This is clear from the exhibits to the Barton Declaration, which show that most press releases and news articles identify the inmates by name and disclose what they were charged or convicted of, how they died, and how old they were at the time.  *See* P. Br. at 26-27; Barton Decl. Exs. 1-50.

DOJ responds first by claiming that USA TODAY "fundamentally misunderstands the k-anonymity method" because, supposedly, it assumes that quasi-identifiers "are the most (or even only) ***sensitive*** information in the dataset, rather than the information most likely to definitively link an individual to other public sources of information."  D. Opp. at 16-17.  Not so.  USA TODAY has never argued that quasi-identifiers are necessarily sensitive.  The argument has always been that a viewer who learns the quasi-identifiers from public sources (and can therefore use them to identify an inmate from the dataset) will happen to already know virtually all the

sensitive information.  And that is because the public sources DOJ identifies as containing quasi-identifiers—inmate databases, press releases, and news articles—also happen to contain most of the sensitive information referenced in the dataset, whether or not that information happens to be a quasi-identifier.[10]  So DOJ's response misses the mark.

DOJ also argues that the public sources do not contain all the information in the dataset that might be sensitive, and thus that a viewer who knows the quasi-identifiers might actually learn something sensitive about an inmate.  It gives one example: whether a person received in-patient psychiatric treatment.  D. Opp. at 17.  True, inmate databases, press releases, and news articles typically do not contain that information.  But DOJ could have addressed this issue by simply redacting the corresponding "Mentalstay" column for each of the 16,625 deceased inmates rather than imposing over ten times more redactions—186,635 in all[11]—across the board that substantially reduce the data's usefulness.  *See* First Caruso Decl. ¶ 16.  It gives no reason for failing to do so, which it should have done.[12]  *See Am. Immigr. Council v. U.S. Immigr. & Custom Enf't*, 464 F. Supp. 3d 228, 239 (D.D.C. 2020) (granting partial summary judgment for requester on segregability "because the agency has not identified any harm that would flow from a more limited disclosure, and the statute requires that reasonably segregable portions of records should be provided").

---

[10] For example, DOJ did not classify "cause of death" as a quasi-identifier, but it is one of the potentially sensitive pieces of information that USA TODAY argued is typically present in the public source material.  *See* P. Br. at 26; First Lauger Decl. ¶ 10.

[11] *See* https://www.ojp.gov/program/ojp-freedom-information-act/ojp-reading-room.

[12] DOJ has already disclosed the results of that column on the spreadsheet.  But it should not get to use its prior improper release as a basis to justify withholding more records.  So if the Court reaches k-anonymity, it should order DOJ to produce a version of the database that redacts the Mentalstay column and nothing else.  At the very most, it should order the parties to confer about the most appropriate way to maximize the release of the data while preserving the anonymity of the 749 deceased inmates—4.5 percent of the total—who are reported as having a mental health stay.

Second, the narratives.  In its opening brief, USA TODAY argued, quite simply, that DOJ offered no justification for redacting narrative descriptions of how the inmates died, and pointed out that DOJ did not classify the narrative descriptions as quasi-identifiers capable of identifying an otherwise-anonymous inmate.  *See* P. Br. at 27.

DOJ responds by introducing a supplemental declaration claiming that the "Notes" column actually was "treated as a quasi-identifier" and that DOJ erred by not pointing this out in its opening brief.  Second Lauger Decl. ¶ 7, ECF No. 39-3.  But this explanation does not justify withholding that column in full.

For one, DOJ gives no cogent reason for treating narrative descriptions as quasi-identifiers. It argues that "press releases and other such statements that state government may release about a death in custody may frequently contain narrative information."  D. Opp. at 19.  But unlike more quantitative information, like an inmate's date of death, there is no reason to expect the details in a state's press release to match the narrative description it provides to DOJ.  So unlike the other quasi-identifiers, there is no reason to expect the narrative in the database to match public information—the *sine qua non* of a valid quasi-identifier.  *See* First Lauger Decl. ¶ 9.

Next, DOJ does not explain why it redacted the entire "Notes" column.  Perhaps it did so because narrative descriptions might use unique verbiage, and DOJ "redacted any value that was unique within its column."  First Lauger Decl. ¶ 19.  But even if the verbiage is unique, the actual content probably is not.  Indeed, DOJ's example, where a press release describes an inmate as being discovered by "[p]rison staff," would likely apply to many narrative entries whether or not they used this precise description.  D. Opp. at 19.  DOJ is not justified in assuming that every narrative description is unique.

Finally, DOJ's wholesale redaction of the "Notes" column is undermined by the fact that at least some cells are likely blank, could not possibly contribute to an invasion of privacy, and hence may not be redacted. *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."). This is likely because many cells in columns directly associated with an inmate's death are themselves blank, including the location of death (65 blanks), whether the death was evaluated (97 blanks), and cause of death (161 blanks).[13] If states sometimes failed to provide this basic information, they probably failed to provide narrative descriptions some of the time. DOJ says nothing to the contrary. The complete redaction of the "Notes" column is unjustified on multiple grounds.

In sum, even if the privacy balance tipped in favor of disclosure, DOJ's redactions are too broad. The Court should, at a minimum, order them redone.

### F.    DOJ must produce federal Bureau of Prison data.

The final issue is DOJ's failure to produce death-in-custody data it obtained from the federal Bureau of Prisons. In its opening brief, USA TODAY argued that DOJ failed to adequately search for that data. Specifically, it argued that the request sought "all information" submitted to the MCI Program, and that DOJ's own website states that the MCI Program includes BOP data. *See* P. Br. at 28-29; First Caruso Decl. Ex. 1; Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)), Bureau of Justice Statistics (2019), https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mciformerly-deaths-custody-reporting-program#0-0 ("MCI Webpage").[14] DOJ does not dispute that it failed to search

---

[13] *See* https://www.ojp.gov/program/ojp-freedom-of-information-act/ojp-reading-room.

[14] Exhibit 1 to the Second Caruso Declaration contains a screenshot of the MCI Webpage as of June 26, 2024. As of that date, it remains unchanged from how it has appeared throughout this case. *See* Second Caruso Decl. ¶ 5.

for BOP data.  It responds instead that it did not have to—that BOP data is in fact not responsive to USA TODAY's request, and that its contrary statement on the MCI Webpage was "simply a clerical error."  D. Opp. at 29.

As a matter of fairness, the Court should not entertain DOJ's belated argument.  Since its first brief in the first round of summary judgment nearly two years ago, USA TODAY has consistently cited the MCI Webpage for the proposition that the MCI Program—and hence USA TODAY's request—includes BOP data.  *See* P. Br. in Support of First Mot. for Summ. J. at 4-5, ECF No. 13-1 (stating that the MCI Program includes data from the Federal Bureau of Prisons and citing MCI Webpage); P. Partial Reconsideration Opp. at 16, ECF No. 29 ("MPR Opp.") (same). The Court has relied on the MCI Webpage for the same proposition.  *See* Mem. Op. at 1, ECF No. 21 (citing USA TODAY's opening brief, ECF No. 13-1, which relied on the MCI Webpage).

DOJ had four briefs to point out this simple alleged "clerical error": its opposition/reply in the first round of summary judgment, its two briefs in support of its reconsideration motion, and its opening brief in the second round of summary judgment.  In none did it claim that its own website conveyed false information about the scope of the MCI Program.  The closest it came was in its opening reconsideration brief, where it obliquely stated, in two footnotes without any citation that supports the proposition, that data from unspecified "federal law enforcement agencies is not responsive to the FOIA request because it was not collected under the MCI program," D. Partial Motion for Reconsideration of Partial Summary Judgment with Respect to Exemption 3 and for a Partial Stay of Production, 9 n.11 (Sept. 29, 2023), ECF No. 27 ("MPR"), and that information from these unspecified federal agencies was collected under a different program, *see id*. at 6 n.10.[15]

---

[15] As USA TODAY pointed out in its opposition to reconsideration, DOJ's sources say that unspecified federal agencies submit data to the Federal Law Enforcement Agency Deaths in Custody Reporting Program, but do not deny that the Bureau of Prisons submits data to the MCI

But in the body of the very same brief, DOJ also stated—citing the MCI Webpage, no less—that the MCI Program "collected data directly from … Federal Bureau of Prisons." *Id.* at 2.

Indeed, USA TODAY devoted an entire section of its reconsideration opposition to arguing that DOJ should be producing BOP data, now citing both the MCI Webpage and DOJ's own endorsement of it in this litigation. *See* MPR Opp. at 16, ECF No. 29. But instead of taking the simple step of correcting its now-multiple inaccurate (purported) misrepresentations, including one in a court filing, DOJ argued that the Court should defer the issue to another round of summary judgment. *See* D. Partial Reconsideration Reply at 14-15, ECF No. 30.

DOJ's failure to correct its purported misrepresentations has prejudiced USA TODAY. USA TODAY intends to report on Bureau of Prisons data, and has been under the impression throughout this litigation that Bureau of Prisons data is part of the MCI Program and thus responsive to the request—an impression caused by DOJ's representations both on the MCI Webpage and in this litigation. *See* Second Caruso Decl. ¶ 5. And had DOJ changed its representations about the scope of the MCI Program, USA TODAY would have filed a separate FOIA request for Bureau of Prisons data long ago, or sought discovery based on the discrepancy between the two inconsistent statements DOJ has now made so as to determine which is true and which is false. *See id.* ¶ 6. Thus, entertaining DOJ's novel "clerical error" argument in these circumstances would be inequitable. *See, e.g.*, *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F. 2d 131, 137 (D.C. Cir. 1985) (discussing the doctrine of laches, which prevents parties from "delay[ing] the assertion of their claims for an unreasonable time"); *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 88 (D.D.C. 2004) (discussing the doctrine of waiver,

---

Program. *See* MPR Opp. at 15-16. It is possible that the Bureau of Prisons submitted the same data to both programs, which would harmonize DOJ's statement with its MCI Webpage. DOJ never disputed that reading.

which is "designed to 'avoid a harsh result when the parties have conducted themselves in such a way as to make that result unfair. It serves to prevent a party from insisting on a right upon which he could have insisted earlier but has found to have surrendered.'") (quoting *L. Ortik Ltd. v. Helme Prods. Inc.*, 427 F. Supp. 771, 776 (S.D.N.Y. 1977)). So whether the MCI Webpage contains a "clerical error" or not, the Court should hold DOJ to its representations that the MCI Program includes BOP data, and order DOJ to produce it. To the extent the Court elects to extend this case even further based on DOJ's belated claim of "clerical error," which it should not, there would plainly be a factual dispute between two different DOJ statements that would require discovery and trial to resolve. *See Hall & Assocs. v. EPA*, 956 F.3d 621 (D.C. Cir. 2020) ("[I]f any reasonable view of the record would permit resolution of a factual dispute in favor of the non-movant, and that fact is material to the outcome, summary judgment must be denied. FOIA cases are no exception.").

## III.    CONCLUSION

The Court should grant summary judgment to USA TODAY, deny summary judgment to DOJ, and order DOJ to produce the records in full, including records from the Bureau of Prisons.

Dated: June 28, 2024                              Respectfully submitted,

                                                  */s/ Stephen Stich Match*
                                                  Matthew Topic, D.C. Bar No. IL0037
                                                  Stephen Stich Match, D.C. Bar No. MA0044
                                                  Merrick Wayne, D.C. Bar No. IL0058
                                                  LOEVY & LOEVY
                                                  311 N. Aberdeen, Third Floor
                                                  Chicago, IL 60607
                                                  Tel. (520) 488-0486
                                                  match@loevy.com
                                                  foia@loevy.com

                                                  *Attorneys for Plaintiff*