**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GANNETT SATELLITE INFORMATION NETWORK, LLC, | |
| Plaintiff, | Civil Action No. 22-475 (BAH) |
| v. | Judge Beryl A. Howell |
| U.S. DEPARTMENT OF JUSTICE, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Gannett Satellite Information Network, d/b/a USA Today, seeks the unredacted release, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, of individual-level data about people who died while in the custody of local jails, state prisons, and the Federal Bureau of Prisons ("BOP") between 2010 and 2019. The data requested by plaintiff was collected by the Bureau of Justice Statistics ("BJS"), a component of defendant U.S. Department of Justice ("DOJ").

The requested information is described as reporting on the deaths of "[t]housands of inmates" who "die [in custody] each year." Pl.'s Mem. in Supp. of its Second Cross-Mot. for Summ. J. & in Opp'n to Def.'s Second Mots. for Summ. J. & Partial Recons. ("Pl.'s Opp'n") at 1, ECF No. 36-1. Plaintiff seeks this information to help "identify trends in how and why inmates are dying in such large numbers" and "allow the public to determine how good of a job [DOJ] is doing at reducing deaths in custody at the state and local level." *Id.* Congress recognized this need when enacting the Death in Custody Reporting Act of 2013 ("DCRA 2013"), which required DOJ, after collection of this data, to "determine means by which such information can be used to reduce the number of such deaths" and "examine the relationship, if any, between the number of

1

such deaths and the actions of management of such jails, prisons, and other specified facilities relating to such deaths." Pub. L. No. 113-242, § 2(f)(1)(A)-(B), 128 Stat. 2860, 2861 (Dec. 18, 2014) (codified at 42 U.S.C. § 13727 (2014) (current version at 34 U.S.C. § 60105)). Recognizing the significance of this issue, DOJ has taken steps to attempt to implement the DCRA and address the goals set out in that law. *See, e.g.*, U.S. Dep't of Justice, *The Report of the Attorney General Pursuant to Section 6(e) of Executive Order 14074: Department of Justice Implementation of the Death in Custody Reporting Act of 2013*, at 1 (Sept. 16, 2022), https://bja.ojp.gov/doc/DOJ-Implementation-of-DCRA-of-2013.pdf [hereinafter *AG's DCRA Report*] ("DCRA addresses a profoundly important issue, which is of great consequence to the legitimacy and integrity of the criminal and juvenile justice systems, to the lives of the people who come into contact with those systems, and to the family members and loved ones of those who have died in custody."); Amy L. Solomon, *Taking Action to Reduce Deaths in Custody*, U.S. Dep't of Justice Off. of Just. Programs (May 23, 2024), https://www.ojp.gov/archive/news/ojp-blogs/safe-communities/inside-perspectives/taking-action-to-reduce-deaths-in-custody [hereinafter *Taking Action*] ("[A]dmittedly, we have a long way to go when it comes to collecting data about and ultimately reducing the number of fatalities that occur when individuals are taken into custody by the police or incarcerated in correctional facilities. Our work to implement the Death in Custody Reporting Act—specifically, to understand the nature and scope of the problem and identify strategies for reducing in-custody deaths—is central to achieving this critical goal.").

Previously, plaintiff was granted summary judgment on the question whether defendant could withhold all records potentially responsive to plaintiff's FOIA request by invoking FOIA Exemption 3, 5 U.S.C. § 552(b)(3). *See Gannett Satellite Info. Network v. U.S. Dep't of Justice* (*Gannett I*), No. 22-cv-475 (BAH), 2023 WL 2682121 (D.D.C. Mar. 29, 2023). Defendant's

position was rejected based on the determination that the requested information was furnished to BJS under the DCRA, rather than Title I of the Omnibus Crime Control and Safe Streets Act of 1968 ("Crime Control Act"), 34 U.S.C. § 10231, and only the latter statute provides for nondisclosure under FOIA's Exemption 3. *Gannett I*, 2023 WL 2682121, at *5-9. After that decision, defendant produced to plaintiff requested information, with redactions, only for the period when the DCRA was authorized, while production of responsive information during the period when the DCRA's authorization lapsed was stayed to allow defendant to seek partial reconsideration of *Gannett I,* based on the lapsed authorization issue recognized by the Court in that decision, but not raised by the parties.

Both parties now move for summary judgment on the propriety of defendant's redactions to disclosed information, as well as the adequacy of defendant's search for responsive records. Def.'s Second Mot. for Summ. J. & for Partial Recons. ("Def.'s Mot."), ECF No. 35; Pl.'s Second Cross-Mot. for Summ. J. ("Pl.'s Cross-Mot."), ECF No. 36. Defendant additionally moves for partial reconsideration of *Gannett I*'s holding that rejected application of Exemption 3 to withhold responsive records as covering the period when the DCRA's authorization had lapsed and also required disclosure of information submitted to BJS by local jails. Def.'s Mot.; Def.'s Mem. of P. & A. in Supp. of Def.'s Second Mot. for Summ. J. & for Partial Recons. ("Def.'s Mem.") at 28-34, ECF No. 35-1. Defendant had failed to raise either issue during initial summary judgment briefing.

For the reasons explained below, plaintiff's cross-motion for summary judgment is granted as to the inadequacy of the search and withholdings made by defendant in the disclosed information, and defendant's motion for summary judgment is denied. In addition, defendant's motion for partial reconsideration is granted, in part, to authorize withholding of responsive state

and local information collected during the period when DCRA authority had lapsed and the Crime Control Act's express confidentiality provision applied, and otherwise denied. In sum, defendant must disclose the unredacted version of responsive records collected by the MCI program from state and local authorities during the period between October 1, 2015, and the end of 2019, as well as BOP data from the same period.

## I.    BACKGROUND

The statutory, factual, and procedural background relevant to the FOIA request and pending cross-motions is described below.

### A.    Statutory Context

In 2000, Congress passed the Death in Custody Reporting Act of 2000 ("DCRA 2000") to "ensure that certain information regarding prisoners is reported to the Attorney General." Pub. L. No. 106-297, 114 Stat. 1045, 1045 (Oct. 13, 2000) (codified at 42 U.S.C. § 13704 (2000) (current version at 34 U.S.C. § 12104)). This law mandated, as part of the eligibility requirements for federal law enforcement grants provided to states from the Edward Byrne Memorial Justice Assistance Grant ("JAG") Program, that states "provide[] assurances that" they would report to DOJ, in line with "guidelines established by the Attorney General," "information regarding the death of any person who is in the process of arrest, is en route to be incarcerated, or is incarcerated at a municipal or county jail, State prison, or other local or State correctional facility (including any juvenile facility)." *Id.* § 2(4); *see also AG's DCRA Report* at 1. The law required states to report to DOJ, at minimum, "the name, gender, race, ethnicity, and age of the deceased"; "the date, time, and location of death"; and "a brief description of the circumstances surrounding the death." Pub. L. No. 106-297, § 2(4), 114 Stat. at 1045.

After DCRA 2000's enactment, BJS established the Deaths in Custody Reporting Program, later renamed the Mortality in Correctional Institutions ("MCI") Program, to collect the required

data from states. *AG's DCRA Report* at 2. When the statutory requirements of DCRA 2000 expired in 2006, BJS continued collecting this data through the MCI program, *id.*, as well as adding additional categories of data collection to the program, *see* Bureau of Just. Stats., *Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP)): Changes Over Time*, https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program#changes-over-time-0 (last visited Feb. 5, 2025).

In 2014, Congress reauthorized the statutory reporting requirements by passing DCRA 2013, which once again required states receiving certain federal law enforcement grants to "report to the Attorney General" "information regarding the death of any person who is detained, under arrest, or is in the process of being arrested, is en route to be incarcerated, or is incarcerated at a municipal or county jail, State prison, State-run boot camp prison, boot camp prison that is contracted out by the State, any State or local contract facility, or other local or State correctional facility (including any juvenile facility)." Pub. L. No. 113-242, § 2(a), 128 Stat. at 2860. These requirements took effect on October 1, 2015. *See* 34 U.S.C. § 60105(a) (explaining that the law would have effect in "each fiscal year after the expiration of the period specified in subsection (c)(1)"); *id.* § (c)(1) (giving states "not more than 120 days from December 18, 2014, to comply" with the reporting requirement); 31 U.S.C. § 1102 (establishing that the federal fiscal year "begins on October 1 of each year"); *see also* Def.'s Mem. at 6 (explaining the effective date of the statute).

DCRA 2013 requires states to report to DOJ the same minimum information about individuals who die in custody as DCRA 2000, as well as "the law enforcement agency that detained, arrested, or was in the process of arresting the deceased." Pub. L. No. 113-242, § 2(b), 128 Stat. at 2860; *see also* 34 U.S.C. § 60105(b). For the first time, DCRA 2013 created a potential penalty to help enforce the reporting requirements, authorizing the Attorney General, at his or her

"discretion," to reduce by "not more than . . . 10[ ]percent . . . the funds that would otherwise be allocated" through the associated grant programs to any state failing to comply.  Pub. L. No. 113-242, § 2(c)(2), 128 Stat. at 2861; 34 U.S.C. § 60105(c)(2).  The law also added similar reporting requirements for federal law enforcement agencies, Pub. L. No. 113-242, § 3, 128 Stat. at 2861-62 (codified at 42 U.S.C. § 13727a (2014) (current version at 18 U.S.C. § 4001 note)), and directed the Attorney General to conduct a study using the data collected and report the results to Congress within two years of enactment of DCRA 2013, *id.* § 2(f); 34 U.S.C. § 60105(f).  *See also AG's DCRA Report* at 3.

The MCI program continued collecting state data until the end of 2019, when the program was discontinued, *AG's DCRA Report* at 3-4, due to concerns that the enforcement and compliance obligations established by DCRA 2013 were "incompatible with BJS's authorizing statute," which permits data collected by BJS to be used only for statistical and research purposes and "precludes their use for law enforcement or any purpose relating to a private person or public agency other than statistical or research purposes," *id.* at 4 (quoting 34 U.S.C. § 10134).[1]  While the MCI program, which collected the mortality data for the years from 2001 through 2019, *see* E. Ann Carson, *Mortality in State and Federal Prisons, 2001-2019 – Statistical Tables*, Bureau of Just. Stats. (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf., was discontinued, the same information required by DCRA 2013 is still being collected but is now reported to DOJ's Bureau of Justice Assistance ("BJA"), rather than BJS.  *AG's DCRA Report* at 4-5.

---

[1]    The AG's Report indicates that MCI's data collection ended at "the end of calendar year 2019."  *AG's DCRA Report* at 4; *see also* Bureau of Just. Stats., *Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP))*, https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program (last visited Feb. 5, 2025) (noting that program "finished collection of deaths that occurred during the 2019 calendar year").

**B.      Plaintiff's FOIA Request**

On April 9, 2021, plaintiff submitted a two-part FOIA request to DOJ's Office of Justice

Programs ("OJP"), seeking information collected by BJS under the MCI program from 2010

forward, specifically:

> 1. [A]ll information submitted to BJS under the Mortality in
> Correctional Institutions program.    This includes information
> contained in submissions of BJS Forms CJ-9 and CJ-10 and any
> other data elements states are required to provide under 34 USC
> 60105, from 2010 through the date on which my request is
> processed.  If this information is stored in a tabular database format,
> please provide a copy to me in tabular, sortable form such as
> comma-separated values (CSV).  If the information exists ONLY as
> a paper or PDF form submission, please provide PDF copies.  To be
> clear, I am requesting data on the deaths of individual inmates, not
> the summaries of inmate deaths published on the BJS website.
>
> 2. [A] copy of any data dictionary, record layout or other
> documentation that describes elements contained in the electronic
> database requested above.

Def.'s Statement of Material Facts as to Which There is No Genuine Issue in Supp. of its Second

Mot. for Summ. J. ("Def.'s SUMF") ¶ 1, ECF No. 35-2; Pl.'s Resp. to Def.'s Statement of Material

Facts as to Which There is No Genuine Issue in Supp. of its Second Mot. for Summ. J. ("Pl.'s

Resp. to Def.'s SUMF") ¶ 1, ECF No. 36-3.[2]

On April 13, 2021, OJP acknowledged receipt of plaintiff's FOIA request and informed

plaintiff that all 236,568 pages of potentially responsive records located by BJS were being

withheld subject to FOIA Exemption 3, 5 U.S.C. § 552(b)(3), citing the confidentiality provision

---

[2]      The FOIA request references BJS Form CJ-9, which reports information on the death of an inmate "Under
Jail Jurisdiction," and CJ-10, which reports information on the death of an inmate in a "Private [or] Multi-
Jurisdictional Jail[]."  Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem. Supp. 1st Mot.
Summ. J.") at 7, ECF No. 12-1.  In addition, the FOIA request references 34 U.S.C. § 60105, the current
codification of DCRA 2013, which in subparagraph (a), requires reporting, in relevant part, "regarding the death of
any person who is detained, under arrest, or is in the process of being arrested, is en route to be incarcerated, or is
incarcerated at a municipal or county jail, State prison, State-run boot camp prison, boot camp prison that is
contracted out by the State, any State or local contract facility, or other local or State correctional facility (including
any juvenile facility)."  34 U.S.C. § 60105(a).

of the Crime Control Act, 34 U.S.C. § 10231.  Def.'s SUMF ¶¶ 4, 10; Pl.'s Resp. to Def.'s SUMF ¶¶ 4, 10.  On April 14, 2021, plaintiff appealed OJP's decision to withhold these records to DOJ's Office of Information Policy, *see* Def.'s SUMF ¶ 11; Pl.'s Resp. to Def.'s SUMF ¶ 11, which affirmed OJP's initial withholding decision, *see* Pl.'s Opp'n, Decl. of James Douglas Caruso, Data Editor, USA Today ("Caruso Decl.") ¶ 9, Ex. 4, ECF No. 36-5.

### C.    Procedural History

Plaintiff filed the instant complaint on February 23, 2022, seeking to compel defendant to produce the requested records and alleging that defendant "refused to release non-exempt information under Exemption 3."  Compl. ¶ 1, ECF No. 1.  After defendant re-asserted, in its answer, that the information was exempt from disclosure, *see* Def.'s Answer to Pl.'s Compl., Defenses ¶ 1, ECF No. 7, the parties agreed to seek resolution of defendant's invocation of Exemption 3 before litigating other potential issues, including whether other FOIA exemptions might apply, *see* Joint Status Report at 1-2, ECF No. 10, which joint request was granted, *see* Min. Order (May 31, 2022).  Each party moved for summary judgment on the propriety of defendant categorically withholding the records responsive to plaintiff's request pursuant to FOIA Exemption 3, *see* Def.'s Mot. for Summ. J., ECF No. 12; Pl.'s Cross-Mot. for Summ. J., ECF No. 13 ("Pl.'s 1st Cross-Mot."), and summary judgment was granted to plaintiff.  This Court held that defendant's "withholding [was] improper" under Exemption 3, Order, ECF No. 20, since the data was furnished to BJS under the DCRA rather than the Crime Control Act, *see Gannett I*, 2023 WL 2682121, at *5-6, 10.  In so holding, the gap in DCRA authority between the expiration of DCRA 2000 and the enactment of DCRA 2013 was noted but, since "[n]either party raise[d] that plaintiff requests information during a time when no DCRA reporting requirement was in effect," this issue was "not address[ed]."  *Id.* at *9 n.3.

Citing the gap in DCRA authority first highlighted by the Court, *see id.*, defendant moved for partial reconsideration, requesting clarification that the summary judgment granted to plaintiff "does not apply to any records submitted to the Bureau of Justice Statistics . . . between 2010 . . . and the effective date of the Death in Custody Reporting Act of 2013 . . ., and to any records submitted to BJS by local, as opposed to state, agencies." Def.'s Partial Mot. for Recons. of Partial Summ. J. with Respect to Exemption 3 and for a Partial Stay of Production ("Def.'s 1ˢᵗ Recons. Mot.") at 1, ECF No. 27. Defendant also requested a partial stay of "its obligation to produce the records . . . pending resolution of the [reconsideration] motion." *Id.* The partial stay request was granted, over plaintiff's objection. *See* Min. Order (Oct. 3, 2023); Def.'s 1ˢᵗ Recons. Mot. at 1 (noting plaintiff's objection to "all relief sought in this motion"). Defendant's stand-alone motion for partial reconsideration was denied, without prejudice, and the partial stay on defendant's production obligation was kept in place, for any reconsideration arguments to be addressed in the next round of summary judgment briefing, *see* Min. Order (Feb. 22, 2024), which had been scheduled to address the remaining issues in the case, *see* Min. Order (Feb. 9, 2024).

Defendant then produced to plaintiff the responsive records not subject to the partial stay, with portions withheld, pursuant to FOIA Exemptions 6 and 7(C), 5 U.S.C. § 552(b)(6), (7)(C). Def.'s Mem. at 9. According to defendant, the redactions were made using what it calls the "k-anonymity" de-identification method, to protect against the disclosure of the identity of any of the deceased individuals in the dataset to protect their privacy. *See id.* at 10-14; Def.'s Mem., Decl. of Amy Lauger, Senior Statistician, BJS ("Lauger Decl."), ECF No. 35-4.[3]

Adhering to the schedule proposed by the parties and adopted by the Court, *see* Joint Status Report, ECF No. 33; Min. Order (Feb. 9, 2024), the parties subsequently briefed summary

---

[3]    The Lauger Declaration outlines the specific methodology used and steps taken to redact the data. *See* Lauger Decl. ¶¶ 4-24.

judgment on the remaining issues in this case, addressing the adequacy of defendant's search and propriety of defendant's invocation of FOIA Exemptions 6 and 7(C) for withholdings in the data produced to plaintiff, as well as defendant's renewed motion for partial reconsideration. *See generally* Def.'s Mot.; Pl.'s Cross-Mot.; Def.'s Mem.; Pl.'s Opp'n; Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. & Reply in Supp. of Def.'s Second Mot. for Summ. J. & for Partial Recons. ("Def.'s Reply"), ECF No. 39; Pl.'s Reply in Supp. of its Second Cross-Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 41. These motions are now ripe for consideration.

## II.    LEGAL STANDARD

### A.    Summary Judgment

Federal Rule of Civil Procedure 56 entitles a party to summary judgment "only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (citation omitted); *see also* Fed. R. Civ. P. 56(a). Most FOIA cases "can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

FOIA "requires federal agencies to make records publicly available upon request unless one of nine exemptions applies." *Emuwa v. U.S. Dep't of Homeland Sec.*, 113 F.4th 1009, 1012 (D.C. Cir. 2024). The law balances two important-but-sometimes competing interests: "pierc[ing] the veil of administrative secrecy" to "open agency action to the light of public scrutiny," *Cabezas v. FBI*, 109 F.4th 596, 602 (D.C. Cir. 2024) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)), and protecting "legitimate governmental and private interests [that] could be harmed by release of certain types of information," *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1108 (D.C. Cir. 2019) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)). To accommodate both goals, FOIA's nine enumerated exemptions "are to be 'narrowly construed,'" *Cabezas*, 109 F.4th at 602 (quoting *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011)), but still given

"meaningful reach and application," *id.* (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)).

The federal agency invoking a FOIA exemption to withhold requested information bears the burden of establishing that the claimed exemption applies. *Watkins L. & Advoc., PLLC v. U.S. Dep't of Justice*, 78 F.4th 436, 450 (D.C. Cir. 2023). To satisfy this burden, "courts may rely on non-conclusory agency affidavits demonstrating the basis for withholding if they are not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021) (citation omitted). To warrant a grant of summary judgment in the agency's favor, the submitted affidavits, even if not contradicted, must "describe[] the justifications for withholding the information with specific detail" and "demonstrate[] that the information withheld logically falls within the claimed exemption." *DiBacco v. U.S. Dep't of the Army*, 926 F.3d 827, 834 (D.C. Cir. 2019) (citation, internal quotation marks omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)).

### B.    Reconsideration

Under Federal Rule of Civil Procedure 54(b), "any order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and responsibilities." In contrast to a motion for reconsideration pursuant to Rule 59(e), which governs post-judgment motions for reconsideration, "Rule 54(b)'s approach to the interlocutory presentation of new arguments as the case evolves can be more flexible, reflecting the 'inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'" *Cobell v. Jewell*, 802 F.3d

12, 25 (D.C. Cir. 2015) (quoting *Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 22 (1st Cir. 1985) (Breyer, J.)); *see also Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) ("Rule 54(b) . . . not only authorizes the court to enter a partial final judgment but also recognizes its inherent power to reconsider an interlocutory order 'as justice requires.'" (quoting *Greene*, 764 F.2d at 22)).

"Despite the imprecision of the 'as justice requires' standard, 'it is clear that courts have more flexibility in applying Rule 54(b) than in determining whether reconsideration is appropriate under Rules 59(e) and 60(b).'" *Wannall v. Honeywell Int'l, Inc.*, 292 F.R.D. 26, 30 (D.D.C. 2013), *aff'd sub nom. Wannall v. Honeywell, Inc.*, 775 F.3d 425 (D.C. Cir. 2014) (internal quotation marks omitted) (quoting *Cobell v. Norton*, 224 F.R.D. 226, 272 (D.D.C. 2004)). "'The considerations embedded in the as justice requires standard leave a great deal of room for the court's discretion' and, accordingly, the standard amounts to a determination 'whether relief upon reconsideration is necessary under the relevant circumstances.'" *Hisp. Affs. Project v. Perez*, 319 F.R.D. 3, 6 (D.D.C. 2016) (quoting *Wannall*, 292 F.R.D. at 30). Courts may not grant reconsideration under Rule 54(b) without limits, however; "once the parties have 'battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Id.* (quoting *Wannall*, 292 F.R.D. at 30-31).

## III.    DISCUSSION

The parties raise four issues for resolution in this long-pending matter, regarding: (1) the adequacy of defendant's search for records responsive to plaintiff's FOIA request; (2) the propriety of defendant's invocation of FOIA Exemptions 6 and 7(C) to redact data disclosed to plaintiff; (3) the propriety of defendant's invocation of Exemption 3 to withhold responsive records—requested from 2010 to the date of the processing of plaintiff's FOIA request—that were collected by BJS

in the MCI program during the lapse in authorization of DCRA 2000 until the effective date of DCRA 2013, *i.e.* the period of 2010 (the start date for responsive records in plaintiff's FOIA request) through October 1, 2015; and (4) the propriety of defendant's invocation of Exemption 3 to withhold data submitted by local jails to the MCI program. Each issue will be considered in turn.

### A. Defendant's Search Was Inadequate

The first step in assessing the adequacy of an agency's search is "ascertain[ing] the scope of the [FOIA] request itself." *Clemente v. FBI*, 867 F.3d 111, 116 (D.C. Cir. 2017) (first alteration in original) (quoting *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 889 (D.C. Cir. 1995)). Agencies are required to make available nonexempt agency records upon receipt of a request that "reasonably describes such records," 5 U.S.C. § 552(a)(3)(A)(i), so that "the agency is able to determine precisely what records are being requested," *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997) (quoting *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 388 (D.C. Cir. 1996)). In determining which records fall within the scope of the request, an agency is generally "not obliged to look beyond the four corners of the request for leads to the location of responsive documents," *Kowalczyk*, 73 F.3d at 389, but "[t]his is not to say that the agency may ignore what it cannot help but know," *id.* In other words, an agency may not narrowly construe a request when the agency knows better about the intended scope of requested records. Thus, for example, when a plaintiff's request for records is "not a model of clarity" but is "reasonably susceptible to [a] broader reading" than the agency's interpretation, the broader reading applies, *LaCedra v. Exec. Off. for U.S. Att'ys*, 317 F.3d 345, 348 (D.C. Cir. 2003), particularly "[i]n view of the Government's obligation . . . 'to construe a FOIA request liberally,'" *id.* (quoting *Nation Mag.*, 71 F.3d at 890); *PETA v. Nat'l Insts. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014) (explaining the same). This precedent ensures that "federal agencies may not use the 'reasonably describes' requirement to

deny the public access to responsive records." *Pub. Emps. for Env't Resp. v. U.S. EPA*, 314 F. Supp. 3d 68, 74 (D.D.C. 2018). As the D.C. Circuit has succinctly stated, "[w]e do not require technical precision in FOIA requests, and a request certainly should not fail where the agency knew or should have known what the requester was seeking all along." *Inst. for Just. v. IRS*, 941 F.3d 567, 572 (D.C. Cir. 2019).

Next, when performing the search for records within the determined scope, the agency must use "methods which can be reasonably expected to produce the information requested." *Watkins L. & Advoc.*, 78 F.4th at 442 (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Therefore, to establish the adequacy of a search, the government must "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Id.* (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999)).

Here, plaintiff's challenge to the adequacy of defendant's search rests on the parties' dispute about whether BOP data submitted to BJS are records "relevant" to plaintiff's FOIA request. *See* Pl.'s Opp'n at 28; Def.'s Reply at 29; Pl.'s Reply at 21-24. Plaintiff argues that this BOP data is relevant and thus "must [be] produce[d]." Pl.'s Reply at 21. Defendant, meanwhile, concedes that no search "for records submitted by federal law enforcement agencies (including the Bureau of Prisons)" was conducted, Def.'s Reply, Second Decl. of Elizabeth Ann Carson, Branch Chief of Preparedness Statistics, Office of Homeland Security Statistics, Department of Homeland Security, & former Statistician, BJS ("2nd Carson Decl.") ¶ 4, ECF No. 39-4, and argues that BOP records are not relevant to the FOIA request at issue because "BJS never collected MCI data from BOP," Def.'s Reply at 29 (citing 2nd Carson Decl. ¶ 5).

14

To be sure, plaintiff's FOIA request specifically asked for "all information submitted to BJS under the [MCI] program." Def.'s SUMF ¶ 1; Pl.'s Resp. to Def.'s SUMF ¶ 1. Normally, defendant's declaration that "BJS never collected MCI data from the Federal Bureau of Prisons," 2nd Carson Decl. ¶ 5, would be dispositive in defendant's favor, since, if BOP data was never collected by the MCI program, such data would not fall within the four corners of plaintiff's FOIA request. Plaintiff, however, argues such a result would be "inequitable," Pl.'s Reply at 23, because plaintiff's understanding that the MCI program included BOP data was due to "false information" on defendant's "own website," *id.* at 22, and defendant, despite being on notice about plaintiff's understanding about the scope of the MCI program's data collections for more than two years, "fail[ed] to correct" this erroneous information, *id.* at 23. This Court agrees with plaintiff.

The factual chronology underlying this dispute over the scope of the search conducted to respond to the FOIA request suggests, at best, sloppiness and inaccuracy on the part of defendant in publicly posted information and in exercising good faith efforts to respond to a FOIA request, or, at worst, intentional obfuscation over the course of this litigation. The circumstances here certainly do not flatter defendant. Plaintiff's initial motion for summary judgment quoted a public DOJ website describing the MCI program as collecting "inmate death records from each of the nation's 50 state prison systems, *Federal Bureau of Prisons*, and approximately 2,800 local jail jurisdictions." Pl.'s 1st Cross-Mot. at 4-5 (emphasis supplied) (quoting Bureau of Just. Stats., *Mortality in Correctional Institutions (MCI) (Formerly Deaths in Custody Reporting Program (DCRP))*, https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program [hereinafter MCI Webpage] (last visited Feb. 5, 2025)). As of the issuance of this decision, defendant's website still states the same information. Based on this public representation from DOJ, plaintiff reasonably and logically assumed that BOP data was

included within the scope of its FOIA request seeking data from the MCI program. *See* Pl.'s Reply at 23 (noting that plaintiff "has been under the impression throughout this litigation that Bureau of Prisons data is part of the MCI program and thus responsive to the request," based in part on "DOJ's representations . . . on the MCI Webpage"). Defendant made no effort to correct or otherwise clarify the scope of the data collected by the MCI program in the first round of summary judgment briefing. *See generally* Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. & Reply in Supp. of Def.'s Mot. for Summ. J. ("Def.'s 1st Summ. J. Reply"), ECF No. 17. Thus, relying on this public DOJ website and the parties' briefing, this Court construed, in the first paragraph of *Gannett I*, granting summary judgment to plaintiff on defendant's invocation of FOIA Exemption 3, plaintiff's FOIA request as seeking "data regarding individual-level information on the deaths of incarcerated people in the custody of local jails, state prisons, *and the Federal Bureau of Prisons*." *Gannett I*, 2023 WL 2682121, at *1 (emphasis supplied) (internal quotation marks, citation omitted). Even after the issuance of *Gannett I,* defendant did not correct or clarify the scope of plaintiff's FOIA request or MCI's data collection either with the Court nor, apparently, in conferral with plaintiff. *See generally* Joint Status Reports, ECF Nos. 22, 23, 24, 25, 26. Such conferral would have allowed plaintiff to amend the FOIA request or file a new FOIA request for BOP data submitted to BJS on the same topic regarding individuals who die in the custody of law enforcement. *See* Pl.'s Reply at 23.

Instead, six months later, and more than a year after plaintiff first cited the DOJ webpage in its brief, defendant moved for partial reconsideration, Def.'s 1st Recons. Mot., and included in its briefing two footnotes totaling three sentences discussing this issue. The first footnote discussed the creation of a reporting requirement for "federal law enforcement agencies" in DCRA 2013 and noted that BJS created a separate collection program for "arrest-related deaths and deaths

in custody information from federal law-enforcement agencies from federal fiscal year 2016 onwards" that "is distinct from the MCI data collection specified in Plaintiffs' FOIA request, and thus is not at issue in this case," *id.* at 5 n.10, and the second footnote stated that "[d]ata collected from federal law enforcement agencies is not responsive to the FOIA request because it was not collected under the MCI program," *id.* at 9 n.11. Neither footnote specifically mentioned BOP or addressed plaintiff's explicitly-stated understanding of the scope of its FOIA request as including BOP data, and neither footnote made clear that, no matter how federal law enforcement data was *collected*, this data would not at any point be reported to or included in the MCI program. *See id.* at 5 n.10, 9 n.11. Moreover, the footnotes failed to mention that the public description of the scope of MCI data collections on the MCI Webpage was patently incorrect, an omission that only compounded the confusion because defendant's briefing provided conflicting information, quoting the MCI Webpage, and the allegedly incorrect information, itself: "MCI collected data directly from 'each of the nation's 50 state prison systems, *Federal Bureau of Prisons*, and approximately 2,800 local jail jurisdictions.'" *Id.* at 2 (emphasis supplied) (quoting MCI Webpage).

When plaintiff raised this inconsistency in opposition, *see* Pl.'s Opp'n to Def.'s Partial Mot. for Recons. of Partial Summ. J. with Respect to Exemption 3 and for a Partial Stay of Production ("Pl.'s Opp'n 1st Mot. Recons.") at 2, 3, 4, 5, 15-16, ECF No. 29, and renewed its argument that the MCI program "d[id] in fact collect BOP data," *id.* at 16, and thus defendant was obligated to produce this data, *id.* at 15-16, defendant still did not clarify the scope of the MCI program. Instead, defendant dismissed this issue as not presented by the reconsideration motion and argued the Court had never decided whether BOP data was responsive to plaintiff's FOIA request. Def.'s Reply in Supp. of Partial Mot. for Recons. of Partial Summ. J. with Respect to Exemption 3 ("Def.'s 1st Recons. Reply") at 14-15, ECF No. 30. To the contrary, this Court had

understood, as had plaintiff, that BOP data was submitted to BJS, was part of the MCI program used for analysis and reporting by the Attorney General, as indicated in the MCI Webpage, and was subject to the FOIA request, as stated in the first paragraph of *Gannett I*.  2023 WL 2682121, at *1.

In its opening brief in support of the instant motion for summary judgment, defendant posited that an adequate search was conducted without further addressing the issue of BOP data or otherwise clarifying the scope of the MCI program's data collection, *see* Def.'s Mem. at 15-16 (failing to raise the issue), despite having been on notice of plaintiff's understanding of the MCI program's scope for roughly a year and a half, *see, e.g.*, Pl.'s 1st Cross-Mot. at 4-5; *Gannett I*, 2023 WL 2682121, at *1.[4]  After this search was challenged as inadequate for failing to search for BOP data submitted to BJS and included in the MCI program, *see* Pl.'s Opp'n at 28, defendant, in reply, *for the first time* represented that "BJS never collected MCI data from BOP," and characterized the statement on the DOJ website to the contrary as a mere "clerical error."  Def.'s Reply at 29; *see also* 2nd Carson Decl. ¶ 4 ("I did not search for records submitted by federal law enforcement agencies (including the Bureau of Prisons) because BJS never collected records from federal law enforcement agencies under the MCI program."); *id.* ¶ 5 ("The statement on the BJS webpage referenced by the Plaintiff . . . is a clerical error because BJS never collected MCI data from the Federal Bureau of Prisons.").[5]  Notably, this "clerical error" with erroneous information about the scope of the MCI program's data collection persists.  *See* MCI Webpage.

---

[4]      Defendant's brief did include a footnote with the identical language as the first footnote discussed above in defendant's first motion for partial reconsideration.  *See* Def.'s Mem. at 6 n.10.

[5]      Neither defendant's brief nor its supplementary declaration acknowledge that defendant previously cited the same language about the scope of MCI's data collection from the DOJ webpage.  *See* Def.'s 1st Recons. Mot. at 2 ("MCI collected data directly from 'each of the nation's 50 state prison systems, Federal Bureau of Prisons, and approximately 2,800 local jail jurisdictions,' whereas DCRA 2000 only required reporting by states." (quoting MCI Webpage)).

Plaintiff's argument that the Court "should not entertain [defendant]'s belated argument," Pl.'s Reply at 22, because of the "prejudice[]" plaintiff has suffered, *id.* at 23, is well-placed. While defendant is not required to wantonly search for information outside the four corners of plaintiff's FOIA request, *see Kowalczyk*, 73 F.3d at 389, the agency does have an obligation to "show that it made a good faith effort to conduct a search *for the requested records*, using methods which can be reasonably expected to *produce the information requested*," *Watkins L. & Advoc.*, 78 F.4th at 442 (emphasis supplied) (quoting *Oglesby*, 920 F.2d at 68), which understanding must be construed broadly, *PETA*, 745 F.3d at 540. Furthermore, defendant's own FOIA regulations impose a "duty to confer" with plaintiff "to clear up any confusion" about the scope of the information sought by the request. *Tokar v. U.S. Dep't of Justice*, 304 F. Supp. 3d 81, 92 (D.D.C. 2018) (citing 28 C.F.R. § 16.3(b)). In the circumstances of this case, any reasonable definition of scope of the records sought by plaintiff should have included BOP data.

For roughly two and a half years, since the filing of plaintiff's first cross-motion for summary judgment, *see* Pl.'s 1st Cross-Mot., plaintiff has clearly communicated its understanding that the request for "all information submitted to BJS under the [MCI] program," Def.'s SUMF ¶ 1; Pl.'s Resp. to Def.'s SUMF ¶ 1, includes BOP data, *see* Pl.'s 1st Cross-Mot. at 4-5; Pl.'s Opp'n 1st Mot. Recons. at 2, 3, 4, 5, 15-16, which view was adopted by the Court in reliance on the parties' briefing, *Gannett I*, 2023 WL 2682121, at *1. Plaintiff's understanding of the scope of its request was not based merely on its own erroneous understanding of BJS's data collection programs but instead on information provided publicly by DOJ on the MCI Webpage, and relied on by plaintiff, *see* Pl.'s 1st Cross-Mot. at 4-5 (quoting MCI Webpage); Pl.'s Reply at 23 (pointing out plaintiff's belief "throughout this litigation that Bureau of Prisons data is part of the MCI program and thus responsive to [its FOIA] request," based in part on "DOJ's representations . . .

on the MCI Webpage"). Rather than correcting plaintiff's understanding, based on defendant's own error, through conferral or a court filing, defendant did not act to clarify the information, resulting in plaintiff continuing to litigate for BOP records in this case rather than filing "a separate FOIA request for [that] data" or seeking alternative solutions. Pl.'s Reply at 23. Defendant cannot now, in fairness, be allowed to wash its hands of the issue and walk away so easily, claiming the misunderstanding is "simply a clerical error." Def.'s Reply at 29.

In these circumstances, defendant cannot "ignore what it cannot help but know," *Kowalczyk*, 73 F.3d at 389—that plaintiff sought BOP records submitted to BJS through the FOIA request in this case. Any misunderstanding by plaintiff of the scope of the MCI program's data collections was the result of defendant's own erroneous public representations that defendant failed to clarify over almost two years of active litigation. Given defendant's duty to "construe [the] FOIA request liberally," *PETA*, 745 F.3d at 540 (quoting *Nation Mag.*, 71 F.3d at 890), and make "a good faith effort to conduct a search for" the records requested by plaintiff, *Watkins L. & Advoc.*, 78 F.4th at 442 (citation omitted), defendant's failure to search for BOP data submitted to BJS, *see* 2nd Carson Decl. ¶ 4, renders defendant's search inadequate.

### B. Defendant's Redactions Are Not Justified

Next, defendant asserts that FOIA Exemptions 6 and 7(C) were properly invoked to redact the data so far produced to plaintiff, to protect the identities of those who died in custody. Def.'s Mem. at 17-28; Def.'s Reply at 3-20. Plaintiff counters that Exemption 7(C) does not apply to the data at issue and that the redactions made by defendant are not justified by Exemption 6, Pl.'s Opp'n at 11-27; Pl.'s Reply at 2-21. Plaintiff is correct as to both exemptions.

#### 1. Exemption 7(C)

FOIA Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records

or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7), (7)(C). To withhold responsive records, pursuant to Exemption 7(C), the government must first "make a threshold showing that the FOIA request seeks records 'compiled for law enforcement purposes,'" *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 64 (D.C. Cir. 2018) (quoting *Jefferson v. Dep't of Justice, Off. of Pro. Resp.*, 284 F.3d 172, 176 (D.C. Cir. 2002)); *see also Shapiro v. U.S. Dep't of Justice*, 893 F.3d 796, 800 (D.C. Cir. 2018) (citing *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982)), which requires the government to "produce evidence" sufficient to allow a court to "make [this] required threshold evidentiary determination," *Jefferson*, 284 F.3d at 179 (citing *King v. U.S. Dep't of Justice*, 830 F.2d 210, 217-18 (D.C. Cir. 1987)). Although law enforcement agencies are entitled to some deference when invoking Exemption 7, *see, e.g.*, *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998) (citing *Pratt*, 673 F.2d at 419), declarations relied on to justify this exemption must still "establish a rational 'nexus between the investigation and one of the agency's law enforcement duties,'" and also identify "a connection between an 'individual or incident and a possible security risk or violation of federal law,'" *id.* (citing *Pratt*, 673 F.2d at 420, 421); *see also Clemente*, 867 F.3d at 119 (citing *Campbell*, 164 F.3d at 32).

Here, BJS does not specialize in law enforcement. To the contrary, "BJS's enabling statute expressly forbids it from compiling data for law enforcement purposes." Pl.'s Mem. at 4 (citing *AG's DCRA Report* at 4); *see also* 34 U.S.C. § 10134 ("Data collected by the Bureau shall be used only for statistical or research purposes, and shall be gathered in a manner that precludes their use for law enforcement . . ."); Def.'s Mem. at 6 n.10 (acknowledging this limitation on BJS). Thus, defendant's invocation of Exemption 7(C) to shield BJS records from disclosure "merits no deference." *Bartko*, 898 F.3d at 64 (finding that DOJ's Office of Professional Responsibility

records compiled for employment-supervision purposes did not meet threshold requirement for Exemption 7(C)).

In any event, the record is devoid of any factual evidence to satisfy defendant's burden of showing the data at issue was compiled for law enforcement purposes. The only evidence offered to support defendant's invocation of Exemption 7(C) is a single paragraph in one declaration, asserting that Exemption 7(C) was properly invoked "[b]ecause the information contained in the requested MCI data concerns information compiled for law enforcement purposes (correctional institutions)." Lauger Decl. ¶ 26.[6] This declaration provides no factual information describing the existence of a law enforcement investigation or linking any of the data requested by plaintiff to any such investigation. *Cf, e.g.*, *Clemente*, 867 F.3d at 120 (describing statements in a declaration that would sufficiently "demonstrate [this] requisite connection"). In short, defendant has put forward no factual information to support a finding that *any*, much less *all,* of the data at issue was gathered for a law enforcement purpose. Defendant's *ipse dixit* explanation is insufficient to support Exemption 7(C). *See* Lauger Decl. ¶ 26 (declaring that Exemption 7(C) applies because the records were "compiled for law enforcement purposes"). Such a "conclusory statement" is "alone inadequate" to support a finding that records were created, gathered, or used for a law enforcement purpose, *Maydak v. U.S. Dep't of Justice*, 254 F. Supp. 2d 23, 38 (D.D.C. 2003); *see also Campbell*, 164 F.3d at 32, as would be required to uphold defendant's invocation of Exemption 7(C), *see Jefferson*, 284 F.3d at 179, since a government agency "cannot rely on a bare

---

[6]     None of defendant's other declarations address the basis for invoking Exemption 7(C). *See* Def.'s Mem., Decl. of Elizabeth Ann Carson, Branch Chief of Preparedness Statistics, Office of Homeland Security Statistics, Department of Homeland Security, & former Statistician, BJS ("Carson Decl."), ECF No. 35-3; Decl. of Kevin M. Scott, PH.D., Principal Deputy Director & Acting Director, BJS ("Scott Decl."), ECF No. 35-5; Def.'s Reply, Second Decl. of Amy Lauger, Senior Statistician, BJS ("2nd Lauger Decl."), ECF No. 39-3; 2nd Carson Decl.

assertion to justify invocation of an exemption from disclosure" under FOIA, *id.* at 178 (citation omitted).

Nor can defendant prevail merely because the data sought was originally collected by "correctional institutions," as the Lauger Declaration seems to suggest. Lauger Decl. ¶ 26. "Not every document compiled by a law enforcement agency satisfies the law enforcement purpose inquiry." *Pinson v. Dep't of Justice*, 236 F. Supp. 3d 338, 364 (D.D.C. 2017) (citing *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 245-46 (D.D.C. 2013), and *Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141, 146-47 (D.D.C. 2011)); *see also Benavides*, 774 F. Supp. 2d at 145 ("The fact that the relevant agency's principal purpose is the enforcement of criminal law does not absolve it of its obligation to demonstrate that the records at issue were compiled for a law enforcement purpose." (citing *Pratt*, 673 F.2d at 416)). Instead, "[t]o meet the agency's burden . . ., the declarations must establish a connection between the assertedly exempt records and an inquiry into 'a possible security risk or violation of federal law.'" *Clemente*, 867 F.3d at 119 (quoting *Pratt*, 673 F.2d at 420-21). In other words, they must contain evidence. *See, e.g.*, *Watkins L. & Advoc.*, 78 F.4th at 450 ("[T]he government bears the burden of establishing that a FOIA exemption applies"); *Maydak*, 254 F. Supp. 2d at 38 ("If the agency's declaration fails to supply *facts* in sufficient detail to apply the *Pratt* rational nexus test, then a court may not grant summary judgment for the agency." (emphasis supplied) (alterations accepted, internal quotation marks omitted) (quoting *Quinon v. FBI*, 86 F.3d 1222, 1229 (D.C. Cir. 1996)). Since defendant has failed to produce any evidence to support its invocation of Exemption 7(C), and since the record therefore contains no dispute of material facts on this question, summary judgment must be granted to plaintiff.[7]

---

[7]     Defendant makes several broad arguments about why Exemption 7(C) applies, including that "[r]ecords concerning the circumstances of an inmate's death obviously and necessarily are linked to a particular individual

### 2.    Exemption 6

FOIA Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The 'primary purpose' of Exemption 6 is to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" *Hum. Rts. Def. Ctr. v. U.S. Park Police*, --- F. 4th ---, No. 23-5236, 2025 WL 286516, at *2 (D.C. Cir. Jan. 24, 2025) (quoting *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982)).

This Circuit generally follows a "two-step process when considering withholdings or redactions under Exemption 6." *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016) (citation omitted). The first step involves a determination of whether the withheld or redacted material constitutes "personnel[, . . .] medical[, . . .] [or] similar files" as protected by the statute. 5 U.S.C. § 552(b)(6). "The phrase 'similar files' has been construed to

---

and incident subject to investigation." Def.'s Reply at 3. As a factual matter, this unsupported assertion is not as "obvious[]" or "necessar[]y" as defendant claims. For instance, investigations may be unlikely as to the 13,504 inmate deaths attributed to illness, *see* Pl.'s Opp'n at 14, and, as plaintiff suggests, it is at least plausible that, "given the history of the MCI Program . . . states compiled [the comprehensive] data [at issue in this case] only because federal law required them to or the federal government asked [them] to," *id.* at 12-13. This reality easily distinguishes the records sought in this case from those at issue in the main cases cited by defendant, *see* Def.'s Mem. at 18 (citing *Pinson*, 236 F. Supp. 3d at 365; *Mingo v. U.S. Dep't of Justice*, 793 F. Supp. 2d 447, 453 (D.D.C. 2011); *Holt v. U.S. Dep't of Justice*, 734 F. Supp. 2d 28, 41 (D.D.C. 2010)), in which cases the records sought related directly to specific incidents of "wrongful conduct within the prison," *Pinson*, 236 F. Supp. 3d at 365, such as "an altercation involving over 50 inmates," *Mingo*, 793 F. Supp. 2d at 453, or "an inmate-on-inmate assault," *Holt*, 734 F. Supp. 2d at 41 (citation omitted), that were under express investigation, *see Mingo*, 793 F. Supp. 2d at 453; *Holt*, 734 F. Supp. 2d at 41. By contrast here, no such evidence exists linking *any*, much less *all*, of the records sought to an investigation. *Cf. Appeal, Inc. v. U.S. Dep't of Justice's Off. of Just. Programs*, No. 5:22-cv-02111-WLH-SK, 2024 WL 4868282, at *6 (C.D. Cal. Oct. 15, 2024) (holding the same in a case seeking the same data).

Moreover, for the purposes of summary judgment, such unsupported assertions made only in a brief are not evidence, *see Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (citation omitted) (noting that, where an "affidavit or other evidence" is required, legal briefs "are not evidence"), and precedent makes clear that the government bears the burden to prove such an investigation actually exists and relates to the specific information to be withhold. *See, e.g.*, *Campbell*, 164 F.3d at 32 (citing *Pratt*, 673 F.2d at 420, 421); *Bartko*, 898 F.3d at 64 (citation omitted); *Jefferson*, 284 F.3d at 179; *Clemente*, 867 F.3d at 119. In this case, as plaintiff correctly argues, "[t]here is simply no evidence that the states compiled or used any of the data for law enforcement purposes." Pl.'s Opp'n at 13.

included 'detailed Government records on an individual which can be identified as applying to that individual.'" *Hum. Rts. Def. Ctr.*, 2025 WL 286516, at *2 (quoting *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146-47 (D.C. Cir. 2015)); *see also Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006) ("The Supreme Court has read Exemption 6 broadly, concluding the propriety of an agency's decision to withhold information does not 'turn upon the label of the file which contains the damaging information.'" (quoting *Wash. Post Co.*, 456 U.S. at 601)).

If the records at issue satisfy the first requirement, the second step focuses on "the significance of the privacy issues at stake," *Ray*, 502 U.S. at 175, to determine whether disclosure "would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6). This process requires the court to "balance the public interest in disclosure against the interest Congress intended [Exemption 6] to protect," *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 495 (1994) (quoting *U.S. Dep't of Justice v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989)), which inquiry proceeds in two steps. First, the court must determine "whether disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Niskanen Ctr. v. FERC*, 20 F.4th 787, 791 (D.C. Cir. 2021) (quoting *Prison Legal News*, 787 F.3d at 1147). "A substantial privacy interest is anything greater than a *de minimis* privacy interest." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229-30 (D.C. Cir. 2008). In this analysis, the relevant "privacy interest at stake belongs to the individual, not the government agency." *Ford v. Dep't of Justice*, 208 F. Supp. 3d 237, 250 (D.D.C. 2016) (citing *Reps. Comm. for Freedom of the Press*, 489 U.S. at 763-65). "If no significant privacy interest is implicated . . . FOIA demands disclosure," *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989), since FOIA's exemptions "are explicitly made exclusive and must be narrowly construed," *Milner*, 562 U.S. at 565 (cleaned up), with the presumption in favor of disclosure.

When a substantial privacy interest is implicated, that interest must next be balanced "against the public interest in the release of the records." *Horner*, 879 F.2d at 874. The only relevant public interest is "the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding of the operations or activities of the government.'" *Fed. Lab. Rels. Auth.*, 510 U.S. at 495 (quoting *Reps. Comm. for Freedom of the Press*, 489 U.S. at 775) (original formatting omitted); *see also Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999) ("[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" (alterations in original) (quoting *Fed. Lab. Rels. Auth.*, 510 U.S. at 497)). Even where "a privacy interest may be substantial," it may still be "insufficient to overcome the public interest in disclosure." *Multi Ag Media*, 515 F.3d at 1230. "Unless the invasion of privacy is 'clearly unwarranted,' the public interest in disclosure must prevail." *Hum. Rts. Def. Ctr.*, 2025 WL 286516, at *2 (alterations accepted) (quoting *Ray*, 502 U.S. at 177).

Here, both parties agree that the data sought qualifies as "similar files" sufficient to trigger application of Exemption 6. *See* Pl.'s Opp'n at 14 (acknowledging that "Exemption 6 . . . provides the framework for the . . . analysis"); Def.'s Mem. at 17 ("[T]he records at issue . . . satisfy Exemption 6's threshold requirement."). This conclusion is supported by the record, since plaintiff requests data that consists of "detailed Government records on . . . individual[s] which can be identified as applying to th[ose] individual[s]," *Prison Legal News*, 787 F.3d at 1147 (citation omitted), and is sufficient to fit within the Supreme Court's "broad[]" construction of Exemption 6, *Jud. Watch*, 449 F.3d at 152. Therefore, the parties' dispute about the invocation of Exemption 6 proceeds to the balancing portion of the inquiry, considering whether any cognizable public

interest in disclosure outweighs any privacy interest, or whether disclosure would be a clearly unwarranted invasion of privacy.

### a.    The Privacy Interest

Defendant claims a privacy interest in the right of the individuals named in the data, as well as their close family members, to "control . . . information concerning [their] person[s]."  Def.'s Mem. at 19 (quoting *Reps. Comm. for Freedom of the Press*, 489 U.S. at 763).  Courts have long recognized that such a right may exist, encompassing "prosaic" information such as "place of birth," *Painting & Drywall Work Pres. Fund, Inc. v. Dep't of Hous. & Urban Dev.*, 936 F.2d 1300, 1302 (D.C. Cir. 1991); *see also Wash. Post Co.*, 456 U.S. at 600, as well as more personal information such as medical records, *see Bast v. U.S. Dep't of Justice*, 665 F.2d 1251, 1254 (D.C. Cir. 1981), and that "certain reputational interests and family-related privacy expectations survive death," *Campbell*, 164 F.3d at 33.  Such an interest cannot be categorically asserted, however, since "Exemption 6 'does not categorically exempt individuals' identities' but calls for case-by-case evaluation 'because the privacy interest at stake may vary depending on the context in which it is asserted.'"  *Hum. Rts. Def. Ctr.*, 2025 WL 286516, at *3 (quoting *Jud. Watch*, 449 F.3d at 152).

Here, defendant contends that "the records at issue . . . contain precisely the kind of highly sensitive and potentially embarrassing information about the subjects of the records that merits protection even post-mortem."  Def.'s Mem. at 20.  As support, defendant notes that the data contains information about "the full name, date of birth, and date of death of the deceased inmate," "the deceased inmate's race and ethnicity, the date of their admission to the correctional facility, and their crime(s) of conviction[,]" as well as "whether the deceased inmate stayed overnight at a mental facility; the inmate's place of death and the location of the incident causing the death . . .;

the cause of death (with specific variables for causes including AIDS-related illness, accidental alcohol or drug intoxication, suicide, and homicide); and details about the inmate's medical and surgical care." *Id.*

As an initial matter, defendant's reliance on *National Archives & Records Administration v. Favish*, 541 U.S. 157 (2004), to define the scope of such interests in this case is not persuasive, as the Supreme Court's holding in that case "was limited to 'surviving family members' right to personal privacy with respect to their close relative's *death-scene images*,'" *Mobley v. CIA*, 924 F. Supp. 2d 24, 70 (D.D.C. 2013) (emphasis in original) (quoting *Favish*, 541 U.S. at 170), and defendant has not alleged that any such images are among the responsive records. Furthermore, defendant provides no support for the assertion that variables such as name, birth date, death date, race, ethnicity, or date of admission to a correctional facility would reveal sensitive or embarrassing information about any individual. Without "even minimal substantiation," *Hum. Rts. Def. Ctr.*, 2025 WL 286516, at *3, to support finding a blanket privacy interest in such information, this claim does not support finding a substantial privacy interest for all the deceased inmates, or their close family members, named in the data, *see id.* (finding that conclusory assertions are not sufficient, since "showing that a substantial invasion of privacy will occur if the . . . names are released requires 'reasonable specificity of detail rather than merely conclusory statements.'" (quoting *Prison Legal News*, 787 F.3d at 1147)). Moreover, the D.C. Circuit has previously held that even living individuals have "not . . . much more" "than a *de minimis* privacy interest" in the disclosure of a crime of conviction, since such information is "already publicly available and readily accessible to anyone who might be interested in it." *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 12 (D.C. Cir. 2011). In this case, where both parties agree that any privacy interests implicated by disclosure are diminished because the individuals in question are all

deceased, *see* Def.'s Mem. at 19-20; Pl.'s Opp'n at 16, many of the individuals named in responsive records would not have a substantial privacy interest in such information, but instead only a *de minimis* one.

On the other hand, disclosing information that would reveal that an individual suffered from mental health or substance abuse issues or died as the result of an "AIDS-related illness, accidental alcohol or drug intoxication, suicide, [or] homicide," Def.'s Mem. at 20; *see also* Def.'s SUMF ¶ 33 (listing the variables in the dataset), is, in the abstract, sufficiently "intimate and sensitive," Def.'s Mem. at 21, to implicate a substantial privacy interest. This privacy interest, however, cannot support withholding the identity of all 16,625 inmates in the data so far produced to plaintiff, *see* Pl.'s Opp'n at 14, given the lack of evidence to suggest the data would reveal such information about all 16,625 inmates. Nevertheless, in withholding the identities of every deceased inmate on these grounds, defendant has utterly failed to conduct the "case-by-case evaluation" of the applicable privacy interests required by Exemption 6. *Hum. Rts. Def. Ctr.*, 2025 WL 286516, at *3.

In sum, at this initial stage of the balancing inquiry, the deceased inmates in the data sought by plaintiff fall into two separate categories. The first group consists of inmates for whom disclosing their identities would not disclose any of the intimate and sensitive information discussed above, such as mental health or substance abuse issues or a death resulting from AIDS, intoxication, homicide, or suicide. As to these inmates, defendant has failed to demonstrate a substantial privacy interest exists, and thus the Exemption 6 claim fails, without needing to proceed to step two of the balancing inquiry. *See id.* at *4 ("Because the [government] does not satisfy the first step of its burden to show that Exemption 6 applies, we do not proceed to the balancing inquiry at step two."). The second group consists of inmates as to whom disclosing their identities would

reveal some or all of the sensitive information discussed above.  For those individuals, defendant has shown the existence of a more than *de minimis* privacy interest sufficient to invoke Exemption 6, although the strength of this interest is somewhat diminished because all of the individuals are deceased, *see* Def.'s Mem. at 19-20; Pl.'s Opp'n at 16.

Plaintiff argues that two other factors further decrease this privacy interest: (1) the family members of deceased inmates "overwhelmingly" support disclosure of the information sought, Pl.'s Opp'n at 16; Pl.'s Reply at 6, and (2) "much of [the] data" sought by plaintiffs is already made available by states, Pl.'s Opp'n at 19.  In this case, however, neither argument has been sufficiently established to diminish the significant privacy interests at stake for the second group of inmates.  The desires of some families, even several "dozens of people whose loved ones died in jails and prisons," for the information to be revealed publicly, Pl.'s Opp'n at 17 (quoting Pl.'s Opp'n, Decl. of Gina Barton, USA Today Investigative Reporter ("Barton Decl.") ¶ 6, ECF No. 36-4), does not mean the release would not implicate privacy concerns for other families.  The records so far disclosed contain the information of 16,625 inmates, *see id.* at 14, meaning that Barton's contacts may represent only a miniscule fraction of those potentially impacted.[8]  The family members not discussed by Barton or covered by plaintiff's single other declaration, *see* Pl.'s Opp'n, Decl. of Cynthia Telford, mother of Jeremy Cunningham, who died in custody ("Telford Decl."), ECF No. 36-6, retain a privacy interest in the information sought by plaintiff. *See* Def.'s Reply at 8.  Where privacy interests have not been explicitly waived, the government "is expected," under the FOIA, to "attempt to protect [them] by asserting them." *Ayuda, Inc. v. FTC*, 70 F. Supp. 3d 247, 269 (D.D.C. 2014) (quoting *Hill v. Dep't of Agric.*, 77 F. Supp. 2d 6, 8 (D.D.C. 1999)); *see also Battle Born Invs. Co. v. U.S. Dep't of Justice*, No. 24-cv-67 (BAH), 2024

---

[8]    The record contains no information to establish how many of the 16,625 inmates in the disclosed records experienced mental health or substance abuse issues or died as a result of AIDS, intoxication, homicide, or suicide.

WL 5246515, at *7 (D.D.C. Dec. 30, 2024).  That is what the government has done in this case, and those privacy interests are not diminished merely because some other similarly-situated individuals favor disclosure.

As to plaintiff's second argument, which suggests that much of the data sought is already regularly released to the public by states, thus reducing any privacy interest in that information, *see* Pl.'s Opp'n at 19; Pl.'s Reply at 8, the record is simply not clear about how many states publicly release death-in-custody information, or what specific information is released, *see* Def.'s Reply at 9-11 (contesting plaintiff's claims about states' public release of death-in-custody information). As a result, the record here provides no basis to determine whether enough states regularly disclose information that sufficiently overlaps with the data sought by plaintiff to off-set the privacy interests asserted by defendant.

Therefore, although the privacy interest for the individuals as to whom the data would reveal sensitive information is diminished because of their deaths, this interest exceeds the *de minimis* threshold, and thus must be balanced against any cognizable public interest in the information asserted by plaintiff.  *Horner*, 879 F.2d at 874.[9]

### b.    The Public Interest in Disclosure

Plaintiff asserts four public interests in the unredacted disclosure of the death-in-custody data.  First, plaintiff claims the data would help "shed light on whether DOJ is properly allocating funding on matters correlated with inmate mortality."  Pl.'s Reply at 9.  Defendant counters this purported interest by arguing that, since DOJ *"does not consider facility-level death data . . . from*

---

[9]    Defendant also advances the argument that release of the data sought by plaintiff should be denied because of the "negative impacts" and "grave harm" disclosure would have on BJS and the "broader mission of the federal statistical system."  Def.'s Mem., Decl. of Kevin M. Scott, PH.D., Principal Deputy Director & Acting Director, BJS ("Scott Decl.") ¶ 2, ECF No. 35-5; *see also generally* Scott Decl.  Such arguments are not cognizable under FOIA, where the only relevant "privacy interest at stake belongs to the individual, not the government agency."  *Ford*, 208 F. Supp. 3d at 250 (citing *Reps. Comm. for Freedom of the Press*, 489 U.S. at 763-65).

*the MCI data collection in awarding grants to state or local government facilities,"* this information could not help "the public . . . evaluate what the federal government is up to," and would instead amount to scrutinizing "what it *could* or *should* be up to." Def.'s Reply at 14-15 (emphasis in original). Defendant's opposition, however, mischaracterizes plaintiff's argument, which focuses not on whether DOJ *should* consider MCI data in its grantmaking, but instead how well DOJ grantmaking *is* addressing the issue of reducing deaths in custody. During the pendency of this litigation, DOJ has publicly discussed how it is "[t]aking action to reduce deaths in custody," including through providing "grants, research, training and technical assistance" to state and local agencies and facilities. *Taking Action.*[10] Whether or not the data collected by the MCI program is specifically considered in allocating such grants, this data and subsequent reporting relying on the data could be probative of the effectiveness of grantmaking by allowing the public to compare the deaths reported in the MCI data to the facilities receiving funding and evaluate how well, if at all, DOJ grantmaking is helping to reduce deaths—or as plaintiff puts it, "whether [the agency] is doing [its job] well," Pl.'s Reply at 10. The current redactions would significantly hamper those efforts, since, for instance, "the facility where the inmate died" was redacted in "58 percent of cases" in the data provided to plaintiff, "making it impossible to identify trends with respect to specific prisons and jails." Pl.'s Opp'n at 10.

Second, plaintiff argues the unredacted data would help "reveal the effectiveness of DOJ's support to state and local governments," Pl.'s Reply at 11, including the efficacy of training provided to help reduce deaths and "whether the federal government is sufficiently investigating state and local facilities," *id.* at 12. This purported public interest, like the first, is strong, and DOJ offers no rebuttal. Again, DOJ has publicly discussed the "training and technical assistance" the

---

[10]    Judicial notice is appropriately taken of information on official public government websites. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

agency provides to help "reduce deaths in custody." *Taking Action*.  As plaintiff explains, examining individual-level data of deaths-in-custody could help the press and the public at large identify facilities that suffer from high numbers of inmate deaths and further identify common causes of deaths at those facilities—which information could then be compared with federal training and investigations to determine whether DOJ "is adequately choosing which state and local facilities to investigate" or assist with additional resources.  Pl.'s Reply at 12.  Just as above, however, the current redactions would significantly decrease the utility of the MCI data to assist in this analysis.

Third, plaintiff contends that disclosing the data would "shed light on DOJ's implementation of DCRA's" reporting requirement, including its determination of the relationship between deaths and the management of the facilities in question, including allowing "the press to fill [any] gaps" left by the report.  *Id.* at 13.  Defendant responds that since, at the time of filing briefing in this case, DOJ had delivered one report to Congress and planned to deliver another, "the public already has all the information it needs to evaluate DOJ's own implementation of DCRA."  Def.'s Reply at 13.  This assertion is contradicted by DOJ's own public assertions, which, while recognizing "robust response" to BJS's collection efforts, also acknowledges that DCRA implementation has "a long way to go."  *Taking Action*.  Defendant's claim that plaintiff's use of the raw data to "conduct its own statistical analyses" would "only . . . shed additional light on state and local governments," Def.'s Reply at 13, rather than on defendant's effectiveness in carrying out the DCRA's goals, is similarly unpersuasive.  DCRA 2013 tasked DOJ with "carry[ing] out a study of the information reported" under the law to "examine the relationship, if any, between the number of [deaths in custody] and the actions of management of [the specified] jails, prisons, and other specified facilities relating to such deaths."  Pub. L. No. 113-242, §§ 2(f), 2(f)(1)(A), 128

Stat. at 2861. Access to the raw data would allow USA Today and other entities and individuals to perform their own analysis, providing the public with valuable information about the possible strengths and weaknesses (or complete oversights or omissions) of the DOJ analysis, which in turn would allow the public to determine how well DOJ carried out this specific statutory duty.

Finally, plaintiff argues that the unredacted data would enable public scrutiny of "the Attorney General's decision" not to invoke the penalty provision in DCRA 2013 against states that fail to meet their reporting obligations. Pl.'s Reply at 15. This interest, too, is exactly the type of public interest cognizable under FOIA, relating to informing the public about the agency's use of its statutory powers. While DOJ may have "been transparent about the many issues with state data-reporting under DCRA" and shared some concerns about using the financial penalty mechanism, Def.'s Reply at 13-14, access to individual-level data would help the public understand exactly how "widespread," *id.* at 14 (quoting *AG's DCRA Report* at 11), the reporting problems are and allow them to better evaluate the concerns about implementing the penalty, in light of the scale of the problem. Although defendant claims in response that plaintiff has not shown how "particular details such as an inmate's name or medical history would have any bearing on informing public assessment" of this issue, *id.* at 13, the redactions at issue do not solely relate to inmate names or medical histories; for instance, plaintiff represents that "DOJ . . . redacted the state of death in 22 percent of the entries" and in "58 percent of cases . . . redacted the facility where the inmate died," Pl.'s Opp'n at 10—information that is directly relevant to this claimed public interest.[11]

For the reasons explained above, plaintiff has succeeded in demonstrating four distinct, strong public interests in disclosure of the unredacted data sought. *Cf. Appeal, Inc.*, 2024 WL

---

[11]    Defendant raised no segregability argument to suggest that lesser redactions could be appropriate, or needed, to protect any other interests, and so the Court does not address that consideration here.

4868282, at *7-8 (finding that, in a case seeking disclosure of the same data, "the public interest in disclosure is undoubtedly high"). Since both parties have succeeded in demonstrating their cognizable interests, they must next be balanced to determine whether the redactions were appropriate. *See Horner*, 879 F.2d at 874.

**c.  Balancing**

The final step of the analysis pits one diminished privacy interest against four strong public interests—a balance that strongly favors disclosure. DOJ itself has recognized that the agency has "a long way to go" in both "collecting data about and ultimately reducing the number of fatalities that occur when individuals are taken into custody by the police or incarcerated in correctional facilities." *Taking Action*. Given the scope and importance of the deaths in custody problem, as well as DOJ's previous years-long delay in reporting to Congress, as required by DCRA 2013, *see* Def.'s Reply at 13 (acknowledging DOJ delivered the reports due by December 2016 "in December 2022 and September 2024 (or later)"), and ongoing acknowledgment of "widespread" reporting issues, *id.* at 14 (quoting *AG's DCRA Report* at 11), a substantial public interest is demonstrated in release of the unredacted data to inform the public about DOJ's operations and allow them to evaluate the agency's performance of its duties to report on and analyze deaths in custody and, ultimately, "reduce deaths in custody." *Taking Action*. In light of the strong public interests present and the diminished privacy interest opposing them, any invasion of privacy from disclosure of the withheld information would not be clearly unwarranted, and thus summary judgment is granted to plaintiff as to Exemption 6.

Accordingly, defendant's withholdings, pursuant to Exemptions 6 and 7(C), do not withstand scrutiny, and defendant will be directed to disclose the data without redactions.

35

**C.      Defendant is Entitled to Reconsideration for Data Collected When No DCRA Authority Existed**

Federal Rule of Civil Procedure 54(b) recognizes a court's "inherent power to reconsider an interlocutory order 'as justice requires.'" *Capitol Sprinkler Inspection*, 630 F.3d at 227 (quoting *Greene*, 764 F.2d at 22-23).   In general, courts grant reconsideration sparingly, only when "the movant demonstrates: '(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order.'" *Zeigler v. Potter*, 555 F. Supp. 2d 126, 129 (D.D.C. 2008) (quoting *Keystone Tobacco Co. v. U.S. Tobacco Co.*, 217 F.R.D. 235, 237 (D.D.C. 2003)).  As other Judges on this Court have found, however, the Court's discretion allows reconsideration to be granted when "good reasons for doing so" exist, *Donato v. Exec. Off. for U.S. Att'ys*, No. 16-cv-632 (FYP), 2021 WL 5161740, at *2 (D.D.C. Nov. 5, 2021) (Pan, J.) (quoting *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 308 F. Supp. 3d 186, 193 (D.D.C. 2018)), which includes circumstances "where the court failed to consider information that 'might reasonably be expected to alter the conclusion reached by the court,'" *id.* (quoting *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)), or "where the movant presents new information that 'constitute[s] a change in the court's awareness of the circumstances,' even though it 'may not constitute a change in the actual facts of the case,'" *id.* (alteration in original) (citation omitted).

In granting summary judgment to plaintiff on defendant's invocation of Exemption 3, the Court did "not address" the fact that "plaintiff requests information during a time when no DCRA reporting requirement was in effect."  *Gannett I*, 2023 WL 2682121, at *9 n.3.  Of course, this issue was not considered because "[n]either party raise[d]" it.  *Id.*  Still, this information is crucial to the central issue in that decision—"whether the text of the Crime Control Act's confidentiality provision exempts disclosure of the requested information under FOIA Exemption 3," *id.* at *1—

36

and was not considered in the decision, *id.* at *9 n.3.  Summary judgment was granted to plaintiff

on Exemption 3 "because the requested information was 'furnished under' or 'pursuant to' the

DCRA."  *Id.* at *5.  Both parties now acknowledge, after the issue was highlighted in *Gannett I*,

that DCRA was not in effect between 2010 (the start date of plaintiff's FOIA request) and October

1, 2015 (the effective date of DCRA 2013).  *See* Def.'s Mem. at 31; Pl.'s Opp'n at 3 (noting that

DCRA 2000 expired in 2006 and was not reauthorized until DCRA 2013).  Therefore, the data

collected by the MCI program *could not* have been furnished pursuant to DCRA authority during

this time.

Plaintiff contends this reality does not necessitate a finding that the data collected during

this time was furnished under the Crime Control Act.  *See* Pl.'s Opp'n at 34-35.  While tempting,

this argument ultimately fails because plaintiff is unable to point to any other authority for BJS's

MCI data collection during this period.  The 1979 amendment to the Crime Control Act authorizes

BJS to "collect and analyze statistical information, concerning the operations of the criminal

justice system at the Federal, State, and local levels."  Pub. L. No. 96-157, Part C, § 302(c)(4), 93

Stat. 1167 (Dec. 27, 1979) (codified at 42 U.S.C. § 3732(c)(4)).  Without a more specific authority

such as DCRA, BJS's data collections would be performed "pursuant to" this general authority,

meaning that the privacy provision of Title I of the Crime Control Act would apply to the data

collected.  *See Gannett I*, 2023 WL 2682121, at *6.  Since both parties agree that this privacy

provision qualifies for Exemption 3, *id.* at *5 ("The parties do not dispute that the Crime Control

Act's Title I confidentiality provision is an exemption that qualifies for withholding under FOIA's

Exemption 3—rightfully so, because it undoubtedly is."), denying reconsideration would

ultimately be unjust, despite defendant's failure initially to brief or timely raise this issue, *see* Pl.'s

Opp'n at 31-32.  Therefore, defendant properly invoked Exemption 3 as to data collected by the MCI program from 2010 to October 1, 2015, and thus is not required to produce this data.

### D.    Defendant is Not Entitled to Reconsideration Regarding Local Jail Data Submitted to the MCI Program

Defendant has not provided an adequate basis for reconsideration as to data submitted to BJS by local jails, rather than state departments of corrections.  *See* Def.'s Mem. at 32-33.  On this issue, defendant contends that DCRA required *states* to report death-in-custody data without extending that requirement to local entities.  *See id.*  Yet, nothing in the DCRA counsels against treating "submissions by local governments" as "attributable to the relevant state and thus furnished under DCRA whoever takes the clerical step of submitting them."  Pl.'s Opp'n at 36. Specifically, both DCRA 2000 and DCRA 2013 require death in custody data to be reported from "municipal [and] county jail[s]," Pub. L. No. 106-297, § 2(4), 114 Stat. at 1045; Pub. L. No. 113-242, § 2(a), 128 Stat. at 2860, but despite this clear mandate, defendant strains to argue that if such required data is not funneled to BJS through a state collection method, the submission is not required by the DCRA and amounts to only a voluntary submission under the Crime Control Act, *see* Def.'s Reply at 32.  This proffered interpretation is an overtechnical reading to avoid disclosure of data the DCRA clearly mandates be submitted to BJS, and is rejected.  The DCRA clearly requires that deaths in custody at municipal and county jails be reported to BJS, whether via a state collection system or an alternative method.  In this circumstance, no error, let alone plain error, was made in *Gannett I* to warrant reconsideration.

Adopting defendant's interpretation of the DCRA requirement could further "lead to a perverse result totally at odds with DCRA's statutory scheme," whereby a state could be deemed noncompliant with its DCRA reporting requirement and thus face the penalty provision's "10 percent reduction in grant funding," Pl.'s Opp'n at 36, even if every death in custody in the state

was reported directly to BJS by local entities "and the state did not duplicate those submissions," *id.* at 37. Such an illogical result can be avoided by "reading the statute naturally to provide that submissions by local governments are attributable to the state and thus furnished under DCRA." *Id.* Defendant must, therefore, produce local jail data collected by the MCI program to plaintiff for the period from October 1, 2015, to the end of 2019.

## IV.    CONCLUSION

For the reasons discussed above, plaintiff is entitled to summary judgment as to the inadequacy of defendant's search and as to the redactions applied under Exemptions 6 and 7(C) in data so far produced. Furthermore, defendant's motion for partial reconsideration is granted as to data collected during the period when DCRA authority had lapsed, *i.e.* from the start of plaintiff's FOIA request in 2010 until October 1, 2015, and denied as to data collected under DCRA from local jails. Accordingly, defendant must produce to plaintiff the unredacted version of responsive records collected by BJS in the MCI program from state and local authorities between October 1, 2015, and 2019, when the MCI program ceased, and also search for and produce to plaintiff BOP data submitted to BJS from the same period. The parties are additionally directed to file, by February 21, 2025, a joint status report on the status of productions in this case, as described in the accompanying order.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  February 6, 2025

_____
**BERYL A. HOWELL**
United States District Judge